## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAYMAN POWER BARGE I, LTD.<br>c/o Corporate Filing Services Ltd.<br>PO Box 613 GT, 4th Floor Harbour Centre<br>Grand Cayman, Cayman Islands,<br><br>              Plaintiff,<br><br>   v.<br><br>THE STATE OF THE DOMINICAN<br>REPUBLIC, and CORPORACIÓN<br>DOMINICANA DE EMPRESAS<br>ELÉCTRICAS ESTATALES (formerly known<br>as CORPORACIÓN DOMINICANA DE<br>ELECTRICIDAD),<br><br>              Defendants. | Civil Action No. 1:06CV01362 (RMC) |

## SPECIAL ENTRY OF APPEARANCE, MOTION TO DISMISS
## OR, ALTERNATIVELY, FOR OTHER RELIEF
## AND MEMORANDUM IN SUPPORT OF MOTION

Counsel for Defendants, the State of the Dominican Republic ("Dominican Republic")

and Corporación de Empresas Eléctricas Estatales ("CDEEE") (collectively "Defendants"),

hereby make a special and limited entry of appearance in order to move this Court to dismiss

Plaintiff's Application to Confirm Foreign Arbitral Award ("Application") pursuant to Fed. R.

Civ. Proc. 12(b)(1), (2) and (6). In the event that this Court does not dismiss Plaintiff's

Application, this Court should (a) vacate the arbitration Award, or (b) deny confirmation of the

Award, or (c) stay these proceedings pending a judicial determination of the legal issues

described below by a competent court in the Dominican Republic. By making this special and

limited entry of appearance to contest the Court's jurisdiction over them, Defendants are not submitting themselves in any way to this Court's jurisdiction nor do they consent to jurisdiction, and Defendants reserve all other defenses that they may have with respect to this matter. Moreover, by filing this Motion at this time, Defendants reserve the right to file a responsive pleading admitting and/or denying the specific allegations of Plaintiff's Application.

In support of their Motion, Defendants state as follows:

## I.     INTRODUCTION

This matter involves a dispute between Plaintiff Cayman Power Barge ("CPB") and Defendants regarding a Power Purchase Agreement ("Agreement") between CPB and Defendants.[1] Defendant CDEEE is the successor to Corporación Dominicana de Electricidad ("CDE"). Both CDEEE and CDE are state-owned entities of the Dominican Republic.

CPB negotiated to supply electricity to the Dominican Republic and CDE from an electrical generation barge owned and operated by CPB. The Agreement was executed, expressly providing that it was to be governed by Dominican Republic law. Even though serious and fundamental questions existed from the very beginning as to whether the Agreement would be valid and binding under the Dominican Republic's Constitution and other laws of that country, CPB began to supply the Dominican Republic electricity.

Disagreements between the parties occurred almost from the outset. After a period of some performance, disputes arose which the parties were unable to resolve. In response, CPB acted unilaterally: It removed its barge from the Dominican Republic and initiated arbitration proceedings before the International Court of Arbitration ("ICA"). Defendants appeared before

---

[1]     For the convenience of the Court, Defendants incorporate by reference and have attached as **Exhibit A** the English translation of the Agreement that was attached as Exhibit A to the Declaration of Genevieve M. Hartel ("Hartel Declaration") accompanying Plaintiff's Application.

the ICA and vigorously contested the legitimacy of the entire arbitration proceedings, among other reasons, arguing the Agreement, including the arbitration provisions upon which the arbitration had been brought, was invalid.  The ICA, however, brushed aside Defendants' well-founded challenges and rendered the Award in favor of CPB.[2]

Even though this dispute has no connection whatsoever with the United States -- significantly, neither Plaintiff nor Defendant are citizens of the United States; the underlying Agreement centers on domestic matters concerning the Dominican Republic; the arbitration proceedings occurred in Paris, France; Defendants have no assets in the United States upon which a confirmed award could be executed nor do they have any plans during any foreseeable time-frame to bring assets into the United States that could be subject to attachment and execution -- Plaintiff now asks this Court to confirm the Award pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), 21 U.S.T. 2517 (which is incorporated into the Federal Arbitration Act by 9 U.S.C. § 207). Accordingly, Defendants make this special entry of appearance to file this Motion.

## II.    SUMMARY OF ARGUMENT

This Court should dismiss Plaintiff's Application because it lacks jurisdiction over this matter and because Plaintiff's Application fails to state a claim upon which relief may be requested.  The Agreement provided that it was to be interpreted under the laws of the Dominican Republic.  Critically, however, key provisions upon which the Agreement is based – specifically, those relating to sovereign immunity, arbitration, and taxes – directly violated the laws of the Dominican Republic.  Under the Dominican Republic's Constitution and other

---

[2]    Attached as **Exhibit B** is an English translation of the Award which was included as Exhibit G to the Hartel Declaration accompanying Plaintiff's Application.

applicable domestic law of that country, these violations nullified the entire Agreement. Thus, there was no legal basis for either CPB to initiate the arbitration proceedings or for the ICA to render an arbitral award. The invalidity of the entire arbitration process therefore deprives this Court of jurisdiction over Defendants. Accordingly, Defendants' Motion must be granted and Plaintiff's Application dismissed.

