# EXHIBIT A

**Power Purchase Agreement between The State of the Dominican Republic,
Represented by Corporacion Dominicana de Electridad
And Cayman Power Barge I, LTD.**

**Dated as of March 17, 1998**

# LANGUAGE COMPANY
# TRANSLATIONS
### COMMUNICATE WITH THE WORLD



July 16, 2006

TO WHOM IT MAY CONCERN:

In March of 1998 I certified the translation to English of the *Power Purchase Agreement between the State of the Dominican Republic, represented by Corporación Dominicana de Electricidad and CAYMAN POWER BARGE I, LTD.,* dated March 17, 1998, to be a faithful and complete translation from Spanish of the *Acuerdo de Compra de Energía entre EL ESTADO de la República Dominicana representado por la Corporación Dominicana de Electricidad y CAYMAN POWERBARGE I, LTD.,* also dated March 17, 1998.

As requested by Deborah A. Green of Elliott Management Corp., I have compared the original Spanish of that agreement with the English translation and again certify the validity of the translation to English.

Nancy T. Hancock, Director
Notary Public

**RECEIVED**

APPROVED_____
APPROVED (PS)_____

JUL 2 0 2006

OFFICIAL SEAL
NOTARY PUBLIC
IN AND FOR STATE OF OKLAHOMA
Nancy T. Hancock
Commission # 06001189
Expires January 30, 2010

HEDGE _____
G/L ACCOUNT_____

Hartel Ded.
Exh. B

March 17, 1998

*Power Purchase Agreement*

*between*

*the State of the Dominican Republic,*

*represented by*

*Corporación Dominicana de Electricidad*

*and*

*CAYMAN POWER BARGE I, LTD.*

*DATED AS OF MARCH 17, 1998*

CAYMAN
16-3-98 8:00 PM

## TABLE OF CONTENTS

ARTICLE 1:  DEFINITIONS.................................................................................2

1.1  "AGREEMENT"......................................................................................2
1.2  "GUARANTEED DISPATCH ADJUSTMENT".................................2
1.3  "CONTRACT YEAR"..............................................................................3
1.4  "BTU" .......................................................................................................3
1.5  "GOOD ENGINEERING AND OPERATION PRACTICES".........3
1.6  "ADDITIONAL CAPACITY"................................................................3
1.7  "DEPENDABLE CAPACITY"..............................................................3
1.8  "GUARANTEED CAPACITY"..............................................................3
1.9  "LETTER OF CREDIT"..........................................................................4
1.10  "FUEL"....................................................................................................4
1.11  "COMMISSIONED"..............................................................................4
1.12  "COMMISSIONING".............................................................................4
1.13  "INSTALLATION SITE".......................................................................4
1.14  "SPECIFIED CONSENTS"...................................................................4
1.15  "GUARANTEED DISPATCH" ............................................................4
1.16  "DAY" ......................................................................................................4
1.17  "DOLLARS" ...........................................................................................5
1.18  "THE STATE".........................................................................................5
1.19  "EMERGENCY".....................................................................................5
1.20  "TECHNICAL GROUP".......................................................................5
1.21  "FORCE MAJEURE...............................................................................5
1.22  "HEAT RATE FACTOR".......................................................................5
1.23  "PHASE I"................................................................................................5
1.24  "PHASE II"..............................................................................................5
1.25  "CONNECTION DATE".......................................................................5
1.26  "COMMERCIAL OPERATION DATE"..............................................6
1.27  "REQUIRED COMMERCIAL OPERATION DATE"........................6
1.28  "EFFECTIVE DATE"..............................................................................6
1.29  "FORCED OUTAGE HOURS" .............................................................6
1.30  "MAINTENANCE OUTAGE HOURS"...............................................6
1.31  "SCHEDULED OUTAGE HOURS" .....................................................6
1.32  "TAXES"..................................................................................................6
1.33  "KW" .......................................................................................................7
1.34  "KWH".....................................................................................................7
1.35  "THE CORPORATION".........................................................................7
1.36  "LAWS OF THE DOMINICAN REPUBLIC".....................................7
1.37  "TECHNICAL LIMITS".........................................................................7
1.38  "INTERCONNECTION FACILITIES" ...............................................7
1.39  "MONTH".................................................................................................7
1.40  "EXCESS FUEL PAYMENT" ...............................................................7
1.41  "PARTY"..................................................................................................7

i

1.42   "PARTIES" ....................................................................7
1.43   "TERM" .......................................................................8
1.44   "POWERBARGE I" ....................................................8
1.45   "AVERAGE UNIT ENERGY PRICE" ........................8
1.46   "NET ENERGY PRODUCTION" ...............................8
1.47   "MINIMUM NET ENERGY PRODUCTION ...............8
1.48   "DELIVERY POINT" .................................................8
1.49   "METERING POINT" ................................................8
1.50   "ACTUAL HEAT RATE" ............................................9
1.51   "FORCED OUTAGE" .................................................9
1.52   "MAINTENANCE OUTAGE" .....................................9
1.53   "MAJOR OVERHAUL OUTAGE" ...............................9
1.54   "SCHEDULED OUTAGE" .........................................9
1.55   "METERING SYSTEM" .............................................9
1.56   "FACILITY" ...............................................................9

