# EXHIBIT A

**Power Purchase Agreement between the State of the Dominican Republic,
Represented by Corporacion Dominicana de Electridad and
Cayman Power Barge I, LTD**

**Dated as of March 1, 1998**

# PART II

5.3.3 ADDITIONAL TESTS.

THE SELLER shall be entitled to attempt as many DEPENDABLE CAPACITY tests of the POWERBARGE I as are necessary, within a period of ninety (90) days beginning on the CONNECTION DATE to satisfy the minimum criteria for achieving the COMMERCIAL OPERATION DATE. THE SELLER shall give THE CORPORATION not less than forty-eight (48) hour notice of each additional DEPENDABLE CAPACITY test it desires to attempt. If the results of a test satisfy the minimum performance criteria for DEPENDABLE CAPACITY necessary to achieve the COMMERCIAL OPERATION DATE, but THE SELLER is not satisfied with the results of such test, it may, within the term previously established, conduct two additional tests to establish the COMMERCIAL OPERATION DATE with at least forty-eight (48) hour notice provided to THE CORPORATION prior to a subsequent test.

When THE SELLER is satisfied with a test to establish the COMMERCIAL OPERATION DATE, it shall notify THE CORPORATION that it has designated such test as the test and shall set the Dependable Capacity at any level successfully demonstrated during the test. The date upon which the Dependable Capacity is established shall be the date the POWERBARGE I is COMMISSIONED which will establish the COMMERCIAL OPERATION DATE.

The COMMERCIAL OPERATION DATE, notwithstanding the established hereunder, should occur within the ninety (90) day period after the CONNECTION DATE.

After each twelve (12) Month period after the COMMERCIAL OPERATION DATE, THE SELLER agrees to carry out a DEPENDABLE CAPACITY following the applicable procedure of Article 5, to establish the new value of the DEPENDABLE CAPACITY, which will be considered as the GUARANTEED CAPACITY for all purposes of the AGREEMENT during the following twelve (12) months.

5.4 TESTING ASSISTANCE.

5.4.1 THE CORPORATION shall use reasonable efforts within its reach to comply promptly with all requests by THE SELLER for attendance while carrying out the testing and COMMISSIONING of the FACILITY. The DEPENDABLE CAPACITY test which establishes the COMMERCIAL OPERATION DATE cannot be carried out without the presence of THE CORPORATION's authorized personnel to that end. In the event that on the day and scheduled time for any DEPENDABLE CAPACITY test, THE CORPORATION's authorized personnel is not present, said test shall be carried out after a new twenty-four (24) hour advance notice to THE CORPORATION. In the event that THE CORPORATION's representative is not present after being notified in accordance with the previous notification, the test shall be carried out having the desired effect even without the presence of THE CORPORATION's authorized personnel. The ninety (90) day

period to establish the **COMMERCIAL OPERATION DATE** will be extended if these delays cause the carrying out of the test to be scheduled after such ninety (90) days.

5.4.2  **THE STATE** shall pay **THE SELLER** for the **NET ENERGY PRODUCTION** at the Unit Energy Price for the **POWERBARGE I** for all electric energy delivered to **THE CORPORATION** during any testing prior to the **COMMERCIAL OPERATION DATE**. Such payments shall be made in accordance with the applicable provisions of Article 10.

5.5  **COPIES OF TEST RESULTS.**

**THE SELLER** shall provide **THE CORPORATION** with copies of the results of all tests performed pursuant to Articles 5.2, 5.3 and 5.6 above and after every major overhaul of the **POWERBARGE I**. **THE CORPORATION** shall not use or disclose such results other than in connection with the administration and enforcement of this **AGREEMENT**.

5.6  **TESTING AND COMMISSIONING OF ADDITIONAL CAPACITY.**

The testing and **COMMISSIONING** of the **ADDITIONAL CAPACITY** shall be conducted pursuant to the applicable provisions of Article 5.1 through 5.5 above, using criteria no greater than and in proportion to those established in relation to the **POWERBARGE I**. The **NET ENERGY PRODUCTION** generated by the **ADDITIONAL CAPACITY** during the testing of the same and after the **ADDITIONAL CAPACITY** is **COMMISSIONED** shall be paid as part of the **ENERGY PAYMENT** by **THE STATE** as provided in Articles 2 and 10 hereof.

5.7  **DEEMED COMMISSIONING**

5.7.1  In the event that for any reason, including any Event Of Default by **THE STATE**, other than a breach by **THE SELLER** of its obligations under this **AGREEMENT**, the tests to establish the **DEPENDABLE CAPACITY** provided in this Article 5 are delayed for more than thirty (30) days from the date on which such tests would otherwise have been completed, then, upon satisfactory completion of those tests required prior to synchronization pursuant to Article 5.2, and before such thirty (30) day period, the **POWERBARGE I** and/or the **ADDITIONAL CAPACITY** shall be deemed **COMMISSIONED** as of the **DAY** following the end of such thirty (30) day period.

