# EXHIBIT A

**Power Purchase Agreement between the State of the Dominican Republic, Represented by Corporacion Dominicana de Electridad and Cayman Power Barge I, LTD**

**Dated as of March 1, 1998**

# PART IV

## POWER PURCHASE AGREEMENT

## ATTACHMENT B

## INSTALLATION SITE

### I. PowerBarge I

#### Description and Location of Site

The site mutually acceptable to **THE SELLER** and **THE CORPORATION**. The berth will be parallel to and abutting a dock to which fuel piping and electrical connections will be made by **THE CORPORATION**. Adequate pilings will be provided on the outboard side of the Facility by **THE CORPORATION** to provide additional mooring stability for the Site.

### II. Additional Capacity

#### Description and Location of Site

A land area immediately adjacent to the PowerBarge I Site that is adequate to accommodate 30 MW of slow speed diesel engines, generators, housing, auxiliary equipment and other facilities required to operate such a 30 MW plant. The Site will have fuel piping and electrical connections brought to the edge of the Site.

CAYMAN
16-3-98 8:00 PM

POWER PURCHASE AGREEMENT

ATTACHMENT C

INTERCONNECTION FACILITIES

A.    Description of **THE CORPORATION** Interconnection Facilities.
      [to be provided]

B.    Description of **THE SELLER** Interconnection Facilities.

      (i) PowerBarge I

      **THE SELLER** Interconnection Facilities include the 13.8 kV OCB, revenue metering
CT's and PT's, 36,000KVA, 69kV power transformer, manual disconnect switches, lightning
arresters, and associated cabling and insulators up to the Delivery Point.

      (ii) Additional Capacity

      **THE SELLER** Interconnection Facilities for the Additional Capacity include the 13.8
kV OCB or switcher, revenue metering CT's and PT's, 69kV power transformer, manual
disconnect switches, lightning arresters, and associated cabling and insulators up to the Delivery
Point.

C.    Description of Metering Point.

      The metering CT's and PT's for the PowerBarge I shall be located on the 13.8 kV side
of the main power transformer until the earlier of (i) the Additional Capacity is Commissioned,
or (ii) 10 Months from the beginning of Phase I. Subsequent to such date, the metering CT's
and PT's for Phase I shall be located on the 69 kV side of the main power transformer. **THE
SELLER** shall reach agreement with **THE CORPORATION** as to the percentage of
transformer loss to subtract from the Net Energy Production. If **THE CORPORATION** does
not agree with **THE SELLER** to the percentage of transformer losses, then **THE SELLER**
will install meters on the 69 kV side of the main power transformer. The metering CT's and
PT's for the Additional Capacity will be located on the 69 kV side of the main power
transformer.

      The following instrumentation will be used for both the PowerBarge I and the Additional
Capacity:

            1.  3 - potential transformers (PT's)
            2.  3 - current transformers (CT's)
            3.  1 - Kilowatt hour totalizer

C-1

D.    Description of the Delivery Point.

-PowerBarge I

The Delivery Point is at the 69kV insulators on top of the Facility steel takeoff structure near the stern over the power transformer.    This connection is made with **THE CORPORATION** supplied NEMA 4 pads terminating the 700 MCM (minimum) cables for each phase. The connection can be to either the port or starboard side. **THE CORPORATION** shall install a static line from shore to above the Point of Delivery for lightning protection. The Facility also requires two (2) 500 MCM copper grounding cables connected to the starboard side that will tie the barge's grounding and protection system to **THE CORPORATION** ground grid. The Facility requires a single pair of control wires to trip **THE CORPORATION** onshore tie breaker to protect the Facility's electrical system from a fault condition.

**THE CORPORATION** shall provide a fire water supply to a connection point on the Facility.

-Additional Capacity

The Delivery Point for the Additional Capacity will be located after the metering equipment on the high side of the power transformer located within the Facility

Instrumentation metering tolerance.

Plus or minus 3%

## POWER PURCHASE AGREEMENT

### ATTACHMENT D

### TESTS

**PowerBarge I**

Dependable Capacity Criteria (Article 5.3)

- More than 576,810 KWH Net Electrical Production in a 24 consecutive hour period

**Additional Capacity**

- Criteria as described in Article 5.6

D-1

CAYMAN
16-3-98 8:00 PM

POWER PURCHASE AGREEMENT

ATTACHMENT E

UNIT ENERGY PRICE FOR THE POWERBARGE I
AND THE ADDITIONAL CAPACITY

A.   The Unit Energy Price for the **POWERBARGE I** and the **ADDITIONAL CAPACITY**
     is illustrated in the following Table.

| POWERBARGE I | (US$) Unit Energy Price |
|---|---|
| Capacity Component | 0.0252 |
| Operations & Maintenance Component ("O&M") | 0.0148 |
| Total Unit Energy Price for the **POWERBARGE I** | 0.04 |

| ADDITIONAL CAPACITY (This table is an illustration based on the 25.2MW Man Units for the Additional Capacity - For Illustrative purposes only) | (US$) Unit Energy Price |
|---|---|
| Capacity Component | 0.0227 |
| O&M Component | 0.0153 |
| Total Unit Energy Price for the **ADDITIONAL CAPACITY** | 0.038 |

B. The O&M component of the Unit Energy Price will escalate based on the Consumer Price
Index for the Dominican Republic published by the Central Bank of the Dominican Republic
applicable at the beginning of the third **CONTRACT YEAR**. The first escalation will be for the
second **CONTRACT YEAR**. Each subsecuent escalation will be established for the preceeding
twelve (12) Months.

