# EXHIBIT B

**ICC International Court of Arbitration**
**Case No. 11772/KGA/CCO**

**Dated as of July 11, 2005**

# PART II

*of the defaults.*
*14. Determine which are the remedies the Agreement grants in the event of proven default by both parties.*
*15. Determine whether such remedies correspond to the claims of CPB or the State and/or the Corporation.*
*16. Adjust the accounts between the parties, either directly or through an international audit firm.*
*17. If article 13 of the Contract is declared null and void, resolve on the claims of the Dominican State to sentence CPB to pay all taxes or dues CPB did not pay under said article 13, as determined by an analysis of accounting an operations carried out by CPB and offset the amount of such taxes against any amount that may result from the "Adjustment of accounts."*

*********

## VALIDITY OF THE COMPOSITION OF THE ARBITRAL TRIBUNAL

**15.** The first litigious point Arbitral Tribunal must resolve prior to the points on the merits of the case, concerns the validity of its composition. The Terms of Reference expressed it as follows:
*" Determine whether or not the designation of the arbitrator corresponding to CDEEE (legal successor of CDE) and the Dominican State, made by the ICC International Court violates article 18.5 of the contract which establishes that "each party will be entitled to choose one arbitrator and the third will be designated according to the rules of the International Chamber of Commerce of Paris, France (ICC)."*

**16.** It is a generally admitted principle that an Arbitral Tribunal has the mission to decide about its mission and its jurisdiction.

In this case, the mission of the Arbitral Tribunal is to decide on a dispute acting as arbitrators, by mutual agreement of the parties. The mutual agreement of the parties is contained in clause 18 of the Power Purchase Agreement of March 17, 1998.

Article 18.1 reproduced in its major part in paragraph 6 of this award mentions that *"any dispute...will be referred to arbitration and finally resolved according to the arbitration rules of the International Chamber of Commerce valid in Paris France (the ICC Rules)."*

The common will of the parties was therefore to refer to the arbitration rules of the International Chamber of Commerce valid since January 1, 1998.

In the preliminary award rendered on September 19, 2003 (hereinafter the "Preliminary Award"), the Arbitral Tribunal decided that the arbitration agreement contained in

article 18 of the Agreement was valid and was binding for the Dominican State in spite of the allegations that the agreement violated Dominican public policy laws or certain provisions of the Constitution of the Dominican Republic.

**17.** Paragraph 18.5 of the Agreement indicates in its last phrase that *"each party will be entitled to choose one arbitrator and the third one will be designated according to the rules of the International Chamber of Commerce of Paris, France (ICC)."*

It is clear that neither the State nor the Corporation elected among the three members of the Tribunal the co-arbitrator the Defendants had the right to choose under article 18.5. Co-Arbitrator Luis Enrique BOTTARO-LUPI was designated on behalf of the Defendants by the International Court of Arbitration of the ICC.

**18.** The Arbitral Tribunal wishes to describe the various stages that led to this designation before examining whether the common will of the parties was really ignored:
- In its session of November 15, 2001, the International Court of Arbitration granted the Defendants a term of 15 days from the day following receipt of the fax communication to jointly designate a co-arbitrators (letter from the Secretariat dated November 16, 2001). The Defendants did not answer said invitation, nor did they designate a co-arbitrator.

- In its session of March 7, 2002, the International Court of Arbitration, pursuant to article 9(6) of the Rules, appointed directly Attorney Luis Rafael PELLERANO as arbitrator *"on behalf of the defendants, which refrained from designating a co-arbitrators."* The appointment was made pursuant to article 8.4 of the Rules, which sets for the following: *"If a party refrains from designating an arbitrator, the appointment will be made by the Court."*

**19.** There is no doubt that since the invitation of the Secretariat sent on September 22, 2001 to the Defendants to answer the petition for arbitration, and also from the invitation of the Secretariat to the Defendants to designate an arbitrator within the term of fifteen days, sent on November 16, 2001, the Defendants did not answer said invitations, as they should have according to the obligations undertaken when signing the arbitration agreement, with express reference to the ICC Arbitration Rules.

It is self understood that when a person must exercise a prerogative, such as the selection of an arbitrator, the right to choose the arbitrator must be exercised within a reasonable term, taking into account all circumstances. In this case, a delay of more than two months to exercise the right to designate a co-arbitrator can be interpreted and understood only as a waiver to exercise it.

**20.** After the designation of Co-Arbitrator Luis Rafael PELLERANO by the Court on behalf of the Defendants, the latter challenged him. The International Court of Arbitration accepted the challenging petition on May 31, 2002.

**21.** The Defendants designated instead Dr. Rafael Tulio PEREZ DE LEON by letter of June 14, 2002. The Court confirmed the designation made by the Defendants in its session of July 5, 2002.

On August 9, 2002, the Plaintiff submitted a petition challenging arbitrator PEREZ DE LEON. The Court accepted the challenging petition in its session of August 30, 2002.

**22.** The Defendants jointly designated Dr. Manuel V. RAMOS as Co-Arbitrator by letter of September 18, 2002. By letter of October 4, 2002, CAYMAN POWER BARGE opposed the confirmation of Dr. Manuel V. RAMOS by the Court. In its session of October 25, 2002 the Court decided not to confirm Dr. Manuel V. RAMOS and invited the Defendants to designate a co-arbitrator within a term of seven days.

