# EXHIBIT B

**ICC International Court of Arbitration**
**Case No. 11772/KGA/CCO**

**Dated as of July 11, 2005**

# PART III

*provisions related to the impact on the national revenue...or when they stipulate tax exemptions in general, pursuant to Article 110; without such approval in the other cases."*

82.    The alleged nullity of the Agreement would also be supported according to the Defendants, on Article 110 of the Dominican Constitution: *"No exemption will be admitted, nor will any exoneration, reduction or limitation of taxes, contributions or tax or municipal fees granted to private persons other than according to the Law. However, private persons may acquire, by concessions authorized by Law, or by contracts approved by the National Congress, the irrevocable right to benefit for the entire time stipulated of the concession or contract, complying with the obligations imposed by both, from exemptions, exonerations, reductions or limitations of taxes, contributions or tax or municipal fees levied on certain works or public utility companies or certain works or companies to which it is appropriate to attract investment of new capitals for the support of the national economy, or for any other purpose of social interest."*

Based on these constitutional provisions, the Defendants conclude the following: *"CAYMAN POWER BARGE I, LTD. was obligated to submit its contract to the approval of Congress if it wanted to benefit from tax exemptions. Since it did not do so, it violated the provisions of the Dominican Constitution."*

83.    It is a rule admitted in most democratic States that the establishment of taxes and, symmetrically, tax exemptions, is a prerogative of legislative assemblies. Historically, one of the most important powers given to parliaments has been to approve the taxes the king wanted to levy. The provisions of the Dominican Constitution stem from said democratic tradition.

84. However, as observed by CAYMAN POWER BARGE in its allegations, the Agreement does not exempt it directly from paying taxes. Clause 13.1.1 of the Agreement indicates as a duty of the State *"to obtain from the corresponding tax authorities"* tax exoneration or exemption: ***"The State agrees to obtain from the corresponding tax authorities or political subdivisions in the Dominican Republic, in favor of the Seller and the subcontractors who are not tax residents of the Dominican Republic, the tax exoneration or exemption enjoyed by the Corporation, by extending it to Seller. Such tax exoneration or exemption will include all taxes that may affect the actions or operations under this Agreement and the materials, provisions, equipment, machinery, spare parts, fuel, lubricants, tools, vehicles and other goods or personal property to be used in connection with the operation of the Unit, provided they are delivered in the name of the Corporation. However, the vehicles, equipment and personal properties of the***

*foreign personnel of Seller and its subcontractors must be re-exported when they leave the country free of the corresponding Tax or Taxes paid in the event that they are left in the Dominican Republic, although the Corporation is given a purchase option for said goods (to the exclusion of the Unit) at the price acceptable to Seller"* (emphasis added by the Arbitral Tribunal).

The commitment assumed by the State does not go against the Constitution but, by obligating the State to obtain the appropriate tax exemptions, it gives the State the express power to act according to the Constitution and other organic laws valid in the Dominican Republic. The commitment contracted by the State towards CAYMAN POWER BARGE constitutes an obligation contracted in a constitutional framework. It is obvious that Mr. Rhadamés SEGURA, Secretary of State and General Administrator of Corporación Dominicana de Electricidad, as well as his advisors should have known that obtaining tax exemptions or exonerations from the "corresponding tax authorities" required prior approval from the National Congress.

**85.** Paragraph nine of the letter of intent of November 19, 1997 indicated that *"the Dominican Government will exempt from all customs, duties, income tax, fees and other taxes that may apply currently or in the future."* At that time already, almost four months before signing the Agreement, on March 17, 1998 it could have been examined that the alleged invalidity of the tax exoneration may lead to the nullity of the Agreement.

Much before executing the Agreement, on November 29, 1997, its text was studied by the Legal Counsel of the Executive Branch. The provisions of the Agreement were also reviewed and authorized by the Assistant Legal Counsel of the Executive Branch who, on March 18, 1998 transmitted to the General Administrator of the Corporation the power to sign the Agreement, countersigned the previous day, March 17, 1998, by the President of the Republic, Mr. Leonel Fernandez.

**86.** In the special power of attorney of November 29, 1997, it is mentioned in point eight that, *"the Dominican Government will exempt from all customs, duties, income tax, fees and other taxes that may apply currently or in the future."*

The power of attorney issued on March 17, 1998 is even more explicit: *"For the purposes of the Agreement, CAYMAN POWER BARGE I, LTD., will be exempt from paying the taxes from which the Corporation benefits. Such tax exoneration or exemption will include all taxes that may affect the actions or operations under this Agreement and the materials, provisions, equipment, machinery, spare parts, fuel, lubricants, tools, vehicles and other goods or personal property to be used in connection with the Operation of the Unit, provided they are delivered in the name of the Corporation. However, the vehicles, equipment and personal properties of the foreign personnel of CAYMAN POWER BARGE*

*I, LTD. and its subcontractors must be re-exported when they leave the country free of the corresponding Tax or Taxes paid in the event that they are left in the Dominican Republic."*

The Arbitral Tribunal stresses that the lawyer who drafted the Power Purchase Agreement avoided referring to a direct tax exoneration or exemption, probably because of the doubtful validity of the provision. Hence, he chose the text in clause 13.1.1 of the Agreement, expressing the commitment of the State to obtain said tax exemptions and exonerations from the competent authorities.

