# EXHIBIT B

**ICC International Court of Arbitration
Case No. 11772/KGA/CCO**

**Dated as of July 11, 2005**

# PART IV

By letter of July 24, 2001 (Exhibit 18 to the brief of petition), received by the Corporation on the 25th, addressed by Mr. WILSON, president of CPB to engineer Cesar SANCHEZ, General Administrator of the Corporation, CAYMAN POWER BARGE refers to its previous "letters of notification of contractual default" dated March 5 and 14, 2001, and April 26, 2001.

In that letter, the Plaintiff also indicates that *"it has been more than a year during which the State allowed the Letter of Credit to expire without renewing it"* and repeats its requirement concerning *"the issue of a new Letter of Credit in favor of CPB in order to comply with the obligations assumed by the State under the power purchase agreement (PPA)."*

127. The same letter of July 24, 2001 claims the payment of bills in the amount of US$ 2,198,457.95 with interest: *"2.- In addition to the Events of Default indicated in the letters of Notification of Default previously indicated, CPB by this communication and under Article 22.3 PPA notifies the State that it is in default of the Power Purchase Agreement by not paying the bills for energy produced, duly delivered to it, as established in Article 10.3.1 of the contract, which sets forth the obligation of the State to pay the bills duly presented for these purposes within 25 business days after receipt thereof. The amount which has been billed to date is US$ 2,198,457.95 plus interest.*

*The term granted in the PPA for the payment of said bills has expired, but it was not honored, so that the State is in default on the obligations assumed concerning said payment.*

*In addition, since the Letter of Credit has expired and the State has not replaced it, CPB was denied its right granted to CPB under the PPA to withdraw from the Letter of Credit the amounts owed by the State for Energy produced, as established in Article 11 of the agreement.*

*3.- It is also necessary to add, concerning the unpaid energy bills that, under article 10.5 PPA in addition to the amounts indicated in said bills, the State will have to pay to CPB the legal interest generated by them at the rate of 1% monthly, from the date on which the term for the payment of the bills expired to the date the actual payment thereof is received.*

*In light of all of the above, by this communication CPB formally demands that The State pay the amounts owed to CPB indicated in the bills enclosed with this letter plus the legal interest generated by them, as indicated above."*

The letter of July 24, 2001 refers to a meeting that would have taken place on July 19, 2001 *"between our respective representatives."* The Plaintiff ends by indicating, in the last paragraph that the terms to remedy the default have lapsed and that the "arbitration proceeding" must start on July 31, 2001.

**128.** By letter of August 1, 2001, Mr. Gary MILLER, indicates to engineer Cesar SANCHEZ that, due to the lack of payment of *"the amounts in default owed by CDE,"* CAYMAN POWER BARGE will stop all electricity production the next day, *"given the imperious need to start a reduction in our expenses"* (Exhibit 19 to the brief of petition).

**129.** By letter of September 17, 2001, signed by Mr. WILSON and addressed to engineer Cesar SANCHEZ, received at CDE the same day, CAYMAN POWER BARGE communicates the termination of the Power Purchase Agreement and announces that the Generating Barge will leave: *"We regret to inform you that since we have not received full payment of the amounts owed by CDE and since no acceptable solution has been offered to our Letters of Default, we must take action in this regard. Consequently, effective immediately, pursuant to Article 22.5 of the PPA, this letter constitutes notice of termination of the PPA.*

*We plan to disconnect the Power Barge II from the power network of the State and move it outside the Dominican Republic around September 19, 2001. To minimize the discomfort caused to all parties, we require your assistance in disconnection the Power Barge II"* (Exhibit 20 to the brief of petition).

The request for arbitration submitted by CAYMAN POWER BARGE was received by the International Court of Arbitration on September 21, 2001.

********

**Termination of the contract by Plaintiff CPB**

**130.** The Tribunal must now examine whether the termination of the contract, communicated by letter of September 17, 2001, previously reproduced in this award, was duly founded. The letter alleges two reasons for the termination of the contract:
- delays in payments; and
- failure to restore the letter of credit.

Concerning the delays in payments as of the date of the notice of termination, such delays are a clear reality. The Corporation has not rejected the amounts mentioned in the letter of July 24 (Exhibit 18 to the brief of petition)

i.e., the amount of US$ 2,198,457.95. In addition, in this arbitration, the Defendants admitted that they owe the amount of US$ 2,267,547.34 in their brief of January 30, 2004.

