# EXHIBIT B

ICC International Court of Arbitration
Case No. 11772/KGA/CCO

Dated as of July 11, 2005

# PART V

energy production which, multiplied by the average "price per energy unit (US$ KWH)," allows calculating the debt to the Plaintiff for the electric energy sold.

The guaranteed dispatch is calculated according to the production of what is called "kilowatt hour unit" ("KWH," see Agreement 1.34). The concept of guaranteed dispatch defined in Clause 1.15 of the Agreement:
*"1.15 GUARANTEED DISPATCH. Means the number of KW, no less than ninety percent (90%) of the GUARANTEED CAPACITY of POWERBARGE I before the date the ADDITIONAL CAPACITY is commissioned and subsequently, will mean the sum of KW resulting from ninety percent (90%) of the GUARANTEED CAPACITY of the POWERBARGE I and eighty-five (85%) of the GUARANTEED CAPACITY of the ADDITIONAL CAPACITY (expressed in KW)."*

**159.** The invoices for 2001 corresponding the payment required by CAYMAN POWER BARGE mentioned a guaranteed capacity of 30,400 KWH (January, February, March). Thus, the invoice of April 20, 2001 mentions a guaranteed capacity of 33,592 KWH. This invoice was enclosed with a letter dated April 21, 2001 signed by Mr. Gary MILLER from CPB and addressed to Engineer George REINOSO, advisor to the General Administrator of the Corporation. The letter, written in English, mentions that on April 4, 2001, with the assistance of the Corporation, the capacity test of POWERBARGE II, as agreed in Clause 5.3.2 of the Agreement was done successfully. The letter indicates that at the end of the test, all obligations of CPB were considered duly met. By said letter, CPB also informs the Corporation that it has complied with the guaranteed dispatch mentioned in Clauses 1.15 and 7.1.2 of the Agreement and clause 5 of the Amendment of July 2, 1999.

The file does not contain any document to contradict these statements expressed in the letter of April 21, 2001.

**160.** In May, June and July 2001, the guaranteed dispatch mentioned in the invoices totaled 33,592 KWH. The invoices are accompanied by letters dated May 23, June 21 and July 27, which mention that *"the invoice contains an adjusted dispatch based on the provisions estimated in the Power Purchase Agreement, articles 1.15 and 7.1.2 and Article five of the amendment dated July 2, 1999.*

Clause 7.2 of the Agreement deals with the need to balance the net electricity production at the level of the guaranteed capacity for a period of two months: *"During the TERM of this AGREEMENT, the CORPORATION undertakes to dispatch the UNIT at the level of the GUARANTEED DISPATCH. In the event that the UNIT in any period or periods during a MONTH cannot be dispatched at the level*

*of the GUARANTEED DISPATCH due to reasons attributable to the SELLER, the corporation agrees to make its best efforts to dispatch the UNIT during the following month at a level that will allow the SELLER to balance the NET ENERGY PRODUCTION at the level of the GUARANTEED DISPATCH during both months, provided the UNIT is capable to allow for such offset.*

Clause five of amendment of July 2, 1999 indicates that: *"guaranteed dispatch means the total KW during phase I, no less than 90% of the guaranteed capacity and during phase II no less than 85% of the guaranteed capacity."* In turn, the concept of "GUARANTEED CAPACITY" is defined in clause 1.8 of the Agreement: *"1.8 GUARANTEED CAPACITY means a nominal capacity of 30,000 KW resulting in a net productivity of no less than twenty-four thousand KW during PHASE I (POWERBARGE I), and an aggregated approximate nominal capacity of 30,000 KW, resulting from a net capacity productivity of no less than ninety-four point twenty-five percent (94.25%) of the nominal capacity during PHASE II (ADDITIONAL CAPACITY) which, added to POWERBARGE I results an approximate nominal capacity of 60,000 KW, resulting in a net aggregated capacity productivity of no less than 50,000 KW and no more than 60,000 after the date the ADDITIONAL CAPACITY is COMMISSIONED."*

In August 2001, the invoice dated August 20 mentions a guaranteed dispatch of 30,400 KWH and an additional invoice dated August 30 mentions a guaranteed dispatch of 33,592 KWH. The same amount of the guaranteed dispatch is that mentioned in the invoice of September 20, 2001. There is no objection in the file, before the beginning of arbitration to the amounts of the guaranteed dispatches indicated in these invoices.

