# EXHIBIT A

**Power Purchase Agreement between the State of the Dominican Republic, Represented by Corporacion Dominicana de Electridad and Cayman Power Barge I, LTD**

**Dated as of March 1, 1998**

# PART III

policy holders in this policy;

15.2.2 The policy is primary with relation to **THE STATE'S** interest, represented by **THE CORPORATION**, its directors, officers, employees and agents and any other policy maintained by it in excess is not payable with this policy;

15.2.3 The Insurer renounces all subrogation rights against **THE STATE**, represented by **THE CORPORATION**, its officers, directors, employees and agents; and,

15.2.4 Notwithstanding any provision of the Policy, it cannot be canceled, nor renewed or materially changed by the Insurer without prior written notice of thirty (30) days to **THE STATE**. All the other terms and conditions remain the same.

15.3    **THE SELLER** will cause his insurers and agents to supply **THE STATE** with insurance certificates that attest to the policies and endorsements previously stated. The failure of **THE STATE** to obtain the Insurance Certificates will not release **THE STATE** of the requirements established in this **AGREEMENT**.

## ARTICLE 16: LIABILITY

### 16.1    LIMITATIONS OF LIABILITY.

Notwithstanding anything to the contrary in this **AGREEMENT**, neither **PARTY** nor its officers, elected officials, directors, agents, employees or in any event representatives shall be liable to the other **PARTY** or its officers, elected officials, directors, agents, employees or representatives for claims for incidental, special, consequential or indirect damages, whether arising in tort, contract or otherwise, connected with or resulting from performance or non-performance under this **AGREEMENT**.

### 16.2    RELEASE AND INDEMNITY.

Each one of the **PARTIES** shall be individually civilly liable for all damages, injuries, claims, demands, that as a claim of a third party could occur provided that this individual responsibility of the **PARTIES** is the product of negligence, intentional conduct, or inobservance in the action, which provokes its responsibility. Additionally, the prejudiced **PARTY** will exonerate the other **PARTY** from all responsibility in the case of the previous events.

In the event of joint negligence by both **PARTIES** occurs, each one will exonerate and indemnify the other party and therefore will release the other **PARTY** of all responsibility to the extent of each one's negligence. **THE STATE** agrees that the provisions of this Article will extend to any claim by **THE CORPORATION** against **THE SELLER**.

## ARTICLE 17:  APPLICABLE LAW

This **AGREEMENT** is written and shall be interpreted under the **LAWS OF THE DOMINICAN REPUBLIC** without regard for principles of conflicts of laws.

## ARTICLE 18:  ARBITRATION

### 18.1   INTERNATIONAL ARBITRATION

In the case of any dispute, controversy, reclamation  or difference (each a "Dispute") arising out of or in connection with this **AGREEMENT**, the aggrieved **PARTY** shall give written notice of same to the other **PARTY**.  The **PARTIES** shall strive to resolve such Dispute in an amicable manner.  If within one (1) **MONTH** of the notification of a Dispute it has not been resolved, at the request of any **PARTY** the Dispute shall, regardless of its nature, be referred to arbitration and finally settled in accordance with the arbitration rules established by the International Chamber of Commerce in effect in Paris, France (the "ICC Rules").

18.2   The arbitration proceedings shall be held in Paris, France

18.3   The right of the **PARTIES** to request a resolution of a dispute or a determination of a proceeding in conformance with this **AGREEMENT** will not be affected by the fact that any of the **PARTIES** has received partial compensation on an absolute or conditional basis from any third party (whether it be an individual, state, governmental agency or an international organization) due to any loss or damage subject to the dispute.

18.4   Any arbitration panel constituted per this **AGREEMENT** should apply the **LAWS OF THE DOMINICAN REPUBLIC** and the principles generally accepted of the International Law.