In the event that this Court determines it has jurisdiction, the Court should vacate the arbitration Award because it was rendered in manifest disregard of Dominican Republic law. Specifically, the ICA ignored controlling law on fundamental issues involving violations of the Dominican Republic's Constitution and other laws of that nation. Those offenses invalidated the Agreement and precluded the resolution of the parties' disputes through arbitration. The arbitral panel failed to follow Dominican Republic law on a number of other important issues as well. The combined effect of the ICA's repeated disregard of Dominican Republic law is to make the Award hopelessly and fatally defective.

Even if it does not grant Defendants' Rule 12(b) Motion or vacate the arbitration Award, this Court should deny confirmation because over half the defenses under the New York Convention are applicable. First, the Agreement was not valid under controlling Dominican Republic law and the subject matter of the dispute therefore was incapable of settlement by arbitration. Second, the composition of the arbitral authority was not in accordance with the parties' Agreement. Specifically, the Agreement allowed each side to pick an arbitrator of its choice and those two, in turn, were to select a third arbitrator. Defendants were unduly prejudiced when CPB named an arbitrator, but the ICA rejected three different arbitrators proposed by Defendants and unilaterally appointed the arbitrator that was supposed to have been selected by Defendants. Third, the arbitration Award violates public policy. The Agreement is

grounded on provisions that directly contravene the Dominican Republic's Constitution and other laws of that country in multiple and fundamental ways, including through illicit attempts to waive that country's sovereign immunity. Confirmation of the arbitral Award would thus place the United States, through this Court, in the position of sanctioning a direct violation of the highest laws of another democratic nation.

Defendants' Motion and Memorandum establish beyond question that the legal issues on which this dispute pivots raise fundamental issues regarding Dominican Republic law. Within thirty days, Defendants will file a declaratory action in the Dominican Republic seeking a judicial determination that the Agreement was null and void. Defendants therefore request that if this Court does not refuse to confirm the Award, that it stay a ruling on Plaintiff's Application until the validity of the Agreement has first been determined by a competent court in the Dominican Republic. Because Defendants have no assets in the United States nor any plans to bring assets here in the foreseeable future, Plaintiff will not be prejudiced if this Court awaits a ruling by a Dominican Republic court on these fundamental issues.

### III.    ARGUMENT

**A.    The Dominican Republic Is Immune From This Court's Jurisdiction.**

**1.    Applicable Legal Standard.**

A party that opposes an arbitration award on the grounds that the arbitration clause was void is entitled to present evidence of the clause's invalidity to the District Court. *China Minmetals Materials Import and Export Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 289 (3d Cir. 2003). The attempt by the parties to impose mandatory arbitration on the State and to provide valuable tax relief to CPB under the Agreement was illegal and thereby nullifies and voids the entire Agreement. Hence, any arbitral award under the Agreement is invalid and this Court has

no jurisdiction over Plaintiff's Application.  The Plaintiff's Application should therefore be dismissed.

### 2.     The Arbitration Provisions Under The Agreement Are Invalid.

It is well settled that a foreign state is "presumptively immune from the jurisdiction of United States courts." *Saudi Arabia v. Nelson,* 507 U.S. 349, 355 (1993).  A "foreign state" includes any "agency or instrumentality" thereof. 28 U.S.C. § 1603(a).  Where, as here, Plaintiff cannot overcome this presumption, this Court does not have jurisdiction and Plaintiff's Application should be dismissed.

Article 17 of the Agreement establishes that it is to be governed by Dominican Republic law.  But the very basis on which the Agreement purports to rest is illegal under the organic laws of that nation.

Article 3 of the Dominican Republic Constitution[3] unambiguously sets forth that country's law regarding its sovereign immunity:

> Article 3. – The sovereignty of the Dominican nation as a free and independent State is inviolable. The Republic is and ever shall be free and independent of any foreign power. *Consequently, none of the sovereign powers incorporated under the present Constitution shall realize or cause to be realized any acts which constitute direct or indirect intervention in the internal or external affairs of the Dominican Republic* or any interference which makes an attempt on the capacity and integrity of the State and of the attributes which are recognized and dedicated in this Constitution. The principle of no intervention constitutes an invariable norm of international Dominican policy.

(emphasis added).  Stated differently, none of the three branches of the Dominican Republic government can, acting alone, do or permit any act that results in a direct or indirect interference in the affairs of the Dominican Republic.[4]

---

[3]     **Exhibit C** sets forth the Spanish and English versions of all Dominican Republic laws cited by Defendants in this pleading.