ARTICLE 2:  OBJECTIVE OF THE AGREEMENT ................................10

2.1   SALE AND PURCHASE OF CAPACITY AND ENERGY ...........10
2.2   SUPPLY OF POWER BY THE CORPORATION ........................10

ARTICLE 3:  AGREEMENT DOCUMENTS ..........................................10

ARTICLE 4:  SCOPE OF WORKS ........................................................11

4.1   GENERAL ...................................................................11
4.2   THE SELLER INTERCONNECTION FACILITIES ...............11
4.3   THE CORPORATION INTERCONNECTION FACILITIES ...11
4.4   GUARANTEED CAPACITY ..........................................12
4.5   COMMERCIAL OPERATION DATE ...............................12
4.6   DELIVERY AND METERING SYSTEMS ..........................12

ARTICLE 5:  CAPACITY TESTS .........................................................13

5.1   TEST PROGRAM OF THE POWERBARGE I ....................13
5.2   TESTS PRIOR TO THE SYNCHRONIZATION OF POWERBARGE I ...............13
5.3   TESTS AFTER THE SYNCHRONIZATION OF POWERBARGE I AND
      DEPENDABLE CAPACITY TESTS ................................14
5.4   TESTING ATTENDANCE ...........................................15
5.5   COPIES OF TEST RESULTS ........................................16
5.6   TEST AND COMMISSIONING OF ADDITIONAL CAPACITY ...........16
5.7   DEEMED COMMISSIONING ......................................16

ARTICLE 6:  OPERATION AND MAINTENANCE ..................................17

ii

CAYMAN
16-3-98 8:00 PM

6.1    OBLIGATIONS OF THE SELLER ................................................................17
6.2    APPOINTMENT OF TECHNICAL GROUP .............................................17
6.3    OPERATING PROCEDURES.....................................................................17
6.4    EMERGENCIES...........................................................................................18
6.5    SCHEDULED AND MAINTENANCE OUTAGES....................................18
6.6    EXCESS SCHEDULED AND MAINTENANCE OUTAGES
       AND SANCTIONS.......................................................................................20

ARTICLE 7:  DISPATCH .........................................................................................21

7.1    DISPATCH PROCEDURES ........................................................................21
7.2    GUARANTEED DISPATCH .......................................................................21

ARTICLE 8:  GUARANTEED HEAT RATE ..........................................................21

8.1    POWERBARGE I..........................................................................................21
8.2    POWERBARGE I AND ADDITIONAL CAPACITY ................................22
8.3    ACTUAL HEAT RATE FOR THE FACILITY..........................................22
8.4    HEAT RATE FACTOR AND EXCESS FUEL PAYMENT .......................22

ARTICLE 9:  FUEL FOR THE FACILITY...............................................................23

9.1    FUEL SUPPLY .............................................................................................23
9.2    FUEL STORAGE ..........................................................................................23

ARTICLE 10: INVOICES AND PAYMENTS ..........................................................23

10.1   METER READINGS.....................................................................................23
10.2   PRESENTATION OF INVOICES...............................................................23
10.3   PAYMENTS ..................................................................................................23
10.4   GRACE PERIOD...........................................................................................24
10.5   LATE PAYMENTS .......................................................................................24
10.6   DISPUTED AMOUNTS...............................................................................25
10.7   BILLING ERRORS.......................................................................................25
10.8   INACCURATE METERS..............................................................................25

ARTICLE 11: LETTER OF CREDIT........................................................................25

ARTICLE 12: GENERAL AND LEGAL CONDITIONS.........................................25

12.1   ACCEPTANCES AND WARRANTIES .....................................................25
12.2   LEGALIZATION EXPENSES.....................................................................27
12.3   DOMICILE AND COMMUNICATIONS....................................................27

ARTICLE 13: EXEMPTIONS AND OTHER BENEFITS ......................................28

iii

CAYMAN
16-3-98 8:00 PM

13.1    EXEMPTIONS.................................................................................28
13.2    GRANT OF AUTHORIZATION AND RELATED RIGHTS TO THE SELLER...29
13.3    FOREIGN CURRENCY EXCHANGE AND TRANSFER OF FUNDS ...................30

ARTICLE 14: FORCE MAJEURE, ...........................................................30

14.1    DEFINITION AND LEGAL EFFECTS.................................................30
14.2    FORCE MAJEURE CONDITIONS .....................................................30
14.3    EXTENSION OF THE TERM ...........................................................31

ARTICLE 15: INSURANCE .....................................................................31

ARTICLE 16: LIABILITY .......................................................................32

16.1    LIMITS OF LIABILITY ..................................................................32
16.2    RELEASE AND INDEMNITY ..........................................................32