5.7.2  If the **FACILITY** has been deemed **COMMISSIONED** pursuant to Article 5.7.1 above, **THE SELLER** shall conduct the remaining **DEPENDABLE CAPACITY** tests provided in Articles 5.3 and 5.6, including the opportunity to re-test under the aforementioned articles, immediately after the circumstances that caused the delay have ceased. If when tested pursuant to the foregoing the **FACILITY** shall fail to satisfy the requirements of Articles 5.3 and 5.6, then the **FACILITY** shall cease to be deemed **COMMISSIONED** for all purposes of this **AGREEMENT**.

ARTICLE 6: OPERATION AND MAINTENANCE.

6.1 OBLIGATIONS OF THE SELLER

THE SELLER will be liable for the operation and maintenance costs of the FACILITY during the term of this AGREEMENT.

6.2 APPOINTMENT OF TECHNICAL GROUP

The PARTIES shall appoint a TECHNICAL GROUP. Each PARTY shall designate in writing and deliver to the other party the one person who shall act as its representatives to the TECHNICAL GROUP and will appoint one substitute for each such representative. These representatives and substitutes shall each be persons familiar with this AGREEMENT and the FACILITY and the electric system of THE CORPORATION. Each representative, and substitute when acting as a substitute for such representative, shall be fully authorized to cooperate and agree upon all operating interface matters relative to this AGREEMENT which are not specifically provided for herein. The TECHNICAL GROUP is advisory in nature and shall not have authority to take any action contrary to this AGREEMENT.

6.3 OPERATING PROCEDURES.

The PARTIES shall develop mutually acceptable operating procedures prior to the COMMERCIAL OPERATION DATE. The operating procedures will be based on the design of the FACILITY and the design of THE CORPORATION INTERCONNECTION FACILITIES and of THE SELLER INTERCONNECTION FACILITIES and shall comply with manufacturer's recommendations, GOOD ENGINEERING AND OPERATIONS PRACTICES and the TECHNICAL LIMITS. The operating procedures shall be intended as a guide on how to integrate THE SELLER'S Facilities and NET ENERGY PRODUCTION into THE CORPORATION electric system. Topics covered shall include, but not necessarily be limited to:

a) method of day-to-day communications.

b) operating procedures;

c) maintenance scheduling;

d) procedures for the handling and delivery of FACILITY FUEL by THE CORPORATION;

e) the procedures for communicating the dispatch of the FACILITY by THE CORPORATION;

f) EMERGENCY plans and procedures;

g) generated energy measuring protocol and invoicing procedures;

h) procedures to coordinate protective apparatus;

i) monitoring and auditing the procedures to record reliability, energy and any other parameters that may influence the billing; and

j) scheduling of routine tests.

6.4 **EMERGENCIES.**

6.4.1 The **PARTIES** shall cooperate in establishing agreed **EMERGENCY** plans for the **FACILITY** before the **COMMERCIAL OPERATION DATE** including, without limitation, recovery from a local or general power interruption and voltage reduction in order to effect load curtailment.

6.4.2 **THE SELLER** shall, during an **EMERGENCY**, as quickly as possible consistent with the **TECHNICAL LIMITS** and **GOOD ENGINEERING AND OPERATIONS PRACTICES**, supply such power as the **FACILITY** is able to generate within the **TECHNICAL LIMITS** and **GOOD ENGINEERING AND OPERATIONS PRACTICES**. If a **SCHEDULED OUTAGE** or **MAINTENANCE OUTAGE** coincides with an **EMERGENCY**, **THE SELLER**, upon consultation with **THE CORPORATION**, shall make all reasonable efforts to reschedule the **SCHEDULED OUTAGE** or **MAINTENANCE OUTAGE** or, if the **SCHEDULED OUTAGE** or **MAINTENANCE OUTAGE** has begun, expedite the completion of the work to restore power supply as soon as possible. Nothing contained in this **AGREEMENT** or the Attachments hereto shall be construed as:

a) To require **THE SELLER** to operate any equipment of the **FACILITY** at any time, including during an **EMERGENCY**, in any manner inconsistent with the **TECHNICAL LIMITS** and **GOOD ENGINEERING AND OPERATIONS PRACTICES**.

b) To preclude either **THE CORPORATION** or **THE SELLER** from disconnecting their facilities from the other party's facilities if, on the disconnecting party's reasonable discretion, such disconnection is necessary to protect life or property, or

c) A waiver of the rights of **THE SELLER** under Articles 14 and 22 hereof.