E-1

CAYMAN
16-3-98 8:00 PM

## POWER PURCHASE AGREEMENT

## ATTACHMENT F

## FUEL SUPPLY

### SECTION 1. QUANTITIES

1.1 Fuel Oil. Subject to the other terms and conditions of this Agreement, **THE CORPORATION** agrees to deliver, or cause to be delivered for the account of **THE CORPORATION**, and **THE SELLER** agrees to receive, or cause to be received for its account, No. 6 Fuel Oil (with characteristics not inferior to those specified in Schedule 1 of this Attachment F) ("Fuel") during the term of this Agreement in the quantities required for **THE SELLER** to operate the Facility under the terms of this Agreement. Quantities delivered shall be measured by tank upgauge at the Facility.

### SECTION 2. DELIVERY

2.1 Delivery. Delivery of the Fuel shall be made by **THE CORPORATION** to **THE SELLER** at the Facility as the Fuel passes the Facility flange from the delivering tank, vessel, pipeline or vehicle. Title to, and risk of loss, of all Fuel delivered hereunder shall pass to **THE SELLER** upon delivery at the flanged connection onboard the Facility. The flanged connection is an eight (8") inch pipe located on either the port or starboard side. Delivery pressure of the Fuel shall not be less than 100 psi. **THE CORPORATION** shall provide to the Facility a Fuel shutoff switch to immediately stop deliveries of Fuel to the Facility during emergencies.

### SECTION 3. SCHEDULING

3.1 Scheduling. **THE CORPORATION** and **THE SELLER** shall attempt in good faith through the Technical Group to establish convenient delivery schedules for the delivery and receipt of Fuel supplied pursuant to this Agreement. The provision for establishing delivery schedules and otherwise providing for scheduling shall not negate the obligations of the Parties to deliver and receive as required by the Agreement.

### SECTION 4. QUALITY

4.1 Quality. The products delivered hereunder shall meet the specifications set forth in Schedule 1 of Attachment F.

### SECTION 5. MEASUREMENT AND ANALYSIS

5.1 Measurement and Analysis. The determination of the quantity and quality of Fuel shall be made by a mutually acceptable licensed independent gauging and inspection firm in accordance with standard industry procedure. The findings of the inspector appointed by the Parties shall be final and binding as to quantity and quality of the Fuel as determined on board

F-1

the delivery vessel or vehicle at the time of delivery. The cost of any and all such inspections at loading shall be for the account of **THE SELLER.**

## SECTION 6. CLAIMS

6.1 <u>Claims</u>. Any claims based on the quantity or quality of Fuel delivered shall be waived unless made in writing within thirty (30) days after delivery. **THE SELLER** shall have the right to require Fuel not up to specifications to be taken back by **THE CORPORATION** at **THE CORPORATION's** sole cost, risk and expense.

## SECTION 7. TAXES

7.1 <u>Taxes</u>. Taxes, fees, dues, licenses or other imposts, including, but not limited to, import or processing duties or fees, now or hereafter imposed by governmental authorities in the Dominican Republic ("<u>Fuel Taxes</u>") on the supply of Fuel hereunder shall be the responsibility and for the account of **THE CORPORATION**. If **THE SELLER** is required by law to pay any of the Fuel Taxes, fees or assessments which are the responsibility of **THE CORPORATION**, **THE STATE** shall reimburse **THE SELLER** for all such payments.

## SECTION 8. WARRANTY OF TITLE

8.1 <u>Warranty of Title</u>. **THE CORPORATION** hereby warrants title to the Fuel as delivered to **THE SELLER. THE CORPORATION** warrants that it has the right to supply and deliver same, and that it holds good title, free from all liens and encumbrances or any adverse claims.