**23.** The Secretariat wrote to the Defendants the letter of November 6, 2002 in the following terms:
*"The Secretariat refers to your letter of October 25, 2002 by which it communicated to the parties the decision of the Court in its session of the same date to grant the Defendants a term of 7 days from the day following receipt of said communication by fax to designate an independent arbitrator.*

*Since the term mentioned has expired and the Defendants did not designate a co-arbitrator, please note that the Court will be invited to appoint an arbitrator on behalf of the Defendants pursuant to article 9(6) of the Rules."*

The Defendants did not react to said letter of the Secretariat of the Court.

Nine days later, in its session of November 15, 2002, the Court appointed Dr. Luis Enrique BOTTARO-LUPI as Co-Arbitrator on behalf of the Defendants.

**24.** By letter of December 5, 2002, the Defendants protested against the process implemented by the Court in the designation of Dr. Luis Enrique BOTTARO-LUPI. The Defendants challenged said arbitrator and proposed instead Dr. Manuel Ramon SOSA PICHARDO, legal vice-rector of the Pedro Henriquez Urena National University of Santo Domingo. In its session of December 19, 2002, the Court rejected the petition challenging Dr. BOTTARO-LUPI.

**25.** The protests submitted by the Defendants in their letter of December 5, 2002 are based on two juridical grounds. The first concerns the calculation of the terms based on distance; the second concerns the violation of article 9, paragraph 6 of the Arbitration Rules.

Concerning the first argument, the defendants allege that article 73 of the Code of Civil Procedure of the Dominican Republic (hereinafter "CPC") indicates that the terms are increased by 60 days *"since the Court is in European territory,"* and then concludes:

*"Consequently, the term to choose our arbitrator is still open and we do not intend to waive it, nor will we accept the imposition of an arbitrator by replacing our right."*

**26.** The Secretariat answered said legal argument by letter of December 9, 2002:
*"Please note that the arbitration agreement based on which the petition was initiated indicates that, in the case of a dispute between the parties, "each party will be entitled to choose one arbitrator and the third will be designated according to the rules of the International Chamber of Commerce of Paris, France (ICC)." (Article 18.1 of the Power Purchase Agreement signed by the parties on 3/17/98) ("Agreement"). Consequently, pursuant to Article 6(1) of the Rules, said article must apply to this arbitration proceeding. Consequently, all the terms established in the regulation and/or based thereon are applicable...."*

Even in the event that the Code of Civil Procedure of the Dominican Republic applied to this arbitration, the Arbitral Tribunal adds that, the same as it is inadmissible to extend the term to designate an arbitrator because of the distance, the extension of the terms for reasons of distance of one party in connection with the ICC Court of Arbitration would also be incompatible with article 24 of the Arbitration Rules, which establishes a term of six months for the Tribunal to render its award, regardless of the distance between the Court and the members of the Arbitral Tribunal.

In addition, the extension of the term by reasons of distance referred to in Article 73, CPC, as amended by Law 1821 of October 14, 1948 refers exclusively to the summons of the parties to appear initially before the Tribunal (CPC, Book Two, Title II, Art. 59 to 74).

**27.** The second argument of the Defendants criticizes, in substance, the fact that the Court designated directly the co-arbitrator on behalf of the Defendants without requesting a proposal for a name of arbitrator to an ICC National Committee. This argument was answered by the Secretariat of the Court by letter of December 9, 2002:

*"Please note that, as is of public knowledge and easy to prove through the information provided by the International Chamber of Commerce (ICC) – for example, on its Internet site, there is no National Committee in the Dominican Republic, so that the second sentence in Article 9(6) of the Regulation applies, in other words, in this case the Court was "at liberty to select the person it deems appropriate" by direct designation."*

This controversial point is merely factual. The Arbitral Tribunal need not add any other element.

**28.** The Arbitral Tribunal finds that the Corporation and the State had available an actual term of at least 15 days to propose the name of an independent arbitrator which, in this case, among other criteria, needed to meet the condition that the candidate not be, nor have been, an employee of the Corporation or of the State (article 18.5 of the Agreement). Since the Defendants did not make this designation, it was appropriate under the ICC Regulation, selected as arbitration institution by the parties to the Agreement, that the Court designate an arbitrator on behalf of the Defendants at least as of November 14, 2002.

This Arbitral Tribunal concludes and decides that its composition has been legitimate, as agreed between the parties and pursuant to the Regulation chosen by them to govern this arbitration proceeding.

Having decided on the validity of its composition, the Arbitral Tribunal presents below the position of both parties on the litigious points on the merits.

********

## POSITIONS OF THE PARTIES

### POSITION OF THE PLAINTIFF

**29.** In its petition for arbitration, CAYMAN POWER BARGE explains that it provided electric power according to the contract. It also sent the corresponding bills to the Corporation, calculating the net production of power and payment for power according to the consumption of each preceding month (Agreement, 10.2.1).

The Plaintiff indicates that the State defaulted on its payment obligations: *"Specifically, the State did not pay for the Power within the period stipulated under 10.3.1, i.e., within twenty-five (25) days after receipt of each invoice by the Corporation."* Considering that the absence of payment of the bills constituted a cause of default by the State, as set forth in article 22.2 c of the Agreement, CPB

notified the State and the Corporation in writing of this cause of default, inviting the Defendants to take the necessary steps to remedy the default.