**87.** It is an uncontroversial fact that State official did not carry out the necessary processes to submit the Agreement to the approval of the National Congress.

In its allegation, the Defendants claim that submitting the Agreement to the approval of the National Congress was the duty of CAYMAN POWER BARGE. This charge does not match the text of clause 13.1.1 of the Agreement since the legislation that regulates parliamentary work could not allow a private law entity such as CPB to submit a contract for the approval of the National Congress. This argument was presented by the Plaintiff, but was not answered by the Defendants.

Consequently, this Arbitral Tribunal decides that the lack of action of the State in obtaining the approval of the National Congress cannot damage the rights of CAYMAN POWER BARGE.

**88.** In addition, the last phrase in clause 13.1.1 of the Agreement obligates the State to reimburse CPB for any tax paid by it: *"Should Seller have to pay any tax, including on the import of materials, goods, equipment and spare parts to be used in the operation of the unit, the State undertakes under this Agreement to reimburse Seller for the amount of the tax paid."* Consequently, in the event that it is decided that the tax exoneration is invalid, the Plaintiff would have the right to receive from the State an amount equal to the taxes it owes or which it was forced to pay. In practical terms therefore, the alleged invalidity of the tax exemption would end up by causing the State a loss and not the plaintiff.

This result reinforces the perception and decision of the Arbitral Tribunal that it was the duty of the State to obtain the necessary authorizations for tax exemptions. Whether the petition for approval of the tax exemption would have been rejected by Congress or whether the lack of action of the State would have led to a lack of tax exemption, in all events the State must assume a financial burden equivalent to the amount of the taxes owed.

89. Lastly, the Defendants allege that the defaults that would have been committed by the Plaintiff had, as consequence, the loss of the tax exemptions set forth in the Agreements. The Arbitral Tribunal rejects this argument because it considers that there is nothing in clause 13 or in the entire Power Purchase Agreement that allows considering the tax exemptions in favor of CPB as a recompense or premium whose allocation would depend on a discretionary decision of the other contracting party.

90. In conclusion, the Arbitral Tribunal decides that the tax exonerations and exemptions set forth in article 13.1.1 of the Agreement must actually benefit the Plaintiff, CAYMAN POWER BARGE. The Tribunal decides, as a consequence of this decision, that the validity of the Agreement is not affected by the absence of ratification by the National Congress of the Dominican Republic.

********

### THE AGREEMENT BETWEEN THE PARTIES AND GOVERNING LAW

91. As mentioned in the Terms of Reference, the Arbitral Tribunal now must: *"Determine, according to the contract, which are the obligations of each party and the recourse set forth in the event of default on such obligations."* The agreement between the parties consists of:
- the Power Purchase Agreement between the State of the Dominican Republic, represented by Corporación Dominicana de Electricidad, and Cayman Power Barge I, ETD, dated March 17, 1998 ("the Agreement");
- the Amendment to the Power Purchase Agreement of July 2, 1999 ("the Amendment");
- the Protocol of Understanding of July 8, 2000 ("the Understanding").

92. While the Agreement states the rights and obligations of each party, the Amendment has an eminently technical character, related to "the replacement of the Power Barge I by Power Barge II, with a nominal capacity of 47.5 MW in phase one and in addition another 15 MW unit to operate in phase II." On the other hand, the purpose of the Understanding is to ascertain the differences and discrepancies that the application of the prior agreements may have caused. In substance, points 1 to 7 of the Protocol state the stages for which the Corporación will pay CAYMAN POER BARGE what it owed it and its obligation to supply the appropriate quantity of fuel.

93. Pursuant to article 18.4 of the Agreement, the Court will apply *"the laws of the Dominican Republic and the generally accepted principles of International Law."*

Since the Defendants referred at a certain point to the jurisprudence of the French Court of Cassation in connection with various articles of the Dominican Civil Code with text identical to the provision of the French Civil Code, which was incorporated in the Dominican legal system by a law of June 3, 1854, the Arbitral Tribunal will take into consideration the French jurisprudence and doctrine as a guiding pattern, provided such jurisprudence or doctrine does not oppose the jurisprudence of the Dominican Courts.

The Arbitral Tribunal summarizes below the right and obligations of the parties pertinent for settling disputes, which refer to:
- notifications;
- payments;
- interest in the event of delay in payments;
- letter of credit;
- termination of the contract.

Concerning the validity of the agreement due to absence of approval from the National Congress of the Dominican Republic, this point was resolved earlier when examining the alleged invalidity of the contract.

*Notifications*

**94.** The Agreement indicates the need to notify several acts including:
- notifications of default, based on which the term starts during which the debtor of the defaulted obligation must remedy (Agreement 22.3 and 22.4);
- notifications to be issued prior to making withdraws against the letter of credit (Agreement 11);
- notifications to be sent prior to a suspension of the operation of the generating unit (Agreement 22.5 b);
- notification prior to the termination of the Agreement (Agreement 22.5 a).