By letter of November 25, 2004, the Defendants requested to cancel the previous admission of debt *"because new accounting analysis have shown that said admission of debt was based on a false knowledge of the reality or vice of consent named error."* However, being invited to produce the accounting audit to which the letter referred, the Defendant answered by letter of December 3, 2004 that that *"The account shows a debit balance of CDEEE to Cayman of US$ 2,082,381.5,8.[sic]"* requesting an examination of the final balance of the account "by an international audit firm."

In order to appreciate the validity of the termination of the agreement, the Tribunal finds that, on September 17, 2001, the Defendants were in default on their obligations.

**131.** The Tribunal examines below whether the Defendants respected the term to remedy the default as indicated in Article 22.5 of the Power Purchase Agreement. Said clause indicates that after receiving notice from the seller, the State has 20 days to remedy the default.

The Tribunal must investigate first of all whether the defendants were duly notified of the payment default at least 20 days prior to September 17, 2001.

The letter of July 24, 2001 (Exhibit 18 to the brief of petition) refers to "letters of notification of default on the contract dated March 5, March 14 and April 26, 2001. The existence of these notifications has not been denied or objected by the Defendants. Had they been denied, the same letter of July 24, 2004 constitutes firm notice of default and this date is prior to September 17, 2001 by more than 20 days.

Under Article 22 of the Power Purchase Agreement, the absence of payment for the power supplied by the seller constitutes a contractual default (Article 22.2.c) and the absence of remedy within 20 days after the notice (Article 22.5) authorizes the seller to "terminate this Agreement by delivering a written notice to the State" (Article 22.5.a). Consequently, this Tribunal concludes that the termination of the contract by CAYMAN POWER BARGE due to the lack of payment of power by the Defendants was valid according to the provisions of the Power Purchase Agreement.

132. Concerning the termination due to the lack of restoration of the Letter of Credit, the Tribunal finds that the claims of the Plaintiff go back before the execution of the Protocol of Understanding. According to this settlement agreement, the State had promised to replace the letter of credit "by July 30, 2000 at the latest." Although the notice of default was not necessary given the existence of a firm term agreed upon by the parties, CPB took the precaution anyway to communicate that *"the funds of the letter of Credit have not yet been replaced according to the terms agreed upon between the parties under the Agreement signed on July 8, 2000"* (letter of August 8, 2000, Exhibit 15 to the brief of petition). A new notice was given by letter of August 14, 2000 (Exhibit 16 to the brief of petition), and a third notice was issued by letter of March 5, 2001 (Exhibit 17 to the brief of petition).

Lastly, by letter of July 24, 2001, CAYMAN recapitulated the various prior notices and issued a last notice (Exhibit 19 to the brief of petition). This last notice was prior by much more than twenty days to the termination of the Agreement, which took place by letter of September 17, 2001.

The Tribunal stresses again that the absence of maintenance of extension of the letter of credit is expressly qualified as *"default"* in the Power Purchase Agreement (article 22.2.d) and that the absence of remedy within thirty days after the notice of default (article 22.4) authorizes the Seller to terminate the Agreement *"by delivery of a written notice to the State"* (article 22.4.b). This notice was issued by said letter of September 17, 2001, i.e., more than forty-five days after the notice of default, in the event that the long-term set forth in article 22.4.b should be applied.

133. The Defendants alleges that CAYMAN POWER BARGE could not terminate the contract without becoming the judge of its own case, in violation of Article 1184 of the Civil Code reproduced above (see No. 50 and 64). They refer to the French doctrine and jurisprudence citing the Dalloz Repertory of Civil Law, 1951 edition, volume I, Contracts and Agreements: *"The right of one of the contracting parties to pronounce the cancellation of the contract is an application of the principle according to which the agreements must be performed in good faith (civil code 1134). This explains the role of the Judge: he decides, according to his appreciation of the conduct of the debtor, whether or not the contract must disappear. Article 1184 of the Civil Code speaks of "tacit condition precedent;" this theoretic justification of the cancellation is inexact. If the default on the obligation was a conduct causing cancellation, it bears within itself the destruction of the contract. In any event, the Judge would do nothing more but state this destruction. It is the decision of the Judge that breaks the contractual link."*

Adopting this position, the Defendants are trying to reopen the old debate concerning the contractual will (article 1134 of the Civil Code) and its relation with the

principle of judicial control over the performance of the contracts (article 1184). In the absence of explicit sources in Dominican law, and given that the Defendants make an incursion into the French jurisprudence that interprets Article 1184 of the Civil Code, a rule which, like so many others in civil law, is common to the two countries, the Arbitral Tribunal investigates the jurisprudence of the French Cour de Cassation in the matter.