In addition, clause 10.7 of the Agreement contemplates a lapse term of two months from the issue of the invoice to oppose of lodge any complaint concerning an error in past invoices. In the event of disputes on amounts invoiced, the term to lodge a complaint was established at *"ten business days after the receipt of the respective invoice* (article 10.6).

The Tribunal would have had to respect the will of the parties. Barring circumstances of *force majeure* which were not alleged by the Defendants, the Tribunal is obliged to enforce these last terms. Consequently, the Arbitral Tribunal concludes and decides that there are no grounds to the petition of the Defendants to reduce the amount owed according to the invoices due to an alleged insufficient guaranteed dispatch.

**Interest applicable to the amounts**

161. The Power Purchase Agreement contemplates, in clause 10.5, the obligation

of the State to pay interest in the event of delay "DELAYS IN PAYMENTS. If the Invoice of the SELLER or any other payment obligation of THE STATE is not paid on its due date, the amounts owed will legal interest of one percent (1%) per MONTH from the due date to the date the payment is received by the SELLER."

The Tribunal notes that the parties stipulated monthly interest of 1% without expressing it as an annual interest of 12%. The Tribunal interprets this clause of the Agreement in the sense that the parties wanted that, at the end of each month, the amount resulting from adding the interest rate of 1% be incorporated in the amount of capital, which amount in turn, produces interest. In other words, this is a capitalization of the interest, receiving interest on interest, which is usually identified with the concept of compound interest.

The Defendants claim that the clause is null because it is contrarily to Article 1154 of the Dominican Civil Code which reproduces the text of the French Civil Code (see No. 56 above), which reads: *"The interest produced by capital may produce new interest either following a judicial petition or a special agreement provided that both in the petition and in the agreement the interest is owed for at least one whole year."*

162. Article 1154 does not totally prohibit compound interest but subordinates its application to a judicial petitioner agreement between the parties: *"The interest produced by capital may produce new interest either following a judicial petition or a special agreement..."*
In this case, the Court finds that the agreement between the parties exists.

Article 1154 of the Dominican Civil Code also admits the validity of an agreement that contemplates the capitalization of interest matured or owed for at least one year: *"...provided that both in the petition and in the agreement the interest is owed for at least one whole year."* In the absence of Dominican jurisprudence or doctrine known to the Tribunal or mention by the parties, it is appropriate to refer to a well-established French jurisprudence based on a text identical to Article 1154 of the Dominican Civil Code which validates the agreements that stipulate in advance in the event that the debtor does not punctually pay the debt. (Cour de Cassation, civil chamber, July 15, 1913, D.P. 1917.1.50; October 19, 1938, D.H. 1938 p. 561).

163. In this case, the only point that presents a validity problem is the incorporation of the interest per matured month in the amount of capital.

There is no doubt that Article 1154 of the Civil Code conditions the validity of the

agreements that stipulate compound interest on the fact that only the interest matured for one year may be added to capital. This condition has to do with the internal policy of the Dominican Republic and is inspired from the convenience of avoiding too quick and significant increase to the debts, especially those payable by private persons or consumers.

**164.** When analyzing the history of Article 1154 of the Civil Code, it is noticed that it attempts to reconcile the position that prohibited the loan with interest, embraced by the doctrine of the Catholic Church and the mercantilistic ideas that considered interest a normal remuneration on the money given on loan. The Ecclesiastic doctrine, based on Leviticus, Deuteronomy, and the gospel according the St. Luke, VI, 35 was contained in the Latin formula: *Mutuum date, bihil inde spantes* ("Lend, hoping for nothing again"). The economic revival of Europe and the advance of mercantilism as a promoter of wealth in the West, led to the gradual disappearance of compound interest. Today, some perceive compound interest as a logical and fair corollary of modern capitalism. If the creditor had received the interest owed at the agreed time, he could have given with these funds, a new loan which in turn, would have produced money.