18.5   Any arbitration under this Article will be addressed by a panel constituted of (3) arbitrators. No arbitrator shall be admitted who has had entailments or business relations with any of the **PARTIES**.  The arbitration will take place in Spanish. The decision of the arbitration panel will be definitive and obligatory for the **PARTIES**. Each **PARTY** will have the right to choose an arbitrator and the third one will be designated in accordance with the Rules of the International Chamber of Commerce of Paris, France (ICC).

18.6   The **PARTIES** will go to court and agree to submit to the jurisdiction for arbitration or litigation if necessary for the imposition of any award of the arbitration resolution issued by the panel of arbitrators per this Article.  This award of jurisdiction accepted by the **PARTIES** will be applied to any arbitration proceeding, as well as the decision or arbitration resolution issued by the panel of arbitrators.

18.7   The **PARTIES** agree that any arbitration or judgment can be satisfied against any

property or asset of the **PARTIES** located anywhere.

18.8    The **PARTIES** will be solely liable under this **AGREEMENT**. No shareholder, investor, employee, director, officer or representative of **THE STATE**, nor of **THE SELLER**, will be personally responsible or individually subject to a liability of any type with respect to this **AGREEMENT** even if permitted by the laws that govern the domiciles of the **PARTIES**.

18.9    The resolution produced should decide the arrangements necessary for the solution of the dispute or the termination of this **AGREEMENT** and the same should have the vote of at least two (2) of the arbitrators and will be without appeal by the **PARTIES**. The cost of this arbitration should be distributed between the **PARTIES** as specified by the Administrative Resolutions of the International Chamber of Commerce of Paris, France in fifty percent (50%) between the **PARTIES**.

## ARTICLE 19: SOVEREIGN IMMUNITY.

Each of **THE CORPORATION** and **THE STATE** unconditionally and irrevocably:

a)    Agrees that the execution, delivery and performance by it of this **AGREEMENT** constitute private and commercial acts rather than public or governmental acts;

b)    Agrees that, should any proceedings be brought against or **THE STATE** or its assets in any jurisdiction in relation to this **AGREEMENT**, no sovereign or other immunity from such proceedings shall be claimed by or on behalf of itself or with respect to its assets;

c)    Waives any right of sovereign or other immunity which it or any of its assets now has or may acquire in the future in any jurisdiction; and

d)    Consents generally in respect with the enforcement of any arbitration award or judgment against it in any such proceedings in any jurisdiction, and to the giving of any relief in connection with such proceedings (including, without limitation, the making, enforcement or execution against or with respect to any property whatsoever independent of its use or intended use).

## ARTICLE 20: ASSIGNMENT.

20.1    Neither this **AGREEMENT** nor any rights, duties, interests, or obligations hereunder may be assigned, transferred, pledged, or otherwise encumbered or disposed of by a **PARTY**, without the prior written consent of the other **PARTY**. For such purposes, **PARTY** must be provided with ten (10) days prior written notice and such **PARTY** will have ten (10) days following said notice to consent to or reject the proposed transfer. In the event of a privatization or division of the operations or assets of **THE CORPORATION**, all of the obligations of **THE CORPORATION** under this

AGREEMENT will be assumed by the successor or successors of **THE CORPORATION** and **THE STATE's** obligations and guarantees will continue in effect.

20.2    For the purpose of securing financing or refinancing for the construction and the operation, **THE SELLER** may by providing prior written notice to **THE STATE**, with the consent of **THE STATE**, assign or create security over its rights and interests under or pursuant to (a) this **AGREEMENT**, (b) the **FACILITY**, (c) the movable property and intellectual property of **THE SELLER**, (d) the revenues of **THE SELLER** or (e) any other rights or assets of **THE SELLER.**