The unique position held by the State and the sovereign immunity protection it therefore enjoys is further embodied in Article 1004 of the Code of Civil Procedure of the Dominican Republic in connection with involving the country in arbitrations concerning matters and property of the State. In particular, that Article expressly provides that "[a]rbitration cannot be established…on causes which are concerned with public order, the State, national property, municipalities, public establishments."[5]

As a further safeguard to the nation's sovereignty, the Dominican Republic's Constitution prohibits and nullifies acts, including contracts, that contravene the country's law. Specifically, Article 46 of the Constitution provides that "[a]ny law, decree, resolution, ruling or act contrary to this Constitution shall be null and void by full right." Article 48 of the Constitution further provides that "[a]ll inhabitants of the territory are bound by laws which relate to public order, the police, security and moral principles, which laws cannot be annulled by private agreements." Thus, any act or agreement that improperly seeks to contravene the Dominican Republic's law is prohibited and legally null.

These Constitutional principles are also reflected in the Dominican Republic's Civil Code. In particular, Article 6 of the Code provides: "Laws concerning public order and moral principles cannot be repealed by private contracts." Article 1133 of the Civil Code further provides: "A cause is not lawful if it is prohibited by law or contrary to public order or moral principles." And Article 1172 of the Code provides: "Any condition involving something

---

[4]    In this regard, the Dominican Republic's Constitution is similar to the United States Constitution with respect to its division of power among three separate branches of government -- the legislative, executive, and judicial -- that serve as checks and balances on one another.

[5]    *See* **Exhibit C**.

impossible or against accepted moral principals, or prohibited by law, is null and void *and makes null and void any agreement dependent thereon.*" (emphasis added).

The foregoing teaches that Dominican Republic law (both under its Constitution and its Code) expressly prohibits any act that results in an intervention in the country's affairs unless proper authorizations are obtained. But this never occurred in connection with the Agreement.

Articles 18 and 19 of the Agreement contained provisions dealing with arbitration and waiver of sovereign immunity. Thus, it was necessary to obtain proper approval from *both the Dominican Republic Executive Branch and Congress* in connection with an agreement that purported to waive the country's sovereign immunity and mandate arbitration. It is undisputed that while Executive Branch authorization was obtained, the Dominican Republic Congress never approved the Agreement. Neither party sought that approval.

Articles 18 and 19 of the Agreement are therefore expressly null and void. Articles 18 and 19 contravene Article 3 of the Constitution because they allow outside interference in the affairs of the State. Article 18 also violates Article 1004 of the Code of Civil Procedure which expressly prohibits arbitration involving the State or its property (which in this case would include CDEEE).

Because Articles 18 and 19 of the Agreement directly contravene Dominican Republic law, they are nullified and invalidated by operation of Articles 46 and 48 of the Constitution. Likewise, Articles 18 and 19 of the Agreement are further nullified and invalidated by Articles 6, 1133, and 1172 of the Civil Code. This nullification also invalidates the entire Agreement by operation of Article 46 of the Constitution and Article 1172 of the Civil Code.[6] The nullification

---

[6]  Defendants note that, even if Dominican Republic law could be construed such that only Articles 18 and 19 of the Agreement were invalidated, the result argued here would still be the same: That is, no arbitration could have taken place and, hence, there would be no award for this Court to confirm.

and invalidity of these provisions and the Agreement as a whole, in turn, make invalid any

arbitration and award.[7] Jurisdiction, therefore, does not lie over this matter.

CPB cannot be heard to complain. As a sophisticated party, CPB was fully aware that

Article 17 of the Agreement stipulated that the Agreement was to be governed by Dominican

Republic law. Likewise, CPB knew or should have known of the significance to the Agreement

of Articles 3, 46, and 48 of the Constitution, Article 1004 of the Code of Civil Procedure, as well

as Articles 6, 1133, 1172 of the Civil Code, both at the time CPB executed the Agreement and at

the time it sought to resolve the matter through arbitration. CPB did not blindly sign the

Agreement nor did it blindly choose to pursue arbitration. It was well aware of the problems that

lay at the heart of its transaction and dispute with Defendants. CPB's actions were the result of a

deliberate and calculated decision to ignore and/or contravene unambiguous Dominican Republic

law for purposes of its own monetary benefit.

In sum, Defendants are immune from suit and this Court does not have jurisdiction over

this matter. Accordingly, the Plaintiff's Application should be dismissed.[8]

### 3.    The Tax Provisions Under The Agreement Are Invalid.

The parties' treatment of taxes under the Agreement is similarly flawed and leads to the

same result. That is, the tax provisions of the Agreement are invalid and, by operation of law,

cause the entire Agreement to be null and void. The Court should dismiss Plaintiff's Application

for this reason alone.

---

[7]  In the arbitration proceedings, Defendants repeatedly argued to no avail that the entire arbitration proceedings were not permitted under Dominican Republic law.