ARTICLE 17: APPLICABLE LAW ..........................................................33

ARTICLE 18: ARBITRATION .................................................................33

18.1    INTERNATIONAL ARBITRATION...................................................33

ARTICLE 19: SOVEREIGN IMMUNITY ...................................................34

ARTICLE 20: ASSIGNMENT ..................................................................34

ARTICLE 21: TERM OF THIS AGREEMENT .............................................36

ARTICLE 22: DEFAULT AND RESCISSION ..............................................36

ARTICLE 23: SUBCONTRACTS ..............................................................38

ARTICLE 24: INTERVENTION OF THE CORPORATION ............................38

ARTICLE 25: SURVIVAL .......................................................................39

ARTICLE 26: MISCELLANEOUS PROVISIONS .........................................39

26.1    MERGER.......................................................................................39
26.2    MODIFICATIONS ..........................................................................39
26.3    WAIVER.......................................................................................39
26.4    COMPUTATION OF TIME ..............................................................39
26.5    CAPTIONS....................................................................................39

iv

26.6    INVALIDATION OF THE CLAUSES...................................................39
26.7    ATTACHMENTS AND APPENDIXES ..........................................40
26.8    COUNTERPARTS ..........................................................................40

| APPENDIX I: | LETTER OF INTENT |
| APPENDIX II: | POWER OF ATTORNEY |
| APPENDIX III: | POWER OF ATTORNEY |
| APPENDIX IV: | CORPORATE AUTHORIZATION OF THE SELLER |
| APPENDIX V: | THE SELLER'S MONTHLY INVOICE FORM |
| APPENDIX VI: | LETTER OF CREDIT |
| APPENDIX VII: | DOCUMENT REFLECTING OWNERSHIP OF THE POWERBARGE I BY THE SELLER |

| ATTACHMENT A: | DESCRIPTION AND TECHNICAL LIMITS OF THE FACILITY |
| ATTACHMENT C: | INTERCONNECTION FACILITIES |
| ATTACHMENT D: | TESTS |
| ATTACHMENT E: | UNIT ENERGY PRICE |
| ATTACHMENT F: | FUEL SUPPLY |
| SCHEDULE 1 OF | |
| ATTACHMENT F: | ACCEPTABLE FUEL OIL SPECIFICATION |
| ATTACHMENT G: | SPECIFIED CONSENTS |

### POWER PURCHASE AGREEMENT SIGNED BETWEEN THE STATE OF THE DOMINICAN REPUBLIC AND THE COMPANY CAYMAN POWER BARGE I, LTD.

**BETWEEN:** The State of the Dominican Republic, hereinafter referred to as **"THE STATE"**; duly represented by the Secretary of State, General Administrator of the Corporación Dominicana de Electricidad, **ING. RHADAMES SEGURA**, Dominican, of legal age, married, bearer of Identity Card and Electoral No. 001-0784753-5, domiciled and resident in the city of Santo Domingo, Dominican Republic, acting by virtue of Special Power of Attorney No. 220-97 and Special Power of Attorney No.62-98 issued by His Excellency President of the Dominican Republic, **DR. LEONEL FERNANDEZ REYNA**; and by the other **PARTY**,

The company **CAYMAN POWER BARGE I, LTD**, hereinafter referred to as **"THE SELLER"**, a commercial enterprise organized under the laws of the Cayman Islands, British West Indies, with its principal offices located at P.O. Box 1109, Mary Street, Grand Cayman, Cayman Islands, British West Indies, duly represented by its representative Mr. **DAVID WALTERS**, American, of legal age, married, bearer of Passport No.131320142, domiciled and resident of Oklahoma City, U.S.A., authorized by corporate authorization dated January 2, 1998 (Appendix IV).

### PREAMBLE

**WHEREAS: THE STATE**, considering the instability and the emergency situation of the national electricity generation system, requires additional power and energy to satisfy the requirements of the consumers of this service in the upcoming years, and **THE STATE** has received offers from the private sector for the sale of electric power;

**WHEREAS: THE STATE** is desirous of promoting the generation of electricity in the Dominican Republic by privately owned and financed facilities;

**WHEREAS: THE SELLER** has submitted a proposal for the sale of power that will generate (60) MW to be delivered in two (2) phases; the first phase to consist of a (30) MW facility named the **POWERBARGE I**, and the second phase to consist of an expansion no greater than (30) MW, subject to the terms of this **AGREEMENT**;

**WHEREAS: THE STATE**, represented by the General Administrator of the Corporación Dominicana de Electricidad, Ing. Juan Temístocles Montás and **THE SELLER** signed a Letter of Intent dated the nineteenth (19) of November of 1997, providing for the basic terms and conditions of this **AGREEMENT**;

**WHEREAS:** In conformance with the Power of Attorney No. 220-97 dated November 29, 1997, His Excellency President of the Dominican Republic, Dr. Leonel Fernández Reyna, representing **THE STATE**, has authorized the Secretary of State on such date, General Administrator of the Corporación Dominicana de Electricidad, Ing. Juan Temístocles Montás to sign on behalf of **THE STATE** a letter of intention to sign with **THE SELLER** a Power Purchase Agreement under the terms established in said letter, and subsequently in conformance with Special Power of Attorney No. 62-98 dated March 17, 1998, His Excellency

President of the Dominican Republic, Dr. Leonel Fernández Reyna, representing **THE STATE**, has authorized the Secretary of State, General Administrator of the Corporación Dominicana de Electricidad, Ing. Rhadamés Segura to sign this **AGREEMENT** on behalf of **THE STATE**;

**WHEREAS:** In conformance with said Powers of Attorney, **THE CORPORATION** enters into this **AGREEMENT** to accept, assume and agree upon the provisions that are specifically applicable to the same;

**NOW THEREFORE:** In consideration of the mutual benefits to be derived, and the representations, guarantees, conditions and covenants contained in this **AGREEMENT**, with the intent to be legally obligated, and with the understanding that the previous preamble constitutes an integral part hereof, the **PARTIES** freely and voluntarily.