6.5 **SCHEDULED AND MAINTENANCE OUTAGES.**

6.5.1 **THE SELLER** shall submit its desired schedule of **SCHEDULED OUTAGE** periods (including the duration of each such period) to **THE CORPORATION** before the **COMMERCIAL OPERATION DATE** and by May 1 and November 1 for each subsequent twelve(12) month period. **THE SELLER** shall schedule **SCHEDULED OUTAGE** periods during May and October only or such other alternative months as

THE CORPORATION may specify, provided that THE CORPORATION does so at least one year in advance of the alternative months and that the period available for SCHEDULED OUTAGES is of equal duration to the period specified hereunder. THE SELLER shall reasonably endeavor to make each such SCHEDULED OUTAGE period of relatively short duration consistent with the TECHNICAL LIMITS and GOOD ENGINEERING AND OPERATIONS PRACTICES. Within thirty (30) days of receipt of such schedule, THE CORPORATION shall notify THE SELLER in writing as to the acceptability of such schedule.

6.5.2   If THE CORPORATION does not accept any one or more of the requested SCHEDULED OUTAGE periods, THE CORPORATION shall advise THE SELLER within thirty (30) days of the receipt of THE SELLER'S notification in accordance with Article 6.5.1 of the acceptable period when THE CORPORATION determines any such unacceptable SCHEDULED OUTAGE can be rescheduled. The rescheduled time shall be as close as reasonably practicable to the requested time, shall comply with the TECHNICAL LIMITS, shall be consistent with GOOD ENGINEERING AND OPERATIONS PRACTICES, the recommendations of the manufacturers of the major components of the FACILITY, and shall be of equal duration as the requested period. If THE CORPORATION fails within the allowed period to object to any SCHEDULED OUTAGE for which it receives notice pursuant to Article 6.5.1 or fails within such period to advise THE SELLER of a substitute time, THE SELLER may schedule the SCHEDULED OUTAGE as initially requested.

6.5.3   Notwithstanding the fixing of a time for a SCHEDULED OUTAGE pursuant to Articles 6.5.1 and 6.5.2, THE CORPORATION may, upon at least thirty (30) days prior written notice and the written consent of THE SELLER, request THE SELLER to reschedule a SCHEDULED OUTAGE; provided, however, that:

   a)   THE CORPORATION shall not request such SCHEDULE OUTAGE to be rescheduled for a period of shorter or longer duration or in a manner or time that is outside the TECHNICAL LIMITS, or inconsistent with GOOD ENGINEERING AND OPERATIONS PRACTICES or the recommendations of the manufacturers of the major components of the FACILITY;

   b)   THE CORPORATION shall not require that a single SCHEDULED OUTAGE period be split into two or more periods without compensating THE SELLER for any additional costs imposed thereby, and

   c)   THE CORPORATION shall not request that a SCHEDULED OUTAGE be brought forward any earlier than thirty (30) days from the date of such notice without the consent of THE SELLER.

6.5.4   Notwithstanding the fixing of a time for a SCHEDULED OUTAGE pursuant to Articles 6.5.1 and 6.5.2, THE SELLER may request a rescheduling of any SCHEDULED OUTAGE upon thirty (30) days prior written notice to THE

CORPORATION. THE CORPORATION, by written notice, shall respond to such request within twenty (20) days, otherwise, such request shall be deemed approved.

6.5.5 All scheduling and rescheduling pursuant to Articles 6.5.2, 6.5.3, and 6.5.4 above, shall be done without adverse distinction by THE CORPORATION between the FACILITY and all other plants providing electric capacity and/or energy to the national transmission system.

6.5.6 When the need arises for a MAINTENANCE OUTAGE, THE SELLER shall advise THE CORPORATION in writing of such need, of the date, commencement and estimated duration of such work, and THE CORPORATION shall approve or reject in writing to THE SELLER the scheduling of such MAINTENANCE OUTAGE within a reasonable period of time, in conformance with the TECHNICAL LIMITS and GOOD ENGINEERING AND OPERATION PRACTICES.

6.5.7 For those years in which THE SELLER plans to conduct a major overhaul, THE SELLER shall submit its MAJOR OVERHAUL OUTAGE schedule (including the duration of such period) to THE CORPORATION twelve (12) months in advance by written notice. THE SELLER may not schedule a MAJOR OVERHAUL OUTAGE during. Within thirty (30) days of receipt of this schedule, THE CORPORATION shall notify THE SELLER in writing of its approval or rejection of such schedule. If THE CORPORATION does not accept this schedule, it shall advise THE SELLER within thirty (30) days of the time when THE CORPORATION determines the MAJOR OVERHAUL OUTAGE can be rescheduled. The rescheduled time shall be as close as reasonably practicable to the requested time, shall comply with the TECHNICAL LIMITS, shall be consistent with GOOD ENGINEERING AND OPERATIONS PRACTICES and the recommendations of the manufacturers of the major components of the FACILITY, and shall be of equal duration as the requested period. If THE CORPORATION fails within the allowed period to object to any Major Overhaul Outage for which it receives notice pursuant to this Article 6.5.7 or fails within such period to advise THE SELLER of a substitute time, THE SELLER may schedule the MAJOR OVERHAUL OUTAGE as initially requested.