F-2

CAYMAN
16-3-98 8:00 PM

## SCHEDULE 1 OF ATTACHMENT F

## ACCEPTABLE FUEL OIL SPECIFICATION

|  | Unit | Minimum | Maximum |
|---|---|---|---|
| Specific Gravity 60/60F | KG/L | | .9950 |
| Density A.P.I. (15°C) | | 10.6 | |
| Viscosity (SFS A 122 °F | SSF | | 250 |
| Kinematic Viscosity | CS | | |
| Calorimeter Value | BTU/LB | 18,000 | |
| Flash Point PMCC | F | | 150 |
| Pour Point | F | | 45 |
| Carbon | M | | 15 |
| Sulfur in Weight | M | | 2.8 |
| Water (Distillation) - Volume | V | | 0.5 |
| Sediment | M | | |
| Ash in Weight | M | | 0.1 |
| Sodium in PPM | M | | 30 |
| Vanadium in PPM | M | | 400 |

F-(ATT.)-1

# POWER PURCHASE AGREEMENT

## ATTACHMENT G

### SPECIFIED CONSENTS

Relevant Authority

#### The Company

Registration of the Company if incorporated outside of the
Dominican Republic

SSCI

Business license ("Patent")

TA

Registration of foreign investment and approval to
repatriate profits earned on investment, if a foreign
company registered to do business in the Dominican
Republic, or dividends paid out to Foreign Investors if
incorporated locally

CBDR

#### Taxes

Approval of exonerations or exemptions from Fuel

TA/SSCI/CDE

#### Loans

Approval of any foreign loans.

DS/CBDR

#### Foreign Currency

Foreign exchange transfer consents.

CBDR

#### Imports

License or permits to import the Facility and related
equipment, materials and supplies and replacement parts
free of any and all Taxes.

SSCI/CA/CDE/TA

G-1

Immigration

Authorization for necessary visas.                                        MFA

Authorization for work permits for foreign nationals.                     MFA


Seaward Access and Mooring

License or permits for the transportation of the Facility to             SSPW/DRN/PA
the Site and the use of the Site (including safe berth and
docking facilities).


Environmental Approvals

Permit for fuel storage                                                   SSCI/MSP/EA

Storage of toxic substances, etc.                                        SSCI/MSP/EA

Seaward Mooring Licenses and Permits                                     EA/PA


Key to Relevant Authorities

"CBDR" means Central Bank of the Dominican Republic

"CA" means Customs Authority

"DNR" means Dominican Republic Navy

"DS" means **THE STATE**

"EA" means Environmental Authorities

"MFA" means Ministry of Foreign Affairs

"MSP" means Municipality of San Pedro de Macoris

"NCER" means National Committee of Environmental
Restoration

"NDT" means National Director of Telecommunications

CAYMAN
16-3-98 8:00 PM

"SSCI" means Secretary of State of Commerce and Industry

"SSPW" means Secretary of State of Public Works

"TA" means the National tax authorities

"Taxes" has the meaning set forth in Article 1.35 of this Agreement.