**30.** Since the State did not remedy the default within twenty days after the notification, the Plaintiff indicates that *"CPB exercised its right to draw against the letter of credit to cover the payment of the pending bills, as allowed under articles 11 and 22.5 of the Agreement."*

The Plaintiff mentions that it notified the State and the Corporation by letter dated April 17, 2000, about the initial withdrawal of US$ 1,642,139.78. On May 11, 2000, it communicated a second withdrawal of US$ 397,772.72.

After these two withdrawals of money, the Plaintiff indicates that the State defaulted on its obligation to replenish the payment guarantee of the letter of credit which, as indicated in article 11 of the Agreement, had to have at all times a nominal value of US$ 2,044,912.50.

**31.** By letter of May 23, 2000, CAYMAN POWER BARGE informed the State and the Corporation that the default on their obligation to extend or reissue the letter of credit constituted a *"cause of default of the State"* under Article 22.2 of the Agreement, which indicates that the credit must be restored within thirty days after a withdrawal.

The Plaintiff invited the Defendants to remedy their default within a term of thirty days after the notification, as indicated in Article 22.4 of the Agreement. At that time, the Plaintiff also informed the Defendants that if the letter of credit was not reissued or extended within the period of thirty days established in Article 22.4, the Plaintiff would exercise its right to terminate the contract as allowed under article 22.5 of the Agreement.

**32.** CAYMAN POWER BARGE alleges that it signed with the Corporation a "Memorandum of Understanding" dated July 8, 2000. In said document, the Corporation agreed to reissue the letter of credit by July 30, 2000 at the latest. Neither the State nor the Corporation reissued the letter of credit – neither within the term or afterwards.

The Plaintiff continued explaining that *"by letter dated March five (5), 2001, CPB again notified the State and the Corporation that their failure to reissue the Letter of Credit within the previously indicated term constituted a Cause of Default under this contract."* In fact, CPB explained in that letter that the failure of the State and the Corporation to reissue the letter of credit placed CPB in default with its lender because: *(1) the parent company of CPB guaranteed debt with the Powerbarge as real guarantee, and (2) the*

*provisions of the Contract and the provisions concerning the Letter of Credit in said Contract were guarantees to the lender under the Loan Contract.* By letter dated March fourteen (14), 2001, CPB again *"requested urgently"* the reissue of the letter of credit and indicated that without said reissue the credit institutions of CPB *"would place the State and the Corporation in contractual default."*

33. CAYMAN POWER BARGE indicates that, as of July 24, 2001, the Corporation and the State had not yet remedied the default concerning the letter of credit. This situation justified a final request to the State to issue a new letter of credit.

In the same letter of July 24, 2001, CPB notified the State that it had not paid the bills for the total amount of US$ 2,198,457.95 within the twenty-five days stipulated in Article 10.3.1 of the Agreement and that it could not exercise its right to draw against the letter of credit which had not been reissued. The Plaintiff then required *"payment of the legal interest accrued on the outstanding bills, at the rate of one percent (1%) monthly calculated from the due date of each outstanding invoice until CPB receives payment for such bills."*

34. Given the absence of payment, on August 1, 2001, CAYMAN POWER BARGE notified the State and the Corporation that it was stopping all the production of electric power by the "Powerbarge" and that the barge *"would remain closed waiting for the resolution of the aforementioned causes of default."*

35. Since the causes of default had not been remedied, the Plaintiff notified the State and the Corporation by letter of September 17, 2001 that it was terminating the contract pursuant to article 22.5 of the Agreement.

36. In its argument of November 14, 2003, the Plaintiff mentions that, on July 2, 1999, at the time of the replacement of "Powerbarge I" by an electrical unit with higher capacity, "Powerbarge II," the parties signed an amendment to the Power Purchase Agreement of March 17, 1998 ("the Amendment").

Article Fifteen of the Amendment indicates the payment of US$ 525,000.00 to CPB within ten days after the signing of the Amendment, as compensation *"for any claim, obligation, petition and action "including unpaid bills."* However, on July 23, 1999, the Plaintiff had not received any payment in spite of the notification concerning the installation of "Powerbarge II."

37. In addition, the Plaintiff indicates that, in April 2000, the Corporation defaulted on its obligation to provide the fuel necessary for the production of electricity, in violation of Article 9 of the Agreement. It continues

by mentioning the following:

*"Given this obvious and indisputable default of the Dominican State and after countless meetings and conversations in which CPB was kept in the expectation of receiving payment for the power provided and the fuel needed by the generation unit to operate, all of which were fruitless, on April seventeen (17), two thousand (2000), CPB formally notified the Dominican State and CDE of CPB's intent to exercise the rights granted to it under the Agreement in connection with the default on the payment of bills, payment and provision of fuel (see document No. 5 of the enclosed list); it then proceeded to withdraw the amounts owed from the letter of credit issued in favor of CPB under the Agreement to guarantee the payments owed to it thereunder including the interest produced by said amounts, as established in article 10.5 of the Agreement, all pursuant to Articles 11 and 22.5 of the valid contract between the parties."*

The Plaintiff alleges that on May 4, 2000, it notified the State again of its defaults, for not paying the bills of March and for irregular supplies of fuel, which were necessary for the barge to operate regularly.

**38.** Since the Dominican State and the Corporation did not answer these notifications of default, CPB again notified the Defendants that the situation was untenable. By letter of May 9, 2000, CPB warned the Defendants that if it had not received the expected payment by May 11, 2000, a new withdrawal would be made from the letter of credit pursuant to Article 11 of the Agreement.