In Article 12.3.2 the Agreement indicates the means that may be used to send notifications, which must be issued in writing: *"12.3.2 COMMUNICATIONS AND NOTIFICATIONS. Any notification or communication must be issued in writing, and may be sent by the following means: Registered Mail, First-Class Certified mail, Telex, Fax, Telegram, Private Courier and process server, according to the requirements of the LAWS OF THE DOMINICAN REPUBLIC."*

**95.** This long list of notification means, which would seem to exclude only communication by electronic channel, reflects the common will of the parties to avoid heavy formalities that would lengthen the procedures. The artificial Tribunal does not share the argument of the Defendants that the notifications must be

necessarily made by "process server, according the requirements of the law of the Dominican Republic." The intervention of the process server is one mode of notification that appears among many others.

The thesis of the Defendants in the sense of requiring the notifications to be sent through process server will have some grounds if this clause 12.3.2 of the Agreement were interpreted in the sense that each of the notification means listed therein should be used according to the laws of the Dominican Republic. If, as the Defendants claim, any notification to the State must be made through a process server, then it will be necessary to use such official notification to communicate with the Defendants. Said interpretation however, contradicts a liberal interpretation of this clause, which is the one to be applied to a long enumeration that allows using any of the means included in the list.
In an Agreement executed between parties with different legal culture, it is supposed that the adoption of an official means of notification must be expressed unequivocally.
It would be paradoxical to force the State to use official notification methods when a majority of the provision of the agreements express the will of the parties to derogate to the attributes of sovereignty and place the Defendants on an equal contractual footing with the Plaintiff, in line with the intent that the acts of the State be perceived as *"private and commercial acts rather than public of government acts"* (Agreement 19 a).

**96.** The will of the parties that the act of the Defendants be considered as the acts of a private law person arises from clause 12.3.1 of the Agreement which stipulates the election of domicile both for the Defendant seller and for the State. In the case of the State, the election of domicile was stipulated as follows:
*"In the case of "THE STATE" to:*
*General Administrator, Corporación Dominicana de Electricidad, as representative of the STATE, Main Building, Avenida Independencia Esq., Calle Fray Cipriano de Utrera, Centro de los Heroes, Santo Domingo, Dominican Republic, Telephone: (809) 533-3571, Fax (809) 535-7472."*

After examining the agreement between the parties together with the Dominican Laws, the Arbitral Tribunal finds that the Defendants did not produce convincing elements to conclude that the notifications needed to be made through a process server.

**97.** The Agreement mentions that the elected domicile serves *"to receive all notification and communications under this agreements"* (emphasis added by the Tribunal). Contrary to the allegations of the Defendants, the presence of the adjective "all" prevents distinguishing between routine notifications, related to the operating activity

of the generating barge and those notifications designed to produce legal effects.

It clearly arises from the provisions set forth between the parties in the Agreement that the State waived the application of Article 1039 of the Dominican Code of Civil Procedure and the application of Law 1486 of 1938.

In addition, if the Presidency of the Republic was not informed of the disputes that arose and multiplied between the parties, it is hard to understand how or for what reason this lack of communication between the Defendants could damage the right of CAYMAN POWER BARGE, preventing it from claiming the communications and notifications made according to the Power Purchase Agreement.

**98.** In conclusion, the Arbitral Tribunal decides that the notifications and communications of documents may be made by any form stated in clause 12.3.2 of the Agreement and that all communications addressed to the Dominican State were validly sent by being delivered at the domicile elected by the Corporation and CDEEE.

### Payment terms

**99.** Clause 10 of the Agreement, titled "Bills and payments" organizes the procedures for the presentation of the bills and payment terms. It indicates monthly bills expressed in U.S. dollars. Each "Invoice" must indicate the net production of energy delivered and the payment owed.

Paragraph 10.3.1 mentions the payment terms: *"Within twenty-five (25) business days from the time the Corporation received the Invoice, whose acknowledgement of receipt for the Invoice will not be denied, the State will pay all the Bills delivered under this Agreement in Dollars with immediately available funds, by certified check delivered to an authorized representative of Seller designated in the Invoice..."*

A period of grace is established in favor of the State in clause 10.4: *"Period of Grace. Notwithstanding any provision to the contrary contained herein, the State will not be obligated to pay the Payment for Power for the net power production during the month following the commercial startup date."*

**100.** The payment terms and the term of grace in favor of the State is followed by provisions concerning disputes on the amounts and errors in the bills:
*"10.6 DISPUTES ON AMOUNTS. In the event of any dispute concerning the amount billed, THE STATE will notify SELLER of the amount in dispute within ten (10) business days after the receipt of the respective invoice. The PARTIES will make all efforts to resolve any dispute within a reasonable period of time and will resort to the*

*dispute resolution procedures indicated in Article 18 of this AGREEMENT, in the event that they cannot resolve them. However, THE STATE will pay only those amounts on which the PARTIES agree, although the payment of the Invoice may not be less than seventy-five percent (75%) of the amount of the Invoice. The amounts in dispute will be paid or offset at the time a solution of the conflict is reached."*

*"10.7 BILLING ERRORS.*
*Any claim by a PARTY concerning an error in Bills previously matured must be made no later than two (2) months from the issue of the Invoice."*

**Interest owed in the event of delay**

**101.** In the event of delay in payments, it is indicated that the State will pay monthly interest of one percent: *"10.5 DELAYS IN PAYMENT. If the Invoice of the SELLER or any other payment obligation of the State is not paid on its due date, the amounts owed will accumulate legal interest of one percent (1%) per MONTH from the due date to the date the payment is received by SELLER.*

The Defendants estimate that this clause does not allow sentencing the debtor to pay interest from the due date of each invoice. The Defendants indicate that the collection of interest from the due date of its invoice constitutes an operation of "compound interest" (see No. 56). The Court must examine this point when deciding on interest (see below No. 161 to 169).