**134.** In French positive law, whenever the terms of the contract are unequivocal, the clauses that allow a party to terminate a contract in the even of default on its obligations by the other party are valid. In other words, when there is no doubt that the contractual will was to attribute directly to a party the power to terminate (*Cour de Cassation*, 1st Civil Chamber, November 25, 1986, Bull. Civ. I No. 279; Revue Trimestrielle de droit civil 1987, p. 313; in general, see Jacques Ghestin, Christophe Jamin and Marc Billau, Traite de droit civil. Les effets du contrats [sic] p. 534 No. 471, L.G.D.J., Paris, 2001).

In the Power Purchase Agreement of March 17, 1998, the parties stipulated a direct prerogative to terminate the contract and not only to request the termination to a state or arbitration court, both in favor of the State and of CAYMAN POWER BARGE:
- Clause 2.1 enumerates possible defaults of CAYMAN POWER BARGE: *"the following will constitute the 'causes of default by the seller...;'"*
- Clause 22.2 enumerates possible defaults of the STATE: "the following will constitute 'causes of default by the STATE' under this Agreement..."

The termination of the contract is the penalty that accompanies the list of defaults, which either one of the parties may incur, and it is so established in Article 22.4.b in fine of the Agreement. Unequivocally, said clause gives directly the contracting party the power to terminate the contract without other requisite but to send a written notice to the defaulting party: *"...the complying party may terminate this Agreement by delivery of a written notice to the defaulting party."*

**135.** Another element that supports the validity of the cancellation clauses, without need for judicial intervention, is that said right is incorporated expressly in the contract (*Cour de Cassation*, 3rd Civil Chamber, January 8, 1985, Bull. Civ. No. 6; Cour de Cassation, 3rd Civil Chamber, May 18, 1988, Bull. Civ. No. 94). The Power Purchase Agreement follows this validity requisite, since Clause 22 of the Agreement presents a limited number of "causes of default," which are expressly mentioned in the contract.

**136.** The French jurisprudence also takes into consideration, to validate the unilateral termination without judicial intervention, the fact that the debtor was duly notified of the default and that it was given a prudent term

to remedy the default, according to the circumstances of the case.

The letter of CAYMAN POWER BARGE dated July 24, 2001, complies with this requirement of giving notice and giving an opportunity to the debtor to remedy its default, namely
- paragraph No. 1, concerning the letter of credit, refers to Clause 22.2 (d) of the Agreement and requests the issue of a new letter of credit after many requests prior and subsequent to the Protocol of Understanding;
- paragraph No. 2, concerning the unpaid bills, refers to Clauses 22.3 and 22.3.1 of the Agreement, requesting expressly the payment of US$ 2,198,457.95 plus interest. Also the request to pay, dated July 24, 2001, comes after many other prior notices sent in preceding months.

The termination of the Contract, communicated on September 17, 2001, took place within a reasonable term, taking into account the circumstances of the case, including the magnitude of the debt, duration of the payment delays, commitments made in meetings that were not honored, the agreement reached in the Protocol of Understanding and the fact that due dates were not respected in spit of the fact that engineer Rhadamés SEGURA, Secretary of State with special power of attorney from the President of the Republic had confirmed those commitments.

137. The Arbitral Tribunal considers that, given such severe situation, CAYMAN POWER BARGE had no other remedy but to terminate the contract. Even supposing that the termination of the contract by the creditor was not valid without judicial control, the fact that the petition for arbitration was filed only four days after the communication of the termination validates in the opinion of this Tribunal the termination, whose terms can always be reviewed by a Judge or an Arbitrator, albeit *ex post facto*.

The Defendants, who have not contributed to the speed of this arbitration proceeding, cannot require the award to be rendered prior to the termination of the contract. In conclusion, the Tribunal decides that the termination of the Power Purchase Agreement communicated by CAYMAN POWER BARGE on September 17, 2001, is valid and legal, both under the terms of the contract and under the applicable law.

********

**The alleged contractual default of the Plaintiff by abandoning the Dominican Republic and interrupting the negotiations**

138. Another litigious point mentioned in the Terms of Reference, at the request of the Defendants is "to determine whether the abandonment of the country by CPB without prior

notice constituted a violation of articles 1134 and 1184 of the Civil Code of the Dominican Republic." In light of the presentations of the Defendants, the Tribunal understands that the alleged default is based on three factual premises:
- the departure of the power generating barge from the pier where it was moored and from the territorial waters of the Dominican Republic;
- the suspension of the negotiations communicated by letter of February 26, 2002;
- the departure of all representatives qualified to represent the Plaintiff from the territory of the Dominican Republic.