**165.** This historic digression about the prohibition of compound interest leads the Tribunal to the conviction that the prohibition of the monthly capitalization of interest incorporated in article 1184 of the Napoleon Code is only a remnant of an ethical conception that has been submerged by the development of market economy in the modern world. Hence, in the opinion of the Tribunal, although the prohibition of monthly compound interest continues being an internal public policy principle in the countries that maintain this prohibition, it must not, however, be invoked as a principle of international public policy.

In an internal contract agreed upon between parties established in the territory of the Dominican Republic, and which produces all its effects in this territory, the parties cannot agree on monthly interest capitalization. If they do so, in spite of the prohibition in Article 1154 of the Civil Code, the clause is null and void. It does not produce effects or it must be interpreted as allowed by said provision, i.e., annual compound interest.

**166.** But, in international trade contract, it has been admitted since the beginning of the 20th century that certain contractual clauses, even though contrary to the internal public policy and prohibited in the internal law applicable to the contract maintain their validity to the extent that they are freely agreed upon by parties that decide to get involved in international trade (see for example, in the absence of explicit sources to the contrary known in Dominican law, *Cour de Cassation*, Civil Chamber, December 5, 1910, Ameritan Trading v. Quebec

Steamship; Revue de droit international prive 1911 p. 395). These clauses are null according to internal public policy, but are not contrary to international public policy. The standard or yardstick to be used to appreciate the validity of the agreement of the parties in an international commercial contract is not of internal public policy but of international public policy, also called transnational public policy.

The most propitious terrain to apply these principles has been the international payment. In a famous sentence of June 21, 1950, to which the Tribunal refers in the absence of Dominican jurisprudence or doctrine known or mentioned by the Parties, the French Court of Cassation sustained the validity in international payment of the clauses that indicated the indexation of the amount of a loan to the value of gold, a clause expressly prohibited by applicable internal law (*Cour de Cassation*, Civil Chamber, June 21, 1950, Revue Critique de Droit International Prive 1950, p.609).

Moreover, it must be noted that there are several exception to the limitation of compound interest to the fact that interest must accrue manually. The best known of these exceptions consist of the bank practice to incorporate interest into capital whenever the account is liquidated which in general happens every fifteen days.

167. Lastly, the Arbitral Tribunal cannot be indifferent to the circumstance that the petition for nullity of the calculation of monthly interest was submitted by a sovereign state which signed the clause after a detailed study of the draft (see the stages of the study of the contract by the Dominican administration mentioned in No. 85 et seq. of this award). This petition cannot be analyzed as the state's desire to repair what it agreed to by error, but is intended to ignore an obligation freely consented to after long deliberations.

Said petition for nullity is the fifth submitted by the Defendant in this proceeding, since they claim the nullity of the following provisions:
- nullity of article 18 concerning the settlement of disputes by arbitration;
- nullity of article 13 concerning tax exemption;
- nullity of the contract because it was not approved by Congress;
- nullity of the money withdrawals from the Letter of Credit (article 11);
- nullity of the clause on compound interest (article 10.5).

168. This Tribunal considers that granting a petition for nullity of a clause expressly consented to by the party that alleges the nullity, alleging the violation of an internal law rule, conspires against the juridical safety on which

the investments and the international contracts from which they stem must inevitably be supported. In all events, it cannot be admitted that a contracting party receives something while the other party does not deliver. The courts cannot allow a game in which obligations valid for one party are exchanged against obligations that are null for the other party, with the consequence that the latter receives without giving.

169. If the Tribunal had declared the nullity of the contract, it would have invited the parties to make allegations on the effects of the nullity. Since the time of Roman law, the effects of the nullity of a contract have been governed by the rules applicable to quasi-contracts, especially under the principle that nobody can get rich at the detriment of another person. The practical result of the principle of unlawful enrichment would lead to a result similar to the one that would be obtained by application of the clauses established in the Agreement. Indeed, it would be easy to demonstrate that the price of the energy sold by the Plaintiff has been established taking into consideration the tax exemptions or exonerations and the guarantees for punctual payment.

The Tribunal concludes by affirming the validity of Clause 10.5 of the Power Purchase Agreement.