The holder of any such security shall be permitted by **THE STATE** to enforce such security in accordance with its terms.  **THE STATE** shall execute all such consents to assignment and/or acknowledgments of any security as are reasonably requested by **THE SELLER** to give effect to the foregoing; provided, however, that any consents and/or acknowledgments shall include an undertaking by the security holder (or its representative) that it shall provide **THE STATE** all such information as **THE STATE** may reasonably request with respect to the security holder's endeavors to cure any Event Of Default by **THE SELLER**.  **THE STATE** agrees that such consents and acknowledgments may contain:

a)      An agreement by **THE STATE** to allow the holder of such security to cure defaults hereunder by **THE SELLER**;

b)      An acknowledgment by **THE STATE** that **THE SELLER** is not in default hereunder;

c)      A prohibition against **THE STATE** amending, assigning or terminating this **AGREEMENT** or allowing **THE SELLER** to do so without having given notice to the holder of such security,

d)      Consent by **THE STATE** to allow assignment of this **AGREEMENT** to the successors-in-interest of the holders of such security after an execution of this document;

e)      The agreement by **THE STATE** to make payments owing from **THE STATE** to **THE SELLER** directly into escrow if required by any financing agreements; and

f)      Other provisions, including without limitation reasonable further agreements by **THE STATE**, which are conventional in financing facilities.

**THE SELLER** acknowledges and agrees that any assignment to a secured party pursuant to any financing agreements shall be subject to and shall not relieve **THE SELLER** of its performance obligations to **THE STATE** under this **AGREEMENT**.

**ARTICLE 21: TERM OF THIS AGREEMENT.**

21.1    This **AGREEMENT** will go into effect on the **EFFECTIVE DATE** and will continue in effect during the **TERM** , unless sooner terminated, pursuant to an express right of termination contained herein.

In the event either **PARTY** desires to extend the **TERM** (or any extension thereof), such **PARTY** shall provide to the other **PARTY** an invitation to negotiate an extension not later than six (6) **MONTHS** prior to the expiration of the **TERM**.

21.2    **THE SELLER** will remove the **FACILITY** at the termination of this **AGREEMENT** at its own cost and risk.

**ARTICLE 22: DEFAULT AND RESCISSION**

    **A)**    **DEFAULT**

22.1    The following shall constitute "**EVENTS OF DEFAULT BY THE SELLER**":

    a)    A breach by **THE SELLER** of any material term or condition of this **AGREEMENT**, including but not limited to, any material breach of a representation, warranty, or covenant made in this **AGREEMENT**, including any Attachment or Appendix hereto;

    b)    Entry of an order, judgment or decree approving a petition filed against **THE SELLER** seeking:

        1)    The reorganization, dissolution, liquidation or similar relief under a law relating to bankruptcy, insolvency, or other relief for debtors;

        2)    The voluntary dissolution or liquidation of **THE SELLER;** or

        3)    The dissolution or liquidation of **THE SELLER** by government action.

    c)    Any assignment rights, duties or obligations in violation of this **AGREEMENT;** or

    d)    The failure of **THE SELLER** to supply power for reasons attributable to **THE SELLER** at a level greater than thirty percent (30%) of the **GUARANTEED CAPACITY** for a continuous period of six (6) months.

22.2    The following shall constitute "**EVENTS OF DEFAULT BY THE STATE**" under this **AGREEMENT**:

    a)    A breach by **THE STATE** or **THE CORPORATION** of any material term or condition of this **AGREEMENT**, including but not limited to, any material breach of a representation, warranty, or stipulation in this **AGREEMENT**,

CAYMAN
16-3-98 8:00 PM

including any Attachment or Appendix hereto;

b)    The default by **THE CORPORATION** of delivering the required **FUEL** for the **FACILITY** in conformance with the provisions of this **AGREEMENT**;

c)    Any failure of **THE STATE** to make the **ENERGY PAYMENT** or any other payment when due, pursuant to the payment terms of Articles 10 and 22.4 hereof;

d)    Any failure or breach of **THE STATE** to maintain, reissue or extend the **LETTER OF CREDIT** as required under Article 11 hereof;

e)    Any assignment rights, duties or obligations in violation of this **AGREEMENT**; and

f)    For purposes of this **AGREEMENT**, a political event, whether it occurs inside or directly involves the Dominican Republic or that occurs outside of the Dominican Republic and does not directly involve the Dominican Republic, including, but not limited to:

  1)    Act of war (whether declared or undeclared), invasion, armed conflict or act of foreign enemy, blockade, embargo, revolution, riot, insurrection, civil commotion, act of terrorism, or sabotage; and

  2)    Strikes and stoppage.