[8]  Even if this Court were to determine that it has jurisdiction over this matter, dismissal of Plaintiff's Application would still be warranted. Specifically, Article V.1(a) of the New York Convention allows this Court to refuse to confirm an arbitral award where the "agreement is not valid under the law to which the parties have subjected it." The inclusion of the illegal arbitration provisions invalidates the Agreement and warrants dismissal. *See* discussion *infra*.

Article 110 of the Constitution requires that exemptions and/or exonerations from taxes must be approved by Congress.[9]  Articles 37.19 and 55 of the Constitution allow the President to enter into contracts that affect the other contracting party's tax liability.  However, *all* such contracts *must* be approved by Congress.[10]  Thus, if the President enters into an agreement containing tax exemptions and/or exonerations which are never submitted for approval to Congress, then such acts are legally insufficient and therefore null and void under Article 46 of the Constitution.  This is the situation that exists in this dispute.[11]

Article 13.1.1 of the Agreement required the State to obtain an exemption or exoneration from taxes to which CPB would be subject.  That Article further provided that, in the event CPB was required to pay any taxes, the State would reimburse CPB for the amount paid.  It is undisputed that the tax exemptions or exonerations contemplated under the Agreement were never obtained.

---

[9]    Article 110 provides:

No exemption will be recognized nor exoneration, reduction or limitation on taxes, assessments, or treasury or municipal laws to the benefit of members of the public shall be granted, except as indicated by law. Nevertheless, members of the public can acquire, either through concessions authorized by law or through contracts approved by the National Congress, the irrevocable right to benefits, for the entire time stipulated by the concession or contract, and in compliance with the obligations imposed by one or the other, from exemptions, exonerations, reductions or limitations on taxes, assessments,  or treasury or municipal laws incidental in specific works or public utility firms or in specific works or firms toward which it is important to attract, either for the development of the national economy or any other object of social interest, the investment of new capital.

[10]    *See* **Exhibit C.**  Article 37 provides: "The Congress has the responsibility to:... 19. – Approve or not the contracts submitted to it by the President of the Republic in conformity with Section 10 of Article 55 and with Article 110."

Article 55 provides: "The President of the Republic is the head of public administration and the commander in chief of all armed forces of the Republic and of the police forces. It shall be the responsibility of the President of the Republic:... 10. – To sign contracts, submitting them for approval to the National Congress when they contain provisions relative to the encumbrance of national revenues, the disposition of real or fixed properties with a value in excess of twenty thousand gold pesos, or the relief of loans or the stipulation of exemption from taxes in general, in accordance with Article 110; without such approval in other cases."

[11]    The arbitral panel improperly rejected these arguments.

Article 1156 of the Dominican Republic's Civil Code requires the Court to look beyond the literal meaning of the words in a contract to determine the parties' underlying intent.[12] In this case, it is clear the parties' intent was that the State, rather than CPB, should bear the tax burden associated with the transaction under the Agreement. The Constitution explicitly requires, however, that Congressional approval must be secured before a tax arrangement of this sort can be lawful. *See* Constitution, Articles 37.1, 37.19, 55.10 and 110. That approval was never obtained. Thus, just as the Agreement fails in connection with the parties' flawed attempts to impose an arbitration requirement on the Dominican Republic, the Agreement was invalidated and nullified by operation of Article 46 of the Constitution and Article 1172 of the Civil Code respecting the contemplated treatment of taxes. The result, once again, is that jurisdiction does not lie with this Court and the Application should therefore be dismissed.

Dismissal of the Application cannot come as a surprise to CPB and there is nothing unfair in that outcome. CPB apparently never took steps to determine that the Agreement -- grounded as it is on illegal footings -- would be upheld as lawful before it began to provide electricity to the Dominican Republic. That was its choice and now it must bear the consequences of seeking to enforce an agreement of such dubious provenance.

In short, the inclusion of the tax provisions in the Agreement and the failure to obtain Congressional approval invalidated the Agreement under Dominican Republic law. Accordingly, Defendants are immune from suit, this Court does not have jurisdiction over Defendants and this matter, and Plaintiff's Application must be dismissed.[13]

---

[12]    *See* **Exhibit C.** Article 1156 provides: "Agreements should concern themselves more with the common intent of the contracting parties than with the literal meaning of the words."