HAVE AGREED TO THE FOLLOWING

### ARTICLE 1: DEFINITIONS.

Capitalized terms used in this **AGREEMENT** shall have the meanings set forth below or where such terms are underlined throughout the text of the **AGREEMENT**, unless a different meaning shall be expressly stated.

Unless the context plainly indicates otherwise, words importing the singular number shall be deemed to include the plural number (and vice versa); terms such as "hereof", "herein", "hereunder" and other similar compounds of the word "here" shall mean and refer to the entire **AGREEMENT** rather than any particular part of the same; and references to Articles, Paragraphs, Attachments and Clauses are references to Articles, Paragraphs, Attachments and Clauses of this **AGREEMENT**.

### 1.1    "AGREEMENT"

Shall mean in addition to this document, all the addendums of the same.

### 1.2    "GUARANTEED DISPATCH ADJUSTMENT"

In the event that during any hour of the **MONTH**, the **FACILITY** is dispatched at less than the **GUARANTEED DISPATCH** then **THE SELLER** shall calculate the additional KWH that the **FACILITY** could have produced if the **FACILITY** had been dispatched at the **GUARANTEED DISPATCH** by subtracting from the **GUARANTEED DISPTACH** the number of KW requested by **THE CORPORATION** for dispatch ("Requested Dispatch") and multiplied by such hours. If the **FACILITY** cannot operate at the level of the Requested Dispatch for reasons attributable to **THE SELLER**, then the **GUARANTEED DISPATCH** Adjustment for that hour shall be equal to zero. The **GUARANTEED DISPATCH** Adjustment shall be equal to the sum of such differences expressed in **KWH** for the **MONTH**.

**1.3    "CONTRACT YEAR"**

Shall mean a period of three hundred and sixty-five (365) days of the **AGREEMENT** commencing on the **EFFECTIVE DATE.**

**1.4    "BTU"**

Shall mean a British Thermal Unit.

**1.5    "GOOD ENGINEERING AND OPERATIONS PRACTICES"**

Those practices, methods, equipment, specifications, standards of safety and performance, as the same may change from time to time, as are commonly used or approved by a significant portion of industrialized nations for the operation and maintenance of facilities of the type and size similar to the **FACILITY,** which in the exercise of reasonable judgment and in light of the facts known at the time the decision was made, are considered good, safe and prudent practice in connection with the operation and maintenance of electrical and other equipment, facilities and improvements, with commensurate standard of safety, performance, dependability, efficiency and economy.  Good Engineering and Operations Practices are not intended to be limited to the optimum practice or method to the exclusion of all others, but rather to include reasonable and prudent practices and methods in light of the circumstances. In applying the standard to any matter under this **AGREEMENT,** equitable consideration should be given to the circumstances, requirements and obligations of each **PARTY.**

**1.6.    "ADDITIONAL CAPACITY"**

Shall mean the electric generation unit(s) of a nominal capacity of 30 MW as described in Attachment A.

**1.7    "DEPENDABLE CAPACITY"**

The amount of electrical production capacity of the **FACILITY** as established by the tests provided for in Article 5.

**1.8    "GUARANTEED CAPACITY"**

Shall mean a nominal capacity of 30,000 KW which results in a net capacity output of no less than 24,000 KW during **PHASE I** (the **POWERBARGE I**) and an added nominal capacity of approximately 30,000 KW, that results from a net capacity output of not less than ninety four point twenty-five percent (94.25%) of the nominal capacity during **PHASE II** (**ADDITIONAL CAPACITY**) which added to the **POWERBARGE I** results in a  nominal capacity of approximately 60,000 KW, resulting in an aggregate net capacity output of no less than 50,000 KW and no greater than 60,000 KW after the date that the **ADDITIONAL CAPACITY** is **COMMISSIONED.**

**1.9    "LETTER OF CREDIT"**

Shall mean the **LETTER OF CREDIT** issued by the Banco de Reservas of the Dominican Republic and confirmed by the Chase Manhattan Bank, N.A. (N.Y.) for the principal amount of US$2,044,912.50 to guarantee the performance obligations of **THE STATE** under this **AGREEMENT** pursuant to the provisions in the Letter of Intention between **THE STATE** and **THE SELLER** dated the nineteenth (19) of November of Nineteen Hundred and Ninety Seven (1997) (Appendix VI).

**1.10    "FUEL"**

Shall mean the **FUEL** described in Attachment F.

**1.11    "COMMISSIONED"**

Shall mean the satisfaction of the minimum **DEPENDABLE CAPACITY** criteria for the **POWERBARGE I** and/or the **ADDITIONAL CAPACITY** as set forth in Article 5 of this **AGREEMENT** and provided for in Attachment D.

**1.12    "COMMISSIONING"**

Shall mean the process and criteria used to establish the **DAY** the **FACILITY** is Commissioned pursuant to Article 5 of this **AGREEMENT** and provided for in Attachment D.

**1.13    "INSTALLATION SITE"**

Will have the meaning set forth in Attachment B.

**1.14    "SPECIFIED CONSENTS"**

Shall mean all approvals, consents, authorizations, notices, concessions, acknowledgments, agreements, permits or decisions by the Public Sector Entities or other matters set forth in Attachment G and which **THE STATE** guarantees to be all that are required so that **THE SELLER** can comply with this **AGREEMENT**.