6.6 EXCESS SCHEDULED AND MAINTENANCE OUTAGES AND SANCTIONS.

Commencing after the COMMERCIAL OPERATION DATE, the liquidated damages will be calculated on a quarterly (3 Month) basis for each quarterly period of the CONTRACT YEAR. In the event that the sum of:

a) The SCHEDULED OUTAGE HOURS plus

b) The MAINTENANCE OUTAGES HOURS, exceeds six hundred and fifty seven (657) hours for such quarterly (3 Month) period,

THE SELLER shall pay to THE STATE, as liquidated damages, the amount of five hundred and sixty (US$560) per hour of such excess until such time as the

CAYMAN
16-3-98 8:00 PM                                    20

ADDITIONAL CAPACITY is COMMISSIONED, and thereafter the amount of liquidated damages shall be one thousand one hundred and twenty (US$1,120) per hour of such excess. In computing such liquidated damages payable by THE SELLER for the first CONTRACT YEAR, the liquidated damages amount shall be adjusted by multiplying such amount by 0.75. There shall be no adjustment in any subsequent CONTRACT YEAR. In no event will the liquidated damages under this Paragraph exceed seven hundred and fifty thousand (US$750,000) for any CONTRACT YEAR.

The previous liquidated damages shall be the sole remedy that THE STATE and THE CORPORATION will have a right to in the event of excess SCHEDULED OUTAGES and excess MAINTENANCE OUTAGES.

## ARTICLE 7: DISPATCH.

### 7.1 DISPATCH PROCEDURES.

In general, and consistent with the TECHNICAL LIMITS and GOOD ENGINEERING AND OPERATIONS PRACTICES, THE CORPORATION obligates itself that the FACILITY shall be dispatched as if it were one of THE CORPORATION'S own base load thermal generating facilities. Notwithstanding the foregoing, in no case shall THE CORPORATION require the POWERBARGE I to operate at a net output of below 7 MW or at a net output of below 14 MW of the FACILITY after the ADDITIONAL CAPACITY is COMMISSIONED.

### 7.2 GUARANTEED DISPATCH.

During the TERM of this AGREEMENT, THE CORPORATION agrees to dispatch the FACILITY at the level of the GUARANTEED DISPATCH. In the event that at any time or times during the MONTH, the FACILITY cannot be dispatched at the GUARANTEED DISPATCH level for reasons attributable to THE SELLER, THE CORPORATION agrees to use its best efforts to dispatch the FACILITY, during the following MONTH, at a level such that it allows THE SELLER to balance the NET ENERGY PRODUCTION to the level of the GUARANTEED DISPATCH during both months, provided that the FACILITY is capable of permitting such compensation.

## ARTICLE 8: GUARANTEED HEAT RATE.

### 8.1 POWERBARGE I.

THE SELLER guarantees that during PHASE I, the POWERBARGE I will operate at a heat rate no greater than 12,800 BTU/KWH (measured at the lower heating value, "LHV", of the FUEL) when the POWERBARGE I is operating at a net output greater than 24 MW (the "PHASE I Guaranteed Heat Rate").

8.2  **POWERBARGE I AND ADDITIONAL CAPACITY.**

THE SELLER guarantees that during PHASE II, the POWERBARGE I and the ADDITIONAL CAPACITY jointly will operate with a heat rate no greater than 11,500 BTU/KWH (measured at the lower heating value, "LHV", of the FUEL) when the FACILITY is operating at a net output greater than eighty-five percent (85%) of the GUARANTEED CAPACITY of the FACILITY (the "PHASE II Guaranteed Heat Rate"). In the event that the ADDITIONAL CAPACITY is not COMMISSIONED, due to reasons attributable to THE SELLER, by the commencement of PHASE II, the PHASE I Guaranteed Heat Rate will:

a)   continue at the level of 12,800 BTU/KWH for the first MONTH following PHASE I;

b)   reduce to 12,500 BTU/KWH for the second MONTH following PHASE I; and

c)   reduce to 12,000 BTU/KWH after such two (2) months until such time as the ADDITIONAL CAPACITY is COMMISSIONED or until the end of this AGREEMENT.

8.3  **ACTUAL HEAT RATE FOR THE FACILITY.**

For each MONTH, from the COMMERCIAL OPERATION DATE, THE SELLER shall calculate the ACTUAL HEAT RATE and THE CORPORATION shall have the right to witness such monthly ACTUAL HEAT RATE determination. In a MONTH where such ACTUAL HEAT RATE determination does not take place for any reason, the ACTUAL HEAT RATE determined for the prior MONTH shall be taken into account, THE SELLER and THE CORPORATION will use their best efforts to measure the ACTUAL HEAT RATE for the following MONTH.

8.4  **HEAT RATE FACTOR AND THE EXCESS FUEL PAYMENT.**

Commencing on the CONNECTION DATE, the HEAT RATE FACTOR shall be calculated by THE SELLER for each MONTH. If the HEAT RATE FACTOR is greater than 1.015, THE SELLER shall pay to THE STATE an amount equal to the EXCESS FUEL PAYMENT. The EXCESS FUEL PAYMENT will be deducted from the monthly Invoice and calculated multiplying that portion of the HEAT RATE FACTOR greater than 1.0 a MONTH, by the actual FUEL consumption determined by metering pursuant to Attachment F, for the MONTH multiplied by the average audited price paid by THE CORPORATION for the FUEL used by the FACILITY for the same MONTH, as calculated in Appendix V.