POWER PURCHASE AGREEMENT

### DEFINITIONS ALPHABETIZED IN ENGLISH
(English Version of the PPA Only - Not Translated in Spanish)

1.50 **"ACTUAL HEAT RATE"**

1.6 **"ADDITIONAL CAPACITY"**

1.1 **"AGREEMENT"**

1.45 **"AVERAGE UNIT ENERGY PRICE"**

1.4 **"BTU"**

1.26 **"COMMERCIAL OPERATION DATE"**

1.11 **"COMMISSIONED"**

1.12 **"COMMISSIONING"**

1.25 **"CONNECTION DATE"**

1.3 **"CONTRACT YEAR"**

1.16 **"DAY"**

1.48 **"DELIVERY POINT"**

1.7 **"DEPENDABLE CAPACITY"**

1.17 **"DOLLARS"**

1.28 **"EFFECTIVE DATE"**

1.19 **"EMERGENCY"**

1.40 **"EXCESS FUEL PAYMENT"**

1.56 **"FACILITY"**

1.21 **"FORCE MAJEURE"**

1.51 **"FORCED OUTAGE"**

1.29 **"FORCED OUTAGE HOURS"**

1.10 **"FUEL"**

Definitions Alphabetized-1

1.5    **"GOOD ENGINEERING AND OPERATIONS PRACTICES"**

1.8    **"GUARANTEED CAPACITY"**

1.15   **"GUARANTEED DISPATCH"**

1.2    **"GUARANTEED DISPATCH ADJUSTMENT"**

1.22   **"HEAT RATE FACTOR"**

1.13   **"INSTALLATION SITE"**

1.38   **"INTERCONNECTION FACILITIES"**

1.33   **"KW"**

1.34   **"KWH"**

1.36   **"LAWS OF THE DOMINICAN REPUBLIC"**

1.9    **"LETTER OF CREDIT"**

1.52   **"MAINTENANCE OUTAGE"**

1.30   **"MAINTENANCE OUTAGE HOURS"**

1.53   **"MAJOR OVERHAUL OUTAGE"**

1.49   **"METERING POINT"**

1.55   **"METERING SYSTEM"**

1.47   **"MINIMUM NET ENERGY PRODUCTION"**

1.39   **"MONTH"**

1.46   **"NET ENERGY PRODUCTION"**

1.42   **"PARTIES"**

1.41   **"PARTY"**

1.23   **"PHASE I"**

1.24   **"PHASE II"**

1.44   **"POWERBARGE I"**

1.27    **"REQUIRED COMMERCIAL OPERATION DATE"**

1.28    **"SCHEDULED COMMERCIAL OPERATION DATE"**

1.54    **"SCHEDULED OUTAGE"**

1.31    **"SCHEDULED OUTAGE HOURS"**

1.14    **"SPECIFIED CONSENTS"**

1.32    **"TAXES"**

1.20    **"TECHNICAL GROUP"**

1.37    **"TECHNICAL LIMITS"**

1.43    **"TERM"**

1.35    **"THE CORPORATION"**

1.18    **"THE STATE"**

Definitions Alphabetized-3

**Eileen B. Hennessy**

Translator

551 Fifth Avenue, Suite 720
New York, N.Y. 10176-0799

Tel. (212) 661-7445
Fax (212) 661-7471

AFFIDAVIT OF ACCURACY

STATE OF NEW YORK        )
CITY OF NEW YORK         : ss:
COUNTY OF NEW YORK       )

EILEEN B. HENNESSY, being duly sworn, deposes and says:

That she is a professional translator of the English and Spanish languages and an Adjunct Associate Professor in the Translation Studies Program at New York University, and that she is fully conversant with said languages.

That on or about the 21st day of June 2006, she made the annexed English-language translation of an Amendment executed on 2 July 1999 to the Power Purchase Agreement entered into on 17 March 1998 between Corporación Dominicana de Electricidad and Cayman Power Barge I, Ltd..

That to the best of her knowledge and belief, said translation is a true and correct English rendering of the original document in Spanish.

That her professional qualifications are as follows: University studies in both languages, practice of the translation profession since 1964; certification for translation from Spanish into English, granted to her by the American Translators Association after her successful completion of a qualifying examination.

_____
Eileen B. Hennessy

Sworn to before me this
25 day of July 2006

_____
Notary Public

BASMATIE MOTEE
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN QUEENS COUNTY
REG. NO. 01MO6136418
MY COMMISSION EXPIRES 11-07-2009

Member, American Translators Association, Irish Translators' and Interpreters' Association, New York Circle of Translators, and Modern Language Association. ATA-certified for translation into English from French, German, Spanish, and Italian.

AMENDMENT TO THE POWER PURCHASE AGREEMENT
BETWEEN THE STATE OF THE DOMINICAN REPUBLIC
REPRESENTED BY THE CORPORACIÓN DOMINICANA DE ELECTRICIDAD
AND CAYMAN POWER BARGE I, LTD.
DATED 17 MARCH 1998

BETWEEN:

As PARTY OF THE FIRST PART, the Dominican State, duly represented by Rhadamés Segura, Secretary of State, General Administrator of the Corporación Dominicana de Electricidad, engineer, Dominican, of legal age, married, holder of ID and Voter Registration Card No. 001-0784753-5, domiciled and residing in this city of Santo Domingo, Dominican Republic, acting by virtue of Special Power of Attorney No. 41-99, issued by His Excellency Dr. Leonel Fernández Reyna, President of Dominican Republic, hereinafter referred to as "THE STATE and/or THE CORPORATION," and

As PARTY OF THE SECOND PART, Cayman Power Barge I, Ltd., a trade company organized under the laws of the Cayman Islands, British West Indies, with domicile and registered office at Mary Street, Grand Cayman Islands, British West Indies (P.O. Box 1109), duly represented, pursuant to Power of Attorney dated 25 May 1999, by Mr. David Walters, North American, of legal age, married, holder of passport No. 131320142, domiciled and residing at 6219 Riviera Drive, Oklahoma City, U.S.A., and temporarily in Santo Domingo, Dominican Republic, hereinafter referred to as "THE SELLER."

WHEREAS: (1) On 17 March 1998 the Parties signed a "Power Purchase Agreement" in which THE SELLER offered a Nominal Capacity of 30,000 kW, which would result in a net capacity output of not less than 24,000 kW during Phase I (Power Barge I), and an Additional Capacity of 30,000 kW to be installed subsequently, called Phase II;

WHEREAS: (2) THE SELLER's Plant (Power Barge I), has not been able to supply the contracted kilowatts, a fact that led the PARTIES in good faith to deal with the situation by agreeing with THE CORPORATION on the substitution of Power Barge II, with Nominal Capacity of 47.5 mW, for Power Barge I in the aforementioned Phase I, and in addition another 15 mW Facility to operate in Phase II, subject to the terms of this Amendment;

WHEREAS: (3) As a consequence of the equipment substitutions agreed to, the Parties mutually

- 1 -

AGREE:

FIRST: THE SELLER undertakes to deliver, within forty (40) days after the signing of the Amendment, a barge called Power Barge II, described in Attachment A, with a Nominal Capacity of 47.5 mW, in substitution for and taking and place and location of Power Barge I, which THE SELLER undertakes to move, at its own expense, from its current location.