The Plaintiff adds that after withdrawing the balance of the letter of credit, the State did not replenish the credit within the thirty days after the withdrawal, which constituted a new default.

Since the default had not been remedied, on June 2, 2000, CPB notified the State and the Corporation that it was going to suspend its operations indefinitely, as allowed under said Article 22.5 of the Agreement.

**39.** The Plaintiff indicates that new fuel supply problems were created by the Corporation.

The Plaintiff also mentions that CPB accepted a negotiated solution to the situation by signing a "Memorandum of Understanding" dated July 8, 2000. In that memorandum, the State and the Corporation promised to reissue the letter of credit by July 30, 2000 at the latest. However, CAYMAN POWER BARGE affirms that the Defendants did not reissue the letter of credit and did not pay the pending bills.

By letter of March 5, 2001, the Plaintiff notified the State of its

default in violation of the terms of the Agreement, since the generating barge *"have been given as real guarantee to the entity that financed its operations and the provisions of the Agreement, the same as the provisions concerning the letter of credit contained in the Agreement were guarantees given to said entity as lender under a loan contract singed for this purpose."*

40.    By letter of July 24, 2001, CPB notified the Defendants on the defaults related to the re-issue of the letter of credit under debt *"which on that date totaled US$ 2,198,457.95 plus legal interests generated by said amount at the rate of one percent (1%) monthly, calculated from the due date for the bills outstanding until the actual payment thereof to CPB, pursuant to Article 10.5 of the Agreement."*

On August 1st, 2001, the State had not remedied the defaults. By letter with the same date, CAYMAN POWER BARGE notified the Defendants that *"it would stop all the production of electric power until the situations of default communicated were remedied."* Since there was no remedy, on September 17, 2001, CPB notified the state and the Corporation of *"its intent to terminate the Agreement pursuant to Article 22.5 thereof."*

CAYMAN POWER BARGE filed the petition for arbitration on September 20, 2001.

41.    The Plaintiff considers that the Agreement constitutes the law between the parties *"so that the creditor has the right to require its debtor to comply with the obligation assumed by the latter...hence the Dominican State becomes debtor of CPB for the payment for the net production of power (as defined in section 1.46 of the Agreement) sold by the latter under the Agreement. The legal interests generated by said amount in connection with the payment delay thereof, pursuant to Article 10.5 of said contract, and for all other obligations assumed by the Dominican State...."*

42.    In opposition to the defenses and counterclaims filed by the Defendants (see No. 58 to 68 of this award), CAYMAN POWER BARGE indicates in its brief of answer of February 20, 2004 (hereinafter "CPB Answer"), that the notification by process server is not of public policy under Dominican law and refers to Article 1146 of the Civil Code of the Dominical Republic ("Civil Code"), which exempts from placing the debtor in default when the parties have contractually established a specific term for compliance with the obligations.

43.    The Plaintiff mentions that Article 22.4 b of the Agreement indicates that *"the complying party may terminate this Agreement by delivery of a written notice to the defaulting party,"* which it did – and that Article 1184 of the Civil Code is not of public policy to the extent that it indicates that the termination of the contract must be requested

judicially. It mentions the jurisprudence that establishes that *"if the performance of the obligation was a conduct constituting a cancellation cause, it implies by itself the destruction of the contract, and the Judge would do nothing, in all events, but find the existence of the destruction."*

It adds that *"CPB not only acted within the rights recognized to it in the contract, but after the notice of termination delivered to the state and CPB, it immediately proceeded to resort to the arbitration jurisdiction to find validly the termination of the Agreement validly and regularly exercised by CPB."*

**44.**    Concerning the *"alleged nullity of Article 13 of the Agreement due to alleged violation of Articles 37, paragraph 19, 55 paragraph 10 and 110 of the Constitution of the Republic,"* the Plaintiff considers that if the tax exemptions granted to private persons by contracts must be approved by Congress, then the Defendants had the burden of obtaining such approval from Congress. On this point, the Plaintiff refers to Article 13.1.1 of the Agreement, which gives the State the obligation to obtain from the *"corresponding tax authorities"* the exemption of *"all taxes that may affect the actions or operations under this agreement."*

The Plaintiff cites Article 55 paragraph 10 of the Constitution of the Dominican Republic proclaimed on August 14, 1994 (hereinafter "RP Constitution"), which *"establishes as the attribution of the President of the Republic, who under the provisions of law No. 1486 of March 20, 1938, represents the State,... 'to execute contracts submitting them for the approval of the National Congress when they contain provisions related to the impact on the national revenue...or when they stipulate tax exemptions in general, pursuant to Article 110.'"*

It indicates that *"private persons are not legally entitled to submit directly contracts for approval to the Congress of the Republic."*

In addition, the Plaintiff calls attention to Article 13.1.1 of the Agreement, which sets forth that *"if the seller must pay any tax, including on the import of materials, assets, equipment and spare parts to be used in the operation of the unit, the State consents under this Agreement to reimburse the seller for the amount of the tax paid."*

The Plaintiff indicates that, if there is any tax burden, it must be paid by the State because it was so agree, and that *"the levy of said charge is possible only by default of the State on its obligation."*

**45.**    As to the appointment of a Commission of experts, it considers that this petition is *"dilatory and reckless for the purposes of the litigation, especially since CPB provided to the Arbitral Tribunal all the documentation that supports its claims in the bills delivered at the time to CDE and the legal provisions that support the amounts and items of*

said bills."