**Letter of credit**
**102.** Article 11 of the Agreement indicates a payment guarantee by letter of credit: *"SELLER will have the right to draw against the letter of credit as indicated therein for the payment of any amount owed to SELLER under this AGREEMENT after the lapse of the due dates established in Articles 10 and 22.5 of this AGREEMENT. THE STATE will take all necessary steps to cause the extension and reissue of a LETTER OF CREDIT after each withdrawal to maintain or restore a payment guarantee in the same terms as the LETTER OF CREDIT, including its nominal value of US$ 2,044,912.50, at all times during the TERM of this AGREEMENT, plus a period of sixty (60) days after the termination of the AGREEMENT. The LETTER OF CREDIT issued or renewed will be delivered to SELLER no later than thirty (30) days after withdrawal."*

The reference to Article 22.5 of the Agreement means that in the event of a default of the State, the latter would have to remedy the default within twenty days following notice. If the State does not do it within said term, CAYMAN POWER BARGE may terminate the agreement or discontinue

the production of electricity.

The use of the letter of credit by CAYMAN POWER BARGE gave rise to an important litigious point that will be presented further on (see No. 107 et seq.).

********

**Termination of the contract**

**103.** The termination of the contract is indicated in Article 22 of the Agreement, titled "default and cancellation." Paragraph 1 in Article 22 refers to *"causes of default by seller,"* but the Defendants do not allege any defaults committed by CPB.

Paragraph 2 of Article 22 mentions the causes of default by the State, which include:
b) failure to delivery the fuel required by the generating unit;
c) failure to pay for the power within the terms established in the Agreement;
d) failure to maintain, issue or re-issue the letter of credit.

**104.** Paragraph 3 of Article 22 refers to the process of notification of a possible default: *"In the occurrence of any of the Causes of Default by the STATE or the SELLER, the complying PARTY will notify the other PARTY in writing about the default. This notice will declare in reasonable detail the nature of the default and, when known and applicable, the steps it deems necessary to remedy the default."*

Paragraph 4 of Article 22 indicates that the defaulting party will have thirty days after receipt of said notice to remedy the default or take the necessary steps to remedy the default.

**105.** Paragraph 5 of Article 22 is specifically dedicated to the defaults on payment indicated in Article 22.2 c: *"In the occurrence of a Cause of Default by the STATE under Article 22.2 c, the STATE will have twenty (20) days after receipt of the notice from SELLER, pursuant to Article 22.3, to remedy the default. If the STATE does not remedy the default within such twenty (20) days, SELLER may:*
*a) terminate this AGREEMENT by delivery of a written notice to the STATE;*
*b) discontinue the operation of the UNIT with delivery of a written document to the STATE.*
*The provisions in this Article 22 will apply without prejudice to the rights of SELLER to claim under the letter of CREDIT, pursuant to Article 11."*

********

## DEFAULTS OF THE PARTIES

**106.** The litigious points concerning the possible defaults of the parties are drafted as follows:
*"9. Determine whether the State and/or the Corporation or CPB have defaulted on these obligations.*
*10. If the State and/or the Corporation or CPB defaulted on their obligations, determine of what such default consisted and whether the Corporation or CPB acted in agreement with the procedure stipulated in the Contract and applicable laws."*

Taking into account the circumstances of the case, the Arbitral Tribunal considers that the determination of the existence or non-existence of the contractual default requires a prior examination of the disputes concerning the abusive use of the letter of credit, the unilateral termination of the contract and the interruption of the provisions of electric energy by the generating barge.

********

**Alleged abusive use of the letter of credit by the Plaintiff**

**107.** The matter of the withdrawal of the funds of the letter of credit by CAYMAN POWER BARGE was expressed in the list of litigious points as follows: *"11. Determine whether the appropriation of the pledge without complying with legal formalities constitutes a default on the Contract and its legal system."* (Emphasis added by the Tribunal).

The Defendants chose to characterize the drawing against the letter of credit issued in favor of CPB as the "appropriation of pledge," indicating therefore that *"CAYMAN POWER BARGE I, LTD violated articles 2078 of the Civil Code of the Dominican Republic and 93 of the Commercial Code of the Dominican Republic by appropriating without any legal formality the funds represented by a Letter of Credit that existed as a pledge guarantee by the Letter of Credit."* The resolution of this controversial point requires, first of all, determining the juridical nature of the guarantee established in favor of the Plaintiff to guarantee the payments owed under the Agreement.

**108.** The Defendants erroneously qualify as *"pledge"* the payment guarantee they offered to the Plaintiff, alleging that the latter had appropriated *"without any formality"* the funds deposited as *"pledge guarantee."* According to the Defendants, *the withdrawal of the funds without judicial authorization or any formality violates article 2078 of the Dominican Civil Code, which prohibits the creditor to appropriate the pledge in the event of default of the debtor.* It is important to dissipate the juridical confusion this argument incurs between the concept of pledge and the bank guarantee posted by the Defendants in favor of the Plaintiff.