**139.** The Defendants presented their criticisms of the behavior of CPB in the following terms:
*"...article 18 section 18.1 indicates that, in the event of any dispute, controversy, claim or difference (the Dispute), it will be referred to arbitration and resolved according to the arbitration rules established by the International Chamber of Commerce valid in Paris (ICC rules).*

*What happened in this case? What happened was that, in the presence of a dispute, CAYMAN POWER BARGE I, LTD. removed the Unit, suspended the negotiations concerning the settlement of the accounts that was in progress at the time, and abandoned the country, taking away the Unit without leaving even a qualified representative, all without having previously complied with the provisions in section 18.1 of the Agreement, namely: request the arbitration and wait for the decision of the Court qualifying the dispute and ordering as it deemed appropriate.*

*What CAYMAN POWER BARGE I, LTD. was to qualify the dispute itself as default of the State and act unilaterally, removing the Unit and canceling the Agreement at will.*

*Now, when it realizes its imprudence and default committed, it empowered the Arbitral Tribunal, in a tardy manner, to try to have it legalize its fault retroactively. The time to resort to the Arbitral Tribunal was when the alleged default of the State and of Corporación Dominicana de Electricidad occurred and not now, after it cancelled unilaterally and without the order of a Judge the Power Sale Agreement dated March 17, 1998."*

**140.** The Defendants do not invoke any right of possession or real right on the electricity generating barge, neither in full nor in part. They also do not allege that they have participated in its financing, either directly or through a loan granted or guaranteed by them. Consequently, it cannot be considered that they have any real or pledge right in the barge or its equipment. The departure of the barge from the Dominican territorial waters is therefore a logical effect of the termination of the Power Purchase Agreement. Since the power production purchase contract of the barge was cancelled, the latter, the barge, which was the instrument of the production, can be removed by the Seller, whose possession right in the barge remains inalterable.

This is a classic situation in work and service lease contracts: the peasant rents the services of a miller, to transform the wheat grains provided by the peasant into flour. In this case, the Corporation contracted the services of CPB to transform the fuel it provided into electricity. Once the contract was terminated for any reason, the party that provided grain or fuel has no right in the equipment used by the lessor of the services. Since the Arbitral Tribunal decided that the termination of the agreement was well motivated, the departure of the generating barge cannot be objected in any way by the Defendants.

141.  Concerning the suspension of the negotiations, the Defendants allege the following: *"In spite of the attitude of CAYMAN POWER BARGE I, LTD., Corporación Dominicana de Electricidad (CDE) continues trying to reach an agreement in connection with the Adjustment of Accounts until February twenty-sixth (26) two thousand two (2002), date when it received a communication from Atty. Luis Miguel PEREYRA, lawyer representing CAYMAN POWER BARGE I, LTD., which, copied verbatim, reads:*

*"PEREYRA & ASOCIADOS*

*FEBRUARY 26, 2002*

*Dr. Tomas Lorenzo Roa*
*Legal Counsel*
*CORPORACION DOMINICANA*
*DE ELECTRICIDAD (CDE)*
*Ave. Independencia, Centro de los heroes*
*Santo Domingo, D.N.*

*Dear Dr. Roa:*
*We are informing you that we received letter (sic) from CAYMAN POWER BARGE (CPB) indicating that they decided to cancel the meeting scheduled with CDE technicians in order to reconcile the debit said entity has to CPB, because said company considers that CDE is in default on various provisions of the Power Purchase Agreement signed between the parties, as has been discussed and documented. Consequently, if said entity intends to dispute the amounts of the debt it has to CPB, it must comply with the provisions set forth in Article 10.6 of the contract, for these purposes.*

*Sincerely,*

*Luis Miguel Pereyra."*

142.  The content of said letter has not been denied or objected to by CPB so that the Tribunal appreciates it as a valid means of proof to establish the fact to which it refers. The letter could constitute proof of an abusive breach of the

negotiations if it had been sent a few days before the termination of the Agreement, communicated on September 17, 2001. It could also suggest an abusive exercise by CAYMAN POWER BARGE of its power to terminate the Agreement, if CAYMAN had accepted to negotiate a conventional retraction of the termination soon after being notified of the latter. But the date of this letter, February 26, 2002, demonstrates that we are not in the presence of either one of these two hypotheses. At that date, February 26, 2002, the arbitration proceedings had been done more than five months earlier, since September 21, 2001.