**Conciliation of accounts**

170. In its brief of November 14, 2003, CAYMAN POWER BARGE requests the sentencing of the Dominican State to pay US$ 4,175,082.38 plus interest.

In a letter of July 24, 2001, CPB indicated the following: *"the amount that has been invoiced to date is US$ 2,198,457.95 plus interest."* The file does not contain any document in which the Defendants object to this amount claimed.

The amounts of subsequent invoices are as follows:
- August 20, 2001: US$ 103,397.81;
- August 30, 2001: US$ 552,722.77;
- September 20, 2001: US$ 829,722.40.

To facilitate future calculations to determine the amount owed, the Tribunal deducted the interest (US$ 20,474.78 in the invoice of August 20; US$ 23,727.36 in the invoice of September 20, 2001). Consequently, the total amount owed in capital is US$ 3,684,300.93.

171. In the accounting documents submitted by the Defendants, enclosed with the brief of January 30, 2004, titled *"Presentation of a quantification of the amount of*

*indemnities,*" no payment is mentioned except that of US$ 178,000.00, accompanied by the mention "*advance, protocol of understanding.*"

According to the "Protocol of understanding" of July 8, 2000, said amount was paid soon after the signing of the protocol, so that it must not be deducted from the amount owed by the State based on the documents of July 24, 2001 and subsequent documents.

**172.** In its letter of September 17, 2001, CPB wrote the following: "*Finally, to the extent that any fuel provided by CDE remains aboard the Powerbarge II, we will deduct the value of the fuel from the amount owed by the State and by CDE to CPB. The discount will be equivalent to the amount paid by CDE for the fuel at the time CDE purchased the fuel. In addition, the State and CDE must produce sufficient proof to CPB concerning the amount and date of the purchase of the fuel for CPB to give its consent to said discount*" (Exhibit 20 to the brief of petition).

The Tribunal interprets the terms of this letter in the sense that, on September 17, 2001, two days before disconnecting the generating barge, CAYMAN admitted the presence on-board of fuel supplied by the Corporation. In the absence of an adversarial evaluation of the amount of fuel and its economic value at the time it was purchased by the Corporation, the Tribunal can only consider the price discounted by the Defendants.

In the accounting documents enclosed with the brief of January 30, 2004, the Defendants indicate an amount of US$ 351,769.35 for "fuel on-board the barge." Said amount, which was known to CAYMAN POWER BARGE, was not objected to by the Plaintiff in its brief of answer dated February 20, 2004. Consequently, the Arbitral Tribunal deducts this amount from the debt of the State: US$ 3,684,300.93 – US$ 351,769.35 = US$ 3,332,531.58.

**173.** To the contrary, by letter of October 3, 2001 from Mr. Gary MILLER to engineer George REINOSO, CPB requested reimbursement of the tax it had to pay for the purchase of lubricants, pursuant to clause 13 of the Power Purchase Agreement. Said amount is US$ 65,833.74. There is no documentary proof that said amount was paid by the State. The Tribunal consequently adds it to the debt of the State: US$ 3,332,531.58 + US$ 65,833.74 = US$ 3,398,365.32.

**174.** In conclusion, the Arbitral Tribunal decides that the debt of the State in capital is US$ 3,398,365.32.

To this amount, it is necessary to add interest of 1% monthly *"from the due date of each invoice to the date the payment is received"* (Article 10.5 of the Power Purchase Agreement), incorporating to the capital the interest matured monthly, an agreement which the Tribunal validates for the reasons stated above (see paragraphs No. 161 to 169).

The Arbitral Tribunal does not have the necessary information, which is not revealed in the file, concerning the payment dates and the amount of the partial payments, in order to be able to establish the starting point of the interest for each invoice presented and not paid prior to July 24, 2001, which total amount is US$ 2,198,457.95. Consequently, it decides that the starting point of this amount will be July 24, 2001.

Concerning the invoices matured after July 24, 2001, the due dates and the starting point to calculate the interest are as follows:
- August 20, 2001: US$ 103,397.81;
- August 30, 2001: US$ 552,722.77;
- September 20, 2001: US$ 829,722.40.

Having made by itself the adjustment of accounts, the Tribunal rejects the petition of the Defendants for an accounting expert investigation.