22.3    Upon the occurrence of any such Event Of Default by **THE STATE** or **THE SELLER**, the **PARTY** not in default shall give written notice of the default to the other **PARTY**. Such notice shall set forth, in reasonable detail, the nature of the default and, where known and applicable, the steps it considers necessary to cure such default.

22.4    Upon the occurrence of an **EVENT OF DEFAULT** under Paragraphs 22.1 and 22.2 other than Paragraph 22.2.c., the defaulting **PARTY** shall have thirty (30) days following receipt of such notice to:

a)    cure such default, or

b)    commence in good faith all such steps necessary and appropriate to cure such default in the event such default cannot be completely cured within such thirty (30) day period; provided, however, if the defaulting **PARTY** has not so cured the default within thirty (30) days of such notice, or commenced such cure in good faith within thirty (30) days of such notice in the event the default cannot be cured within thirty (30) days and complete within forty-five (45) days of such notice, the non-defaulting **PARTY** may terminate this **AGREEMENT** upon giving written notice to the defaulting **PARTY**.

22.5 Upon the occurrence of an Event Of Default by **THE STATE** under Article 22.2.c, **THE STATE** shall have twenty (20) days following receipt of **THE SELLER'S** notice pursuant to Article 22.3 to cure such default. If **THE STATE** has not so cured the default within such twenty (20) days, **THE SELLER** may either;

(a)    terminate this **AGREEMENT** upon written notice to **THE STATE**; or

(b)    discontinue the operation of the **FACILITY** upon written notice to **THE STATE**. The provisions of this Article 22.5 shall be applicable without prejudice of **THE SELLER'S** rights to recover under the **LETTER OF CREDIT** pursuant to Article 11.

**B)    RESCISSION**

22.6 The **PARTIES** may rescind this **AGREEMENT** by mutual agreement. In the event that one of the **PARTIES** unilaterally rescinds this **AGREEMENT**, the **PARTY** which considers itself damaged may claim of the other **PARTY** compensation for the damages caused by the rescission of this **AGREEMENT**. In the event that the rescission occurs in conformance with Article 18 hereof, the **PARTIES** will have recourse to the terms provided by the International Chamber of Commerce (ICC).

## ARTICLE 23: SUBCONTRACTS

**THE SELLER** shall have the right to subcontract for the performance of any of its obligations under this **AGREEMENT**, subject to the provisions of Law No. 332 of 2-6-1981, Law No. 6200 of 22-2-1963, and Law No. 6201 of 11-1-1963, that regulate engineering practice in the Dominican Republic. **THE SELLER** shall have sole responsibility for supervising said subcontractors and ensuring said subcontractors comply with the terms of this **AGREEMENT**. The contracting of any subcontractor shall not relieve or subrogate **THE SELLER** of any of its obligations under this **AGREEMENT**.

## ARTICLE 24: INTERVENTION OF THE CORPORATION

**THE CORPORATION** participates in this **AGREEMENT** in order to accept, assume and agree to all provisions herein specifically applicable to **THE CORPORATION** in conformance with the Powers of Attorney granted to the General Administrator of **THE CORPORATION**, attached to this **AGREEMENT** (Appendix II and III). All provisions related to the payment of damages by **THE SELLER** hereunder are for the benefit of **THE STATE** only, and **THE CORPORATION** shall not have any right to claim against **THE SELLER** any damages related to **THE SELLER'S** performance under this **AGREEMENT**. **THE CORPORATION** will make any claim against **THE SELLER** through **THE STATE** as a party to this contract.