[13]    Defendants again note that even if this Court were to determine that it has jurisdiction over this matter, dismissal of Plaintiff's Application would still be warranted. Specifically, Article V.1(a) of the New York Convention allows this Court to refuse to confirm an arbitral award where the "agreement is not valid under the

**B.**    **Assuming, *Arguendo,* That This Court Has Jurisdiction Over The Defendants And This Matter, This Court Should Either Vacate Or Refuse To Confirm The Award.**

    **1.**    **Applicable Legal Standard.**

Preliminarily, Defendants note that they are entitled to present proof as to why the arbitration Award should not be confirmed. "[I]t is well-understood that courts will not enforce an arbitration award if the award itself violates established law or seeks to compel some unlawful action." *American Postal Workers Union v. United States Postal Service*, 789 F.2d 1, 8 (D.C. Cir. 1986). Likewise, "[i]f the arbitrator construes the contract so as to require someone to commit an illegal act, a court can then refuse to enforce the arbitrator's decision." *National Railroad Passenger Corp. v. Consolidated Rail Corp.*, 892 F.2d 1066, 1071 (D.C. Cir. 1990); *see also Al-Ibrahim v. Edde*, 897 F.Supp. 620, 622 (D.D.C. 1995) ("a contract to perform an illegal act…is void and unenforceable."); *Perma-Line Corp. of America v. Sign Pictorial and Display Union*, 639 F.2d 890, 895 (2d Cir. 1981) (refusing to enforce an arbitration award that was based upon an illegal contract provision).

A party that objects to the arbitrability of a dispute but still participates in the arbitration does not waive its ability to argue to the District Court subsequently that the agreement to arbitrate is invalid. *Four Season Hotels and Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1171 (11th Cir. 2004) (remanding to the lower court for a determination whether the agreement to arbitrate was invalid under Venezuelan law); *China Minmetals Materials Import and Export Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 290 (3d Cir. 2003). A party that opposes an arbitration award on the grounds that the arbitration clause was void is entitled to present evidence of the clause's invalidity to the District Court. *Id.* at 289. It is "clear that international

---

law to which the parties have subjected it." The inclusion of the illegal tax provisions in this instance invalidates the Agreement and warrants dismissal. *See* discussion *infra.*

law overwhelmingly favors some form of judicial review of an arbitral tribunal's decision that it

has jurisdiction over a dispute, at least where the challenging party clams that the contract on

which the tribunal rested its jurisdiction was invalid." *Id.* In cases where the parties did not

reach a valid agreement to arbitrate the District Court should not confirm the arbitration award.

*Id.* at 286.

> **2.    The Court Should Vacate The Award Because It Was
> Rendered In "Manifest Disregard" Of Dominican
> Republic Law.**

This Court should vacate the arbitral Award because it was rendered in "manifest

disregard" of Dominican Republic law. The Circuit Court for the District of Columbia as well as

numerous other courts have long recognized that a court may vacate an arbitration award where

it was rendered in "manifest disregard" of the law. *Kurke v. Oscar Gruss and Son, Inc.*, 454 F.3d

350, 354 (D.C. Cir. 2006); *LaPrade v. Kidder, Peabody & Co., Inc.,* 246 F.3d 702, 706

(D.C.Cir.2001); *see also Patten v. Signator Ins. Agency Inc.*, 441 F.3d 230 (4th Cir. 2006)

(vacating arbitration award which was in manifest disregard of law); *Montes v. Shearson Lehman

Brothers, Inc.*, 128 F.3d 1456 (11th Cir. 1997). "Manifest disregard for the law," the courts have

held, is more than a simple error in applying the law. As stated by the D. C. Circuit, "to vacate

an award under that standard [the Court] 'must find that (1) the arbitrators knew of a governing

legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the

arbitrators was well defined, explicit, and clearly applicable to the case.'" *Kurke v. Oscar Gruss

and Son, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006) (citations omitted).

The ICA's decision constituted a manifest disregard for the law of the Dominican

Republic. Specifically, the ICA blatantly ignored multiple Articles of the Dominican Republic

Constitution and Article 1004 of the Dominican Republic's Code of Civil Procedure by allowing

the arbitration to proceed. Likewise, the ICA also blatantly ignored the plain and unambiguous

requirements under the Dominican Republic's Constitution and Civil Code that expressly require

Congressional approval of all tax exemptions and/or exonerations is necessary. As discussed

more fully below, the arbitrators also explicitly ignored Dominican Republic law with respect to

other matters ostensibly decided under the Agreement involving rescission of the Agreement, the

calculation of interest, and the award of legal fees and costs. The ICA's actions were not mere

misinterpretations or misapplications of existing law. Rather, the combined effect of the ICA's

repeated disregard of Dominican Republic law is to make the Award hopelessly and totally

defective. For all these reasons, the Court should vacate the Award.

### 3.    If The Court Does Not Vacate The Award, It Should Refuse To Confirm It.

Article V of the New York Convention expressly provides for seven defenses by which a

Court may deny a request to confirm an arbitration award. At least four of those defenses are

directly applicable and should bar confirmation in this case.[14]

### a.    The underlying arbitration agreement was invalid under Dominican Republic law.

Article V.1(a) of the New York Convention provides: "Recognition and enforcement of

the award may be refused…[if] the said agreement is not valid under the law to which the parties

have subjected it." Article V.2(a) of the New York Convention further provides that the

---

[14]    The specific applicable defenses of Article V are as follows:

1. Recognition and enforcement of the award may be refused…[if]
(a)… the said agreement is not valid under the law to which the parties have subjected it.
….
(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties
….
2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:
(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or
(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

arbitration award should not be confirmed where the "subject matter of the difference is not capable of settlement by arbitration under the law of that country." For the reasons discussed more fully above in section III.A, which arguments are incorporated herein by reference, the Agreement is invalid because it required the arbitration of matters involving the State and its property (*i.e.,* CDEEE, taxes) in direct contravention of the Constitution and other laws of the Dominican Republic. Accordingly, confirmation of the arbitral Award should be denied.