**1.15    "GUARANTEED DISPATCH"**

Shall mean the number of **KW** not less than ninety percent (90%) of the GUARANTEED CAPACITY of the **POWERBARGE I** prior to the date the **ADDITIONAL CAPACITY** is Commissioned, and thereafter, shall mean the sum of KW resulting from ninety percent (90%) of the **GUARANTEED CAPACITY** of the **POWERBARGE I** and eighty five percent (85%) of the **GUARANTEED CAPACITY** of the **ADDITIONAL CAPACITY** (expressed in KW).

**1.16    "DAY"**

Shall mean a twenty-four (24) hour period beginning and ending at twelve (12:00) midnight in the Dominican Republic.

**1.17  "DOLLARS"**

Shall mean the legal currency of the United States of America, referred to as "US$".

**1.18  "THE STATE"**

Shall have the meaning set forth in the Introduction.

**1.19  "EMERGENCY"**

Shall mean a condition or situation that in the reasonable opinion of **THE CORPORATION** or **THE SELLER** may:

(a)    materially adversely affect the ability of **THE CORPORATION** or **THE SELLER** to maintain safe, adequate and continuous electrical service, having due regard to the then current standard of electrical energy provided; or

(b)    endanger the security of people, plant or equipment.

**1.20  "TECHNICAL GROUP"**

Shall mean a group of representatives authorized by the **PARTIES** and **THE CORPORATION** to deal with matters of operation and other matters relative to the **FACILITY** under this **AGREEMENT**.

**1.21  "FORCE MAJEURE"**

Shall have the meaning set forth in Article 14.

**1.22  "HEAT RATE FACTOR"**

Shall mean a factor calculated for each **MONTH** by dividing the **ACTUAL HEAT RATE** of the **FACILITY** during the **MONTH** by the Guaranteed Heat Rate.

**1.23  "PHASE I"**

Shall mean the period of time ending on the sixth **MONTH** after the **CONNECTION DATE**.

**1.24  "PHASE II"**

Shall mean the period of time from the Day following the end of **PHASE I** and continuing through the termination of this **AGREEMENT**.

**1.25  "CONNECTION DATE"**

Shall mean the date that the **POWERBARGE I** is ready for start-up and connected to **THE CORPORATION INTERCONNECTION FACILITIES**, which date shall occur no earlier than thirty five (35) days from the **EFFECTIVE DATE** of this **AGREEMENT** and no later

than sixty (60) days from the arrival of the **POWERBARGE I** in the Dominican Republic. In the event that for any reason there is a delay in the **CONNECTION DATE** that is not due to:

a)    A breach by **THE SELLER** of its obligations under this **AGREEMENT**;

b)    The **CONNECTION DATE** has not been extended by the **PARTIES**; or

c)    The result of an event of **FORCE MAJEURE**;

the **POWERBARGE I** shall be deemed to be connected to **THE CORPORATION INTERCONNECTION FACILITIES** as of the end of the period stated above ("Deemed CONNECTION DATE"). The Deemed **CONNECTION DATE** shall be same as the **CONNECTION DATE** for all purposes under this **AGREEMENT**.

**1.26    "COMMERCIAL OPERATION DATE"**

Shall mean as of the first **DAY** after the **DAY** in which the **POWERBARGE I** is **COMMISSIONED** as provided in Article 5.

**1.27    "REQUIRED COMMERCIAL OPERATION DATE"**

Shall mean no later than ninety (90) Days from the **CONNECTION DATE**.

**1.28    "EFFECTIVE DATE"**

Shall mean the date of the signing of this **AGREEMENT** between the **PARTIES**.

**1.29    "FORCED OUTAGE HOURS"**

Shall mean the hours in which a **FORCED OUTAGE** was in effect during any **MONTH**.

**1.30    "MAINTENANCE OUTAGE HOURS"**

Shall mean the hours in which a **MAINTENANCE OUTAGE** was in effect during any **MONTH**.

**1.31    "SCHEDULED OUTAGE HOURS"**

Shall mean the hours in which a **SCHEDULED OUTAGE** was in effect during any **MONTH**.

**1.32    "TAXES"**

Shall mean all taxes (including on payments and benefits), withholdings, import duties, customs duties, duties (including on imports), tariffs, franchise tax on income, industrial assets, added value, sales or consumption.,

**1.33  "KW"**

Shall mean the unit of kilowatts.

**1.34  "KWH"**

Shall mean the unit of kilowatt hours.

**1.35  "THE CORPORATION"**

Shall mean the Corporación Dominicana de Electricidad.

**1.36  "LAWS OF THE DOMINICAN REPUBLIC"**

Shall mean the laws of Dominican Republic and all rules, regulations, subsidiary legislation, notifications and policies made pursuant thereto.

**1.37  "TECHNICAL LIMITS"**

Shall mean those operation limitations established for the **FACILITY** in Attachment A.

**1.38  "INTERCONNECTION FACILITIES"**

Shall mean the site of the **FACILITY** described in Attachment C.

**1.39  "MONTH"**

Shall mean a period beginning at twelve (12:00) midnight on the last **DAY** of the preceding calendar **MONTH** and ending at twelve (12:00) midnight on the last **DAY** of the calendar **MONTH**.

**1.40  "EXCESS FUEL PAYMENT"**

Shall mean the amount that should be deducted monthly from the **ENERGY PAYMENT** due to the additional **FUEL** utilized by the **FACILITY** when the **FACILITY** operates with an **ACTUAL HEAT RATE** that is one point five percent (1.5%) above the Guaranteed Heat Rate.