ARTICLE 9:   FUEL FOR THE FACILITY.

9.1   FUEL SUPPLY.

The **AVERAGE UNIT ENERGY PRICE** does not include the costs associated with the **FUEL**, including, but not limited to, the procurement, transportation, and handling thereof to operate the **FACILITY** under this **AGREEMENT** from the **CONNECTION DATE**. **THE CORPORATION** shall supply to **THE SELLER** at the **FACILITY** all **FUEL** necessary for the operation of the **FACILITY** at no cost to **THE SELLER**. Such **FUEL** shall meet the quality specifications provided in Attachment F.

9.2   FUEL STORAGE.

**THE CORPORATION** shall provide and operate at its sole cost, risk and expense, **FUEL** storage tanks or other facilities adjacent to the **FACILITY**, together with all pipelines, hoses and structures necessary to provide **FUEL** to the intake of the **FACILITY**, as provided in Attachment F.

ARTICLE 10: INVOICES AND PAYMENT.

10.1   METER READINGS.

**THE SELLER** shall read the metering devices on the last **DAY** of each Month at four in the afternoon (4:00 p.m). **THE CORPORATION** should have a representative present to observe the monthly readings.

10.2   PRESENTATION OF INVOICES.

10.2.1   **THE SELLER** shall prepare and send a monthly Invoice (the "Invoice") in four (4) originals to **THE CORPORATION** and an original to the General Administrator of **THE CORPORATION** in representation of **THE STATE**, by the 10th **DAY** of each **MONTH**.

Each Invoice shall be stated in Dollars and will set forth the **NET ENERGY PRODUCTION** delivered to **THE CORPORATION** during the previous **MONTH** and the Energy Payment due as calculated in conformance with this **AGREEMENT**.

10.3   PAYMENTS.

10.3.1   Within twenty-five (25) business days after **THE CORPORATION** has received the Invoice, which proof of receipt will not be denied, **THE STATE** will pay all the Invoices delivered hereunder in Dollars in immediately available funds by certified check delivered to an authorized representative of **THE SELLER** designated in the Invoice. **THE SELLER'S** Invoices hereunder shall conform to the format provided in Appendix V.

10.3.2 THE STATE shall pay the ENERGY PAYMENT when due in accordance with Article 10, and said payment obligation shall not be affected by any reason of:

a) the inability of THE CORPORATION to receive the NET ENERGY PRODUCTION or failure to dispatch the FACILITY;

b) the failure by THE CORPORATION to provide FUEL pursuant to Paragraph 9.1;

c) the occurrence of any Event Of Default by THE STATE; or

e) any other circumstance, happening or act whatsoever, similar to any of the foregoing.

10.3.3 Upon the occurrence of:

a) An EVENT OF DEFAULT by THE STATE and/or the assertion of a remedy by THE SELLER with respect to such default; or

b) In the event of a Deemed COMMISSIONING hereunder,

THE STATE shall pay THE SELLER, for the duration of the events under clauses a and b, a monthly ENERGY PAYMENT calculated, before the COMMERCIAL OPERATION DATE, by multiplying 24,000 KW by the number of hours of the MONTH multiplied by the Unit Energy Price for the POWERBARGE I, (as defined in Article 1.45), or after the COMMERCIAL OPERATION DATE established pursuant to Article 5, by multiplying the GUARANTEED DISPATCH for the POWERBARGE I by the number of hours in the MONTH multiplied by the Unit Energy Price for the POWERBARGE I or after the ADDITIONAL CAPACITY is COMMISSIONED, multiplying the GUARANTEED DISPATCH for the FACILITY by the number of hours in the MONTH multiplied by the AVERAGE UNIT ENERGY PRICE.

10.4 GRACE PERIOD.

Notwithstanding any provisions to the contrary in this AGREEMENT, THE STATE shall not be obligated to pay an ENERGY PAYMENT for the NET ENERGY PRODUCTION during the MONTH following the COMMERCIAL OPERATION DATE.

10.5 LATE PAYMENTS.

If THE SELLER'S Invoice or any other payment obligation of THE STATE is not paid by the due date thereof, legal interest on unpaid amounts shall accrue at one percent (1%) per MONTH from the date due until the date upon which payment is received by THE SELLER.

10.6  **DISPUTED AMOUNTS.**

In the event of any dispute of the invoiced amount, THE STATE shall notify THE SELLER of the amount in dispute within ten (10) business days following the receipt of the subject Invoice. The PARTIES will use their best efforts to settle any dispute within a reasonable period of time, and will apply the dispute resolution procedures set forth in Article 18 hereof, in the event they are not able to resolve the same. Notwithstanding, THE STATE will only pay those amounts on which the PARTIES agree on, however, the payment of the invoice may not be less that seventy-five percent (75%) of the amount of the invoice. The disputed amounts will be paid or compensated at the time a resolution to the conflict is reached.