SECOND "1.6. ADDITIONAL CAPACITY": The PARTIES modify the obligation assumed by THE SELLER to provide two Facilities: one 30 mW Facility, Power Barge I, in Phase I, and one 30 mW Facility, in Phase II, by the start-up of Power Barge II (47.5 mW), which for all purposes of this Agreement shall be referred to as Additional Capacity, and a 15 mW supplemental Facility which could be installed in Barahona within eight (8) months after the signing of this Amendment, provided that the Operation of Power Barge II complies with the terms of the Agreement, which shall constitute the Phase II agreed to in the Original Agreement.

THIRD: "1.8 GUARANTEED CAPACITY" shall mean:

a) A nominal capacity of 47,500 kW, which results in a capacity of not less than 38,000 kW during Phase II; and

b) In the event that the Supplemental Capacity goes into Operation, there will be a Nominal Capacity of approximately 62,500 kW, as a result of addition of the 47,5000 kW previously mentioned and the 15,000 kW to be installed as "Supplemental Capacity" for Phase II, which results in a capacity of not less than the sum of 38,000 kW plus 80% of the 15,000 kW in Supplemental Capacity.

FOURTH: "1.11 COMMISSIONED" shall mean compliance with the minimum criterion for Dependable Capacity of Power Barge I, the Additional Capacity, and/or the Supplemental Capacity, as established in Attachment D.

FIFTH: "1.15 GUARANTEED DISPATCH" shall mean the total kW: during Phase I, not less than 90% of the Guaranteed Capacity, and during Phase II not less than 85% of the Guaranteed Capacity.

SIXTH: "1.23 PHASE I" shall mean the period of time after Power Barge II, substituted for Power Barge I, is commissioned.

- 2 -

SEVENTH: "1.24 PHASE II" shall mean the period of time that begins on the Effective Date and ends sixty (60) months after the day on which the Additional Capacity goes into operation.

EIGHTH: "1.43 TERM" shall mean a period of time that begins on the effective date and ends sixty (60) months after the day on which the 15 mW Supplemental Capacity goes into operation, if said Supplemental Capacity is implemented.

NINTH: "1.45 AVERAGE RATE PER ENERGY UNIT" shall mean: (a) with respect to Power Barge I, US$0.04/kWh, already substituted; and (b) with respect to Power Barge II and the 15 mW Supplemental Capacity, US$0.038/kWh at high tension (69 kW).

TENTH: "1.46 NET ENERGY PRODUCTION" shall mean all the net electrical power produced by the Substitute Facility and the 15 mW Supplemental Facility and delivered to THE CORPORATION at the Delivery Points, measured in kilowatt hours at the Metering Points.

ELEVENTH: "1.56 FACILITY" shall mean (a) Until the Additional Capacity goes into Operation, Power Barge I; (b) and subsequently, from the date on which the Additional and the Supplemental Capacity go into Operation, Power Barge II and the 15 mW Supplemental Capacity, as described in Attachment A.

TWELFTH: "1.57 SUPPLEMENTAL CAPACITY" shall mean the electric generating unit that may be installed by THE SELLER within eight (8) months after the Additional Capacity is commissioned, with a Nominal Capacity of fifteen (15) mW as described in Attachment A.

THIRTEENTH "4.2. THE SELLER INTERCONNECTION FACILITIES": THE SELLER shall be responsible for the design, purchase, construction, and/or commissioning of the Electric Interconnection Facilities as described in Attachment C ("THE SELLER Interconnection Facilities"). THE SELLER shall retain ownership of its Interconnection Facilities and shall maintain and operate the same. Except with respect to the Additional Capacity and the Supplemental Capacity, THE SELLER shall request from THE CORPORATION, in writing, with six (6) months' advance notice, approval by THE CORPORATION of expanded or new interconnection facilities during the period.

FOURTEENTH "5.6 TESTING AND COMMISSIONING OF ADDITIONAL CAPACITY AND SUPPLEMENTAL CAPACITY": The testing and commissioning of the Additional and Supplemental Capacity shall be conducted

- 3 -

in conformity with the Provisions of Article 5.1 through 5.5 of the "Power Purchase Agreement." The Net Energy Production generated during the testing and after the commissioning of the Additional and the Supplemental Capacities shall be paid as provided in Article Ninth, without responsibility on the part of CDE for Fuel Storage, since the Power Barge II Facility has its own fuel storage capacity.