**46.**     CAYMAN POWER BARGE moves the Arbitral Tribunal:
- to declare the termination of the power purchase Agreement of March 17, 1998, as
amended by the document of May 2, 1992;
- to sentence the Dominican State to pay US$ 4,175,082.38 as payment of the bills
issued in connection with the performance of the Power Purchase Agreement and its
amendment;
- to sentence the Dominican State to pay interest, *"at the rate of one percent monthly,
calculated from the due date of the bills underlying said debt to the actual payment
thereof to CAYMAN POWER BARGE I LTD pursuant to Article 10.5 of the Agreement
as late damages caused by the default of the Dominican State on its payment obligation
under said agreement and pursuant to Article 1153 of the Civil Code of the Dominican
Republic;"*
- to sentence the Dominican State to pay US$ 1,200,000.00 as compensation for the
damage caused by the default on the obligations contracted under Article 11 of the
Agreement, concerning the issuance and maintenance of the letter of credit issued in
favor of CAYMAN POWER BARGE.

**47.**     This petition follows the summary of the claims of CAYMAN POWER BARGE
presented in the Terms of Reference:
*"CPB, Plaintiff, requests an arbitration award which:*
*1- declares that the failure of the State and the Corporation to re-issue the Letter of
Credit constitutes a cause of default by the State under this Contract.*
*2- declares that "the default of the State and the Corporation on the payment of each
unpaid invoice is another cause of default by the State under this Contract."*
*3- declares that "the failure of the State and the Corporation to remedy the causes of
default cited above entitle it...to discontinue the operation of the Powerbarge."*
*4- declares that "failure of the State and the Corporation the remedy the causes of
default cited above entitle it to...terminate this Contract."*
*5- obligates "the State and/or the Corporation to (pay to it) the amount stipulated in the
unpaid bills."*
*6- obligates "the State and/or the Corporation to (pay to it) the legal interests generated
by the delinquent bills from the due date of each delinquent invoice to the date CPB
receives payment for each of said unpaid bills."*

The court does not find it useful to reproduce point seven concerning the provisions on
the cost of arbitration, since the Defendants paid their separate provision on November
12, 2004.

*********

## POSITION OF THE CODEFENDANTS

**48.**     In their defense allegation of January 29, 2003 ("Defense"), the Defendants explain that the difficulties in the performance of the Agreement started in 1998, the very year the Agreement was signed. The Defendants indicate that such difficulties were originated from differences in the calculation of the amounts of energy delivered, which caused several adjustments of accounts between the parties.

**49.**     The first part of the legal arguments of the Defendants refers to the validity of the agreement as to the letter of credit and to what they consider as an illegal appropriation of the funds of the letter of credit:

*"Violation of Articles 2078 of the Civil Code and 93 of the Commercial Code.*
*Using an illegal clause inserted by CAYMAN POWER BARGE I, LTD in the power supply contract, that company proceeded unilaterally, without carrying out any legal formality or without giving any notice of default, to directly execute the funds represented by a Letter of Credit that existed as a pledge guarantee in its favor with the RESERVE BANK OF THE DOMINICAN REPUBLIC, unilaterally appropriating said funds, and thus violating the provisions of Art. 2078 of the Civil Code of the Dominican Republic and Art. 93 of the Commercial Code, the first of which, copied verbatim, reads: "Art. 2078: The creditor cannot, due to lack of payment, dispose of the pledge, without prejudice that it may obtain a court order to have it delivered as payment up to the due amount, according to an appraisal made by experts, or that it be sold in a public auction. Any clause that authorizes the creditor to appropriate the pledge or dispose of it without the indicated formalities is deemed null."*

*Article 93 of the Commercial Code follows the same principle, namely: "Any clause that authorizes the creditor to appropriate the pledge or dispose of it without the aforementioned formalities will be null."*

**50.**     The second legal ground mentioned in the defense allegation refers to the behavior of CAYMAN POWER BARGE. The Defendants consider that CPB, by deciding to terminate the contract and leave the territory of the Dominican Republic without continue with the negotiations, constituted itself as judge of its own case against the provisions set forth in Article 1184 of the Dominican Civil Code:

*"The cancellation condition is always self-understood in sinalagmatic contracts if one of the parties does not comply with its obligation. In this case, the contract is not cancelled ipso jure. The party which suffers the default will be entitled to require from the other the performance of the agreement, with the possibility of requesting the cancellation of the contract and the payment of damages. The cancellation must be requested in court, and a term proportional to the circumstance may be granted to the Defendant."*

**51.** Rejecting the allegations of the Plaintiff, the Defendants invoked the

French jurisprudence, in the sense of requiring the judicial intervention for a party to be able to cancel a contract:

*"The French Jurisprudence has indicated: "The clause of ipso jure cancellation, which allows the parties to take away the cancellation of an agreement from the appreciation of the judges, must be expressed in an unequivocal manner, in the absence of which the judges will resume their power of appreciation (Civil Cassation First Chamber, November 25, 1986... Civil Cassation Third Chamber, December 7, 1988...) An ambiguous cancellation clause will not take away from the judge the power of appreciation granted to him under article 1184 (Civil Cassation First Chamber, July 16, 1992) (Quote taken from Megacode Dalloz, comments to article 1184, Civil Code. Dalloz· Paris, 1997-1998, page 908, p. 5)."*

**52.** The third legal ground alleged by the Defendants is about Article 13 of the Agreement. Said clause exempts CAYMAN POWER BARGE from paying various taxes, a provision which the Defendants consider null because it is contrary to constitutional text. The detailed position of the Defendants on this point will be presented further on with the summary of their brief of answer of April 23, 2004 ("Answer of the Defendants"), which adds new nuances about their arguments (see No. 75).