In legal systems with neo-roman roots that stem from the French Civil Code, as is the case of the Dominican Civil Code, the pledge is a real contract perfected with the delivery or transfer of the pledge goods to the creditor (article 2071 of the Civil Code). In the context of the operation guaranteed underlying this dispute, the fact that the debtors, the Defendants, delivered or deposited the amount of money owed by them in the hands of a representative of the creditor could be conceived as a pledge. However, this has not been the case because there was no movement of money from the Defendants to the Plaintiff, but a promise of payment made by a bank contracted by the Defendants to pay the Plaintiff in the event of default. The correct juridical characterization of this operation so common in international trade corresponds to the concept of the so-called *"documented or documentary credit" (letter of credit)*.

Even in the event that it was a pledge of money, the fungibility of the money received would be confused with other moneys that belong to the assets of the creditor. The fungible character of the money creates the possibility that the same money can be spent and replaced by other money and, in this event, the reasons to prohibit the contract clause relating to the rights and duties of the parties upon breach would be senseless. For this reason, the French jurisprudence and doctrine have always maintained that the prohibition of the contract clause relating to the rights and duties of the parties upon breach referred to in Article 2078 of the French Civil Code does not apply to the pledge of money (*gage-especes*) (See Jacques Mestre, Emmanuel Putman and Marc Billiau, *Traite de droit civil. Droit special des suretes reelles*, page 297, No. 863, L.G.D.J., Paris, 1996). Starting from the same analysis concerning the fungible and consumable character of money, which concepts are also shared by Dominican law, it must be concluded that, under the same Dominican law, Article 2078 of the Dominican[sic] Civil Code does not apply to the pledge of money.

**109.** In the absence of Dominican jurisprudence or doctrine on the topic that would express the contrary, whose existence has not even be suggested by the Parties and is not known, to its best knowledge and belief, by this Tribunal, it is necessary to use, as guiding pattern, the provisions of French doctrine and jurisprudence based on the same provisions of the French Civil Code. Thus, recent French jurisprudence has clearly expressed that the prohibition in Article 2078 of the French Civil Code (with identical content as its Dominican counterpart) also does not apply when the money delivered has been deposited in an account of the creditor especially dedicated to the pledge guarantee (*Cour de Cassation*, April 9, 1996, Dalloz 1996, page 399, with comment by LARROUMET; *Revue Trimestrielle de droit civil* 1996, page 669, with comment by CROCQ).

**110.** But the juridical nature of a letter of credit is not that of a pledge. In this, the payment obligation of the issuing bank, the Reserve Bank of the Dominican Republic,

appears as an irrevocable letter of credit *(irrevocable letter of credit)* in favor of CAYMAN POWER BARGE I, LTD and a standby letter of credit *(standby letter of credit)* in the amount of US$ 2,044,912.50 in order to cover the costs of the generating barge and the obligations of the Dominican State contracted in the Power Purchase Agreement or contract.

The letter of credit indicates that the amount of US$ 2,044,912.50 may be withdrawn if the Dominican State does not comply with the terms of the Agreement. The letter indicates that the money must be paid to CAYMAN POWER BARGE against presentation to the confirming bank, Chase Manhattan Bank of New York, of a letter in accordance with the model enclosed. The letter mentions that it is governed by the Uniform Customs and Practice for Documentary Credits of 1993 published by the International Chamber of Commerce (UCP 500).

Addendum I offers a model of letter for CAYMAN POWER BARGE to claim the payment of the guarantee, and Addendum II contains a certificate for the transfer of money according to the terms of the irrevocable letter of credit.

**111.** Consequently, the Tribunal finds that the letter of credit and its addenda constitute a contingent promise of payment issued in favor of CPB by the Reserve Bank of the Dominican Republic (issuer or guarantor bank), which promise would be confirmed by Chase Manhattan Bank of New York (confirming bank).

According to the text of the guarantee, CAYMAN POWER BARGE could receive the money only based on a declaration that the Dominican State had not complied with its contractual obligations (i.e., the established contingency). This type of guarantee, governed by the UCP 500 rules of the International Chamber of Commerce is extremely common to guarantee payments owed under international contracts. In 1995, the UNCTAD (United Nations Conference on Trade and Development) issued a UN Convention on Independent Guarantees and Stand-By Letters of Credit, adopted in New York (1995). There is no invalidity in this type of guarantee.

**112.** The task of the Tribunal is now to determine whether the transfer of the funds by the beneficiary of the letter of credit, CPB was founded or without cause, i.e., abusive.

Pursuant to Article 11 of the Agreement, reproduced above in paragraph No. 102, CPB has the right to draw on the funds of the letter of credit after the lapse of the terms established in Articles 10 and 22.5. The payment term established in Article 10 is twenty-five (25) days after receipt of the invoice. If the invoice is not paid, the creditor must notify the State of the default, and the State has twenty days to remedy its payment default.