These negotiations to which the Defendants allude, if they existed, must be considered as attempts to conciliation parallel to the arbitration proceeding, which are always permitted, but whose breach does not allow declaring the prior termination of the contract whose consequences the parties are trying to limit as abusive.

**143.** Concerning the departure of all qualified representatives of the Plaintiff, alleged as critical by the Defendants, it can be seen as a violation of the obligation to resolve disputes amicably set forth in article 18.1 of the Power Purchase Agreement, which reads: *"In case of any dispute, controversy, claim or difference, (each on a "Dispute") arising from or in connection with this AGREEMENT, the affected PARTY will give written notice thereof to the other PARTY. The **PARTIES will try to resolve the Dispute amicably**. If within one (1) MONTH after the notice of a dispute, it has not been resolved at the request of either PARTY, the Dispute, in spite of its nature, will be referred to arbitration and finally resolved according to the arbitration rules established by the International Chamber of Commerce valid in Pairs, France (the "ICC Rules").*

**144.** The Tribunal finds that the attempts to conciliation or other amicable solution by CAYMAN POWER BARGE have been many. On various opportunities, the Plaintiff requested the payment of the funds owed according to the letter of credit, asking the Defendants to restore the funds many times, before and after executing the Protocol of Understanding.

The same happened with the payment of the bills, whose payment was requested by the Plaintiff many times, and that is why CAYMAN POWER BARGE was able to affirm in this letter of May 4, 2000 (Exhibit No. 7 to the brief of petition), that it had "produced a substantial quantity of energy that CDE had sold to the discos" without having its bills paid." In the same letter, the Plaintiff indicates further on that "the plant was producing more than 30 MW for the system, so that we understand that it would be beneficial for CDE to keep this project in operation." There is no document whatsoever in the file to contradict or even change said affirmations.

It is not surprising that any other creditor would have lost patience when facing similar situations, in which the creditor finds that his debtor does not pay him in spite of having delivered his own production. However, CPB accepted to negotiate the "Protocol of Understanding," but not without first embarking in a negotiation, as reflected by the exchange of letters that mention expressly the possibility of interrupting the operation or terminating the contract and which proposed discussions, to wit:

- Letter of May 11, 2000 addressed to engineer Rhadamés SEGURA: *"While CPB at this time is not exercising its right to terminate the PPA, or to discontinue the operation of the Power Barge II according to the terms of the PPA, CPB reserves the rights to exercise either one of these options with written notice to CDE. We are available to discuss this matter with you at your earliest convenience."* (Exhibit No. 9 to the brief of petition).

- Letter of June 2, 2000 from attorney Luis Miguel PEREYRA to engineer Rhadamés SEGURA: *"Notwithstanding the above, and in line with your position of contributing to an amicable and satisfactory solution of the conflict, CAYMAN POWER BARGE, LTD. would be willing to start again its operations once CDE has replaced the funds withdrawn from the Letter of Credit opened as payment guarantee by the Dominican State of the obligations assumed towards CAYMAN POWER BARGE, LTD. under the Power Purchase Agreement, as established in the final part of Article 11 of said contract; and once the necessary measures have been taken to resolve the other pending issues between CAYMAN POWER BARGE, LTD. and CDE in order to regularize their commercial relations"* (Exhibit No. 12 to the brief of petition).

**145.** Once executed the "Protocol of Understanding," which is only a type of amicable agreement, the State failed to comply with the basic commitments established in that document, i.e., the replacement of the funds of the letter of credit and the payment of the outstanding bills. The letters previously cited, dated August 8, 2000 and March 5, March 14, April 26, July 24 and August 1, 2001, corresponds to the attempts towards an amicable solution of the disputes indicated in clause 18.1 of the Power Purchase Agreement. All this activity took place before the Plaintiff communicated its decision to terminate the Agreement by letter of September 17, 2001 and file the petition for arbitration on the 21st of the same month.

Pursuant to article 18.1 of the Agreement, the resolution of the disputes belonged at that time to the Arbitral Tribunal. The stay of a CPB representative in the territory of the Dominican Republic would have served no purpose. Consequently, the Arbitral Tribunal decides that CAYMAN POWER BARGE did not commit any fault or abuse of any right when ordering the departure of the barge and suspending the negotiations on February 26, 2002 and that it did not incur in contractual default because it did not keep a qualified representative in the

territory of the Dominican Republic.

The Arbitral Tribunal proceeds below to examine what the Defendants owe in capital and in interest.