**Indemnity for damage**

175. The plaintiff asks, thirdly, after capital and interest, the amount of US$ 1,200,000.00 *"as compensation for the damage caused by the default of the Dominican State on the obligations contracted under article 11 of the Agreement...concerning the issuance and maintenance of the letter of credit."*

The cause for the damage alleged by CAYMAN POWER BARGE is of a financial nature. The Plaintiff does not allege any commercial or moral damage, beyond the loss of the payment guarantee consisting of the letter of credit.

CPB mentioned several times in its briefs that the letter of credit was part of the guarantees required by the banks that lent it money in order to buy the barge and equip it as an electrical energy generating plant. However, the Plaintiff does not allege, nor has it proven, that the lack of delivery of the funds according to the terms of the letter of credit caused it problems with its lenders or translates into damage liable to be calculated in money.

176. The Arbitral Tribunal admits that the loss of the payment guarantee represented

by the letter of credit has been a source of economic insecurity. However, its effects are confused with the damage suffered due to the delay in payment, which has been duly compensated by the late interest established and granted in this award.

It is a principle contained in Article 1153 of the Civil Code that, in obligations whose object is limited to the payment of a certain amount, the reparation for the delay must be restricted to the payment of late interest. However, the creditor may request additional compensation when the debtor caused, by its bad faith, a specific damage other than the mere delay. Article 1153 reads: *"In the obligations limited to the payment of a certain amount, the damage resulting from the delay in compliance never consists of anything but the sentencing to pay the interest indicated in the law, without prejudice to the special rules of commerce and finance. Such damages must be paid, without any obligation for the creditor to prove a loss. They are owed only from the day of the petition, except in cases where the law establishes them ipso jure."*

177. Since CAYMAN POWER BARGE does not allege or prove that it suffered a specific damage of a nature other than that arising from the delay, the Arbitral Tribunal cannot grant an additional compensation other than that which the parties agreed upon as late interest. In addition, the Tribunal takes into consideration the high interest rate agreed upon between the parties (1% per month). Since the payment currency is the US dollar, it must be taken into account that between 2001 and 2004, the interest rate of the US dollar established by the United States Federal Reserve fluctuated between 1.13% and 3.88% per annum (see http://www.federalreserve.gov). If CAYMAN POWER BARGE was in financial difficulties because of the lack of payment of the Defendants, it could have requested loans at an interest rate higher than the rate established by the Federal Reserve, but certainly much lower than 1% monthly. Consequently, the Tribunal rejects the petition of US$ 1,200,000.00 based on the absence of reissue of the Letter of Credit.

**178. Joint nature of the debt of the Dominican State and CDEEE.**

In the summary of its claims, which was included in the Terms of Reference, CAYMAN POWER BARGE requests that the Tribunal obligate *"the State and/or the Corporation to pay to it the amount stipulated in the unpaid invoices, on the one hand, and interest, on the other hand"* (see No. 47).

In spite of the fact that the formula mentioning the State and the Corporation as Defendants was not reiterated in each brief, the Tribunal finds that the same Defendants have consistently presented a common defense against the claims of CPB. For example, at no time have they tried to attribute certain acts to the State and others to CDEEE.

When the obligation is joined, the creditor has the discretion of requesting payment from each of the debtors, either in full or dividing the amount of the debt. Well, now, the mere capacity of co-defendant is not sufficient to justify joined liability, because a sentencing award could also order the amount owed to be divided in equal shares between the two co-defendants. This is what the Tribunal understands that CPB requested when identifying its debtors as "the State and/or the Corporation." The Tribunal will now consider whether the petition to sentence the co-defendants jointly for the debt is well founded.

First of all, the Tribunal finds that the Power Purchase Agreement was signed by engineer Rhadamés Segura (below whose signature there is the inscription "For the State"), in representation of his double capacity of "Secretary of State" and "General Administrator of Corporación Dominicana de Electricidad." This double representation is consistent with the parties involved in the contract, whose heading reads: *"Power Purchase Agreement between the State of the Dominican Republic represented by Corporación Dominicana de Electricidad and CAYMAN POWER BARGE I, Ltd."* The double representation exercised by engineer Rhadamés Segura also appears in the introduction and in the recitals of the contract. In addition, both in the preliminary award and in this award, the Tribunal referred to the role played by the top officials of the Presidency of the Republic when approving each clause of the contract.