### ARTICLE 25:  SURVIVAL.

The provisions of Articles 1, 10, 11, 12, 13, 16, 17, 18 y 19 will survive the termination of this AGREEMENT.

### ARTICLE 26: MISCELLANEOUS PROVISIONS.

**26.1    MERGER.**

The terms and provisions contained in this **AGREEMENT** constitute the agreement among the **PARTIES** and **THE CORPORATION** on the matters addressed in this **AGREEMENT**, and shall supersede all previous communications, representations, or agreements, either verbal or written, between the **PARTIES** and **THE CORPORATION** with respect to the **FACILITY** and this **AGREEMENT**.

**26.2    MODIFICATIONS.**

No modification to the **AGREEMENT** shall be valid unless it is in writing and signed by the **PARTIES** hereto.

**26.3    WAIVER.**

Any waiver at any time by a **PARTY** of its rights with respect to a default under this **AGREEMENT** or with respect to any other matters arising in connection with this **AGREEMENT** shall not be deemed a waiver with respect to any subsequent default or other matter. Except otherwise expressly provided herein, any delay, short of the statutory period of limitations, in asserting or enforcing any right under this **AGREEMENT** shall not be deemed a waiver of such right.

**26.4    COMPUTATION OF TIME.**

In computing any period of time prescribed or allowed by this **AGREEMENT**, the **DAY** of the act, event, or default from which the designated period of time begins to run shall be excluded but the last **DAY** of such period shall be included, unless it is a Saturday, Sunday or legal holiday in the Dominican Republic, in which case the period shall run until the end of the next business **DAY** which is not a Saturday, Sunday or legal holiday in the Dominican Republic.

**26.5    CAPTIONS.**

All subject headings, Article titles, and similar captions are provided for the purpose of reference and convenience, and are not intended to be inclusive, definitive, or affect the meaning of the contents or scope of this **AGREEMENT**.

**26.6    INVALIDATION OF THE CLAUSES.**

The invalidity of any provision or clause in this **AGREEMENT** shall not affect the

validity or enforceability of any other provision or clause set forth herein.

**26.7 ATTACHMENTS AND APPENDICES.**

All Attachments and Appendices referred to in this **AGREEMENT** are attached to this **AGREEMENT**, and such Attachments and Appendices are incorporated herein by reference and made a part hereof as though fully set forth at length wherever so referenced in this **AGREEMENT**.

**26.8 COUNTERPARTS.**

This instrument may be signed by the **PARTIES** and in several original counterparts, which when taken together shall constitute one and the same **AGREEMENT**.

In witness whereof, the **PARTIES** execute this **AGREEMENT** in seven (7) originals of the same meaning and effect in the city of Santo Domingo de Guzmán, National District, capital of the Dominican Republic on the seventeenth (17th) day of the month of March of nineteen hundred and ninety eight (1998).

For **THE STATE**

_____

**RHADAMES SEGURA**

Secretary of State

General Administrator of the Corporación Dominicana de Electricidad

For **THE SELLER**

_____

**MR. DAVID WALTERS**

Authorized Representative

as certified on the back

I, _____, Notary Public of the number for the National District, CERTIFY AND ATTEST: That ING. RHADAMES SEGURA AND DAVID WALTERS appeared before me freely and voluntarily in witness and capacity recorded in this Act, who under oath have declared to me that the signatures affixed in the foregoing are the same as used in all Acts, public or private. In the city of Santo Domingo de Guzmán, National District, capital of the Dominican Republic, on the _____ (_____) day of the month of February of the year nineteen hundred and ninety eight (1998).