### b. The Defendants were unduly prejudiced when they were denied their right to select an arbitrator.

In the unlikely event the Court disagrees that it should not confirm the arbitral Award because it is grounded in an illegal contract, there are a number of other reasons for the Court to refuse to confirm the Award. Chief among these is that Defendants' interests were unduly prejudiced when they were not allowed to select an arbitrator of their choosing in derogation of their express right to do so under the Agreement. Thus, the Court should refuse to confirm the Award pursuant to Article V.1(d) of the New York Convention which states that "[r]ecognition and enforcement of the award may be refused [if]…(d) [t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties."

According to Article 18.5 of the Agreement, "[e]ach **PARTY** will have the right to choose an arbitrator and the third one will be designated in accordance with the Rules of the International Chamber of Commerce of Paris, France (ICC)." This plain language gave Defendants the right to choose one of the three arbitrators that would comprise the arbitral panel. A manifest injustice occurred as a result of the ICA's refusal to permit Defendants to name an arbitrator.

The facts are undisputed surrounding the ICA's rejection of Defendants' many attempts to select an arbitrator. On March 7, 2002, the ICA designated attorney Luis Rafael Pellerano as

an arbitrator for Defendants.[15]  Defendants subsequently challenged that ICA-designated appointment.  The ICA accepted that challenge on May 31, 2002,[16] and approximately two weeks later, on June 14, 2002, Defendants named Rafael Tulio Perez de Leon to serve.  The ICA confirmed this appointment on July 5, 2002.[17]  Thereafter, however, CPB objected to Perez de Leon's appointment and the ICA subsequently rejected Perez de Leon on August 30, 2002.[18]  Two and one-half weeks later, Defendants designated Manuel V. Ramos as their arbitrator.[19]  After two weeks had passed, CPB once again opposed Defendants' arbitrator selection.[20]  Nearly three weeks later on October 24, 2002, the ICA rejected Ramos.  The ICA then inexplicably gave Defendants an unusually short seven days to designate another arbitrator.[21]  When no arbitrator was named by Defendants within that attenuated period of time, the ICA unilaterally appointed Enrique Bottaro-Lupi as the designated arbitrator for Defendants.[22]  Defendants protested this appointment three weeks later and simultaneously proposed a different arbitrator.[23]  This time, however, the ICA rejected Defendants' protest and choice,[24] and refused to reconsider that decision.[25]

---

[15]   Arbitration Award, ¶ 18.

[16]   Arbitration Award, ¶ 20.

[17]   Arbitration Award, ¶ 21.

[18]   Arbitration Award, ¶ 21.

[19]   Arbitration Award, ¶ 22.

[20]   Arbitration Award, ¶ 22.

[21]   Arbitration Award, ¶ 22.

[22]   Arbitration Award, ¶ 23.

[23]   Arbitration Award, ¶ 25.

[24]   Arbitration Award, ¶ 25.

[25]   Arbitration Award, ¶¶ 25-28.

Article 18.5 of the Agreement is plain and unambiguous: Defendants had the right to choose one of the arbitrators for the three-member panel that was to decide any arbitrable matters properly brought before it. Defendants presented three different arbitrators for consideration. The ICA confirmed the first but reversed itself following a challenge lodged by CPB. The ICA then denied Defendants' two other arbitrator choices. Ultimately, the ICA designated the arbitrator that was supposed to have been chosen by Defendants. In so doing, the ICA deprived Defendants of a valuable right provided under the Agreement, thereby causing them irreparable harm.

Why was it so critical that Defendants be allowed to select an arbitrator? First, the Agreement was expressly governed by Dominican Republic law and, as discussed herein, pivots on key issues of the domestic laws of that country. Defendants were entitled to select an arbitrator with knowledge of that law. As a result of the ICA's actions, however, *none* of the arbitrators ultimately selected had any meaningful knowledge of Dominican Republic law even though such knowledge was crucial to the proper resolution of all issues presented to the arbitration panel. Second, CPB and Defendants each had the right to select an arbitrator. These two arbitrators, in turn, were then to designate the third arbitrator. This process allowed each side the opportunity to choose someone who they believed would best understand the issues and controlling law and who would bring that understanding to bear upon the selection of the third arbitrator and the decisions to be made by the full arbitral panel. In the end, CPB was permitted to name an arbitrator but Defendants were not. Because the selection of the arbitrators was "not in accordance with the agreement of the parties," the confirmation of the Award must be denied.