**1.41  "PARTY"**

Shall mean **THE STATE** or **THE SELLER** singularly.

**1.42  "PARTIES"**

Shall mean **THE STATE** and **THE SELLER** collectively.

**1.43  "TERM"**

Shall mean a period of time that begins on the **EFFECTIVE DATE** and ends:

a)    Thirty six (36) Months after the **DAY** on which **PHASE II** commences, or

b)    Thirty (30) Months after the **DAY** on which **PHASE II** commences, in the event that the **ADDITIONAL CAPACITY** is not Commissioned.

**1.44  "POWERBARGE I"**

Shall mean that barge-mounted electric generation facility bearing maritime registration 23216-PEXT issued by Panama in the name of **CAYMAN POWER BARGE I, Ltd.,** and more particularly described in Attachment A.

**1.45  "AVERAGE UNIT ENERGY PRICE"**

Shall mean, the average of: a) with respect to the **POWERBARGE I**, US$0.04/KWH, (the "Unit Energy Price for the **POWERBARGE I**"), and b) with respect to the **ADDITIONAL CAPACITY**, US$0.038/KWH, (the "Unit Energy Price for the **ADDITIONAL CAPACITY**"), subject to escalation as set forth in Attachment E, based on the proportioned **NET ENERGY PRODUCTION** of each, the **POWERBARGE I** and the **ADDITIONAL CAPACITY**, as calculated in Appendix V.

**1.46  "NET ENERGY PRODUCTION"**

Shall mean all the net electric power produced by the **FACILITY** (the **POWERBARGE I** and the **ADDITIONAL CAPACITY**) and delivered to **THE CORPORATION** at the Delivery Point(s), measured in kilowatt hours at the Metering Point(s).

**1.47  "MINIMUM NET ENERGY PRODUCTION"**

Shall mean the lesser of:

a)    The sum of **NET ENERGY PRODUCTION** and the **GUARANTEED DISPATCH ADJUSTMENT**, or

b)    The **GUARANTEED DISPATCH**, if available to **THE CORPORATION**, multiplied by the hours of availability of the **GUARANTEED DISPATCH** during the **MONTH**.

**1.48  "DELIVERY POINT"**

Shall mean the places where the **FACILITY** and **THE CORPORATION INTERCONNECTION FACILITIES** are interconnected as described in Attachment C.

**1.49  "METERING POINT"**

Shall have the meaning set forth in Attachment C.

**1.50  "ACTUAL HEAT RATE"**

Shall mean, for each **MONTH** after the **COMMERCIAL OPERATION DATE**, the heat rate of the **FACILITY** calculated by **THE SELLER** using the actual **FUEL** consumption in BTUs (lower heating value, "LHV") in a six (6) consecutive hour period of operation determined by **THE SELLER** at a **NET ENERGY PRODUCTION** greater than eighty five percent (85%) of the **GUARANTEED CAPACITY**, divided by the actual KWH produced during the same six (6) hour period.

**1.51  "FORCED OUTAGE"**

Shall mean an interruption of the **FACILITY**'s electrical generation that is due to a request by **THE CORPORATION** or **THE STATE** or a condition caused by **THE CORPORATION**, **THE STATE** or **THE SELLER**.

**1.52  "MAINTENANCE OUTAGE"**

Shall mean an interruption of the **FACILITY**'s electrical generation that is for the purpose of performing work on specific components of the **FACILITY** that has caused the interruption or for performing work that should not, in the reasonable opinion of **THE SELLER**, be postponed until the next **SCHEDULED OUTAGE**.

**1.53  "MAJOR OVERHAUL OUTAGE"**

Shall mean a planned interruption of the **FACILITY**'s electrical generation for major overhaul of the **FACILITY**, based on the equipment manufacturers' specifications and consistent with **GOOD ENGINEERING AND OPERATIONS PRACTICES**.

**1.54  "SCHEDULED OUTAGE"**

Shall mean a planned interruption of the **FACILITY**'s generation that:

a)    Has been scheduled and allowed by **THE CORPORATION** in accordance with this **AGREEMENT**; and

b)    Is for inspection, testing, preventive and corrective maintenance, repairs, replacement or improvement of the **FACILITY**.

**1.55  "METERING SYSTEM"**

Shall mean the metering instrumentation described in Attachment C.

**1.56  "FACILITY"**

Shall mean the **POWERBARGE I** until the time **ADDITIONAL CAPACITY** is **COMMISSIONED**, and thereafter, shall mean the aggregate of the **POWERBARGE I** and the **ADDITIONAL CAPACITY**, as more particularly described in Attachment A.

## ARTICLE 2: OBJECTIVE OF THE AGREEMENT.

**2.1    SALE AND PURCHASE OF CAPACITY AND ENERGY.**

Commencing on the **CONNECTION DATE** and during the **TERM** of this **AGREEMENT, THE STATE** shall purchase from **THE SELLER,** and **THE SELLER** shall sell to **THE STATE,** all of the **NET ENERGY PRODUCTION.** The energy payment for the **NET ENERGY PRODUCTION** on any given **MONTH** shall be the **AVERAGE UNIT ENERGY PRICE,** as set forth in Attachment E, multiplied by the **NET ENERGY PRODUCTION** (the "Energy Payment").