10.7  **BILLING ERRORS.**

Any claim by a PARTY regarding an error in Invoices previously paid shall be made within two (2) Months from the issuance of the Invoice.

10.8  **INACCURATE METERS.**

In the event adjustments to Invoices are required as a result of corrected measurements made with respect to inaccurate meters, the PARTIES shall use the corrected measurements described in Article 4.6 of this AGREEMENT to recompute the amounts due. If the total amount, as recomputed, due from a PARTY for the period of one inaccuracy varies from the total amount due as previously computed, and payment of the previously computed amount has been made, then, THE SELLER will include the corresponding adjustment in the following monthly Invoice.

**ARTICLE 11: LETTER OF CREDIT**

THE SELLER shall have the right to draw upon the LETTER OF CREDIT as provided therein for the payment of any unpaid amounts owed to THE SELLER under this AGREEMENT once the payment terms established in Articles 10 and 22.5 hereof have expired. THE STATE shall carry out all necessary acts to cause the extension and the reissuance of a LETTER OF CREDIT after any such drawing in order to maintain or restore a payment guaranty in the same terms as the LETTER OF CREDIT, including the nominal value thereof of US$2,044,912.50, at all times during the TERM of this AGREEMENT plus a period of sixty (60) days after the termination of this AGREEMENT. The LETTER OF CREDIT, extended or re-issued, will be delivered to THE SELLER no later than thirty (30) days after any drawing.

**ARTICLE 12: GENERAL AND LEGAL CONDITIONS**

12.1  **ACCEPTANCES AND WARRANTIES.**

12.1.2 THE SELLER accepts and warrants that:

    a)    It is a company duly organized, validly existing and duly authorized to

      function under the laws of the Cayman Islands, British West Indies, and that it will maintain its corporate status during the term of this AGREEMENT.

b)     It has all requisite corporate power and authority to enter into this AGREEMENT;

c)     The AGREEMENT will be enforceable against THE SELLER in accordance with its terms;

d)     The execution, delivery, and performance of this AGREEMENT by THE SELLER hereunder does not constitute or cause a breach or default under any agreement to which THE SELLER is a PARTY including agreements with other vendors, customers, or third parties, or constitute or cause a breach or default of any judgment, decree or order involving THE SELLER, and

e)     Guarantees that it is owner of the POWER BARGE I, and will be the owner of the FACILITY that will generate the ADDITIONAL CAPACITY, and which evidence of ownership should be delivered to THE STATE at the time the same is installed under the terms of this AGREEMENT.

12.1.2 THE STATE accepts and warrants that:

a)     THE CORPORATION is duly organized, validly existing and duly authorized to function under the LAWS OF THE DOMINICAN REPUBLIC;

b)     THE CORPORATION has all requisite power and authority to agree the legal and technical aspects and carry on the business referred to in this AGREEMENT;

c)     This AGREEMENT will be enforceable against it in accordance with its terms; and

d)     The execution, delivery, and performance of this AGREEMENT by THE STATE hereunder does not constitute or cause a breach or default under any agreement to which THE STATE is a party including agreements with other vendors, customers, or third parties, or constitute or cause a breach or default of any judgment, decree or order involving THE STATE.

12.1.3 THE STATE represents and warrants that:

a)     It has full power, authority, and legal right to incur the obligations, to execute, deliver, and perform and observe the terms and provision of this AGREEMENT;

b)     This AGREEMENT constitutes legal, valid, binding, and enforceable obligations of THE STATE in accordance with its terms;

c)  All necessary action has been taken, and all approvals required have been obtained, under the **LAWS OF THE DOMINICAN** Republic to authorize the execution, delivery, and performance of this **AGREEMENT**;

d)  The obligations and covenants of this **AGREEMENT** constitute obligations for the performance of which the full faith and credit of **THE STATE** is pledged; and

e)  The execution, delivery, and performance by **THE STATE** hereunder does not constitute or cause a breach or default under any agreement to which **THE STATE** is a party, including agreements with other vendors, customers, or third parties, or constitute or cause a breach or default of any judgment, decree or order involving the same.

**12.2  LEGALIZATION EXPENSES**

**THE SELLER** will bear the costs of legalizing this **AGREEMENT**, including any other acts, agreements, and stipulations that may be executed by the **PARTIES** during the term of this **AGREEMENT**.