FIFTEENTH "6.6. EXCESS SCHEDULED AND MAINTENANCE OUTAGES AND SANCTIONS": Commencing after the Commercial Operation date, the liquidated damages shall be calculated quarterly. In the event that the total of the Scheduled outage hours plus the Maintenance outage hours exceeds six hundred fifty-seven (657) hours per quarter (three months), THE SELLER shall pay to THE STATE, as compensation for power not supplied:

(a) During Phase I, eight hundred ninety dollars (US$890) per hour of such excess; and

(b) During Phase II, one thousand one hundred seventy dollars (U$1,170) per hour of such excess; and

In computing said compensatory damages payable by THE SELLER for the first CONTRACT year, the liquidated damages shall be adjusted by multiplying said amount by 0.75. There shall be no adjustment in any subsequent CONTRACT year. In no event shall the liquidated damages under Article 6.6 exceed seven hundred fifty thousand dollars (US$750,000) for any CONTRACT year.

The previously liquidated damages shall be the sole remedy to which THE STATE and THE CORPORATION shall be entitled in the event of excess Scheduled Outages and Maintenance Outages.

As compensation for any claim obligation, demand and action that THE SELLER may have against THE STATE and/or THE CORPORATION arising out of the Power Purchase Agreement that was executed between the PARTIES on 17 March 1999, including but not limited to claims for damages and liquidated damages and any dispute relative to the total invoices related to the purchase of energy, THE STATE and/or THE CORPORATION shall pay to THE SELLER the sum of five hundred twenty-five thousand US dollars (US$525,000.00) within ten (10) days of the date of execution of this Agreement. This amount includes the invoice for the month of May 1999.

- 4 -

On the other hand, and as a substantial part of this Amendment, THE STATE and THE CORPORATION in turn waive any claim, right or action of any kind arising from the Power Purchase Agreement executed by and between the Parties on 17 March 1998, originating between the date of execution of the above-indicated Agreement and the date agreed upon for the Commissioning of Power Barge II, including the time during which Power Barge I has been out of operation after the last breakdown, which originated this Amendment, excluding any claim, right, or action that THE STATE or THE CORPORATION may initiate after commissioning of Power Barge II.

SIXTEENTH "7.1 DISPATCH PROCEDURES": In general, and consistent with the Technical Limits and with Good Engineering and Operations Practices, THE CORPORATION undertakes to dispatch the Facility as if it were one of THE CORPORATION's own base load thermal generating facilities. Notwithstanding the foregoing, in no event shall THE CORPORATION require THE SELLER to operate at a net output of less than 12 mW.

SEVENTEENTH "8.2.1 ADDITIONAL CAPACITY": THE SELLER warrants that during Phase II, including Power Barge II substitution for Power Barge I, the Additional Capacity will operate at a heat rate of not more than 9,000 Btu/kWh (measured at the lower heating value-- "LHV"--of the fuel), when the Facility is operating at a net output greater than eighty-five percent (85%) of the Guaranteed Capacity of the Facility (the "PHASE II Guaranteed Heat Rate").

EIGHTEENTH "8.2.2 SUPPLEMENTAL CAPACITY": THE SELLER warrants that the Supplemental Capacity will operate with a heat rate of not more than 9,500 Btu/kWh (measured at the lower heating value—"LHV"--of the fuel) when the Facility is operating at a net output of more than eighty-five percent (85%) of the Guaranteed Capacity of the Facility. The heat rate of the Facility will not exceed 9.120 Btu/kWh (measured at the lower heating value—"LHV"--of the fuel).

NINETEENTH "10.3.3 (a) and (b) INVOICES AND PAYMENTS": THE STATE shall pay to THE SELLER, for the duration of the events established under clauses (a) and (b) of Article 10.3.3, a Monthly Energy Payment calculated as follows:

1) Before the date of Commercial Operation, 24,000 kW multiplied by the number of hours in the month by the price per Energy Unit of Power Barge I (Article 1.45);

- 5 -

2) After the Commercial Operations date of the Additional Capacity (Article 5), during Phase I, after the substitution of Power Barge II for Power Barge I, and during Phase II, multiplying the Energy Supplied by the number of hours in the month by US$0.038/kWh.

PARAGRAPH: In the event that a dispatch record proves that the CDE issued a Dispatch Order for less than the Guaranteed Energy, the CDE shall pay for the Energy Not Dispatched.

TWENTIETH: As a result of the expansion of the Additional Capacity and the addition of the Supplemental Capacity, the Description and Technical Limits of the Facility, the Description and Location of the Installation Site, as well as the Description of the Interconnection Facilities, shall change; accordingly, Attachments A, B, and C of the Agreement are amended and replaced in their entirety by Attachments A, B, and C of this Amendment.

TWENTY-FIRST: The PARTIES agree to amend and replace Attachments D and E of the Agreement relative to the Supplemental Capacity Test and the Energy Unit Price, respectively, with Attachments D and E of this Amendment.

TWENTY-SECOND "MODIFICATION OF BERTH":    Following the removal of Power Barge I from the Installation Site, THE SELLER shall dredge the Berth and prepare the Installation Site for the delivery of the Additional Capacity, in accordance with the terms of Attachment B of this Amendment.