**53.** In the fourth place, the Defendants affirm that the contract is totally invalid because it was not ratified by Congress:

*"Total nullity of the contract by violation of the Constitution of the Dominican Republic. Not only is Article 13 of the contract null because it violates the Constitution but, due to lack of compliance with the formalities established in said articles: 37, paragraph 19; 55, paragraph 10 and 110 of the Dominican Republic, the contract suffers from the defect of nullity in its entirety, because, since it was not submitted to the knowledge and ratification of the National Congress, it is necessary to receive the sanction established in article 46 of the Constitution of the Republic which reads: "Any Law, Decree, Resolution, Regulation or Act contrary to the Constitution are null ipso jure."*

**55.** In a part titled "Concrete Answers to the Petitions of the Plaintiff," the Defendants summarize prior criticisms as to the lack of notification by process server, the termination of the contract and the departure of the Plaintiff from the Dominican territorial waters without prior judicial authorization, the absence of conciliation of accounts and the illegal execution of the letter of credit.

**56.** In addition, the Defendants oppose the payment of interest as of the due date of each invoice:

*"CAYMAN POWER BARGE I, LTD. claims a sentence to pay interest based on each invoice, using the term "Delinquent Invoice," but violates the Law, particularly article 1154 of the Civil Code which refers to "Compound interest" and indicates under what conditions it can be implemented. That legal provision is of Public Policy as declared by our Supreme Court of Justice in the sentence found in Boletín Judicial 548, page 676;*

*said text of the Civil Code reads:*
*"Article 1154 – The interest produced by capital may produce new interest, either*
*following a judicial petition or a special agreement, referred to interest owed at least for*
*a term of one whole year."*

*As can be seen, even if it were admitted that there are pending bills, none of these*
*conditions have been met and the law is violated by said petition of CAYMAN POWER*
*BARGE I, LTD."*

**57.** The Defense allegation of January 29, 2003, being prior to the preliminary award,
dedicates certain parts to the lack of jurisdiction of the Arbitral Tribunal. Since said
litigious point was resolved in the preliminary award of September 19, 2003, the Court
does not find it necessary to summarize the arguments of the defendants concerning this
topic.

********

In its brief filed on January 9, 2004 ("Counter-answer of the Defendants"), the
Defendants summarize their defenses and counter petitions or counterclaims, requesting
the following:

**58.** One - to declare the nullity of Article 18 of the Agreement, which contains the
arbitration clause, because it violates Article 1004 CPC which prohibits arbitration
agreements on causes that concern the State and the public establishments;

**59.** - Two - to declare that CPB, *"by appropriating without any formality the funds*
*deposited as pledge guarantee through the letter of credit"* acted in violation of Article
2078 Civil Code and Article 93 of the Commercial Code of the Dominican Republic,
which prevent the credit or to appropriate the pledge, in the event of default of the
debtor.

**60.** - Three - to declare that CPB, *"by canceling unilaterally and without cause the*
*contract of March 17, 1998, without the order of a judge or court, by suspending the*
*service and leaving the Dominican Republic abusively, untimely and unilaterally,*
*without any arbitration, violated article 1184 of the Civil Code which establishes that, if*
*a party does not comply with its obligation "the contract is not canceled ipso jure" and*
*that "the cancellation must be requested in court";*

**61.** - Four - to declare the Agreement canceled without liability for the Defendants *"due*
*to violation of article 1184 of the Civil Code of the Dominican Republic by canceling*
*unilaterally said Power Sale Agreement without the order of an Arbitral Tribunal;*

**62.**      - Five - to discharge the Defendants of any liability as its is not guilty and has not committed any fault;

**63.**      - Six - to designate a Commission of experts or an international firm to evaluate fairly and neutrally the accounting documents of CDE, now CDEEE, and to verify whether there is any credit in favor of CAYMAN POWER BARGE, thus adjusting the accounts, as attempted by the parties, taking note of the willingness of CDEEE to pay many amount of money owed to CPB;

**64.**      - Seven - to sentence CPB to pay to the Defendants an indemnity *"for violation of Article 1184 of the Civil Code, since said company, without a court or arbitration decision, abandoned the country, stopping the service and caused damage"* to the State and to CDEEE;

**65.**      - Eight - *"to take note of the violation of Articles 37, paragraph 19; 55 paragraph 10 and 110 of the Constitution of the Republic and as such, declare the nullity of Article 13 of the contract dated March 17, 1998 and sentence CAYMAN POWER BARGE to pay all taxes owed to the Dominican State (Dominican Republic) under the cover of tax or dues, exonerations and exemptions to which they were not entitled;"*

**66.**      - Nine - to declare null the contract covering the claims of CPB due to "non-compliance with the formalities established in Articles 37, paragraph 19; 55 paragraph 10 and 110 of the Constitution of the Republic because, due to the failure to submit to the knowledge and ratification of the National Congress, it is necessary to apply the sanction set forth in Article 46 of the Constitution of the Republic that states: *"Any Law, Decree, Resolution, Regulation or Act contrary to the Constitution are null ipso jure."*