113. By letter of December 14, 1998, addressed to Engineer Rhadamés SEGURA, Secretary of State, General Administrator of the Corporation, the President of CAYMAN POWER BARGE, Mr. David WALTERS, claimed payment of the invoice for August 1998 (see Exhibit 1 to the brief of petition). By letter of July 23, 1999, the Vice-President of CPB, Mr. Gary W. MILLER, claimed from engineer Mr. Oscar LAMARCHE from the Corporation, a delayed payment of US$ 242,800.00 (see Exhibit 1 to the brief of petition).

In a letter of April 13, 2000, addressed to engineer Rhadamés SEGURA, Mr. Rafael ZAPATA from CPB writes the following:

*"To date, Cayman has received sporadic payments, including the month of January, which was received partially due to the lack of funds of CDE. As of 2/20/00, we have outstanding the amount of US$ 1,227,225.92 for energy served and US$ 958,030.00 for fuel.*

*The parent company of Cayman informs us of their concern for the treatment given, due to the financial circumstances which are untenable, so that they would be obligated to execute the letter of credit. It is not possible for a person to decide on the terms applicable without taking into account the validity of the contract and the consequences that their violation may cause. Consequently, your intervention is imperative to avoid a commercial confrontation.*

*Mr. Wilson tells us of his intent to accept a discount of approximately US$ 50,000. However, if a penalty should be applied to Cayman Power Barge II, let it be applied, but not penalties fabricated without any consistency with the Contract should be applied.*

*We hope that you will take steps as soon as possible and without other particulars I remain, sincerely"* (Exhibit 3 to the brief of petition).

The Defendants have not denied or objected that they had received this letter in which the Plaintiff expresses its concern for the lack of payment.

114. A few days later, on April 17, 2000, the President of CPB, David WALTERS, notified the Defendants that his company, the Plaintiff, was going to withdraw the funds of the letter of credit: *"Over the course of the last few months, we have repeatedly notified CDE in writing on these problems and our local representative had numerous meetings with the officials involved. In addition, representatives of the project based in the United States traveled to the Dominican Republic to attend several meetings on these issues. Consequently, given these continuous problems, we can only exercise our rights under the default provisions of our contract related to the lack of fuel and the lack of payment. Consequently, we expect to exercise these provisions of our contract to collect the delayed payments. We regret this action, but the continuous lack of fuel and payments by CDE leaves us few options"* (Exhibit 5 to the brief of petition).

On April 25, 2000, CAYMAN POWER BARGE announced the second withdrawal in its favor and demanded that the amount of the letter of credit be duly restored:

*"The owners of Cayman Power Barge II are preparing another withdrawal from the letter of credit when the invoice of March of this year (3-E-2003[sic]) in the amount of US$ 434,618.57 becomes due on May 10, 2000. As you know, we made the first withdrawal from this letter of credit on April 17, 2000 in the amount of US$ 1,642,139.78 under article 11 of the PPA to assure the payment of the delayed bills for fuel and energy. We will continue with these withdrawals until the payment provisions of our contract are met. Section 10.6 (b) of our PPA indicates that even when disputed, CDE will pay 75% of the invoice until any dispute is resolved. Such payments have not been observed either. CDE has a contractual obligation to replenish the Letter of Credit when these withdrawals continue. Article 11 of the PPA which was signed on March 17, 1998, mentions that CDE will issue and reissue the letter of credit "no more than thirty (30) days after any withdrawal." Consequently, we are asking you to do this, according to the PPA, by May 17, 2000"* (Exhibit 6 to the brief of petition).

115. By letter of May 4, 2000, Mr. D. WILSON, President COO of Odyssea Marine, on behalf of CPB, claimed from engineer Rhadamés SEGURA the payment of the invoice for March *"totaling the amount of US$ 434,618.57."* The letter indicates that CPB provided *"approximately one million dollars in fuel"* which the corporation had not reimbursed to that date.

On this opportunity, the Plaintiff, through Mr. D. WILSON communicated to the Defendants that should they consent to modify the contract so that CPB would be the party buying the fuel, the credit of the letter should be increased to US$ 5 million (Exhibit 7 to the brief of petition).

116. In a letter of May 11, 2000, Mr. WILSON from CPB indicates to engineer Rhadamés SEGURA that CPB made a withdrawal of US$ 397,772.72 Mr. Wilson also announced that CPB reserved the right to cancel or terminate the Power Purchase Agreement and discontinued the operation of the generating plant (Exhibit 9 to the brief of petition).

By letters of June 2, 2000, from Attorney Luis Miguel PEREYRA and June 28, 2000 from Mr. Gary MILLER, CAYMAN POWER BARGE announced the interruption of the supply of electricity due to lack of payment, lack of replenishment of the letter of credit and lack of fuel to produce electricity (Exhibits 12 and 13 to the brief of petition).

117. On July 8, 2000, the parties signed the "Protocol of Understanding" in which it is indicated that engineer Rhadamés SEGURA *"acts under special power of attorney No. 41-99, issued by his Excellency the President of the Dominican Republic."* Consequently, the State knew about the difficulties existing in the performance of the Power Purchase Agreement. The Arbitral Tribunal finds

that in the " Protocol of Understanding," the Corporation promised to may to CAYMAN POWER BARGE *"the amount US$ 325,608.89 as a result of the agreement on debts and legal/contractual interpretations reached by the parties."*

The existence of these debts, admitted by the Corporation and the State, represented by Engineer Rhadamés SEGURA, allows the Tribunal to decide that the withdrawals of funds from the letter of credit made by CAYMAN POWER BARGE in its favor have not been abusive. In addition, the Defendants did not allege that CPB would have failed to comply with the terms of the agreement so that the Defendants may remedy the payment default.