*******

### MERIT OF THE CLAIMS FILED BY THE PLAINTIFF CAYMAN POWER BARGE

146. CAYMAN POWER BARGE asks that the Dominican State be sentenced to pay the following amounts:

- *"Sentence the Dominican State to pay to CAYMAN POWER BARGE I, LTD the amount of FOUR MILLION, ONE HUNDRED SEVENTY FIVE THOUSAND, EIGHTY TWO U.S. DOLLARS AND NINETY FIVE CENTS (US$ 4,175,082.38)- [the difference between the amount of the cents expressed in letters and the amount expressed in figures is present in the brief submitted by the Plaintiff] as payment for the Bills issued in connection with the performance of the Power Purchase Agreement signed between CAYMAN POWER BARGE I, LTD. and the Dominican State through CORPORACION DOMINICANA DE ELECTRICIDAD (CDE) now CORPORACION DOMINICANA DE EMPRESAS ELECTRICAS ESTATALES (CDEEE) on March seventeen (17), nineteen hundred ninety eight (1998) as amended by documents signed May two (2), nineteen hundred ninety nine (1999) whose payment was promised by the Dominican State under Articles 10.3.1 and 10.3.3 of said Agreement."*

- *"Sentence the Dominican State to pay to CAYMAN POWER BARGE I, LTD. legal interest generated by the amount indicated above at the rate of one percent (1%) monthly, calculated from the due date of the bills underlying said debt to the actual payment thereof in the hands of CAYMAN POWER BARGE I, LTD. pursuant to article 10.5 of the Agreement as late damages caused by the default of the Dominican State on its payment obligation under said Agreement, and under the provisions of Article 1153 of the Civil Code of the Dominican Republic."*

- *"Sentence the Dominican State to pay to the CAYMAN POWER BARGE I, LTD. the amount of US$ 1,200,000.00 as compensation for the damage caused to the latter by the default of the Dominican State on the obligations contracted under Article 11 of the Power Purchase Agreement signed between CAYMAN POWER BARGE I, LTD. and the Dominican State, through CORPORACION DOMINICANA DE ELECTRICIDAD (CDE) now CORPORACION DOMINICANA DE EMPRESAS ELECTRICAS ESTATALES (CDEEE) on March seventeen (17), nineteen hundred ninety eight (1998) as amended by*

*documents signed May two (2), nineteen hundred ninety nine (1999) concerning the constitution and maintenance of the Letter of Credit issued in favor of CAYMAN POWER BARGE I, LTD. to guarantee the payments of the Dominican State under said agreement; all pursuant to Articles 1147 and 1184 of the Civil Code of the Dominican Republic."*

The Arbitral Tribunal examines next the grounds of each of the claims, to wit:
- the amount owed for the unpaid bills,
- the interest to be applied to said amounts,
- the conciliation of the accounts,
- indemnity for damage.

**The Bills**

**147.** Concerning the bills, the Defendants criticize the amounts and request an expert investigation by an independent audit firm. The Defendants submitted to the Tribunal an accounting study done by attorney Maritza Alt. CAMACHO SOSA, Director of Internal Audit and attorney Ronny JAQUEZ PEGUERO, Audit Supervisor, dated January 13, 2004, transmitted to engineer Horacio PEREZ MIRANDA, Marketing Director. Said study presents a difference of US$ 2,759,188.39 in favor of the Defendant. It concludes that the balance of CAYMAN POWER BARGE totals US$ 2,267,547.23.

The cover letter of the study, dated January 13, 2004, justifies the difference in the following terms: *"We respectfully inform you on the balance of the company CAYMAN POWER BARGE I, LTD. totaling Two Million, Two Hundred Seventy Seven Thousand, Five Hundred and Forty Seven Dollars and 34/100 (US$ 2,267,547.34). This analysis was made based on the bills for energy served, sent by the Marketing Department and the late interest cut off at December 31, 2003, which are calculated as established in the Power Purchase and Sale Agreement.* ***The Difference reflected in the comparative table of the debt to CAYMAN POWER BARGE I, LTD. in the amount of Two Million, Seven Hundred Fifty Nine Thousand, One Hundred Eighty-Eight Dollars and 39/100 (US$ 2,759,188.39) corresponds to differences in bills for excessive consumption of fuel, adjustment for guaranteed dispatch and the effects reflected in the tabulation of late interest cut off at December 31, 2003, an amount which CDEEE does not recognize based on the Power Purchase and Sale Agreement"*** (Emphasis added by the Tribunal).