Secondly, referring to the performance of the contract, the Tribunal observes that the same engineer, Rhadamés Segura, was the addressee of several letters, mentioned above in this award, and that he signed several letters or documents in his double capacity of "Secretary of State and General Administrator," as is the case of the Protocol of Understanding of July 8, 2000.

For these reasons, it is clear that the will of the State and the Corporation was to sign jointly and severally the rights and obligations arising from the contract, which is one. The consequences of the joined liability are duly indicated in Article 1200 of the Dominican Civil Code, which reads: *"The debtors act jointly when they are obligated to do the same thing, so that each of them may be required for the whole, and the payment made by one releases the others towards the creditor."* Consequently, the Tribunal decides that the Dominican State and CDEEE are obligated as joint co-debtors and that CPB has the right to request complete payment either from the State or from CDEEE, or may claim that the payment be divided between the two entities.

Next, the Tribunal examines the grounds of the counterclaims.

**COUNTERCLAIMS**

179. The counterclaims of the Corporation and of the Dominican State are the following:
- Taxes not paid by CPB:
    - customs duties: US$ 1,084,246.50;
    - income tax: US$ 255,133.70;
    - Tax on the Transfer of Industrialized Goods and Services (ITBIS): US$ 1,020,534.80;
- Compensation for damage suffered by the Corporation: US$ 1,000,000.00.

180. Concerning the taxes, the Arbitral Tribunal has already decided, when examining the challenge of the validity of the Agreement due to lack of approval by Congress, that the exemptions established in clause 13 of the Agreement were valid (see No. 78 to 90 above). The reasons for this decision were that clause 13.1.1 does not directly exempt CPB from paying taxes, but establishes the burden of the State *"to obtain from the corresponding tax authorities"* the tax exoneration or exemption. The Tribunal found that the officials of the Dominican administration did not comply with the necessary steps to obtain the tax-exempting vote from Congress. This Tribunal consequently decided that *"the lack of action of the State in obtaining the approval of the National Congress cannot damage the rights of Cayman Power Barge"* (see No. 87).

181. It is true that, in the absence of vote by Congress, CPB is subject to the tax laws of the Dominican Republic. There is also no doubt whatsoever that taxes have been calculated by the competent authorities of the Dominican Republic, to wit:
- the General Customs Department, Department of Audit, for customs duties;
- the General Internal Taxation Department for income tax and ITBIS.

182. The amounts requested by the State should correspond to sums actually owed. However, the last phrase in clause 13.1.1 of the Agreement obligates the State to reimburse to CAYMAN POWER BARGE any tax paid by it (see above No. 88). The Tribunal applied this aspect of the agreement of the parties when it presented the conciliation of accounts (see No. 173 above). In other words, the application of the agreement between the parties in Clause 13.1.1. of the Agreement leads the Tribunal to sentence, first of all, CPB to pay the taxes claimed and to decide, secondly, that the Dominican State must reimburse the taxes paid. Since the Tribunal found that the two mutual debts are certain, liquid and payable, strictly applying the provisions of the Agreement, the Tribunal decides that CPB owes nothing to the Dominican State for unpaid taxes.

183. With respect to the indemnity for damage suffered by the Corporation, the Defendants explain that the amount requested *"corresponds to profits not received, loss of energy production, damage to the image of the company, etc., because of these arbitration proceedings and the unjustified claims of CAYMAN POWER BARGE LTD."*

184. The Arbitral Tribunal states that the Defendants do not present any document to justify the existence and the amounts of the damage they allege. However, no proof is necessary to understand that the Corporation delivered electricity to its clients selling it at a higher price than it paid to CPB. Consequently, it is evident that the termination of the contract has caused the loss of such profit.

It appears from the file that the clients of the Corporation for the energy produced by the generating barge were "discos" (letter of CPB dated May 4, 2000, Exhibit No. 7 to the brief of petition). The discotheques are establishments whose customers are partly foreigners, who have a certain flexibility to pay the admission charge. For that reason, the Corporation could price the electricity sold to discotheques so as to obtain a certain profit.