_____

**NOTARY PUBLIC**

**POWER PURCHASE AGREEMENT**

**APPENDIX I**

**LETTER OF INTENT**

**POWER PURCHASE AGREEMENT**

**APPENDIX II**

<u>**POWER OF ATTORNEY**</u>

POWER PURCHASE AGREEMENT

APPENDIX III

<u>POWER OF ATTORNEY</u>

POWER PURCHASE AGREEMENT

APPENDIX IV

<u>CORPORATE AUTHORIZATION OF THE SELLER</u>

# POWER PURCHASE AGREEMENT

## APPENDIX V

### THE SELLER'S MONTHLY INVOICE FORM

Submitted to:  Ing. Rhadames Segura
              General Administrator
              CDE

Invoice No._____

Invoice Date:_____

Submitted by:  General Administrator of the **FACILITY**

| | | PowerBarge I | Additional Capacity | Facility |
|---|---|---|---|---|
| Meter Reading at Beginning of Month: | | | | |
| Meter Reading at End of Month: | | | | |
| Net Energy Production for Month: | A | | B | C |

**1.    Minimum Net Energy Production Calculation:**

| | | |
|---|---|---|
| D | Guaranteed Dispatch for each hour of the Facility (KWH) | |
| E | Requested Dispatch for each hour of the Facility (KWH) | |
| F | Guaranteed Dispatch Adjustment (KWH) (The sum of the difference of (D-E) for each hour of the Month except for those hours excluded in Art. 1.2 of this AGREEMENT, for which the adjustment is equal to zero (0) | |
| G | Net Energy Production for Month and Guaranteed Dispatch Adjustment (KWH) (C + F) | |
| H | Guaranteed Dispatch of the Facility x hours in Month (KWH) | |
| I | Minimum Net Energy Production for Month (KWH) (Lesser of G or H) | |

**2.    Invoice for Energy Payment for the Month are due as follows:**

| | | |
|---|---|---|
| J | Net Energy Production of the Facility (KWH) (Not less than the Minimum Net Energy Production after the Commercial Operation Date, I) | |
| K | Average Unit Energy Price (US $/KWH) (AE) | $ |
| L | Energy Payment (J * K) (US $) | $ |

**3.    Reduction of Invoice for Excess Fuel Payment:**

| | | |
|---|---|---|
| M | Guaranteed Heat Rate | |
| N | Actual Heat Rate, pursuant to Art. 1.51 | |
| Z | Heat Rate Factor (N ÷ M) pursuant to Art. 1.23 | |
| P | Amount of Fuel used during Month (bbls.) | |
| Q | Audited Average Price of THE CORPORATION for the Fuel for the Month (US$/bbl.) | $ |

AP.V-1

| R | Value of Fuel used for the Month (US$) (P * Q) | |
|---|---|---|
| S | Excess Fuel Charge (US$) ((Z - 1.0) * R) | $ |

**4.     Other Adjustments to the Invoice:**

| T | Adjustment | |
|---|---|---|

**5.     Interest Charges and Payments for outstanding amounts during the Month are due as follows:**

| U | Number of Days of Late Payment | |
|---|---|---|
| V | Amount Paid (US$) | $ |
| W | Interest Rate | |
| X | Total Interest and Payments for Late Payment | $ |

**6.     Total Invoice for the Month is due as follows:**

| Y | Total Invoice for the Month (L - S + T + X) (US $) | $ |
|---|---|---|

**7.     Average Unit Energy Price**

| AA | PowerBarge I Net Energy Production as a percentage of the Facility Net Energy Production (A/C) | |
|---|---|---|
| AB | Additional Capacity Net Energy Production as a percentage of the Facility Net Energy Production (B/C) | $ |
| AC | PowerBarge I portion of Average Unit Energy Price (AA x PowerBarge I Unit Energy Price) | |
| AD | Additional Capacity portion of Average Unit Energy Price (AB x Additional Capacity Unit Energy Price) | |
| AE | Average Unit Energy Price (AC + AD) | |

Payment Instructions:

Total amount invoiced (Y) must be paid by:

a)      electronic funds transfer in U.S. Dollars to the following bank account:

Marine Midland Bank
ABA# 021 001 088
Acct:   Midland Bank Trust Corporation (Cayman) Limited
Acct #:  000-05041-5
Reference: Cayman Power Barge I Limited