### c. The arbitral panel consistently disregarded Dominican Republic law in contravention of the Agreement of the parties.

The ICA's failure to adhere to the requirements of the Agreement respecting the selection of the arbitrators fatally infects the Panel's Award. There is no dispute that Dominican Republic law controlled the Agreement. Throughout the arbitration, however, the improperly constituted panel disregarded Dominican Republic law. In these circumstances, the Court should refuse to confirm the Award under Article V.1(d) of the New York Convention where the "arbitral procedure was not in accordance with the agreement of the parties."

Indeed, as discussed more fully above, the arbitration would never have proceeded in the first instance if Dominican Republic law had been correctly followed. But it is not only with respect to matters of sovereign immunity involving arbitration and taxes that the ICA ignored Dominican Republic law, acted arbitrarily, and committed plain error. There are several other examples as well.

### i. The panel disregarded Dominican Republic law which required CPB to obtain a rescission of the Agreement before commencing arbitration proceedings.

Another of the arbitrators' plain errors was their finding that CPB could proceed with the arbitration proceedings after Defendants allegedly breached the Agreement. Article 1134 of the Dominican Republic's Civil Code states that legally formed contracts "cannot be annulled except by mutual consent or by causes authorized by law."[26] Article 1184 of the Civil Code further provides that, in cases of a breached contract, the agreement is not dissolved but rather rescission of the contract must be requested and secured from a court.[27]

---

[26]    *See* **Exhibit C.**

[27]    *See* **Exhibit C.**

It is undisputed that CPB never filed a court action seeking rescission of the contract after Defendants allegedly breached the Agreement. Rather, CPB simply ceased performance of its obligations under the Agreement and left the country. CPB's failure to obtain a court order authorizing rescission meant that it breached the Agreement (which damaged Defendants). Because CPB failed to seek the termination of the Agreement in accordance with Dominican Republic law – an essential condition precedent – CPB had no right to invoke the arbitration clause. The Panel, however, brushed aside Defendants' arguments that Dominican Republic law had not been properly satisfied.[28] Thus, the arbitration Award is the result of proceedings that were fatally flawed at the outset. In these circumstances, this Court should refuse to confirm the arbitration Award.

### ii. The arbitrators failed to apply Dominican Republic law respecting the calculation of interest on the alleged amounts owed.

Article 10.5 of the Agreement provides that interest on late amounts will accrue at 1% per month. In contrast, Article 1154 of the Dominican Republic Civil Code provides that "[i]nterest earned from capital can produce new interest either through judicial petition or by special agreement, if, whether through petition or agreement, it be a question of interest owed at least for the space of a full year." Stated differently, Article 1154 prohibits the accrual of compound interest for the first year following the incursion of an interest bearing debt. Thus, Article 10.5 of the Agreement contradicts Article 1154 of the Civil Code by allowing interest to begin accruing after one month, while Article 1154 only permits interest to commence accruing after one year.

---

[28]    *See generally* Arbitration Award, ¶¶ 133-137.

Even though the arbitrators recognized the policy behind Article 1154 (*viz.* to keep debts from increasing too rapidly due to interest[29]) they nonetheless ignored the Dominican Republic's Civil Code. Instead, the panel looked to French law and international public policy to determine the method by which interest amounts should be calculated.[30] In direct contravention of Dominican Republic law, the ICA ultimately awarded monthly interest of 1% to be incorporated in the capital owed every month.[31]

### iii. The ICA ignored Dominican Republic law regarding the award of legal fees and costs.

On its own initiative, the Panel awarded legal fees and costs even though this was not contemplated by the parties and is not provided for under the Agreement. In connection with any such award the Panel might order, Defendants argued that Dominican Republic law No. 302 of 1964 was controlling.[32] The Panel rejected Defendants' argument, and relied instead on Article 31.1 of the ICC rules.[33] Once again, the Panel flouted Dominican Republic law in contravention of the express requirements of the Agreement.

### 4. Confirmation Of The ICA's Arbitration Award Would Be Contrary To Public Policy.

Article V.2(b) of the New York Convention allows this Court to refuse recognition and enforcement of an arbitration award if such recognition and enforcement would be contrary to

---

[29]    Arbitration Award, ¶ 163.

[30]    Arbitration Award, ¶¶ 164-169

[31]    Arbitration Award, ¶ 193.

[32]    Arbitration Award, ¶ 191; *see* **Exhibit C**.

[33]    Arbitration Award, ¶191.

public policy.[34]  Public policy must be well defined and dominant; it is ascertained from specific laws and court decisions and not from general public interests.  *W.R. Grace and Co. v. Local Union 759*, 461 U.S. 757, 766 (1983).