Commencing on the **COMMERCIAL OPERATION DATE,** the minimum Energy Payment for any given **MONTH,** shall be the **UNIT ENERGY PRICE** multiplied by the **MINIMUM NET ENERGY PRODUCTION.**

The **EXCESS FUEL PAYMENT** should be subtracted from the Energy Payment referred to above, calculated pursuant to Article 8.4 of this **AGREEMENT.**

In addition, until the time in which the **METERING POINT** of the **POWERBARGE I** is located on the sixty-nine (69) Kv side of the main power transformer, the **NET ENERGY PRODUCTION,** measured at thirteen point eight (13.8) Kv, will be reduced by the percentage of transformer losses calculated as set forth in Attachment C of this **AGREEMENT.**

**2.2    SUPPLY OF POWER BY THE CORPORATION.**

**THE CORPORATION** shall provide all electric energy required by the **FACILITY** during the periods when the **FACILITY** is not being operated to generate electric energy.

## ARTICLE 3: AGREEMENT DOCUMENTS

a)    Letter of Intent granted between **THE STATE** and **THE SELLER** dated the nineteenth (19th) of November of Nineteen Hundred and Ninety Seven (1997) - **APPENDIX I**

b)    Special Power of Attorney granted to the General Administrator of **THE CORPORATION** by the President of the Dominican Republic for the signing of the Letter of Intent dated the twenty-ninth (29th) of November of Nineteen Hundred and Ninety Seven (1997) - APPENDIX II

c)    Special Power of Attorney granted to the General Administrator of **THE CORPORATION** by the President of the Dominican Republic for the signing of this **AGREEMENT** dated March 17, 1998 - APPENDIX III.

d)    Corporate Authorization from **THE SELLER** - APPENDIX IV

e)    Form of **THE SELLER'S** Invoice - APPENDIX V

f)    **LETTER OF CREDIT** - APPENDIX VI

g)    Document reflecting ownership of the **POWERBARGE I** - APPENDIX VII

h)    Description and Technical Limits of the **FACILITY** - ATTACHMENT A

i)    Site and Site Conditions - ATTACHMENT B

j)    Interconnection   Facilities,   Metering   and   **DELIVERY   POINT**   -
ATTACHMENT C

k)    Tests - ATTACHMENT D

l)    **UNIT ENERGY PRICE** - ATTACHMENT E

m)    **FUEL** Supply - ATTACHMENT F

n)    Specific Consents - ATTACHMENT G

**ARTICLE 4: SCOPE OF WORKS**

**4.1    GENERAL**

**THE SELLER** shall build, install, test, commission, own and operate the **FACILITY**
pursuant to the terms of this **AGREEMENT**, including Attachments A, B, C, D, E and
F. Further, **THE SELLER** shall operate the **FACILITY** in such a manner that it will
comply with the environmental laws in effect in the Dominican Republic as of the
**EFFECTIVE DATE**.

**4.2    THE SELLER INTERCONNECTION FACILITIES.**

**THE SELLER** shall be responsible for the design, purchase, construction and/or
**COMMISSIONING** of the electric **INTERCONNECTION FACILITIES** as
described in Attachment C (the "SELLER INTERCONNECTION FACILITIES").
**THE SELLER** shall retain ownership of its **INTERCONNECTION FACILITIES**
and shall maintain and operate the same. Except with respect to the **ADDITIONAL
CAPACITY, THE SELLER** shall in writing and with six (6) months notice request
from   **THE   CORPORATION**   approval   for   any   new   **SELLER
INTERCONNECTION FACILITIES**, or the expansion of the capacity of **THE
SELLER INTERCONNECTION FACILITIES**, during the **TERM** of this
**AGREEMENT**.

**4.3    CORPORATION INTERCONNECTION FACILITIES.**

**THE CORPORATION** shall be responsible for the design, purchase, construction
and/or commissioning of the **INTERCONNECTION FACILITIES** as described in
Attachment C (the "CORPORATION INTERCONNECTION FACILITIES").

THE CORPORATION shall retain ownership of the its INTERCONNECTION FACILITIES and shall maintain and operate the same. THE CORPORATION shall in writing and with six (6) months notice request from THE SELLER approval for any new CORPORATION INTERCONNECTION FACILITIES, or the expansion of the capacity of the CORPORATION INTERCONNECTION FACILITIES, during the TERM of this AGREEMENT, that adversely affect THE SELLER in complying with its obligations agreed to hereunder.

**4.4    GUARANTEED CAPACITY**

THE SELLER, subject to the terms of this AGREEMENT, undertakes to produce and make available to THE CORPORATION the GUARANTEED CAPACITY after COMMISSIONING under this AGREEMENT. The GUARANTEED CAPACITY level will be the same number of KW equal to the level established by the DEPENDABLE CAPACITY test which established the COMMERCIAL OPERATION DATE as set forth in Article 5.3.

**4.5    COMMERCIAL OPERATION DATE.**

If the COMMERCIAL OPERATION DATE for the POWERBARGE I has not occurred by the REQUIRED COMMERCIAL OPERATION DATE and said date has not been extended by the PARTIES and such delay is not the result of a FORCE MAJEURE or an EVENT OF DEFAULT by THE STATE (as defined in Article 22.2), THE STATE shall have, as its sole and exclusive remedy, the right to terminate this AGREEMENT. It is understood by the PARTIES that if the POWERBARGE I is deemed COMMISSIONED in accordance with Article 5, the REQUIRED COMMERCIAL OPERATION DATE shall have occurred on such deemed COMMISSIONING date for purposes of this Article 4.5, subject to the provisions contained in Article 5.7.2.