**12.3  DOMICILE AND COMMUNICATIONS**

**12.3.1 ELECTION OF DOMICILE OF THE PARTIES.**

The **PARTIES** elect the following domicile for the receipt of all notices and communications under this **AGREEMENT** at:

In the case of "THE SELLER" to:

**CAYMAN POWER BARGE I, LTD.**
c/o Midland Bank Trust Corporation (Cayman) Ltd.
P.O. Box 1109
Mary Street
Grand Cayman, Cayman Islands
British West Indies
Telephone: (345)914-7524
Telefax No. (345) 949-7634
Attn: Mr. David Whitfield

In the case of "THE STATE" to:

General Administrator of the **CORPORACIÓN DOMINICANA DE ELECTRICIDAD**
as representative of **THE STATE**
Edificio Principal
Avenida Independencia Esq. Calle Fray Cipriano de Utrera
Centro de los Héroes

CAYMAN
16-3-98 8:00 PM                                27

Santo Domingo, Dominican Republic<br>
Telephone: (809) 533-3571<br>
Telefax: (809) 535-7472

### 12.3.2 COMMUNICATIONS AND NOTICES

Any notice or communication shall be in writing and can be made in the following manner: Registered Mail, Certified First Class, Telex, Telecopy, Telegram, Private Courier, and by act of Marshall pursuant to the requirements of the **LAWS OF THE DOMINICAN REPUBLIC**. Said communications should be sent to the respective **PARTIES** or **THE CORPORATION** at the addresses indicated in this **AGREEMENT** in the Dominican Republic. Except where stipulated to the contrary, any notice sent by a **PARTY** to the other, will be considered as received by the other, upon presentation of the communication or notice acknowledging receipt, containing the time, date, and the name of the person who received it.

**12.4** **THE SELLER** designates Dr. José Manuel Hernández as its legal representative in the Dominican Republic, Dominican, of legal age, bearer of Identity Card and Electoral No. 001-0143078-3, Telephone (809) 686-0362, Fax No. (809) 687-0687, domiciled and resident in Félix María Delmonte No. 8, Gazcue, Santo Domingo.

**12.5** Any **PARTY** can, by giving written notice to the other, change the representative or the address to which said notices and communications shall be sent.

**12.6** All the communications to **THE CORPORATION**, including to the dispatcher should be sent to:

**CORPORACIÓN DOMINICANA DE ELECTRICIDAD**<br>
Edificio Principal<br>
Avenida Independencia Esq. Calle Fray Cipriano de Utrera<br>
Centro de los Héroes<br>
Santo Domingo, Dominican Republic<br>
Telephone: (809) 533-3571<br>
Telefax: (809) 535-7472

### ARTICLE 13: EXEMPTIONS AND OTHER BENEFITS

**13.1 EXEMPTIONS**

**13.1.1** **THE STATE** agrees to obtain from the corresponding taxing authorities or political subdivision in the Dominican Republic, in favor of **THE SELLER** and subcontractors that are not legal residents of the Dominican Republic, the exoneration or exemption from those **TAXES** from which **THE CORPORATION** benefits, extending them to **THE SELLER**. Such exoneration or exemption from **TAXES** will include all the **TAXES** that could affect the actions or operations under this **AGREEMENT**; and the

materials, supplies, equipment, machinery, spare parts, **FUEL**, lubricants, tools, vehicles or other personal or real property to be used in connection with the operation of the **FACILITY**, provided that the same come consigned on behalf of **THE CORPORATION**. Notwithstanding, the vehicles, equipment and personal property of the foreign personnel of **THE SELLER** and its subcontractors must be reexported at the end of their stay in the country free of **TAXES** or the corresponding **TAXES** paid in the event they are left in the Dominican Republic, without prejudice of granting to **THE CORPORATION** an option to purchase such personal property (excluding the **FACILITY**) at a price acceptable to **THE SELLER**.

In addition, **THE SELLER** shall be entitled to import into the Dominican Republic the **FACILITY** and any equipment, machinery, materials and supplies required for the installation or the operation and maintenance and the construction of the **FACILITY** free of **TAXES**. **THE STATE** shall ensure the granting to **THE SELLER** for the operation of the **FACILITY** of all Specified Consents, necessary import permits and authorizations for such property free of import **TAXES**. **THE STATE** guarantees that **THE SELLER** shall have the right to re-export the **FACILITY** and all appurtenances thereto upon termination of this **AGREEMENT** free of Taxes.

In the event that **THE SELLER** has to pay any Tax including on the import of materials, goods, equipment, and spare parts to be used in the operation of the **FACILITY**, **THE STATE** hereby agrees to reimburse **THE SELLER** the amount of the Tax paid.

13.1.2 **THE STATE** agrees that if after the **EFFECTIVE DATE** and during the **TERM** of this **AGREEMENT** there is any change in the **LAWS OF THE DOMINICAN REPUBLIC** (or in their interpretation or implementation) including environmental laws and/or regulations, and such change modifies the terms of the **AGREEMENT**, increases the cost of operation of the **FACILITY** or any other cost or expense of the **FACILITY** in the Dominican Republic, or causes the modification of the **FACILITY** or changes the operation and maintenance of the **FACILITY** or the terms of this **AGREEMENT**, once it or the previous events occur, the **PARTIES** will meet to discuss such modifications, provided, however, that the rights acquired by the Parties, in this **AGREEMENT**, will not be affected.