TWENTY-THIRD "DELIVERY OF ADDITIONAL CAPACITY":    THE SELLER shall deliver the Additional Capacity to THE CORPORATION at the Installation Site, and shall commence Commissioning of the Additional Capacity within forty (40) days from the date of this Amendment.

TWENTY-FOURTH: As a result of the Agreements Contained in this Amendment, 1.57 is added and the following provisions in the "Power Purchase Agreement" are modified:

(a) The third Whereas clause;

(b) Articles 1.6, 1.8, 1.11, 1.15, 1.23, 1.24, 1.43, 1.45, 1.46, 1.56, 1.57, 4.2, 5.6, 6.6, 7.1, 8.2.1, 8.2.2, 10.3.3 (a) and (b), and

(c) Attachments A, B, C, D, and E.

TWENTY-FIFTH: The Power Purchase Agreement signed between the Parties on 17 March 1998 shall remain in full force and effect in respect of all provisions that have not been modified in this Amendment.

TWENTY-SIXTH: The Parties agree that this Amendment shall go into effect as soon as it is signed.

Executed in two originals, one for each of the Parties, in Santo Domingo, Dominican Republic, on the second (2) day of July in the year nineteen-hundred ninety-nine (1999).

FOR THE STATE
[signature]
RHADAMES SEGURA, ENGINEER
Secretary of State
General Administrator


FOR THE SELLER
[signature]
MR. DAVID WALTERS
Authorized Representative


I, *Licenciado* Rafael Melgen Seman, Attorney at Law and Public Notary for the National District, Certify and attest that the signatures at the end of this document were freely and voluntarily apposed in my presence by RHADAMES SEGURA, ENGINEER, and DAVID WALTERS, who swear that these are the signatures that they customarily use in all their public and private acts, for which reason they should be given full faith and credit.

Santo Domingo, National District, Capital of the Dominican Republic, on the second (2) day of July in the year nineteen hundred ninety-nine (1999).

*LICENCIADO* RAFAEL MELGEN SEMAN
Attorney at Law and Public Notary

- 7 -

POWER PURCHASE AGREEMENT

ATTACHMENT A

DESCRIPTION AND TECHNICAL LIMITS OF THE FACILITY

POWER BARGE 1

DESCRIPTION

| . Hull: | Max. Displacement: | 5,000 tons |
|---|---|---|
| | Draft: | 13 feet loaded |
| | Height: | 96 feet light draft to top of stacks |
| | Length: | 318 feet |
| . Boilers: | Two (2) 170,000 pph Babcock and Wilcox Boilers | |
| | Divided "M" furnace, single uptake, double casing | |
| . Turbine: | 30 mW General Electric steam turbine | |
| . Generator: | 36 mva General Electric 2-pole generator | |
| . Transformer: | 36,000 kva, 69 kW Westinghouse transformer | |
| . Other auxiliary, Balance of Plan, and support equipment | | |

TECHNICAL LIMITS:

1)  CAPACITY;
    Nominal Capacity (Nameplate):      30,000 kW
    Internal use by barge:             1,725 kW
    Guaranteed Capacity:               Not less than 24,000 kW

2)  HEAT RATE:
    Expected:                          12,800 Btu/kWh
    Guarantee:                         23,800 Btu/kWh

3)  HIGH VOLTAGE ELECTRICAL OUTPUT:
    Power Factor:                      0.85 lead – 0.85 lag
    Voltage:                           69 kv – 73 kv
    Frequency Trips:                   62 Hz – 57 Hz

4)  OPERATIONAL:
    Power Barge I is a base-load thermal power facility. It can be dispatched on the basis of the following limitations:
    Minimum operation:          7,000 kW
    Cold Plant Start-Up:        6 hours to full load
    (boiler pressure less than 300 psig or after 12 hours of shutdown)

Hot Plant Start-Up:          3.5 hours to full load
(boiler pressure 300 to 400 psig)

Minimum Load Ramp Up:    2 hours to full load
(minimum load at 7 mW)

Plant Shutdown:              1.0 hour
(full load to generator breaker open)

Minimum Run Time:         8 hours

5)    WATER
      Circulating Water System
      . Water Depth:                18 feet minimum
      . Minimum Open Water         100 feet
        behind barge:

6)    SOOTBLOWING SCHEDULE:
      Daily Minimum:               3 times

ADDITIONAL CAPACITY – POWER BARGE II

DESCRIPTION:

. Dimensions: Length:       358.0 feet
              Width:        82.0 feet
              Depth:        23.25 feet

. Capacities:                    L.T.      Gals.
              Diesel             600       165,000
              Aft Day Tank       28        8,000
              H.F.O. (C5-Cleaned) 869      265,000
              H.F.O. (C1, C2, C3, C4) 4,472  1,364,000
              H.F.O. (1P, 2S, 3P) 1,6234   95,000
              Fresh Water        573       175,000
              Dirty Oil Tank     56        15,500
              Bilge Slop         9         2,500