********

**67.**      By briefs of January 30 and February 9, 2004, the Defendants submitted the quantification of the amount of the indemnities:
- for unpaid customs duties: US$ 1,084,246.50;
- for income tax not collected, whose gross amount is US$ 10,205,348.03, from which the presumed net profit is equivalent to ten percent (10%) of said income, i.e.,: US$ 1,020,534.80;

*"The Dominican tax is calculated at the rate of twenty-five percent (25%) of the net income, i.e.,: US$ 255,133.70 plus the surcharges established in law 11-92 of May 16, 1992 (Tax Code of the Dominican Republic), which amount had to be collected through the General Department of Internal Taxation of the Dominican Republic."*

- the amount of US$ 1,224,641.70 *"as 12 percent (12%) tax on the*

*transfers of industrial goods and services (ITBIS) on the cost billed and paid by CDEEE,
which amount had to be levied through the General Department of Internal Taxation of
the Dominican Republic."*

**68.**    The amount of US$ 1,000,000.00 for damage suffered by CDEEE. This amount
*"corresponds to profits not received, loss of energy production, damage to the image of
the company, etc., because of these arbitration proceedings and the unjustified claims of
CAYMAN POWER BARGE LTD."*

**69.**    In its rejoinder brief of April 23, 2004, which answers in detail the brief of
CAYMAN POWER BARGE dated February 20, 2004, which the Defendants qualify as
"bulky," they indicate that:
*"The declaration of the Plaintiff is false, namely that Corporación Dominicana de
Electricidad (CDE) and the Dominican State have had an unpleasant attitude of
repeated non-compliance, since the non-compliance took place when, in an abusive and
exaggerated manner, the adventurers of CAYMAN POWER BARGE tried to collect an
exaggerated amount and obtain abusive income beyond the fair amounts and those
established in the contract, and then fled from the country and refused at all times to
conciliate the accounts and correct their bills adjusting to the real quantities
consumed."*

**70.**    The Defendants consider that the Plaintiff has not complied with the provisions
of the Agreement: *"Desperately, CAYMAN POWER BARGE I, LTD., invokes Article
1134 of the Civil Code, but when it had to comply with its text, they preferred to escape
furtively, to dismantle their barge and avoid doing what the Contract indicated, and that
was the great mistake of these adventurers. What happened to Articles 22, paragraph
22.3 and 18, paragraph 18.1 of the Contract?"*

The Arbitral Tribunal understand that the Defendants allege the contractual default of
CAYMAN POWER BARGE because:
- it did not comply with the processes mentioned in Article 22.1 of the Agreement,
which enumerates the causes of default of the "Seller;"
- it has not complied with the process of notification of defaults to be carried out by the
complying party, under Article 22.3 of the Agreement;
- it did not notify the Defendants to resolve the disputes amicably as indicated in Article
18.1 of the Agreement.

**71.**    The Defendants also consider that the bills issued by CPB are not valid because
they are not in line with the reality or real consumption. They qualify them as abusive
and inexact. In the brief of April 23, 2004, the Defendants admitted that they owed US$
2,267,547.34 and proposed to pay it. However, in a subsequent letter dated November
25, 2004, they declared the following:
*"The new authorities of Corporación Dominicana de Empresas Electricas Estatales
(CDEEE) conducted an audit of the account of CAYMAN POWER BARGE I, LTD., in
light of new evidence and proof obtained by them, which gave, as a*

*result, an accounting situation that is totally different, which shows a credit balance in favor of Corporación Dominicana de Empresas Eléctricas Estatales (CDEEE), the Recognition of Debt and Offering of Payment be made to the International Court of Arbitration of the International Chamber of Commerce (ICC) in our brief of Counterclaims is inapplicable."*

**72.** The Defendants allege that CAYMAN POWER BARGE forgot to notify the Dominican State of what was happening:

*"It is unconscionable to say that CAYMAN POWER BARGE I, LTD. notified the Dominican State when the process does not contain any notification pursuant to Law 1486 of 1938 concerning the notification of documents to this Public Law entity, and this is one of the deficiencies of CAYMAN POWER BARGE I, LTD., which were pointed out in this arbitration proceeding."*

The Defendants consider that the election of domicile made by the Dominican State cannot be extended to serious aspects of the contract and it wonders: *"Where are the acknowledgements of receipt of the communications allegedly delivered?...What state entities were reached by these communications?..."*

Law 1486 of 1938 refers to notifications by process server, a law that the Defendants consider to be of public policy and not subject to derogation by agreements between private parties.

They conclude by affirming that the Dominican State did not know what was happening between the owners of the Barge and the Corporation.

**73.** Concerning the absence of reissue of the letter of credit, the Defendants indicate: *"It was the abusive and furtive conduct of CAYMAN POWER BARGE I, LTD. that caused the letter of credit not to be reissued because again they illegally appropriated its funds. It would be really childish to believe that said provision for a creditor who suspiciously fled, without negotiating or clarifying the items it was collecting and that now claims to appear as the victim of a situation that itself created."*

**74.** The Defendants allege the need for an authorization from the Arbitral Tribunal before CAYMAN POWER BARGE can draw to its benefit the funds of the letter of credit and to dismantle the barge to take it away. According to the Defendants: *"It is not true that the act of piracy committed by the owners of the barge was contractually authorized, they acted beyond what was indicated."*

**75.** As to the amount of the taxes, the Defendants indicate that the evaluation was made by the General Department of internal Taxation itself. According to them, it is "a credit, firm, liquid and payable and therefore perfectly subject to offsetting."