********

**The obligations of the parties in light of the Protocol of Understanding and the clauses of the Agreement**

**118.** When appreciating the behavior of the Plaintiff and consequently examining whether the Plaintiff proceeded according to the applicable law and the terms of the agreement when deciding to terminate it. The Tribunal must start by analyzing the terms of the Protocol of Understanding of July 8, 2000.

This Protocol of Understanding expresses the will of the parties to put a final point to the disputes arising from the previous period, which the Arbitral Tribunal just described in the previous paragraph. After referring to the contractual documentation (Power Purchase Agreement and Amendment), the parties refer to their differences and disputes in the following terms:

*"WHEREAS: In these agreements, the parties establish the main condition that would govern the relations between them such as price of the power, supply of fuel, guaranteed capacity inter alia.*

*WHEREAS:    In spite of the fact that said conditions are contained in said agreements, in their applications, differences and discrepancies have emerged that caused differences in the payment of the bills submitted by the SELLER."*

Once they mention the existence of disagreements, the parties indicate that their common interest is to find a solution that would be mandatory between them: *"CONSEQUENTLY, and even the mutual benefits to be obtained from the guarantees, conditions, obligations contained in this agreement in the intent of being legally bound, parties..."*

Afterwards, the parties established various obligations whose objective was to respond and resolve the conflicts that had occurred since 1998 due to lack of payment by the Defendants.

119.    This amiable settlement, titled "Protocol of Understanding," corresponds to the figure of the settlement contract, as defined in Article 2044 of the Dominican Civil code, (which is a replica of the same provision in the Napoleon Code):
*"The settlement is a contract under which the parties end a dispute already existing or anticipated as a future dispute, to avoid it."*

Spontaneously, the parties to the Protocol gave binding effect to the obligations stipulated in the Protocol, to which Article 2052 of the Dominican or French Civil Code give the category of "res judicata:" *"Settlements have, between the parties, the authority of res judicata in last instance."*

120.    The authority of res judicata has double effect. Concerning past disputes, it settles them finally. It is no longer possible for a party to base itself on any act or event prior to the settlement to claim a payment or indemnity, provided the act or event was known to it. Concerning the future, the authority of res judicata obligates the party to conform to the obligations undertaken as if they were the decision of a judge rendered in a sentence.

The Tribunal finds that neither party to this litigation alleges a cause of invalidity of the Protocol of Understanding, so that it proceeds to examine the conduct of the parties in light of the obligations contracted therein.

121.    The recitals to the Protocol indicate that the substantial part of the settlement refers to the payment obligation of the State: *"WHEREAS: In connection with the obligation of the STATE to pay for the power produced by the SELLER, both parties have made their respective interpretations in this agreement."*

After affirming that the Corporation (identified as "CDE" in the Protocol of Understanding) and CAYMAN POWER BARGE *"HAVE ESTABLISHED AND AGREED IN GOOD FAITH AS FOLLOWS,"* it mentions several payment obligations, to be met on various days.

Thus, paragraphs 4 and 5 indicate that the barge will resume the production of electricity after CPB receives a certain amount:
*"4. CDE will pay to CPB II the amount of US$ 212,009.61, equivalent to 70% of the June invoice by July 17, 2000 at the latest.
5. CPB II will resume the operations when receiving the payments identified above in section (4)."*

The Tribunal stresses that the Corporation promised to pay within a certain term and that the obligation of CPB was contingent upon said payment, whereby the Corporation undertook to reissue the letter of credit: *"6. CDE will replenish*

*by July 30, 2000, at the latest, in favor of CPB II, the letter of credit pursuant to Article 11 of the Power Purchase Agreement dated March 17, 1998 in the amount of US$ 2,044,912.50. An additional letter of Credit will be issued by July 30, 2000 at the latest, in the amount of US$ 750,000.00, both letters of credit totaling US$ 2,794,912.50, sufficient to cover two months of operations of the plant."*

The following paragraph makes it clear that the increase of the guarantee in the amount of US$ 750,000.00 corresponds to an amendment of the Agreement, under which CAYMAN POWER BARGE would provide the necessary fuel to produce electricity (supply obligation, which, according to the terms of the Agreement, was held by the Defendants).

*"CDE will supply an adequate quantity of fuel to sustain the operations of CPB II until the replenishment of the original Letter of Credit and issuance of the additional Letter of Credit, resulting in a total amount of payment guarantee of US$ 2,794,912.50. As of the time such letters of credit are replenished and confirmed and the amendment to the Power Purchase Agreement is signed, **CPB II assumes full responsibility to supply the fuel of the plant, which will be billed to CDE according to the current contract"*** (emphasis added by the Tribunal).