**148.** On November 25, 2004, the Defendants sent a brief titled "Brief of new allegations concerning the counterclaims" in which, in the following terms, they affirmed that they were creditors of CPB:
" *The new authorities of CORPORACION DOMINICANA DE EMPRESAS*

*ELECTRICAS ESTATALES (CDEEE) conducted an audit of the account of CAYMAN POWER BARGE I, LTD., in light of new evidence and proof obtained by them, which gave, as a result, an accounting situation that is totally different, which shows a credit balance in favor of Corporación Dominicana de Empresas Eléctricas Estatales (CDEEE), the Recognition of Debt and Offering of Payment be made to the International Court of Arbitration of the International Chamber of Commerce (ICC) in our brief of Counterclaims is inapplicable."*

By letter of November 27, 2004, the Tribunal invited the Defendants to sent said account audit. The defendants answered by letter of December 3, 2004 indicating that, contrary to what they had reported in their letter of November 25, 2004, *"the account shows a debit balance of CDEEE to CAYMAN of US$ 2,082,381.58."*

**149.** In a letter dated December 4, 2004, the Tribunal observed that the amount was close to the debit balance mentioned by the Defendants in one of the documents enclosed with their brief of January 30, 2004. The accounting study of that date presented a debit balance US$ 2,267,547.34.

The Tribunal invited CAYMAN POWER BARGE to indicate whether it wishes to comment on the accounting document transmitted on December 3, 2004. The Tribunal mentioned that, if that was not the case, it would consider that CPB referred to the part titled "Conciliation of Accounts" of its answer of February 20, 2004. Since it did not receive any observations from CPB on December 15, 2004, the Tribunal declared the closing of the investigation of the case.

**150.** The Plaintiffs submitted to the Arbitral Tribunal a series of invoices issued during the commercial relation between CAYMAN POWER BARGE, on the one hand, and the Corporation (CDE) and the State on the other hand. Said invoices, written in English, mention in the beginning the following:
- *Meter reading at the beginning of the month,*
- *Meter reading at the end of the month,*
- *Net energy production for month.*

The third line indicates the difference between the amount marked by the meter at the beginning and the end of the month or other period. Concerning the amount marked, CPB produces a document originating from the Corporation, department of meter reading titled "Reading minutes." Said documents bears the signature of a representative of the Corporation and a representative of CAYMAN POWER BARGE. There is no disagreement between the parties concerning the quantity of energy produced by the generating barge.

The invoices contain, further on the following mentions:

*1 - Minimum net energy production calculation;*
*2 - Invoices for energy payment for the month are due as follows;*
*3 - Reduction of invoice for excess fuel payment;*
*4 - Other adjustments to the invoice;*
*5 - Interest charges and payments for outstanding amounts during the month are due as follows;*
*7 - Average unit energy price.*

The terminology used in the invoices corresponds to the definitions mentioned in clause 1 of the Agreement from clause 1.1 to clause 1.56. Other expressions, such as references to "guaranteed capacity" or "guaranteed dispatch," are defined in some of the first articles, of a technical character, of the Agreement.

**151.** Clause 10, titled *"invoices and payments,"* indicates, first of all, the record of the meters:
*"10.1 RECORDS OF THE METERS. THE SELLER will record the measurement instruments the last DAY of each MONTH at four PM (4:00 p.m.). THE CORPORATION must have a representative present to observe the monthly readings."*

The Tribunal mentioned previously that the Corporation was represented by the "department of meter reading" when the meters were recorded at the beginning and end of the periods. In addition, or for that reason, the amounts of net energy production have not created any controversies.

**152.** Clause 10.2 deals with the presentation of the invoices: *"10.2 PRESENTATION OF INVOICES. 10.2.1 THE SELLER will prepare and send a monthly invoice (the Invoice) in four (4) originals to THE CORPORATION and one original to the General Administrator of THE CORPORATION in representation of THE STATE on the tenth (10th) DAY of each MONTH. Each Invoice will be expressed in Dollars and will indicate the NET ENERGY PRODUCTION delivered to THE CORPORATION during the prior MONTH and the Payment for Energy owed, calculated pursuant to this AGREEMENT."*

There is also a reference to the form of the invoices in clause 10.3.1 concerning payment. The last phrase of this clause indicates that *"the invoices of the seller under this document will be made up in the form indicated in appendix V."*