185. Although the Defendants have suffered a loss due to the termination of the Agreement, it can only be cause for an indemnity if the termination was not legitimate. This Tribunal has already decided that CAYMAN POWER BARGE had serious and legitimate reasons to end the contract, including:
 - multiple and significant delays in payment;
 - absence of restoration of the letter of credit in spite of numerous demands;
 - absence of fuel provision.

It is not conceivable that the Corporation or the Dominican State had been able to think that they could receive electrical energy for a long period of time without paying the price and without even providing the necessary fuel so that the plant could operate normally.

186. In July 2000, the conditions required for CAYMAN POWER BARGE to be able to end the Agreement had already been fulfilled. Nevertheless, the Plaintiff, supplier of the energy, accepted a settlement, which was the Protocol of Understanding of July 8, 2000. In spite of that possibility to resume the commercial relations on new bases, the Defendants did not meet the obligations they had just negotiated and accepted.

The Tribunal considers it enough to state that the commercial operation organized by the Power Purchase Agreement of March 17, 1998 and the Amendment of July 2,

1998 was viable and could be fruitful for both parties. If it was not, it was because the minimum rules of good commercial practice, such as reserving part of the money paid by the customers to buy fuel or to pay the energy supplier, have not been respected.

187. Consequently, the Arbitral Tribunal decides that the damage suffered by the Corporation has its origin in the breaches committed by it or by the Dominican State. This appreciation refers both to the alleged damage due to loss of power production and to the alleged damage to the image of the company.

**COSTS OF ARBITRATION AND DEFENSE EXPENSES**

188. In order to distribute the burden of the costs of arbitration incurred at ICC (fees and expenses of the arbitrators, administrative expenses), the Tribunal takes into consideration the specific agreement of the Parties on that subject expressed in article 18.9 of the Power Purchase Agreement:

*"The award to be rendered will have to decide on the necessary adjustments in the solution of the dispute or the termination of this AGREEMENT and it must have the vote of at least two (2) arbitrators and will be unappealable by the PARTIES. The cost of this arbitration must be distributed between the parties, as specified by the Administrative Resolutions of the International Chamber of Commerce of Paris, France, fifty percent (50%) to each of the PARTIES."*

This agreement prevails over the discretion granted to the arbitrators under Article 31.3 of the Arbitration Rules.

Nevertheless, the Tribunal considers that the terms of this pact incorporated in Article 18.9 of the Agreement cover only the distribution of those "costs" that *"are specified by the Administrative Resolutions of the International Chamber of Commerce of Paris, France...,"* which costs are fixed by the Court, independently of the activity carried out by the parties and of the outcome of their claims. But this clause of the Agreement does not include those expenses incurred by the parties in the defense of their positions in this arbitration (lawyers' fees and related expenses). To interpret this clause otherwise, i.e., in the sense that it should concern the fees and expenses included at discretion by the adversary, would be illogical and unjust.

For that reason, the Tribunal applies Article 31.3 of the Arbitration Rules in order to determine the proportion of expenses and lawyers' fees for which it must charge each of the parties, according to the reasons that each of them had to file its claims and defenses and the outcome achieved in this arbitration. For that purpose, the Tribunal takes into consideration the following elements of judgment:

a) partial admission of the claims of CAYMAN POWER BARGE, including:

    i) admission of its credit up to the sum of US$ 3,398,365.32, instead of the US$ 4,175,082.38 that it requested in its brief of petition;

    ii) admission of its claim for interest capitalized monthly, as set forth in the Agreement; and

    iii) rejection of its request for US$ 1,200,000.00 in damages, and

b) complete rejection of the counterclaims of the Defendants.

**189.** Consequently, the Arbitral Tribunal decides that the Defendants, in addition to bearing all the costs incurred for its defense, will have to reimburse to CAYMAN POWER BARGE 60% (sixty percent) of its costs incurred for the defense of its interests.