**OR**

b)      check to be personally delivered to _____, authorized representative of **THE SELLER.**

AP.V-2

CAYMAN
16-3-98 8:00 PM

# POWER PURCHASE AGREEMENT
## APPENDIX VI
### LETTER OF CREDIT

CAYMAN
16-3-98 8:00 PM

POWER PURCHASE AGREEMENT

APPENDIX VII

<u>DOCUMENT REFLECTING OWNERSHIP OF THE POWERBARGE I</u>

<u>BY THE SELLER</u>

CAYMAN
16-3-98 8:00 PM

**POWER PURCHASE AGREEMENT**

**ATTACHMENT A**

**DESCRIPTION AND TECHNICAL LIMITS OF THE FACILITY**

**POWER BARGE I**

**DESCRIPTION:**

- Hull:        -Max. Displacement:     5,000 tons
               -Draft:                 13 feet loaded
               -Height          --     96 feet light draft to top of stacks
               -Length:                318 feet
- Boilers:     -Two (2) 170,000 pph Babcock and Wilcox boilers
               -Divided "M" furnace, single uptake, double casing
- Turbine:     -30 MW General Electric steam turbine
- Generator:   -36 MVA General Electric 2 pole generator
- Transformer: 36,000 KVA, 69 kV Westinghouse transformer
- Other auxiliary, Balance of Plant, and support equipment.

**TECHNICAL LIMITS:**

1)  **CAPACITY:**
    Nominal Capacity (Nameplate):   30,000 kW
    Barge internal usage:           1,725 kW
    Guaranteed Capacity:            no less than 24,000 kW

2)  **HEAT RATE:**
    Expected:                       12,800 Btu/kWh
    Guarantee:                      12,800 Btu/kWh

3)  **HIGH VOLTAGE ELECTRICAL OUTPUT:**
    Power Factor:                   0.85 lead - 0.85 lag
    Voltage:                        69kV - 73kV
    Frequency Trips:                62Hz - 57Hz

4)  **OPERATIONAL:**
    The PowerBarge I is a base-load thermal power
    facility.   It can be dispatched based on the
    following limitations:

    Minimum Operation:              7,000 KW

A-1

Cold Plant Start Up: 6 hours to full load
(less than 300 psig boiler pressure or after 12 hours
of shutdown)

Hot Plant Start Up:              3.5 hours to full
                                 load
(300 to 400 psig boiler pressure)

Minimum Load Ramp Up:            2 hours to full
                                 load
(minimum load at 7 MW)

Plant Shutdown:                  1.0 hours
(full load to generator breaker open)

Minimum Run Time:                8 hours

5)   WATER:
     Circulating Water System
     • Water Depth:              18 foot minimum
     • Minimum Open Water
       Behind Barge:            100 feet

6)   SOOTBLOWING SCHEDULE:
     Daily Minimum:             3 times

## ADDITIONAL CAPACITY

**THE SELLER** will provide Additional Capacity, the exact details of which are dependent on the availability and type of equipment. The equipment used will meet the following criteria:

1. Operational Six (6) months from the Connection Date, or later as provided in Paragraph 8.2.
2. Land mounted or barge mounted
3. Nominal Capacity - at 30 MW
4. Guaranteed Capacity Range - 24 to 30 MW (not less than 94.25% of the nominal capacity)
5. Availability - 85%
6. Operates on Bunker C (Fuel Oil No. 6)
7. Prime mover
   • Internal combustion engine (*i.e.*, reciprocating or combustion turbine)
   • Single or multiple units
8. Guaranteed Heat Rate will be less than 11,500 Btu/KWH (LHV), as required to obtain a combined heat rate of the **FACILITY** no greater than 11,500 Btu/KWH.
9. Other auxiliary, Balance of Plant and support equipment will be provided.

A-2

CAYMAN
16-3-98 8:00 PM