It is axiomatic that a contract is illegal and unenforceable if its terms violate the laws of the country whose laws are to govern the agreement.  As previously discussed, Dominican Republic law prohibits one branch of government from unilaterally waiving that country's sovereign immunity and performing acts that otherwise contravene established law.  In this case, the Agreement required but never received proper approval from both the Dominican Republic Executive Branch and Congress in connection with key provisions that purported to waive the country's sovereign immunity in direct contravention of Dominican Republic's Constitution and other laws.  Moreover, the arbitral Award was fatally flawed for several other reasons:  The arbitral panel was improperly constituted in derogation of the Dominican Republic's and CDEEE's valuable rights which directly lead to a series of erroneous rulings under Dominican Republic law.  In these circumstances, confirmation of the arbitration Award would violate the public policy of the United States because it would place this country in the position of sanctioning a would-be contract that on its face violates Dominican Republic law in multiple and fundamental ways.

---

[34]    Article V.2(b) of the New York Convention specifically provides:

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that: ... (b) The recognition or enforcement of the award would be contrary to the public policy of that country.

**C.    If This Court Is Not Prepared To Refuse To Confirm The Award At This Time, It Should Stay Its Ruling On Plaintiff's Application Until The Validity Of The Agreement Has First Been Determined By A Competent Court In The Dominican Republic.**

Article V.1(e) of the New York Convention provides that recognition and enforcement of an arbitral award may be refused if the "award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." Within the next thirty days, Defendants will commence a legal proceeding in the Dominican Republic seeking a judicial declaration that the Agreement was invalid and unenforceable (particularly Articles 18 and 19 of the Agreement) for the reasons discussed above. Therefore, if this Court is not prepared to refuse to confirm the arbitral Award at this time, the Court should stay its ruling on Plaintiff's Application until the validity of the Agreement has first been determined by a competent court in the Dominican Republic. Because this matter involves fundamental issues relating to the interpretation and application of Dominican Republic law respecting that country's sovereignty, Executive Branch authority and Constitutional requirements, it is essential that these matters be addressed first by a Dominican Republic court and not one of the United States. There are, moreover, other compelling reasons that make this Court a poor choice for the resolution of these matters.

Significantly, this case has no connection whatsoever with the United States other than the fact that this country is a signatory to the New York Convention. Plaintiff is a Cayman Islands corporation and Defendants are the Dominican Republic and one of its state-owned enterprises. The underlying Agreement centers on domestic matters concerning the Dominican Republic. The arbitration proceedings occurred in Paris, France. Why should a United States Court be in the middle of a dispute of this nature, in which it is being asked to expend

considerable time and resources, where any national interest is so attenuated and is certainly highly dubious?

*The Court should also consider that Defendants have no assets in the United States upon which a confirmed award could be executed.* Moreover, Defendants have no plans during any foreseeable time-frame to bring assets into the United States that could be subject to attachment and execution. Hence, any confirmation by this Court would be nothing more than a hollow victory that is likely to complicate proceedings further and unnecessarily in the Dominican Republic.

Thus as a practical matter, Plaintiff will not be harmed if this Court stays its ruling on CPB's Application pending resolution by the Dominican Republic of the central legal issues. In short, principles of international comity and judicial economy mandate that this Court abstain from considering Plaintiff's Application until such time as the basic legal issues involving the Agreement may be resolved by a competent court in the Dominican Republic.

## IV.   CONCLUSION

**WHEREFORE** for the reasons set forth above, Defendants request that this Court grant Defendants' Rule 12(b) Motion and dismiss Plaintiff's Application. In the event that the Motion is denied, Defendants request that this Court vacate the ICA's arbitration Award as being manifestly contrary to Dominican Republic law. Alternatively, Defendants request that this Court deny confirmation of the arbitration Award. If this Court is not prepared to refuse to confirm the arbitral Award at this time, the Court should stay its ruling on Plaintiff's Application

until the validity of the Agreement has first been determined by a competent court in the

Dominican Republic.

Respectfully submitted,

Marvin T. Griff (D.C. Bar No. 423839)
Michael Fielding (D.C. Bar Admission – Motion to
    appear *pro hac vice* granted)
Blackwell Sanders Peper Martin, LLP
750 17th St. N.W., Suite 1000
Washington, D.C. 20006-4656

*Attorneys for Defendants The State of the*
*Dominican Republic and Corporación Dominicana*
*de Empresas Eléctricas Estatales*

Dated: February 20, 2007

## Certificate of Service

I herby certify that on this 20th day of February, 2007, a true and correct copy of the above and foregoing was served by electronically filing it with the Court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

Marvin T. Griff (D.C. Bar No. 423839)
Blackwell Sanders Peper Martin, LLP
750 17th St. N.W., Suite 1000
Washington, DC 20006-4656
*Attorney for Defendants The State of the Dominican*
*Republic and Corporación Dominicana de*
*Empresas Eléctricas Estatales*