**4.6    DELIVERY AND METERING SYSTEMS**

**4.6.1    METERING.**

The NET ENERGY PRODUCTION shall be delivered by THE SELLER to THE CORPORATION at the DELIVERY POINT, and shall be as measured by THE SELLER at the METERING POINT and recorded monthly in accordance with the METERING SYSTEM.

**4.6.2    METERING SYSTEM TESTS.**

**4.6.2.1** THE SELLER must test the METERING SYSTEM, and notify THE CORPORATION in writing forty-eight (48) hours in advance, each time that there is an indication of one of the component's malfunctions or every twelve (12) Months, whichever comes first, or more frequently upon request of THE CORPORATION. However, if THE CORPORATION requests a test to be made within twelve (12)

Months of a previous test, such test shall be at the expense of **THE CORPORATION**, if any of the transducers and other components of the system prove to be accurate within the limits stated in Attachment C. In the event errors greater than those stated in Attachment C are discovered upon such test, the cost of the test shall be at the expense of **THE SELLER**. Unless the period of inaccuracy can be accurately determined as the basis for adjustments, retroactive billing adjustments for errors found as a result of any test shall be made for a period equal to one half (1/2) of the time elapsed since the last previous test, but not to exceed six (6) Months.

**4.6.2.2** **THE CORPORATION** shall be notified in writing at least forty-eight (48) hours prior to a **METERING SYSTEM** test and shall have a representative present to observe the test. If any component of the **METERING SYSTEM** is found to be inaccurate or defective, it shall be adjusted, repaired or replaced, at **THE SELLER'S** expense, in order to provide accurate billing information.

## ARTICLE 5:  CAPACITY TESTS.

### 5.1    TEST PROGRAM OF THE POWERBARGE I

**THE SELLER** shall deliver to **THE CORPORATION** its schedule for testing not less than ten (10) days prior to the commencement of the tests required by Articles 5.2 and 5.3. If the schedule for any test required by Articles 5.2 or 5.3 is adjusted after **THE SELLER** has provided **THE CORPORATION** with the testing schedule, **THE SELLER** shall advise **THE CORPORATION** not less than forty-eight (48) hours prior to the commencement of any such test. Beginning with the **DAY** on which the testing commences, **THE SELLER** shall provide **THE CORPORATION** with a schedule of the tests to be conducted on the following **DAY** or **DAYS** (if such test will continue for more than one (1) day). All testing of the **FACILITY** shall satisfy the test conditions provided in Attachment D.

### 5.2    TESTS PRIOR TO SYNCHRONIZATION OF THE POWERBARGE I.

**5.2.1** **THE SELLER** and **THE CORPORATION** shall verify that the protection level settings for the following are as agreed by the **TECHNICAL GROUP**:

   a)    stator earth fault;

   b)    reverse power relay;

   c)    generator transformer overcurrent and earth fault; and

   d)    high voltage busbar protection

**5.2.2** **THE SELLER** shall carry out the following tests:

   a)    Voltage phasing checks between the substation of the **FACILITY** and the national transmission system.

b)    All intertripping circuits between the **POWERBARGE I** and **THE CORPORATION** equipment will be proven.

**5.3    TESTS AFTER SYNCHRONIZATION OF THE POWERBARGE I AND DEPENDABLE CAPACITY TEST.**

5.3.1  After first synchronizing the **POWERBARGE I**, initial operational testing of the **POWERBARGE I** shall   be conducted by **THE SELLER** so that the **POWERBARGE I** can be **COMMISSIONED**. Once **THE SELLER** is satisfied that the **POWERBARGE I** is capable of continued reliable operation, **THE SELLER** shall so notify **THE CORPORATION** and carry out the **DEPENDABLE CAPACITY** prerequisite tests, which includes:

a)    automatic voltage regulator operation;

b)    turbine governor operation;

c)    reactive capability; and

d)    response of **POWERBARGE I** to step load changes.

**5.3.2  DEPENDABLE CAPACITY TEST.**

Upon completion of the **DEPENDABLE CAPACITY** prerequisite tests (5.3.1 a-d above), **THE SELLER** shall advise to **THE CORPORATION** in writing at least forty-eight (48) hours prior to the commencement of the **DEPENDABLE CAPACITY** test. The **DEPENDABLE CAPACITY** of the **POWERBARGE I** will be determined in the following manner:

a)    The **POWERBARGE I** shall be in operation with normal auxiliaries and full load conditions.

b)    **THE SELLER** will declare to **THE CORPORATION** the commencement of the **DEPENDABLE CAPACITY** test and will record the KWH reading of the **METERING SYSTEM**.

c)    The test duration will be twenty-four (24) hours, and at the end of this period **THE SELLER** will record the new KWH reading of the **METERING SYSTEM**.   The **DEPENDABLE CAPACITY** shall be the difference between the reading taken at the end of the twenty-four (24) hour test and the reading taken at the beginning of such period divided by twenty-four (24) hours, provided that the **DEPENDABLE CAPACITY** of the **POWERBARGE I** shall not be considered to have been established unless the result of such determination is equal to or greater than the minimum criteria for such test as set forth in Attachment D.