13.2    **GRANT OF AUTHORIZATION AND RELATED RIGHTS TO THE SELLER.**

13.2.1 **APPLICATIONS TO BE MADE BY THE SELLER**

The information supplied in the applications for permits, licenses, authorizations and certifications required under the terms of this **AGREEMENT** by **THE SELLER** shall be complete and accurate and shall satisfy the **LAWS OF THE DOMINICAN REPUBLIC.**

**THE SELLER** shall make applications for work, employment visas and other immigration permits necessary to effect all registration for individuals involved in the

exercise and performance of THE SELLER'S rights and obligations under this AGREEMENT

13.2.2 Subject to the provisions of Article 13.2.1, THE STATE shall arrange and ensure the granting by any department, organization, Secretary of Estate or General Office owned by or under the control of THE STATE ("Public Sector Entity") to THE SELLER of the exclusive definite rights to transport, deliver, design, insure, construct, own, operate and/or maintain the FACILITY until the termination of this AGREEMENT and THE SELLER'S applications, whether initial or renewal, including all those previously indicated, whether initial or renewal under the terms of this AGREEMENT, including under Attachment G hereof, THE SELLER shall have the right to invoke the provisions of Article 5.7 even when said applications have not been granted.

13.2.3 THE STATE hereby grants or will cause to be granted to THE SELLER a comodato over all land, berth, dock, piling and adjacent land located at the INSTALLATION SITE described in Attachment B, to be granted by THE CORPORATION or THE STATE for the use by THE SELLER as the Site for the FACILITY without cost to THE SELLER during the TERM of this AGREEMENT.

13.3 FOREIGN CURRENCY EXCHANGE AND TRANSFER OF FUNDS

THE STATE shall permit THE SELLER and its foreign subcontractors and their respective foreign employees to freely transfer outside of the Dominican Republic all funds and financial settlements in Dollars connected with this AGREEMENT, excepting the provisions contained in the Dominican Republic Tax Code.

ARTICLE 14: FORCE MAJEURE.

14.1 DEFINITION AND LEGAL EFFECTS.

Except for the obligations of either PARTY to make any required payments then due and owing under this AGREEMENT, neither PARTY shall be liable for any failure or delay in complying with its obligations hereunder to the extent that such failure or delay has been caused, or contributed to by one or more FORCE MAJEURE events without liability for any loss or expense suffered by the other PARTY. FORCE MAJEURE shall include, but not limited to the following natural events:

a) Any Act of God, material effect of the natural elements, including lightning, earthquake, hurricane, flood, storm, cyclone, typhoon or tornado; or

b) Epidemic or plague.

14.2 FORCE MAJEURE CONDITIONS.

a) The non-performing PARTY should give the other PARTY within forty-eight (48) hours written notice describing the particulars of the occurrence.

b)  The suspension of performance will not be of greater scope and of no longer duration than is required by the **FORCE MAJEURE**.

c)  The non-performing **PARTY** will use its best endeavors to remedy its inability to perform.

d)  When the non-performing **PARTY** is able to resume performance of its obligations under this **AGREEMENT**, it shall promptly give the other **PARTY** written notice to that effect.

14.3 EXTENSION OF THE TERM.

The periods allowed for the performance by the **PARTIES** of their obligations under this **AGREEMENT** shall be extended for so long as one or more **FORCE MAJEURE** events continues to affect materially and adversely the performance of such **PARTY** of such obligation(s) under or pursuant to this **AGREEMENT**. In the event that the period for the performance of an obligation is extended due to a **FORCE MAJEURE**, then the **TERM** of this **AGREEMENT** will be extended for the same period. Provided, however, that either **PARTY** may, by written notice to the other **PARTY**, immediately terminate this **AGREEMENT** without further obligation, if a **FORCE MAJEURE** event delays the **PARTY'S** performance for a period greater than twelve (12) months.

ARTICLE 15: INSURANCE

15.1 **THE SELLER** shall obtain and maintain in force with a company or companies, authorized to operate in the Dominican Republic, the following Policies of Insurance during the **TERM** of this **AGREEMENT**.

15.1.1 Global Comprehensive Insurance or general commercial liability insurance with bodily injury and property damage combined with a limit of two million dollars (U.S.$2,000,000.00) per occurrence  Such insurance shall include, but not necessarily be limited to, specific contractual risk coverage, including the indemnification provisions of Article 16 hereof, broad form property damage liability, personal injury liability, and coverage against risks of explosions.

15.1.2 Comprehensive automobile liability insurance or bodily injury and property damage combined with single limits of one million dollars (U.S.$1,000,000) per occurrence covering vehicles owned, hired or non-owned.

15.1.3 General risk insurance with a single limit of at least four million dollars (US$4,000,000.00) per occurrence in excess of the limits of the policies provided in Articles 15.1.1 and 15.1.2 above.

15.2 **THE SELLER** will request the following endorsements from his insurers:

15.2.1 **THE CORPORATION**, its directors, officers, employees and agents are additional