. Generating Equipment:
    - One (1) Paxton black start engine/generator 400 kW
    - Four (4) M.A.N. 5/55A 18,00 hip./Dual-Fuel Diesel Engines with 12.5 mW
    Brush generators
    - One (1) G.E. 1213 75 kW/DC generator
    - One (1) Delco 100 kW/AC generator

Fire Protection
- Two (2) 300 g.p.m. fire pumps
- Six (6) foam fire stations and roof-mounted monitors
- Two (2) water fire stations

Fire detection:
- Zoned smoke and heat detectors throughout the power plant with central reporting to Control Room

Lifting Equipment
One (1) overhead crane with 17-ton capacity hoist and 2-ton capacity hoist for maintenance activities

Cargo Handling Pumps
- Two (2) Cat. 343 12" cargo pumps
- Two (2) 20 h.p. ballast pumps
- One (1) marine sanitation device
- One (1) oily water separator rated at .5 cum/hr.

Mooring equipment:
- One (1) 6-ton anchor
- One (1) Windlass/Capstan electric anchor at bow of barge
- One (1) Capstan electric mooring at stern of barge
- Three (3) 42" exhaust fans over main engine deck
- Two (2) exhaust fans located in maintenance shop area

TECHNICAL LIMITS:

1) CAPACITY:
| | |
|---|---|
| Nominal Capacity (Nameplate): | 47,500 kW |
| Internal use of barge: | 2,500 kW |
| Guaranteed Capacity: | not less than 38,000 kW |

2) HEAT RATE:
| | |
|---|---|
| Expected: | 8,800 Btu/kWh |
| Guaranteed: | 9,000 Btu/kWh |

3) HIGH VOLTAGE ELECTRICAL OUTPUT:
| | |
|---|---|
| Power Factor: | 0.85 lead – 0.85 lag |
| Voltage: | 69 kv - 73 kv |
| Frequency Trips: | 37 Hz – 62 Hz |

4) OPERATIONAL
Power Barge II is a base-load thermal power facility. It will be dispatched on the basis of the following limitations:

| | |
|---|---|
| Minimum Operation: | 7,000 kW |
| Minimum Fuel Oil Inventory: | 300,000 gal. |
| Minimum Diesel Fuel Inventory: | 475,000 gal (start-up) <br> 30,000 gal (operating) |
| Cold Plant Start-up: | 1 hour (assuming air pressure is available) |
| Hot plant Start-up: | 15 minutes |
| Time to Full Load: | 1 hour |
| Plant Shutdown: | 15 minutes |

5) WATER:
- Water depth:                    20 feet minimum

6) ELECTRICAL PROTECTION AND CONTROL INTERFACES REQUIRED:
- Ability to trip THE CORPORATION's 72 kv circuit breaker
- Contacts to indicate status of THE CORPORATION's high voltage circuit breaker (52a & 52b contacts)
- THE CORPORATION's high voltage breaker must be equipped with synchronism check relay to prevent closing of the circuit breaker when the barge and THE CORPORATION's systems are out of synchronism.


SUPPLEMENTAL CAPACITY

THE SELLER will provide the Supplemental Capacity, the exact details of which are dependent on availability and type of equipment. The equipment used will meet the following criteria:

1. Land-mounted or barge-mounted
2. Nominal Capacity – at 15 mW
3. Guaranteed Capacity – 80% of the nominal capacity
4. Operates on Bunker C (Fuel Oil No. 6) or Distillate
5. Prime mover
   . Internal combustion engine (i.e., reciprocating or combustion turbine)
   . Single or multiple units
6. Guaranteed Heat Rate will be less than 9,500 Btu/kWh (LHV), as required in order to obtain a combined heat rate of the FACILITY not greater than 9,120 Btu/kWh
7. Other auxiliary, Balance of Plant, and support equipment will be provided.

POWER PURCHASE AGREEMENT

ATTACHMENT B

INSTALLATION SITE

I. Additional Capacity – Power Barge II

1. The Power Barge II will occupy the site of Power Barge I, which will be enlarged by THE SELLER to the dimensions and capacity of the barge.

2. The site mutually acceptable to THE SELLER and THE CORPORATION. The berth will be parallel to and abutting a dock to which fuel piping and electrical connections will be supplied by THE CORPORATION. Adequate pilings will be provided on the outboard side of the Facility by THE CORPORATION to provide additional mooring stability for the site.

II. Supplemental Capacity

Description and Location of Site

A piece of land within 30 kilometers of the Power Barge II Site that can adequately accommodate 15 mW of diesel engines, generators, boxes, auxiliary equipment, and other facilities required to operate a 15 mW plant. The Site will have fuel piping and electrical connections brought to the edge of the site by The Seller solely at its expense.