According to the Defendants, CPB was exempt from paying its tax debt provided CPB complied with its obligations:

*"Exempting from the payment of the tax would have been logical if CAYMAN POWER BARGE I, LTD. had complied with its obligations, but the way it behaved, the way it violated the contract, unmoored its barge, illegally appropriated the guarantee and did not go timely to arbitration to remedy the disputes, but if not to validate its claims, disqualifying it from claiming a fault on the part of the Dominican state and trying to obtain tax exemptions that it does not deserve, and which are reflected exclusively in gains for this abusive entity.*

*Only if it had complied with its obligations would CAYMAN POWER BARGE I, LTD. been able to argue a tax exemption, which, due to its blamable conduct, it does not deserve.*

*The tax exemption must be a premium for correct compliance and good faith, and must be denied to shrewd and fraudulent companies.*

*The parties were negotiating when CAYMAN POWER BARGE I, LTD. fled without reason, surreptitiously, from the port where it was located. Prior to these facts, there was no reason to collect taxes from it; the defense of said company must make it understand that the collection of taxes is a consequence of the faults committed by the fleeing company that believes that only it is being owed and that it is owed exclusively what it unilaterally establishes."*

76. Concerning the petition for expert investigation to conciliate accounts between the parties, the Defendants allege the following: *"Conducting an evaluation or adjustment of accounts through an accounting expert is primordial for the correct administration of justice, since we are dealing with amounts of millions and disagreeing, of companies which have organized accounting in which everything must be very clear, so that the arbitration jurisdiction cannot tackle the merits of the matter without ordering an investigation of this nature, unless CAYMAN POWER BARGE I, LTD. believes that it has a monopoly over truth, and that its accounts are absolutely correct? ...*

*By fear of uncovering its incorrect calculation and accounting mistakes, the furtive CAYMAN POWER BARGE I, LTD. wants our conclusions and counterclaims to be excluded from the debate, even though they are implicit in the Right of Defense.*

*It has been traditionally said that "The judge is the expert of experts," but in aspects of accounting records, the unilateral statement of one of the parties is not what must be believed, when accounting fraud is an element that may be latent and can only be noticed by an expert or an in-depth analysis of the procedures and systems used; the judge may be misled by some bills which are not reliable, which are not authentic, which are purely unilateral, partial documents, exaggerated to convenience.*

*It is obvious that CAYMAN POWER BARGE I, LTD. in its ambition, exaggerated the amounts in the bills submitted by it to Corporación Dominicana de Electricidad (CDE), and therefore its accounts do not coincide with ours, and therefore it is necessary to reconcile the accounts as an absolutely necessary work in order to administer justice."*

**77.** In its rejoinder brief, the Defendants also contest a part of the brief of CAYMAN POWER BARGE concerning the competence of the Arbitral Tribunal. The Tribunal does not find it necessary or appropriate to refer to this litigious point which has been resolved in the Preliminary Award rendered by this Tribunal on September 19, 2003.

## DECISIONS OF THE ARTIBTRATION TRIBUNAL

## THE ALLEGED INVALIDITY OF THE CONTRACT DUE TO LACK OF APPROVAL OF THE AGREEMENT BY CONGRESS

**78.**     The first litigious point on the merits of the dispute on which the Tribunal must decide concerns the *"validity or lack thereof of the Contract in the absence of ratification of the National Congress of the Dominican Republic."* The grounds for the allegation of the defendants in connection with this point is that Article 46 of the Dominican Constitution declares *"Any Law, Decree, Resolution, Regulation or Act contrary to the Constitution are null ipso jure."*

**79.**     According to the Defendants, the nullity that would affect Clause 13 of the Power Purchase Agreement of March 17, 1998 would cause the nullity of the entire Agreement.

In their allegation of January 9, 2004, the Defendants affirm the following: *As we affirmed, not only is Article 13 of the contract null because it violates the Constitution but, due to lack of compliance with the formalities established in said articles: 37, paragraph 19; 55, paragraph 10 and 110 of the Dominican Republic, the contract suffers from the defect of nullity in its entirety, because, since it was not submitted to the knowledge and ratification of the National Congress, it is necessary to receive the sanction established in article 46 of the Constitution of the Republic."*

To the extent that the alleged legislative approval would be necessary by constitutional mandate in contracts under which the State decides to grant tax exemptions (Constitution RP, Sections 55.10 and 110), the Tribunal considers it appropriate to examine the validity of Article 13 of the Agreement, concerning the tax exonerations or exemptions that constitute the following litigious point.

## VALIDITY OF THE TAX EXONERATIONS OR EXEMPTIONS

**80.**     In substance, the Defendants allege that the provisions of the Power Purchase Agreement that grant tax exonerations should be approved by the National Congress. The Terms of Reference presents this litigious point as follows: *"Determine whether article 13 of the Contract, which exempts CPB from paying taxes, is valid in the absence of approval of the National Congress of the Dominican Republic and decide on the consequences of its possible invalidity."*

**81.**     The objection of the Defendants refers to Article 55, paragraph 10 of the Constitution that establishes as an attribution of the President of the Republic: *"To execute contracts submitting them for the approval of the National Congress when they contain*