**122.** The Tribunal is now in a condition to resolve the litigious points listed below, in light of the grounds alleged by the parties and the events that occurred after July 8, 2000, according to the provisions of the Protocol of Understanding considered in its entirety and the terms of the Agreement of March 1998:

*"12. Determine whether the abandonment of the country by CPB without notice constituted a violation of Articles 1134 and 1184 of the Civil Code of the Dominican Republic.*
*13. Determine what are the remedies that the Agreement and the applicable laws grant to the victim of the defaults.*
*14. Determine which are the remedies the Agreement grants in the event of proven default by both parties.*
*15. Determine whether such remedies correspond to the claims of CPB or those of the State and/or the Corporation."*

********

**Default by the Defendants on their obligation to supply fuel, restore the funds of the letter of credit and pay the bills**

**123.** CAYMAN POWER BARGE alleges that the Defendants did not comply with the obligations established. Concerning the supply of fuel, Mr. Gary W. MILLER, Vice President of Operations Power Systems, acting on behalf

of CAYMAN POWER BARGE LTD, wrote to engineer José Ramón BONILLA, adviser to the General Administrator of the Corporation (with copy to engineer Rhadamés SEGURA, General Administrator), the following:

*"I have been informed by ESSO that the Refinery has the fuel in stock. As you know, we have stopped our operations due to the lack of supply of fuel, which has occurred since July 26 of this year. We would appreciate it if you informed us when we would receive the fuel in order to be able to start the operations of our plant and proceed to organize the Reliable Capacity test immediately. It is our wish to do this test two days after the resumption of the operations of CPB II"* (Exhibit 15 to the brief of petition). The letter bears the receipt stamp of CDE, dated August 8, 2000, and the signature of engineer Rhadamés SEGURA with the same date.

There is no document in the file issued by the Defendants to object the authenticity or deny or object the content of this letter, in the sense that, since July 26, 2000, and at least until August 8 of that year, the necessary fuel for the operation of the electricity generating plant had not been provided.

The same letter of August 8 signed by engineer MILLER also contains a complaint about the Letter of Credit: *"In another order of ideas, CDE continues in default on the Power Purchase Contract because the funds of the Letter of Credit have not yet been replenished according to the terms agreed between the parties in the Agreement signed on July 8, 2000. Please inform us when CDE will comply with the obligations of this document. We are anxiously waiting for an answer in order to proceed with the normal operations of the plant"* (Exhibit 15 to the brief of petition).

The Defendants have not denied the fact that they have not replenished the funds of the Letter of Credit nor did they allege or present any document to contradict the affirmation of the Plaintiff.

124. Apparently the Corporation had not remedied its default as of August 14, 2000, which would have motivated a letter signed by Mr. MILLER, addressed to engineer César SANCHEZ (at the time designated General Administrator), in the following terms: *"To date, the current Administration of CDE has not complied with the payment of the amounts owed and has not replenished the Letter of Credit. Our main executives will carry out their decision to stop the operations of the plant if by the end of the day on Tuesday, August 15, the payment obligations and replenishment of the Letter of Credit have not been met.*

*The conditions under which we will return the service are to receive payment of the amounts owed, namely US$ 212,000.00, replenishment of the original Letter of Credit, plus supply of fuel and/or increase of the Letter of Credit in the amount of US$ 750,000.00, as*

*specified in our Agreement with CDE, dated July 8, 2000 (see exhibit). If the non-operative plan is chosen, this would include adding preservatives to the water, to the steam system and adding preservatives to the lubrication system. Additionally, we would send most of our operators home.*

*A new startup of the plant would take us at least two weeks and as much as two weeks if the action became necessary.*

*We are keeping our contractual commitment to produce energy for CDE but we can not continue with the financial obligation imposed on us by the present Administration of CDE. Consequently, we must reduce our expenses immediately. We will start up our plant as soon as possible for CDE to comply with the contractual terms. We regret that we are not able to postpone this action, as you requested in our recent meeting"* (Exhibit 16 to the brief of petition).

125. The Arbitral Tribunal finds it useful to reproduce this letter in its entirety because it denounces several defaults on obligations contracted by the State in the Protocol of Understanding, to wit:
- payment of US$ 212,000.00 as a condition for CPB to start again operating the generating barge (paragraphs 4 and 5 of the protocol);
- supply of *"an adequate quantity of fuel to support the operations of CPB II until the replenishment of the additional letter of credit resulting in a total amount of the payment guarantee of US$ 2,794,912.50"* (paragraph 7 of the Protocol of Understanding);
- replenishment of the funds of the letter of credit.

In addition to these three complaints, the letter notifies the Defendants that the plant will be placed in non-operating condition, stressing the technical consequences (e.g., adding preservatives to the water to the steam system and to the lubrication system) and human consequences (e.g., return of most operators home) which it entailed.

The last phrase of the letter alludes to a "recent meeting," which would eliminate from the letter a possible character of unforeseeable ultimatum.

It can be inferred from an allusion to a discount in the value of the fuel, in a letter from Cayman Power Barge dated September 17, 2001 (Exhibit 20 to the brief of petition) that the Corporation finally delivered the fuel necessary to produce electricity.

126. In the following months, the complaints of CPB were limited to the lack of payment of the funds of the Letter of Credit in its minimum amount of US$ 2,039,912.50 (letter of March 5, 2001, Exhibit 17 to the brief of petition). In that letter, CAYMAN POWER BARGE also indicates that the letter of credit partially guarantees the loan that had been given to it in order to purchase electricity production equipment.