**153.** The Arbitral Tribunal finds that the mentions described above in Spanish are according to the invoice model found in Appendix 5, enclosed with the Power Purchase Agreement, to wit:
- *medicion de la produccion neta de energia;* [net energy production metering]
*1 - calculo de la produccion de energia neta;* [Minimum net energy production calculation]
*2 - factura para el pago de energia para el mes...;* [Invoices for energy payment for the month are due as follows]

*3 - reduccion de la factura por el pago de combustible en exceso;* [Reduction of invoice for excess fuel payment]
*4 - otros ajustes a la factura;* [Other adjustments to the invoice]
*5 - cargos de interes y pagos para montos retrasados;* [Interest charges and payments for outstanding amounts during the month are due as follows]
*6 - factura total para el mes;* [Total invoice for the month]
*7 - precio promedio por unidad de energia.* [Average unit energy price]

These seven mentions are actually present in the invoices delivered to the Corporation. Consequently, the invoices are in line with the agreement of the parties. In addition, the Defendants have not objected to any aspect of the form of the invoices.

**154.** The criticisms of the Corporation alleged to justify the difference of US$ 2,759,188.39, refer to the following items:
- excess fuel consumption;
- adjustment for guaranteed dispatch;
- late interest (covering letter of the audit dated January 13, 2004, see No. 147 above).

The discrepancies concerning the interest are the object of a specific examination in this award (see No. 161 to 169 below).

**Excess fuel consumption**

**155.** The third item of the invoices refers to the "reduction of invoice for excess fuel payments." This item or section referring to fuel consumption is contemplated in Appendix 5 of the Agreement, which has six lines:
M - Guaranteed Thermal Regimen
N - Real Thermal Regimen, according to clause 1.51
Z - Thermal Regimen Factor (N/M) according to clause 1.23
P - Amount of Fuel consumed during the Month (bbls.)
Q - Average Audited Price of THE CORPORATION for the Fuel for the Month (US$/bbls.)
R - Value of the Fuel consumed for the Month (US$) (P*Q).

The Tribunal finds that the invoices delivered to the Corporation contain the information corresponding to each item. The Defendants therefore had the elements that would have allowed them to object in detail to the calculation of the excess fuel and request the appropriate reduction of the invoice. No objection can be observed in the exchange of letters between the parties referring to the need to reduce the amount of the payment because of an excessive invoicing of the fuel consumed by the plant.

**156.** In a letter dated September 10, 1998, Mr. Gary MILLER wrote, on behalf of CAYMAN POWER BARGE, to engineer Rhadamés SEGURA,

General Administrator of the Corporation (CDE) that in the calculation of the excess fuel CPE based itself on a report prepared by the employees of the Corporation itself. CPB accepted the calculation to avoid losing time, even though the contract indicated an independent audit of the volumes of fuel and average price. The representative of the Plaintiff concludes that, since the Real Thermal Regimen of the barge (POWER BARGE I, 12,900 BTU/KWH) is maintained within acceptable limits, there is no collection for excess fuel.

In the absence of a document from the Corporation to prove otherwise, Mr. Gary MILLER's observation allows the Tribunal to infer that it was the Corporation itself that controlled the information concerning the calculation of the excess fuel. The "Q" item expressly mentions the *"audited average price of the Corporation for fuel for the month (US$/BBL)."* This situation is logical in a contractual context in which the Corporation was the party obligated to provide the fuel. The Tribunal has already stressed that this was not always the case, since there were periods in which CPB supplied the fuel itself (see paragraph 123 of this award). The file does not contain any element to contradict the implications of the invoices during the reference periods.

157. In addition, the Power Purchase Agreement contains detailed procedures in the event of inexact meters: *"Should adjustments be necessary in invoices as a result of corrected measurements made in connection with inexact meters, the PARTIES will use the corrected measurements described in Article 4.6 of this AGREEMENT to recalculate the amounts owed. If the total amount, as recalculated, owed by a PARTY for the period of an error is different than the total amount owed as calculated previously, and payment of the previously calculated amount has been made, then the seller will include the corresponding adjustment in the following monthly Invoice (article 10.8)."*

Clause 4.6 of the Agreement deals with the measurement of the net energy production and the tests of the measurement system. The Tribunal finds that the file does not contain any documents referring to a request of the Corporation for a test of the measurement system in spite of the fact that such request is indicated in clause 4.6.2.1.

In conclusion, the Tribunal finds the argument of the Defendants intended to reduce the debt of the Corporation due to inexact invoicing because of excessive fuel consumption without any grounds.

**Guaranteed Dispatch**

158. The other cause of account alleged by the Defendants concerns the so-called "guaranteed dispatch," an element of the calculation of the net