**190.** Considering that the ICC International Court of Arbitration established the costs of the ICC arbitration at US$ 285,000, 50% (fifty percent) of this sum, i.e., US$ 142,500, will be paid by CAYMAN POWER BARGE and the same amount will be paid by the defendants.

**191.** With respect to the costs incurred by the parties for their defense (lawyers' fees and related expenses), the Plaintiff has indicated the following items and amounts (see document transmitted on February 18, 2005):

- for legal expenses, the sum of US$ 10,137.32
- for professional arbitration fees (JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE, New Orleans, Louisiana, United States, and Pereyra & Asociados, Santo Domingo, Dominican Republic): US$ 178,605.55.

In turn, the Defendants indicate that their legal expenses (US$ 8,441.45) and lawyers' fees (US$ 90,000.00) total US$ 98,441.45.

Repeatedly, the Defendants have declared that they opposed *"the statement of expenses, costs and honoraria presented by the lawyers of Cayman, which must comply with the provisions of the Dominican law No. 302 of 1964 on the matter."* However, this Tribunal has already decided that the election of the Dominican laws by the Parties in the Power Purchase Agreement is restricted to issues of substance, and does not apply in matters of costs and procedural issues, which are corrected by the decision of the parties and, in the absence thereof, by the Arbitration Rules of the ICC. Consequently, to appreciate the reasonable character of the account presented by the lawyers of CAYMAN POWER BARGE, the Tribunal resorts to the prerogatives given to it under Article 31.1 of said Rules.

192. Having examined at great length the brief of the Plaintiff of February 18, 2005, the Tribunal has stated that several work hours have been attributed several times to the same tasks, that certain professional tasks are not conducive to decisive points in this arbitration and that other tasks do not require the time stated in that brief. Therefore, the Tribunal decides that, as the fees of all the lawyers who have participated for the Plaintiff, the reasonable amount according to Article 31.1 of the Rules is US$ 130,000.00.

As a consequence of the above, the Arbitral Tribunal decides that the Defendants must reimburse to CAYMAN POWER BARGE 60% of the defense expenses, represented by the sum of US$ 10,137.32 for legal expenses, plus the sum of US$ 130,000.00, for lawyers' fees, which total US$ 140,137.32. The amount of the reimbursement will be US$ 84,082.39 (60% of US$ 140,137.32).

********

**HOLD**

**193. The Arbitral Tribunal decides as follows:**

1) Corporación Dominicana de Empresas Estatales de Electricidad (CDEEE) and the Dominican State jointly, or either one of them individually, will pay to CAYMAN POWER BARGE the following amounts:

    a) US$ 3,398,365.32 (three million three hundred ninety-eight thousand three hundred sixty-five U.S. dollars and thirty-two cents) as the capital of its debt; plus

    b) monthly interest of 1%, to be incorporated in the capital owed every month, from the following dates:

- US$ 2,198,457.95 on July 24, 2001,
- US$ 103,397.81 on August 20, 2001,
- US$ 552,722.77 on August 30, 2001,
- US$ 829,722.40 on September 20, 2001.

2) The claim of CAYMAN POWER BARGE to be compensated in the amount of US$ 1,200,000.00 for damage allegedly caused by the absence of reissuance of the letter of credit is dismissed.

3) The counterclaims presented by Corporación Dominicana de Empresas Eléctricas Estatales (CDEEE) and the State for taxes not paid and for damage allegedly caused by the termination of the Agreement and the filing of this arbitration procedure are dismissed.

4) The costs of the ICC arbitration will be divided by half between CAYMAN POWER BARGE and the Defendants. Consequently, the Secretariat of the Court will reimburse to the CPB the sum of US$ 62,500 and, to the Defendants, the sum of US$ 72,500.
Corporación de Empresas Eléctricas Estatales and the Dominican State jointly, or either one of them individually, must pay to CAYMAN POWER BARGE US$ 84,082.39 for lawyers' fees and legal expenses.

Arbitration Venue: Paris.

May 30, 2005.

                              [signature]
                             Jean-Paul BERAUDO
                      Chairman of the Arbitral Tribunal

[signature]                                    [signature]
Alejandro M. GARRO                  Luis Enrique BOTTARO-LUPI
Co-Arbitrator                                  Co-Arbitrator