**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAYMAN POWER BARGE I, LTD.,<br><br>    Applicant,<br><br>  v.<br><br>THE STATE OF THE DOMINICAN REPUBLIC,<br>and CORPORACIÓN DOMINICANA DE<br>EMPRESAS ELÉCTRICAS ESTATALES (formerly<br>known as CORPORACIÓN DOMINICANA DE<br>ELECTRICIDAD),<br><br>    Respondents. | Civil Action No. 1:06CV01362<br>(RMC) |

**APPLICANT CAYMAN POWER BARGE I, LTD.'S
MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT
OF ITS APPLICATION TO CONFIRM A FOREIGN ARBITRAL AWARD AND
IN OPPOSITION TO RESPONDENTS' MOTION TO DISMISS**

**DECHERT LLP**
Frank J. Eisenhart (D.C. Bar No. 418630)
Christian A. Natiello (D.C. Bar No. 473960)
1775 I Street, NW
Washington, DC 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-3333

Robert A. Cohen (admitted *pro hac vice*)
George K. Foster (D.C. Bar No. 497152) (admitted *pro hac vice*)
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 3

I.    THE PPA AND RESPONDENTS' BREACH THEREOF ............................................. 3

    A.    The PPA ....................................................................................................... 3

    B.    Respondents' Undisputed Breach of the PPA ...................................................... 5

II.    THE ARBITRATION AWARD................................................................................ 5

    A.    CPB's Filing of the Arbitration Claim.................................................................. 5

    B.    The Selection of the Arbitral Tribunal................................................................. 6

    C.    The Preliminary Award Rejecting Respondents' Jurisdictional Arguments ......... 9

    D.    The Award In Favor of CPB ............................................................................. 10

    E.    The Finality of the Award and Respondents' Acknowledgement of Its Validity ................................................................................................................ 11

    F.    CPB's Application to Confirm the Award........................................................... 12

ARGUMENT ........................................................................................................................ 12

I.    THE AWARD SHOULD BE RECOGNIZED AND ENFORCED UNDER THE CONVENTION AND 9 U.S.C. § 207........................................................................ 12

    A.    Respondents' Arguments Under Federal Rule of Civil Procedure 12(b) Are Mismatched and Without Merit .................................................................. 15

        1.    The Court Has Jurisdiction Over Respondents....................................... 15

        2.    There Is No Forum More Suitable Than This Court to Confirm the Award in the United States ...................................................................... 18

        3.    The Relief Requested by CPB Is Expressly Authorized by the Convention............................................................................................... 19

    B.    Respondents' Request That the Court "Vacate" the Award is Misguided and Untimely......................................................................................................... 20

    C.    The Arbitration Clause Was Valid and Enforceable Under Applicable Law ...... 20

        1.    French Law Governed the Arbitration Clause, and the Arbitration Clause Is Valid Under French Law........................................................ 21

        2.    A Well-Established Principle of International Law Would in Any Event Preclude Respondents From Invoking Their Own Law to Avoid  Their Obligation to Arbitrate ...................................................... 23

**TABLE OF CONTENTS**
(continued)

Page

3.   The Arbitral Tribunal's Determination That the Arbitration Agreement Was Valid and Enforceable Should Be Given "Considerable Leeway" by This Court ..................................................... 27

4.   The Arbitration Clause Would Also Be Valid and Enforceable Under Dominican Law if That Country's Laws Were Treated as Applicable ............................................................................................. 29

D.   The Arbitral Tribunal was Properly Constituted in Accordance with the Parties' Agreement and the ICC Rules ................................................................. 32

E.   U.S. Public Policy Would Not Be Violated by Recognition of the Award ......... 33

F.   Respondents' Threat to Commence Proceedings in a Dominican Court – Which Was Later Withdrawn – Is No Bar to Recognition and Enforcement of the Award in this Court ......................................................................................... 34

G.   Respondents' Manifest Disregard Argument Is Unavailing ................................. 37

1.   "Manifest Disregard" Is Not A Ground for Non-Recognition Under the New York Convention ..................................................................... 37

2.   Even if "Manifest Disregard" Were a Potential Ground for Non-Recognition, That Standard Could Not Be Met Here .............................. 38

II.   NO STAY IS WARRANTED UNDER ARTICLE VI OF THE CONVENTION ......... 40

III.   RESPONDENTS SHOULD BE ORDERED TO PAY CPB'S ATTORNEYS' FEES IN CONNECTION WITH THIS PROCEEDING FOR OPPOSING RECOGNITION IN BAD FAITH ................................................................................................ 42

CONCLUSION ................................................................................................................................ 43

# TABLE OF AUTHORITIES

## CASES

Admart AG v. Stephen and Mary Birch Found.,
    457 F.3d 302 (3rd Cir. 2006) ........................................................................13, 38

Al-Harbi v. Citibank, N.A.,
85 F.3d 680 (D.C. Cir. 1996) ........................................................................38

*American Constr. Mach. & Equip. Corp. v. Mechanised Constr. of Pakistan, Ltd.,
    659 F. Supp. 426 (S.D.N.Y. 1987) ........................................................25,26, 34, 36

Apollo Computer, Inc. v. Berg,
    886 F.2d 469 (1st Cir. 1989) ........................................................................28

In re Buques Centroamericanos, S.A. v. Refinadora Costarricence de Petroleos, S.A
    87 Civ. 3256, 1989 U.S. Dist. Lexis 5429 (S.D.N.Y. May 18, 1989) ...............26

Caribbean Trading and Fidelity Corp. v. Nigerian National Petroleum Corp.,
    90 Civ. 4169, 1990 U.S. Dist. LEXIS 17198 (S.D.N.Y. 1990) .........................42

China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.,
    334 F.3d 274 (3d Cir. 2003) ........................................................................20

In re Chromalloy Aeroservices v. Arab Republic of Egypt,
    939 F. Supp. 907 (D.D.C. 1996) ........................................................14, 34, 36, 38

Cliftex Corporation vs. Local 377, New England Regional Joint Board, Amalgamated
    Clothing and Textile Workers Union, AFL-CIO, CLC,
    625 F. Supp. 903 (D. Mass. 1986) ........................................................................43

*Compagnie Des Bauxites De Guinee v. Hammermills, Inc.,
    90 Civ. 0169, 1992 WL 122712 (D.D.C. 1992) ...........................................14, 37

Coutinho Caro & Co. U.S.A., Inc. v. Marcus Trading, Inc.,
    95 Civ. 2362, 2000 WL 435566 (D. Conn. Mar. 14, 2000).............................33, 36

Creighton Ltd. v. Government of Qatar,
    181 F.3d 118 (D.C. Cir. 1999) ........................................................................16

Energoinvest DD v. Democratic Republic of Congo,
    355 F. Supp. 2d 9 (D.D.C. 2004) ........................................................................14, 37

Europcar Italia, S.p.A. v. Maiellano Tours, Inc.,
    156 F.3d 310 (2d Cir. 1998)........................................................................14

Fertilizer Corp. of India v. IDI Management, Inc.,
    517 F. Supp. 948 (D. Ohio 1981) ....................................................................42

In re Ferrara S.p.A.,
    441 F. Supp. 778 (S.D.N.Y. 1977) ...............................................................26

Filanto S.p.A. v. Chilewich Int'l. Corp.,
    789 F. Supp. 1229 (S.D.N.Y. 1992) ...............................................................13

*First Options of Chicago, Inc. v. Kaplan,
    514 U.S. 938 (1995) .............................................................................27, 28

Gulf Res. Am., Inc. v. Republic of the Congo,
    370 F.3d 65 (D.C. Cir. 2004) .......................................................................17

Haim v. Islamic Republic of Iran,
    425 F. Supp. 2d 56 (D.D.C. 2006) ................................................................17

Henry v. Murphy,
    No. M-82,2002 WL. 24307 (S.D.N.Y. Jan. 8, 2002) ..........................................29

Industrial Risk Ins. v. M.A.N. Gutehoffnungshutte GmbH,
    141 F.3d 1434 (11th Cir. 1998) ...................................................................38

Int'l Standard Elec. Corp. v. Bridas Sociedad anonima Petrolera Industrial y Commercial,
    745 F. Supp. 172 (S.D.N.Y. 1990) ...............................................................35

International Ins. Co. v. Caja Nacional De Ahorro y Seguro,
    293 F.3d 392 (7th Cir. 2002) .......................................................................42

Kanuth v. Prescott, Ball & Turben, Inc., 949 F.2d 1175 (D.C. Cir. 1991) ....................................38

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,
    364 F.3d 274 (5th Cir. 2004) ................................................................. passim

La Societe Nationale Pour La Recherche v. Shaheen Natural Resources Co.,
    585 F. Supp. 57 (S.D.N.Y 1983) .................................................................29

Lessin v. Merril Lynch, Pierce, Fenner & Smith, Inc.,
    5 Civ. 171, 2006 WL. 1096623 (D.D.C. Mar. 31, 2006) .................................37, 39

M.B.L. Int'l Contractors, Inc. v. Republic of Trinidad and Tobago,
    725 F. Supp. 52 (D.D.C. 1989) ...................................................................17

*M & C Corp. v. Erwin Behr GmbH & Co.,
    87 F.3d 844 (6th Cir. 1996) ...............................................................20, 37, 38

Ministry of Defense in Support for the Armed Forces of the Islamic Repub. of Iran,
    29 F. Supp. 2d 1168 (S.D. Cal. 1998) ................................................................38

Nicor Int'l Corp. v. El Paso Corp.,
    292 F. Supp. 2d 1357 (S.D. Fla. 2003) ............................................................36

*Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Papier,
    508 F.2d 969 (2d Cir. 1974).........................................................................14, 33

PMI Trading, Ltd. v. Farstad Oil, Inc.
    00 Civ. 7120, WL 38282 (S.D.N.Y. Jan. 16, 2001).............................................43

Poponin v. Virtual Pro, Inc.,
    06 Civ. 4019, 2006 WL. 2691418 (N.D. Cal. Sept. 20, 2006) ..........................28

Reliance Ins. Co. v. Sweeney Corp., Maryland,
    792 F.2d 1137 (D.D.C. 1986) ........................................................................43

Scherk v. Alberto Culver Co.,
    417 U.S. 506 (1974)........................................................................................13

Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l.,
    198 F.3d 88 (2d Cir. 1999)..............................................................................31

Skandia Am. Reins. Corp. v. Seguros Law Republica,
    96 Civ. 2289, 1996 WL 622559 (S.D.N.Y. Sept. 20, 1996) )............................29

Spier v. Calzaturificio Tecnica S.p.A.,
    663 F. Supp. 871 (S.D.N.Y. 1987) .................................................................42

Stern v. Islamic Republic of Iran,
    271 F. Supp. 2d 286 (D.D.C. 2003)................................................................17

*TMR Energy, Ltd. v. State Property Fund of the Ukraine,
    411 F.2d 296 (D.C. Cir. 2005)............................................................... passim

The Shaw Group, Inc. v. Triplefine International Corp.,
    322 F.3d 115 (2d Cir. 2003)........................................................................27, 28

Ukrvneshprom State Foreign Econ. Enter. v. Tradeway, Inc.,
    95 Civ. 10278, 1996 WL 107285 (S.D.N.Y. Mar. 12, 1996) ...........................34

Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.,
    126 F.3d 15 (2d Cir. 1997)...............................................................................38

# STATUTES

D.C. Code § 15-108 ...................................................................................................43

Fed. R. Civ. P. 12 ..............................................................................................15, 19

Federal Arbitration Act, 9 U.S.C. § 1 et seq. .............................................. *passim*

Foreign Sovereign Immunities Act,
　28 U.S.C. §§ 1330, 1332(a), 1391(f), 1332(a), 1391(f) and 1601 et seq. ..................2, 16, 17

9 U.S.C. § 6 ...............................................................................................................13

9 U.S.C. § 12 ...........................................................................................................20

9 U.S.C. § 201 et seq. ...................................................................................... *passim*

9 U.S.C. § 202 ...........................................................................................................13

9 U.S.C. § 207 ............................................................................................13, 19, 37

9 U.S.C. § 208 .....................................................................................................16, 37

28 U.S.C. § 1330 ......................................................................................................17

28 U.S.C. § 1605 ...............................................................................................16, 17

28 U.S.C. § 1608 ......................................................................................................17

# MISCELLANEOUS

W. Laurence Craig, William W. Park, and Jan Paulsson,
　International Chamber of Commerce Arbitration (2000) ..................................28

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10,
　1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (entered into force with respect to the
　United States, Dec. 29, 1970) ........................................................................ *passim*

Restatement (Second) of Conflict of Laws (1971) .........................................................23

Applicant Cayman Power Barge I, Ltd. ("CPB" or "Applicant") respectfully submits this Memorandum of Points and Authorities in further support of its Application to confirm a foreign arbitral award (the "Application") against the State of the Dominican Republic (the "Dominican Republic" or the "Dominican State") and Corporación Dominicana de Empresas Eléctricas Estatales ("CDEEE"), formerly known as Corporación Dominicana de Electricidad ("CDE") (collectively "Respondents"), and in opposition to Respondents' Motion to Dismiss or for other relief ("Motion" or "Mot.").

## PRELIMINARY STATEMENT

The pending Application is a straightforward request for recognition and enforcement of a foreign arbitral award. The arbitral award at issue (the "Award") was rendered in Paris in May 2005 by the International Court of Arbitration of the International Chamber of Commerce (the "ICC Court"), the world's leading arbitration institution. The underlying dispute arose out of a Power Purchase Agreement (the "PPA"), under which CPB supplied Respondents with electricity from a barge-mounted power generator for several years.

The parties' arbitration under the PPA commenced in September 2001 and lasted nearly four years. After the ICC Court issued the Award, which was in CPB's favor, CDEEE promptly wrote to CPB, acknowledged the validity of the Award, and assured CPB that the amounts necessary to pay the Award would be allocated in CDEEE's budget for the year 2006.

Despite that assurance, Respondents still have not made any payment to CPB. As a result, CPB has chosen to pursue collection by obtaining recognition and enforcement of the Award in appropriate courts pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention").[1]

---

[1] A true and correct copy of the Convention is attached as Exhibit I to the accompanying Declaration of George K. Foster ("Foster Declaration" or "Foster Decl."). The Convention — the United Nations

Surprisingly in light of their previous written acknowledgement of the validity of the Award, Respondents decided to oppose the pending Application by submitting a "Motion to Dismiss." In disregard of the established process and standards that govern the recognition of foreign arbitral awards, Respondents' Motion treats the pending Application as though it were a complaint in a lawsuit, raising a host of meritless arguments that have no place in a confirmation proceeding under the Convention. They make inappropriate objections to the Court's jurisdiction, despite the fact that the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1332(a), 1391(f) and 1601 et seq. (the "FSIA") explicitly provides that U.S. courts have both subject matter and personal jurisdiction in cases, such as this one, that are brought against foreign sovereigns to confirm awards under the Convention. Respondents also urge the Court to decline to exercise jurisdiction based on their unsupported assertion that they lack assets in the forum, despite the fact that the Court of Appeals for the District of Columbia Circuit has held that an alleged absence of assets is not relevant to a Court's consideration of an application under the Convention. Respondents also assert that the Application "fails to state a claim upon which relief may be requested," even though the relief requested – the recognition of a foreign arbitral award – is explicitly authorized by the Convention and its implementing legislation in the United States. In addition, Respondents improperly invite the Court to "vacate" the Award, in disregard of case law that establishes conclusively that a U.S. court lacks the authority to vacate a foreign arbitral award.

When Respondents' Motion finally gets around to addressing the standards for recognition and enforcement of foreign arbitral awards under the Convention, it does so in

---

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (entered into force with respect to the United States, Dec. 29, 1970) — is codified at 9 U.S.C. § 201 et seq.

cursory fashion, and the limited arguments offered are wholly misguided. Respondents'
principal argument is that the arbitration clause in the PPA is invalid because it is contrary to
laws of the Dominican Republic. That contention is specious – resting entirely on an
unsupported and inaccurate characterization of Dominican law – but it is also beside the point
because the arbitration agreement at issue is governed by French law, not Dominican law, as the
Arbitral Tribunal concluded in the underlying arbitration. Moreover, Respondents' contention
runs directly contrary to a fundamental principle of international law, which provides that a
foreign State may not enter into a commercial agreement, induce the other side to perform
thereunder, and then invoke its own laws to void its own obligations.

Contrary to Respondents' assertion in their Motion, the Award at issue is
perfectly valid and enforceable, as they acknowledged shortly after it was issued. This Court
should not be taken in by Respondents' cynical and bad faith attempt to reverse course and cast
doubt on the matter. The Court should recognize and enforce the Award, so that CPB may at last
seek to collect on this longstanding debt.

## STATEMENT OF FACTS

**I.    THE PPA AND RESPONDENTS' BREACH THEREOF**

    **A.    The PPA**

On or about March 17, 1998, CPB and Respondents entered into the PPA. The
PPA related to the supply of power to Respondents through a barge-mounted power generation
facility owned and operated by CPB. See Declaration of Genevieve M. Hartel, dated July 18,
2006 ("Hartel Decl."), ¶ 2, Exhs. A (PPA) & B (Certified English translation).[2] The PPA was
subsequently amended by the parties in a writing dated June 25, 1999. Id.

---

[2]    CPB filed the Hartel Declaration in connection with the Application.

In inducing CPB to agree to provide services under the PPA, Respondents unequivocally and unconditionally represented, in a litany of ways, that the PPA would be binding against each Respondent, and that Respondents' sovereign status would not undermine the validity or enforceability of the PPA. *First,* Respondents "unconditionally and irrevocably" agreed, in Article 19 of the PPA, that the "execution, delivery, and performance" of the PPA "constitute private and commercial acts rather than public or governmental acts" and that they waived any sovereign immunity with respect to proceedings brought against them. PPA, Art. 19. *Second*, Respondents represented to CPB that the PPA as a whole, and every provision contained therein, was valid and enforceable against both Respondents under Dominican law. Specifically, the Dominican Republic accepted and warranted in Article 12, among other things, that:

- "[CDE] has all requisite power and authority to agree to the legal and technical aspects and carry on the business referred to in [the PPA];"
- "[The PPA] will be enforceable against it in accordance with its terms;"
- "It has the full power authority, and legal right to incur the obligations, to execute, deliver and perform and observe the terms and provisions of [the PPA];"
- "[The PPA] constitutes legal, valid, binding and enforceable obligations of THE STATE in accordance with its terms;"
- ""The obligations and covenants of [the PPA] constitute obligations for the performance of which the full faith and credit of THE STATE is pledged."

PPA, Art 12.

*Third,* the Dominican Republic agreed that, to the extent any governmental steps were required to be taken in connection with the PPA, it was its sole responsibility to take such steps, and that it had already taken them or would duly do so:

- "All necessary action has been taken, and all approvals required have been obtained, under the LAWS OF THE DOMINICAN REPUBLIC to authorize the execution, delivery, and performance of [the PPA];
- "The STATE agrees to obtain from the corresponding taxing authorities or political subdivision in the Dominican Republic, in favor of [CPB] and subcontractors that are not legal residents of the Dominican Republic, the exoneration or exemption from those TAXES from which [CDE] benefits, extending them to [CPB]."

4

PPA, Arts. 12.1.3(c), 13.1.1.

### B. Respondents' Undisputed Breach of the PPA

After the PPA was executed, CPB complied with its contractual obligations and supplied power to Respondents.  Application, ¶ 13.  Respondents, however, breached the PPA in numerous respects, including by failing to make the required payments to CPB and by failing to replenish a letter of credit in favor of CPB.  Id.; Hartel Decl. ¶ 5.[3]

## II.    THE ARBITRATION AWARD

In response to Respondents' breaches of the PPA, CPB sought dispute resolution in the manner expressly provided for in the PPA, and that agreed-upon adjudication process resulted in a final and binding award in favor of CPB.

### A. CPB's Filing of the Arbitration Claim

The PPA provided that all disputes between the parties were to be resolved through arbitration in Paris, France under the ICC Rules.  Specifically, Article 18 of the PPA (the "Arbitration Clause") provides in part:

18.1    INTERNATIONAL ARBITRATION

In the case of any dispute, controversy, reclamation or difference (each a "Dispute") arising out of or in connection with this AGREEMENT, the aggrieved PARTY shall give written notice of same to the other PARTY.  The PARTIES shall strive to resolve such Dispute in an amicable manner.  If within one (1) MONTH of the notification of a Dispute it has not been resolved, at the request of any PARTY the Dispute shall, regardless of its nature, be referred to arbitration and finally settled in accordance with the arbitration rules established by the International Chamber of Commerce in effect in Paris, France (the "ICC Rules").

18.2    The arbitration proceedings shall be held in Paris, France.
PPA, Art. 18.

---

[3] Respondents do not deny their breach, but merely suggest that "disputes arose which the parties were unable to resolve."  Mot. at 2.  This vague and evasive comment — made without reference to any supporting documentation or testimony— fails to cast doubt on Respondents' breach.

On or about September 20, 2001, CPB submitted a Request for Arbitration to the ICC Court on the grounds that Respondents had breached their contractual obligations in numerous respects.  Hartel Decl. ¶ 5.

**B.    The Selection of the Arbitral Tribunal**

A preliminary procedural step in the arbitration was the selection of the Arbitral Tribunal.  Despite Respondents' attempts to disrupt this process with undue delay and the selection of biased arbitrators, the ICC Court ensured that Arbitral Tribunal was constituted pursuant to the terms of the Arbitration Clause and the ICC Rules.[4]

Pursuant to Article 18.1 of the Arbitration Clause, the ICC Rules governed the procedures for the arbitration.  Article 18.5 of the Arbitration Clause sets forth the process to be used for the selection of the panel of arbitrators in accordance with the ICC Rules[5]:

> Any arbitration under this Article will be addressed by a panel constituted of (3) arbitrators.  ***No arbitrator shall be admitted who has had entailments or business relations with any of the PARTIES***.  The arbitration will take place in Spanish.  The decision of the arbitration panel will be definitive and obligatory for the PARTIES.  Each PARTY will have the right to choose an arbitrator and the third one will be designated in accordance with the Rules of the International Chamber of Commerce of Paris, France (ICC)

PPA, Art. 18.5 (emphasis added).

CPB nominated Professor Alejandro Miguel Garro as co-arbitrator, and Respondents did not challenge CPB's nomination.  <u>See</u> ICC Cert., ¶ 4.  Respondents' nominations did not proceed as smoothly, however, as a result of Respondents' misconduct.

---

[4]  CPB has obtained a Certificate from the Deputy Secretary General of the ICC International Court of Arbitration, dated March 23, 2007 (the "ICC Certificate" or "ICC Cert."), which sets forth a chronology relating to the selection of the Arbitral Tribunal. *See* Foster Decl. ¶¶ 2-3, Exh. A (ICC Certificate).  The ICC Certificate is consistent with the discussion of the selection process contained in the Award.  Hartel Decl. ¶ 9, Exhs. F (Award) and G (Certified English translation) at ¶¶ 9, 18-28.

[5]  A true and correct copy of the ICC Rules was attached as Exhibit C to the Hartel Declaration.

Respondents failed to respond to the ICC Court's invitation to submit their nomination for co-arbitrator within fifteen days. ICC Cert., ¶¶ 5-6. Two-and-one-half months later, due to Respondents' continued silence, the ICC Court announced that, pursuant to Article 8(4) of the ICC Rules, the ICC Court would appoint an arbitrator on Respondents' behalf.[6] ICC Cert., ¶ 6; Award, ¶ 18. The ICC Court appointed Luis Rafael Pellerano on behalf of Respondents in accordance with Article 9(6) of the ICC Rules.[7] ICC Cert., ¶¶ 7-9; Award, ¶¶ 18, 19.

Respondents finally entered the selection process to challenge Mr. Pellerano's appointment. ICC Cert., ¶ 10; Award, ¶ 20. The ICC Court accepted Respondents' challenge, and allowed Respondents to submit their own nomination. ICC Cert., ¶ 11. However, Respondents' nomination for arbitrator, Dr. Rafael Tulio Pérez de León, did not possess the neutrality and independence required by Article 18.5 of the PPA and Article 7.1 of the ICC Rules,[8] due to his close professional relations with counsel and agents for Respondents. Foster Decl. ¶¶ 4-6, Exhs. B (CPB's challenge to the appointment of Dr. Tulio Pérez de León) &

---

[6] ICC Rules, Art. 8(4): "Where the dispute is to be referred to three arbitrators, each party shall nominate in the Request and the Answer, respectively, one arbitrator for confirmation. **If a party fails to nominate an arbitrator, the appointment shall be made by the Court.** The third arbitrator, who will act as the chairman of the Arbitral Tribunal, shall be appointed by the Court, unless the parties have agreed upon another procedure for such appointment, in which case the nomination will be subject to confirmation pursuant to Article 9. Should such procedure not result in a nomination within the time limit fixed by the parties or the Court, the third arbitrator shall be appointed by the Court" (emphasis added).

[7] ICC Rules, Art. 9(6): "Where the Court is to appoint an arbitrator on behalf of a party which has failed to nominate one, it shall make the appointment upon a proposal of the National Committee of the country of which that party is a national. If the Court does not accept the proposal made, or if the National Committee fails to make the proposal requested within the time limit fixed by the Court, or if the country of which the said party is a national has no National Committee, **the Court shall be at liberty to choose any person whom it regards as suitable.** The Secretariat shall inform the National Committee, if one exists, of the country of which such person is a national" (emphasis added). As of the ICC's appointment of Mr. Pellerano, there was no ICC Dominican National Committee. ICC Cert., ¶ 9.

[8] ICC Rules, Art. 7(1): "Every arbitrator must be and remain independent of the parties involved in the arbitration." Foster Decl. ¶ 5, and Hartel Decl., Exh. C (ICC Rules).

C (Certified English translation). Accordingly, CPB challenged Respondents' nomination, and the ICC Court accepted CPB's challenge. ICC Cert., ¶¶ 14-15; Award, ¶ 22.

Respondents then nominated Dr. Manuel V. Ramos to fill the open arbitrator slot, but he, too, did not possess the necessary neutrality and independence because he had served as an attorney for Respondents in a separate arbitration proceeding dealing with similar issues. Foster Decl. ¶ 7, Exhs. D (CPB's challenge to the appointment of Dr. Ramos) & E (Certified English translation). The ICC Court upheld CPB's objection and declined to confirm Dr. Ramos as an arbitrator. ICC Cert., ¶¶ 16-18; Award, ¶ 22.

Thereafter the ICC Court granted Respondents seven days to nominate an independent arbitrator. ICC Cert., ¶¶ 19-20; Award, ¶ 22. When Respondents failed to submit a nomination within the prescribed time limit, the ICC Court announced that it would, for the second time, appoint an arbitrator on behalf of Respondents. ICC Cert., ¶ 21; Award, ¶ 23. After nine more days had passed and Respondents had failed to respond to the ICC Court's announcement, the ICC Court appointed Dr. Luis Enrique Bottaro-Lupi on behalf of Respondents pursuant to Article 9(6) of the ICC Rules. ICC Cert., ¶¶ 21-23; Award, ¶¶ 23, 28.[9]

The ICC Court also appointed Jean-Paul Beraurdo as the third arbitrator and the Chairman of the Tribunal, in accordance with Article 18.5 the ICC Rules. ICC Cert., ¶ 7. Neither party challenged that appointment. ICC Cert., ¶ 7.

---

[9] Respondents later challenged the appointment of Dr. Bottaro-Lupi based on the arguments that (a) Dominican law somehow extended their time to submit a nomination and (b) the ICC Court's selection of Dr. Bottaro-Lupi was not made in accordance with Article 9(6) of the ICC Rules, because the ICC Dominican National Committee had not been consulted. Award, ¶ 25. In rejecting CDEEE's arguments, the ICC Court found that: (1) pursuant to 18.1 of the Arbitration Clause and Article 6(1) of the ICC Rules, Dominican law did not govern the arbitral process, and (2) there was no ICC Dominican National Committee, and the ICC Court was thus at liberty to designate an arbitrator on behalf of Respondents. ICC Cert., ¶¶ 21-23; Award, ¶¶ 23-27.

Accordingly, the Arbitral Tribunal consisted of Jean-Paul Beraudo, Dr. Alejandro Miguel Garro, and Dr. Luis Enrique Bottaro-Lupi, each of whom was appointed in accordance with the terms of the Arbitration Clause and the ICC Rules. In connection with the issuance of the Award, the Arbitral Tribunal re-reviewed the selection process of the Tribunal and confirmed its compliance with the Arbitration Clause and the ICC Rules, concluding that "its composition has been legitimate, as agreed between the parties and pursuant to the Regulation chosen by them to govern this arbitration proceeding." Award, ¶¶ 13, 28.

C.     **The Preliminary Award Rejecting Respondents' Jurisdictional Arguments**

After the Arbitral Tribunal was constituted, it heard a challenge to its jurisdiction brought by Respondents. Respondents argued, based on theories similar to those invoked in the current Motion, that the Arbitration Clause was void under Dominican law and that the ICC Court did not have jurisdiction to resolve the dispute. The Arbitral Tribunal rejected that challenge.

As part of its decision, the Arbitral Tribunal found that French law, not Dominican law, governed the Arbitration Clause. Foster Decl. ¶ 9, Exhs. F (Preliminary Award of the Arbitral Tribunal, dated September 19, 2003) & G (Certified English translation) at ¶¶ 30-31. In reaching its conclusion, the Tribunal determined that the parties' election, under Article 18(4) of the PPA, to have the Tribunal apply "the laws of the Dominican Republic and the generally accepted principles of International Law" referred to the law governing the underlying substantive dispute, not to the law applicable to the Arbitration Clause itself. Foster Decl., Exh G, ¶ 29. Without an agreement as to the law governing the Arbitration Clause specifically, the Arbitral Tribunal conducted a choice-of-law analysis, and concluded that "there is no element that the allows the Court to infer that the Parties had any intention of applying any other law than that in effect in the seat of the arbitration." Id., ¶ 30.

9

The Arbitral Tribunal also observed that the principle of good faith inherent in international law precluded Respondents from denying "the application of the arbitration agreement that they, themselves, deliberately and freely entered into after prior study and enjoying all the guarantees set forth in Dominican law regarding powers that must be accorded to officials and other attorneys in fact who [sic] execute contracts on behalf of the State." Id., ¶ 48. According to the Arbitral Tribunal, Respondents' sovereign status did not give them free reign to deceive CPB by "denying what [they] had signed." Id., ¶ 46.

### D.     The Award In Favor of CPB

With the jurisdictional issues decided, the parties thereafter undertook a full exchange of written evidence and pleadings. The parties agreed that the dispute could be decided by the Arbitral Tribunal on the basis of their written submissions, without an evidentiary hearing. Hartel Decl. ¶ 8. [10]

The Arbitral Tribunal issued the Award on May 30, 2005. Hartel Decl. ¶ 9. The Award was subsequently approved by the ICC Court, and was dispatched to the parties on or about July 11, 2005. Id. In its lengthy and carefully-reasoned opinion, the Arbitral Tribunal rejected the defenses to payment and counterclaims advanced by Respondents, and concluded that Respondents had breached the PPA in several respects, including by failing to make the required payments to CPB and to replenish the letter of credit.

As a result of Respondents' breaches of the PPA, the Arbitral Tribunal ordered Respondents, jointly and severally, to pay CPB the following amounts:

- US$ 3,398,365.32 in damages (a sum reflecting the principal debt of US$ 3,684,300.93 that is owed to CPB for the supply of power, plus US$ 65,833.74 due to CPB under the PPA as reimbursement for a tax paid by CPB, minus US$ 351,769.35 for the value of certain fuel supplied to CPB by Respondents);

---

[10] CDEEE participated in the arbitration as a party after notifying the Tribunal that it was legal successor to CDE and had been formed to replace CDE. Hartel Decl. ¶ 7.

- Monthly interest of 1%, the contractual rate specified in Article 10.5 of the PPA, to be incorporated into the principal owed every month, from the following dates:

  - US$ 2,198,457.95 on July 24, 2001;

  - US$ 103,397.81 on August 20, 2001;

  - US$ 552,722.77 on August 30, 2001;

  - US$ 829,722.40 on September 20, 2001;

- US$ 84,082.39 for attorneys' fees and legal expenses.

Award, ¶ 193.

### E.    The Finality of the Award and Respondents' Acknowledgement of Its Validity

The Award issued in favor of CPB is final and binding on the parties. Pursuant to Article 18.8 of the PPA, the parties agreed that "the resolution produced [by the arbitrators] . . . will be without appeal by the PARTIES." In addition, Article 28(6) of the ICC Rules provides that: "Every Award shall be binding on the parties. By submitting the dispute to arbitration under these Rules, the parties undertake to carry out any Award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made." Hartel Decl. ¶ 16, Exh. C (ICC Rules).

Following the issuance of the Award, Respondents did not question its obvious finality. Instead, CDEEE acknowledged that the Award was valid and binding, and expressed its intention to satisfy the same. In a letter to counsel for CPB dated September 28, 2005, CDEEE stated as follows:

> this is to inform you that ***CDEEE intends to abide by the decision handed down by the International Court of Arbitration***. For this purpose, please be informed that the sums that this establishment has been ordered to pay with respect to the above-mentioned action, including professional fees, will be allocated for inclusion in our budget for the year 2006.

11

Declaration of Robert A. Cohen, dated July 26, 2006 ("Cohen Decl."), ¶ 3, Exhs. A (CDEEE

Letter) & B (Certified English translation) (emphasis added).[11]

### F.    CPB's Application to Confirm the Award

Notwithstanding Respondents' promise to abide by the Award, Respondents have

failed to pay CPB the amounts due.  Hartel Decl. ¶ 17; Cohen Decl. ¶ 15.  Faced with

Respondents' recalcitrance, CPB decided to pursue collection efforts.  On August 1, 2006, CPB

applied to this Court for confirmation of the Award pursuant to the Convention.

In response to CPB's application, Respondents continued their efforts to obstruct

CPB's path to relief.  On February 20, 2007, Respondents filed a motion asking this Court to

dismiss CPB's Application, or in the alternative, to vacate the Award, deny confirmation, or stay

the proceedings pending a judicial determination in the Dominican Republic.[12]  Subsequently,

Respondents filed a "Notice of Non-Filing" in which they stated that they would not seek any

judicial determination on the Award in the Dominican Republic.  Despite the now non-existent

threat of a parallel proceedings, Respondents refused to withdraw their request of a stay of the

instant proceeding.  See Foster Decl. ¶¶ 11-15., Exh. J (Letter from George K. Foster to Marvin

Griff, dated March 14, 2007).

### ARGUMENT

## I.    THE AWARD SHOULD BE RECOGNIZED AND ENFORCED UNDER THE CONVENTION AND 9 U.S.C. § 207

Proceedings on arbitration agreements and awards in courts of the United States

are governed by a special framework established under the Federal Arbitration Act, 9 U.S.C. § 1

---

[11] CPB filed the Cohen Declaration in connection with the Application.

[12] The date for the Respondents' filing of their responsive pleading was agreed to by a stipulation, dated December 22, 2006.  Pursuant to such stipulation, the Respondents also agreed to waive any possible objections as to service of process.

et seq. (the "FAA").  Under this framework, such proceedings are heard as motions, on an

expedited basis, in order to avoid encumbering the proceedings with the complicated and time-

consuming procedural elements and formalities associated with lawsuits.  See 9 U.S.C. § 6

("Any application to the court hereunder shall be made and heard in the manner provided by law

for the making and hearing of motions . . . .");  Admart AG v. Stephen and Mary Birch Found.,

457 F.3d 302, 311 (3rd Cir. 2006) (observing that elaborate proceedings to review an arbitral

award would frustrate "the basic purpose of arbitration, which is to dispose of disputes quickly

and avoid the expense and delay of extended court proceedings") (citation omitted).

The FAA is divided into multiple chapters, with Chapter 1 principally governing

domestic arbitration awards, and Chapter 2 governing international awards, such as the instant

one, that are subject to the Convention.  The Convention was enacted "to encourage the

recognition and enforcement of commercial arbitration agreements in international contracts."

Scherk v. Alberto Culver Co., 417 U.S. 506, 520 n. 15 (1974).  The Convention entered into

force in the United States on December 29, 1970, and is explicitly incorporated into U.S. law

through implementing legislation found in Chapter 2 of the FAA.  As an international treaty duly

ratified by the United States, the Convention "is the supreme law of the land, U.S. Const. art. VI

cl. 2, and controls any case in any American court falling within its sphere of application."

Filanto S.p.A. v. Chilewich Int'l. Corp., 789 F. Supp. 1229, 1236 (S.D.N.Y. 1992).  The Award

at issue falls within that sphere of application, because it arises from a commercial arbitration

agreement, and was rendered outside the United States.  See 9 U.S.C. § 202.

The Convention and the FAA provide that a U.S. court must enforce a foreign

arbitral award unless the court finds one of the grounds for refusal of recognition set forth in

Article V of the Convention.  See 9 U.S.C. § 207 (the Court "shall confirm the award unless it

finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention"); Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Papier, 508 F.2d 969, 974, 977 (2d Cir. 1974) (holding that the Article V grounds are the exclusive basis for non-recognition); Energoinvest DD v. Democratic Republic of Congo, 355 F. Supp. 2d 9, 11 (D.D.C. 2004) (same).

The party defending against enforcement of the arbitral award bears the burden of proving the existence of an Article V ground. Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 364 F.3d 274, 288 (5th Cir. 2004); Europcar Italia, S.p.A. v. Maiellano Tours, Inc., 156 F.3d 310, 313 (2d Cir. 1998); Compagnie Des Bauxites De Guinee v. Hammermills, Inc., 90 Civ. 0169, 1992 WL 122712, *3 (D.D.C. 1992).  These grounds must be construed narrowly in order "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts." Karaha Bodas, 364 F.3d at 288 (citation omitted); see also Parsons & Whittemore Overseas Co., 508 F.2d at 974, 976-77; Compagnie Des Bauxites De Guinee, 1992 WL 122712, *3.

Moreover, the Article V grounds are discretionary, not mandatory.  Accordingly, even where a party resisting enforcement demonstrates the applicability of one of these grounds, the court is still free to confirm the award.  See In re Chromalloy Aeroservices v. Arab Republic of Egypt, 939 F. Supp. 907, 909 (D.D.C. 1996) (holding that the Article V grounds were only discretionary, and deciding to enforce a foreign arbitral award even though one of the Article V grounds was met).  Here, however, the Court need not decide whether or not to exercise such discretion, because Respondents have not carried their burden of proving the applicability of any of the Article V grounds.

A.    **Respondents' Arguments Under Federal Rule of Civil Procedure 12(b) Are Mismatched and Without Merit**

Respondents styled their submission of February 20, 2007 a "Special and limited entry of appearance in order to move this Court to dismiss Plaintiff's Application to Confirm Foreign Arbitral Award … pursuant to Fed. R. Civ. Proc. 12(b)(1), (2) and (6)," Mot. at 1, and devoted the bulk of their Motion to arguing the applicability of defenses listed in Rule 12(b). Yet Rule 12(b) is inapplicable to a proceeding to confirm an arbitral award. See Rule 12(a)(1)-(2) (prescribing the time in which a "defendant" must serve an "answer" to a "summons and complaint"); Rule 12(b) (setting forth the manner in which defenses to claims in such a "pleading" should be asserted). By invoking Rule 12(b), Respondents are seeking to treat the Application as though it were a complaint in a lawsuit – in which Applicant is the "plaintiff" and Respondents the "defendants" – and thereby avail themselves of the full panoply of defenses that can be invoked by a defendant in a lawsuit.

Respondents urge the Court in particular to "dismiss" the Application based on their erroneous contentions that (a) the Court "lacks jurisdiction over this matter," (b) the Dominican Republic would be a more suitable forum for hearing this Application, and (c) "Plaintiff's Application fails to state a claim upon which relief may be requested." Mot. at 3, 22-23. None of these contentions has any merit.

1.    **The Court Has Jurisdiction Over Respondents**

Respondents argue that they are immune from this Court's jurisdiction, and cite a number of provisions of Dominican law that they claim establish their immunity from suit. Mot. at 7-9. What Respondents fail to mention, however, is that the scope of this Court's jurisdiction is in no way a function of Dominican law. Rather, this Court's jurisdiction is determined by U.S. law and U.S. law alone, and the FSIA establishes conclusively that this Court has jurisdiction over Respondents in this case.

Although the FSIA provides that foreign sovereigns and their agencies and instrumentalities are presumptively immune from jurisdiction, that statute also sets forth a number of exceptions to immunity, and at least two of those exceptions are satisfied in this case. *First*, Respondents are subject to the "arbitration exception" to immunity set forth in 28 U.S.C. § 1605(a)(6)(B). That Section provides that a sovereign is not entitled to immunity from suit in any proceeding to confirm an arbitral award that "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." And the Convention is just such a treaty. TMR Energy, Ltd v. State Property Fund of the Ukraine, 411 F.2d 296, 299 (D.C. Cir. 2005)("the New York Convention is exactly the sort of treaty Congress intended to include in the arbitration exception") (quoting Creighton Ltd. v. Government of Qatar, 181 F.3d 118 (D.C. Cir. 1999)).

*Second*, Respondents are subject to the "waiver" exception to immunity set forth in 28 U.S.C. § 1605(a)(1). That Section provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." In this case Respondents have explicitly, unconditionally, and irrevocably waived any immunity to which they might otherwise have been entitled. Article 19 of the PPA states as follows:

> Each of the Corporation [CDEEE] and the State unconditionally and irrevocably ... [a]grees that, should any proceedings be brought against the State or its assets in any jurisdicdtion in relation to this Agreement, no sovereign or other immunity from such proceedings shall be claimed by or on behalf of itself or with respect to its assets, [and] [c]onsents generally in respect [to] the enforcement of any arbitration award or judgment against it in any such proceedings (including, without limitation, the making, enforcement or execution against or with respect to any property whatsoever independent of its use or intended use).

16

Such a contractual waiver is exactly the sort of waiver contemplated by Section 1605(a)(1). <u>See</u> <u>Gulf Res. Am., Inc. v. Republic of the Congo</u>, 370 F.3d 65, 73-74 (D.C. Cir. 2004).

Pursuant to 28 U.S.C. § 1330(a), U.S. courts have federal subject matter jurisdiction without regard to amount in controversy over any matter in which any of the exceptions under Section 1605 have been established. Accordingly, it cannot credibly be disputed that this Court has subject matter jurisdiction to hear this matter.

Nor is there any doubt that Respondents are subject to personal jurisdiction in this proceeding. 28 U.S.C. § 1330(b) provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction [under the FSIA] where service has been made in accordance with section 1608 of [Title 28]." Based on that provision, this Court has held previously that personal jurisdiction is automatic once jurisdiction has been established under the FSIA and service of process has been effectuated. <u>See, e.g.</u>, <u>Stern</u> <u>v. Islamic Republic of Iran</u>, 271 F. Supp.2d 286, 298 (D.D.C. 2003) ("The FSIA . . . provides that personal jurisdiction over defendants will exist where service of process has been accomplished pursuant 28 U.S.C. § 1608 and plaintiff establishes the applicability of an exception to immunity pursuant to 28 U.S.C. § 1605"); <u>Haim v. Islamic Republic of Iran</u>, 425 F. Supp. 2d 56, 68 (D.D.C. 2006) (same); <u>M.B.L. Int'l Contractors, Inc. v. Republic of Trinidad and</u> <u>Tobago</u>, 725 F. Supp. 52, 55-56 (D.D.C. 1989) (holding that "'[b]ecause the FSIA governs both personal and subject matter jurisdiction … [Respondents'] implicit waiver of immunity under Section 1605(a)(1) constituted a waiver of the defense of lack of personal jurisdiction' notwithstanding the absence of minimum contacts otherwise required") (citation omitted). <u>See</u> <u>also</u> <u>TMR Energy, Ltd.</u>, 411 F.2d at 299.

17

Respondents do not dispute that service was proper in this case, and in fact they explicitly waived any objections they might otherwise have had with regard to service of process pursuant to the joint stipulation that was filed in this case on December 22, 2006. Accordingly, the Court's personal jurisdiction over Respondents is unassailable.

For the foregoing reasons, neither the Dominican Republic nor CDEEE is in a position to object to the exercise of subject matter or personal jurisdiction over it by this Court.

### 2.    There Is No Forum More Suitable Than This Court to Confirm the Award in the United States

Respondents also assert in their Motion that this Court is a "poor choice for the resolution of these matters," because the parties are both from foreign countries and Respondents allegedly "have no assets in the United States upon which a confirmed award could be executed." Mot. at 22 (italics omitted). Respondents' assertion that they lack assets in the United States is completely unsupported – consisting of nothing more than the bald and unsworn assertion of counsel – and should not be credited. Yet even if that assertion were true, it would not have any consequence for this Court's consideration of the Application.

It is telling that Respondents cite no legal authority in support of their proposition that the alleged absence of assets in the forum, or the fact that both parties are foreigners, would warrant a refusal to confirm the Award. The reason for Respondents' silence in this regard is simple: this proposition has been *rejected* by the D.C. Circuit in another proceeding on a foreign arbitral award. Specifically, in TMR Energy Ltd., 411 F.3d at 303, the D.C. Circuit held that dismissal of an application to confirm a foreign arbitral award on such facts would not be appropriate because "only a court of the United States (or one of them) may attach the commercial property of a foreign nation located in the United States," and as such there is no other forum that would be adequate to the applicant for purposes of attaching such assets. Id., at

18

303. The Court added that this reasoning applies irrespective of whether or not the applicant has actually located attachable assets of the foreign state in the United States, because even if such assets are not available at present the foreign state may own attachable property in the United States in the future, and "having a judgment in hand will expedite the process of attachment." Id., at 303.

In light of the above controlling authority – which Respondents failed to bring to the Court's attention – their references to an alleged absence of assets in the forum and the foreign status of the parties should be disregarded.

### 3.    The Relief Requested by CPB Is Expressly Authorized by the Convention

Equally ill-suited to a proceeding to confirm a foreign arbitral award is Respondents' vague assertion that the Application "fails to state a claim upon which relief may be requested" within the meaning of Fed. R. Civ. P. 12(b)(6). Mot. at 3. Respondents have not articulated any pleading standard that they believe applies to an application to confirm a foreign arbitral award, let alone identified any aspect of the Application at issue that failed to meet that standard. Moreover, the relief requested by the Application – the recognition and enforcement of a foreign arbitral award – is explicitly authorized by the Convention and 9 U.S.C. § 207. Accordingly, Respondents' argument under Rule 12(b)(6) is mismatched and does not withstand scrutiny.[13]

---

[13]  Given the procedural mismatch of 12(b)(6) and Respondents' failure to address the standards applicable to a 12(b)(6) motion, CPB treats Respondent's Motion as an opposition to recognition pursuant to Article V of the Convention. For the reasons set forth below, see Argument Sections I(C)-(E), Respondents' opposition to recognition is baseless.

**B.    Respondents' Request That the Court "Vacate" the Award is Misguided and Untimely**

In Respondents' Motion, they repeatedly urge the Court to "vacate" the Award. See Mot. at 1, 4, 12, 13. In doing so Respondents are inviting the Court to commit error, because it is well settled that a U.S. court lacks the authority to "vacate" a foreign arbitral award. See, e.g., M & C Corp. v. Erwin Behr GmbH & Co., 87 F.3d 844, 849 (6th Cir. 1996) (holding that a motion to vacate "may be heard only in the courts of the country where the arbitration occurred or in the courts . . . whose procedural law was specifically invoked in the contract calling for arbitration of contractual disputes"); China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp., 334 F.3d 274, 285 (3d Cir. 2003) (holding that a court reviewing a foreign award under the Convention is limited to deciding whether or not to enforce the award; it may not vacate or modify the award).

Respondents' misguided request that the Court "vacate" the Award would, in any event, be untimely, because 9 U.S.C. § 12 mandates that any request to vacate an award (where such a request is permissible) must be brought within *three months* from the issuance of the award. The Award here was issued in May 2005, nearly two years before Respondents' Motion was filed.

For the above reasons, Respondents' request for vacatur of the Award is manifestly devoid of merit.

**C.    The Arbitration Clause Was Valid and Enforceable Under Applicable Law**

When Respondents at last begin to discuss the grounds for non-recognition of a foreign arbitral award under Article V of the Convention – more than halfway through their Motion – the first argument they raise is under Article V(1)(a). Specifically, Respondents invoke the language in that clause which provides that a court may decline recognition if the parties' arbitration agreement "is not valid under the law to which the parties have subjected it." Mot. at

14. Respondents then refer back to their earlier contention (raised in connection with their misguided jurisdictional arguments) that certain vague, general principles of Dominican Constitutional law prohibit the arbitration of matters involving the Dominican State or its property. As will be seen below in Argument Section I(C)(4), this contention rests on a mischaracterization of Dominican law, which provides nothing of the sort. But this contention is also entirely beside the point, because Dominican law does not apply to the parties' arbitration agreement. As the Arbitral Tribunal in the underlying arbitration concluded, the PPA's Arbitration Clause is severable from the rest of the contract and is governed by French law, the law of the arbitral situs designated by the parties. Moreover, even if Dominican law were somehow applicable, Respondents are precluded under a well-established principle of international law from invoking any aspects of their own law to void their obligation to arbitrate.

1.    **French Law Governed the Arbitration Clause, and the Arbitration Clause Is Valid Under French Law**

The Arbitral Tribunal held in the underlying arbitration that the general choice-of-law clause found at Article 17 of the PPA did not extend to the severable Arbitration Clause in Article 18, and that the validity of the arbitration clause was governed by the law of France, the arbitral situs selected by the parties. See Foster Decl., Exh. G (Preliminary Award) at ¶¶ 26-31. The Arbitral Tribunal also noted that French law should be the law applied by a reviewing court — i.e., the "law to which the parties have subjected" the agreement to arbitrate — when reviewing the Award under Article V(1)(a) of the Convention. Id., ¶ 31; Convention, Art. V(1)(a). This is because Article V(1)(a) directs a reviewing court to apply the law of the arbitral situs in the absence of an indication by the parties of the law that they intended to govern the arbitration agreement, and — as the Arbitral Tribunal in this case noted — the PPA did not specify the law to govern the arbitration clause specifically. Id., ¶ 29. The Arbitral Tribunal

took note of the fact that the Arbitration Clause directed the Arbitral Tribunal to apply "the laws of the Dominican Republic and the principles generally accepted of the International Law," but interpreted this as referring to the law to be applied to the *merits* of the parties' dispute, not to the validity of the arbitration agreement itself.  Id., ¶ 28.

The decision to apply the law of the arbitral situs to the validity of an arbitration clause — rather than the law specified in a general choice-of-law clause — is a common approach in international arbitration, and one that has been advocated and endorsed by a number of leading scholars and practitioners in the field.  This point is attested to by international law expert Professor George A. Bermann, Professor of Law at Columbia University School of Law, in a Declaration accompanying this Memorandum.[14]  Declaration of George Bermann, dated March 22, 2007 ("Bermann Decl."), ¶ 12.

This approach was also recently upheld by the Court of Appeals for the Fifth Circuit in a proceeding to confirm an arbitral award under the Convention.  See Karaha Bodas, 364 F.3d at 290.  In that case, the Fifth Circuit was reviewing an award under the Convention, and faced an argument by the respondent State that the tribunal in the underlying arbitration had improperly applied the law of the arbitral situs (Swiss law) to the validity of the arbitration agreement, rather than the law specified in the contract's general choice-of-law clause (Indonesian law).  The Fifth Circuit noted that "[u]nder the New York Convention the rulings of the Tribunal interpreting the parties' contract are entitled to deference," and declined to second

---

[14]  Respondents' argument that Dominican law is determinative of the validity of the Arbitration Clause because of the general choice-of-law provision not only ignores this common and accepted approach, but also misrepresents the terms of the PPA.  Even if the parties' general choice-of-law were construed to dictate the law applicable to determinations of the validity of the Arbitration Clause, the Arbitral Tribunal, pursuant to Article 18.4, would not be restricted to applying Dominican law, as it could also rely on "the principles generally accepted of International Law."  PPA, Art. 18.4.  As discussed below, in Argument Section I(C)(2), principles generally accepted in international law founded on the concept of good faith decisively bar Respondents' efforts to invalidate their own agreement.  The same principles of good faith are also embraced in Dominican law as discussed in Argument Section I(C)(4).

guess the tribunal's decision to apply Swiss law to this issue. Id., at 290. As part of its analysis the Fifth Circuit noted that "[c]ertain sections and comments of the Restatement [(2d) Conflict of Laws] also support a determination that Swiss law applied to the arbitration agreement." Karaha Bodas, 364 F.3d at 292 n.43. The Fifth Circuit observed in particular that § 6 of the Restatement requires consideration of the relevant policies of the arbitral situs, and that § 218 of the Restatement provides "that the arbitration forum may have the most significant relationship to the arbitration and that a contractual provision requiring arbitration to occur in a certain forum may evidence an intention by the parties that the local law of this forum should govern." Id.

As in Karaha Bodas, the conclusion of the Arbitral Tribunal in the instant case that the law of the arbitral situs governed the validity of the Arbitration Clause was a sound one. And once the Arbitral Tribunal had made that determination, it had no difficulty concluding that the Arbitration Clause was valid and enforceable under French law. Foster Decl., Exh. G (Preliminary Award) at ¶¶ 32-41. It bears noting that Respondents have not challenged this conclusion as a matter of French law. Accordingly, Respondents have not met (and cannot meet) their burden of proving the applicability of Article V(1)(a).

**2.    A Well-Established Principle of International Law Would in Any Event Preclude Respondents From Invoking Their Own Law to Avoid Their Obligation to Arbitrate**

Respondents' attempt to rely on Dominican law to invalidate the Arbitration Clause in any event runs directly contrary to a fundamental tenet of international law that sovereign entities cannot rely on provisions of their own law to challenge the validity of an arbitration agreement into which they unreservedly entered.

In inducing CPB to enter the PPA, Respondents waived sovereign immunity in relation to the arbitration, agreed that that the PPA as a whole, including the Arbitration Clause, was valid and enforceable under Dominican law, and represented that their participation in the

PPA constituted "private and commercial acts rather than public and governmental acts." PPA, Arts. 12, 18, 19. In spite of their unequivocal agreement to arbitrate without restriction, Respondents later sought to deny the ICC Court's jurisdiction by arguing that the Arbitration Clause was prohibited by Dominican law.[15] The Arbitral Tribunal rebuked Respondents in finding that international public policy could not allow Respondents' bad faith effort to "deny the application of the arbitration agreement that they, themselves, deliberately and freely entered into after prior study and enjoying all the guarantees set forth in Dominican Law regarding powers that must be accorded to officials and other attorneys in fact who execute contracts on behalf of the State." Foster Decl., Exh. G (Preliminary Award) at ¶ 38. Through this Motion, Respondents again seek to evade their contractual obligation to arbitrate – and now their agreement to respect an arbitral award as well – by rehashing, in bad faith, their ill-conceived Dominican law arguments. The same rebuke is warranted from this Court.

As recognized by Professor Bermann, although it is not unusual for States or their instrumentalities to attempt to avoid an obligation to arbitrate or to respect arbitral awards by invoking provisions of internal law, such attempts are consistently rejected because:

> [i]t is an "established principle that a State party may not invoke its own domestic law to defeat an arbitral agreement or award, where the State party itself represented the agreement to be entirely valid under its law at the time it was entered into, and the other party reasonably relied on the validity of the agreement in entering into, and performing under, the agreement."

Bermann Decl. ¶ 16.

---

[15] Respondents' entirely unsubstantiated suggestion that "serious and fundamental questions existed from the very beginning as to whether the Agreement would be valid and binding under the Dominican Republic's Constitution and other laws of that country (Mot. at 2)" does not change the fact that Respondents made unequivocal representations in the Agreement as to its validity and enforceability under Dominican law.

The sound reasoning behind this is that "[p]ermitting a State or its instrumentality, after the fact, to impeach an apparently valid arbitration agreement or the award that resulted from it by invoking the agreement's invalidity under the State's own law obviously offends general principles of estoppel, good faith and fair dealing" and "also would clearly jeopardize the security of contractual arrangements to arbitrate and inject an unacceptably high level of uncertainty into the international arbitral regime governing agreements between private parties and foreign States and their instrumentalities." Id. ¶ 17. If States "could renege on [commitments to arbitrate] by unilaterally challenging them under their own law, the integrity of contracts with State parties and the integrity of international arbitration as the dispute settlement system of choice in such contracts would be irretrievably harmed." Id. ¶ 18  Accordingly, international arbitral case law and the academic literature on international arbitration are all emphatic and unambiguous as to this issue. Id. ¶ 20.  Consistent with the findings of the Arbitral Tribunal, it is recognized that "the principle that States and State instrumentalities are bound by their commitments to arbitrate and respect arbitral awards – the peculiarities of their internal law notwithstanding – has become a principle of 'international public policy'." Id. ¶ ¶¶ 21-24 (collecting international arbitral case law); ¶¶ 25-28 (collecting academic literature); ¶¶ 29-34 (discussing Preliminary Award).[16]

When faced with sovereigns seeking to oppose recognition of an arbitral award by invoking their own law to void their obligation to arbitrate, U.S. courts have followed the dominant international approach embraced by the Arbitral Tribunal.  For example, in American

---

[16]  Respondents' reliance on the Dominican Constitution does not add any legitimacy to their efforts to circumvent the Agreement. As Professor Bermann affirms, "the analysis of this issue does not depend on where exactly in the State's internal hierarchy of legal norms the allegedly offended norm happens to be situated. The frustration of contracts between States and private parties, and the damage to the international arbitration regime by which disputes under such contracts are characteristically resolved, will be just as great when the norm invoked by a State to defeat the parties' understandings is clothed in national constitutional language." Bermann Decl. ¶ 19.

Constr. Mach. & Equip. Corp. v. Mechanised Constr. of Pakistan, Ltd., a Pakistani State entity (MCP) sought to avoid enforcement in the United States of a foreign arbitral award (rendered in Geneva) on the ground that the arbitration agreement was invalid under Pakistani law. 659 F. Supp. 426 (S.D.N.Y. 1987). MCP sought recourse in a Pakistani court (as Respondents initially threatened to do in this action), which declared the arbitration clause invalid. Id. The arbitral tribunal disregarded this obstructionist effort and proceeded to render an award in favor of the claimant, which the claimant then sought to enforce in the U.S. Id. The court granted enforcement, stating that "public policy would be violated if the Court declined to confirm the award" after MCP "had agreed to arbitrate, appeared in the proceeding, and then sought to circumvent the process." Id. at 429; see also TMR Energy, Ltd., 411 F.3d at 305 (affirming recognition where the State entity knew of the alleged legal constraints of its own law when it entered the agreement); In re Buques Centroamericanos, S.A. v. Refinadora Costarricence de Petroleos, S.A., 87 Civ. 3256, 1989 U.S. Dist. Lexis 5429 (S.D.N.Y. May 18, 1989) (finding "untenable" a State entity's opposition to confirmation based on the argument that the arbitrators had no authority, because the State had voluntarily entered into an arbitration agreement and the arbitrators had rejected the same invalidity argument); In re Ferrara S.p.A., 441 F. Supp. 778, 781 (S.D.N.Y. 1977) (holding that U.S. federal law precludes a court from giving effect to a rule under Italian law that subjected arbitration agreements to restrictive requirements not applicable to other types of agreements).

Respondents' disdain for the parties' agreement and the dispute resolution process to which they freely submitted should not be tolerated by this Court. The Court should reach the

same conclusion as the above-cited courts, arbitral tribunals, and commentators in confirming the Award and denying Respondents' Motion.[17]

> **3.    The Arbitral Tribunal's Determination That the Arbitration Agreement Was Valid and Enforceable Should Be Given "Considerable Leeway" by This Court**

Whether based on its conclusion that the Arbitration Clause was governed by French law, or on its application of the principle of international law that precludes a State from invoking its own law to invalidate an arbitration agreement, the Arbitral Tribunal's determination that the parties' arbitration agreement was valid and enforceable should be afforded considerable deference by this Court.

In First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995), the United States Supreme Court held that if the parties' agreement reflects an intent to submit issues of arbitrability to the arbitrator, "then the court's standard for reviewing the arbitrator's decision about that matter should not differ from the standard courts apply when they review any other matter that parties have agreed to arbitrate . . . . That is to say, the court should give *considerable leeway* to the arbitrator, setting aside his or her decision only in certain narrow circumstances." Id. at 943 (emphasis added). And while the Court added that this approach should be followed only if there is "clear and unmistakable evidence" of intent to arbitrate arbitrability, Id. at 944, several courts have found such evidence is present in cases – such as the instant one – where the parties' agreement selected the ICC Rules to govern their arbitration. This is because Article 6(2) of the ICC Rules confers on the ICC Court and the Arbitral Tribunal the power to decide the scope of their own jurisdiction. See, e.g., The Shaw Group, Inc. v.

---

[17] Respondents blithely suggest that "CPB cannot be heard to complain" about this disregard because it should have known that the Arbitration Clause was invalid under Dominican law. Mot. at 9. In other words, Respondents' theory is that CPB should have known that Respondents, as representatives of the Dominican Republic, were dissembling when they expressly warranted that the Agreement was in compliance with their own law. This anomalous contention should not be credited in the slightest.

Triplefine International Corp., 322 F.3d 115, 122 (2d Cir. 2003) (holding that the parties'

selection of the ICC Rules to govern their arbitration constituted "clear and unmistakable

evidence" of intent to arbitrate arbitrability by virtue of Article 6(2)); Apollo Computer, Inc. v.

Berg, 886 F.2d 469, 473–74 (1st Cir. 1989) (same); Poponin v. Virtual Pro, Inc., 06 Civ. 4019,

2006 WL 2691418, at *9 (N.D. Cal. Sept. 20, 2006) (same).

      The rule articulated in First Options applies equally well in proceedings to

confirm arbitral awards under the Convention, even though First Options itself involved a

domestic arbitration agreement.  See, e.g., TMR Energy, 411 F.3d at 304-05 (noting that the

arbitrators had the authority to determine the law to be applied to an issue of arbitrability, and

affording deference to their finding); Karaha Bodas, 364 F.3d at 290 (stating that "the rulings of

the Tribunal interpreting the parties' contract are entitled to deference" and declining to disturb

the arbitrators' conclusion that the arbitration agreement at issue was governed by the law of the

arbitral situs and was valid).

      Deference to the Arbitral Tribunal's conclusion about the validity of the parties'

arbitration agreement is particularly appropriate under the facts of the instant case, where the

conclusion was well-reasoned and in accord with the consistent practice of arbitral tribunals and

the writings of several of the field's most eminent scholars and practitioners.  See Argument

Section I(C)(4) above, and the Bermann Declaration, ¶¶ 29-34.  In addition, the Arbitral

Tribunal's decision was upheld and endorsed by the ICC Court, a body comprised of many of the

world's leading arbitration practitioners and scholars, which performs a unique quality control

function in reviewing and commenting on draft awards prepared by ICC arbitral tribunals before

they become final.  See W. Laurence Craig, William W. Park, and Jan Paulsson, International

Chamber of Commerce Arbitration 377 (2000) (observing that this unique internal review

mechanism is part of the reason that "over 90% of ICC awards are respected voluntarily by the parties, and that ICC awards have a very good record of enforcement by national courts whenever they are challenged").[18]

### 4. The Arbitration Clause Would Also Be Valid and Enforceable Under Dominican Law if That Country's Laws Were Treated as Applicable

Even if the Court were to move beyond the inapplicability of Dominican law and the bar on invoking such law to invalidate the agreement to arbitrate, Respondents' argument would still fail because it materially misrepresents Dominican law. Contrary to Respondents' assertion, the Arbitration Clause is perfectly valid under Dominican law.

As a threshold matter, Respondents fail to meet their burden of establishing the pertinent Dominican law. Their presentation of Dominican law is sparse and wholly unsupported as they merely cite to provisions of the Dominican Civil Code and Constitution without providing context or analysis. This perfunctory effort is insufficient proof as a matter of law. See, e.g., Henry v. Murphy, No. M-82, 2002 WL 24307, *3 (S.D.N.Y. Jan. 8, 2002) (finding, in confirming award, that respondents' citation to an Irish statute was insufficient proof of the award's invalidity); Skandia Am. Reins. Corp. v. Seguros Law Republica, 96 Civ. 2289, 1996 WL 622559, *1 (S.D.N.Y. Sept. 20, 1996) (finding, in confirming award, that the mere attachment of a Mexican statute did not meet the respondents' burden of proof and gave the court "no idea" as to why the contract at issue was invalid). The mere reference to excerpts of foreign law – including some very broad, catch-all principles (e.g., "Laws concerning public order and moral principles cannot be repealed by private contracts," Mot. at 7) – cannot result in a finding that the Arbitration Clause is necessarily invalid under Dominican law. See, e.g., La Societe Nationale Pour La Recherche v. Shaheen Natural Resources Co., 585 F. Supp. 57, 65 (S.D.N.Y

---

[18]    The relevant excerpt from this treatise is set forth at Foster Decl. ¶ 10, Exh. H.

1983) (finding that Algerian state-owned entity was "grasping for straws" when it misinterpreted broad principles of Algerian law to serve its own purpose by arguing that state-owned entity was not entitled to enter into an agreement to arbitrate.)

The reason for Respondents' shallow treatment of Dominican law is that a more careful approach would lead to a contrary result – *i.e.,* that the Arbitration Clause is valid. As explained in the Declaration of Dominican law expert Sara V. Sicard that accompanies this Memorandum, the principles of contractual liberty and good faith are of preeminent significance under Dominican law. Declaration of Sara V. Sicard, dated March 23, 2007 ("Sicard Decl."), ¶¶ 4, 14-20, 46-54. Such principles preclude Respondents from agreeing to arbitrate and then raising objections to the validity of the arbitration agreement. Id. ¶¶ 20, 54. Respondents seek to avoid the force of those bedrock principles by invoking Article 1004 of the Dominican Civil Code, and seeking to portray that provision as a universal bar on arbitrations involving the State or its property. See Mot. at 7. In truth, however, Respondents' interpretation of Article 1004 is both erroneous and inconsistent with Respondents' own business practices. As Ms. Sicard explains, Article 1004 is treated within the Dominican Republic as pertinent only in the domestic context, and even in that context it has an increasingly limited application. Id. ¶¶ 22-24. In the context of international agreements into which the Dominican State and State-entities enter as private and commercial actors – a category into which the PPA undeniably falls – it is clear as matter of law and practice that they are free to consent to arbitrate and must abide by their agreement to do so. Id. ¶¶ 25-32, 7.[19] Neither Article 1004, nor the Dominican Constitutional concept of sovereign immunity referenced in Respondents' Motion, prohibits the State from

---

[19]  The other broad provisions of Dominican law relied on by Respondents are likewise unavailing as they require a threshold violation of the law. See Mot. at 7-9. Moreover, if anything, it is a State's refusal to comply with its contractual obligations that conflicts with such notions as "moral principles" and "public order."

agreeing to arbitrate in the international context, and neither gives Respondents a free pass to circumvent its obligations under any such agreement. Id. ¶¶ 32, 41-45.[20]

Respondents also argue that Article 13.1.1 grants CPB a tax exemption in violation of the Dominican Constitution, and that this has the effect of voiding the entire PPA. The Arbitral Tribunal soundly rejected this argument and Respondents' misinterpretation of the PPA, concluding that Article 13 merely provided a framework through which Respondents could seek to go through any necessary governmental channels. Award at ¶¶ 84, 90. The Arbitral Tribunal's understanding of the Dominican Constitution was accurate. Sicard Decl. ¶¶ 60-61.

Respondents' recourse to erroneous arguments under their own law in an effort to cast doubt on the validity of the Arbitration Clause is all the more remarkable in light of their established practice of entering into agreements to arbitrate. In fact, "[a]rbitration and waiver of immunity clauses are a common fixture in contracts with the Dominican State and are especially used in all the agreements of the energy sector."[21]   Id. ¶¶ 33-40. The Arbitration Clause in the PPA is representative of Respondents' normal course of dealing, and their arguments in this Motion "are wholly irreconcilable with their standard practice." Id. ¶ 40.

Respondents' position — that they can regularly and customarily enter into agreements to arbitrate, and at the same time avoid all consequences of such agreements — is not permissible under Dominican law or international law, and should not be permitted by this Court.

---

[20]  This interpretation of Dominican law has been further strengthened since the Dominican Republic's ratification of the Convention, whereby the Dominican Republic committed itself to uphold international agreements to arbitrate. Id. ¶ 44.

[21]  In fact, there are reported decisions in the U.S. which pertain to arbitration agreements entered into by Respondents. See, e.g., Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l., 198 F.3d 88, 89 (2d Cir. 1999) (relating to arbitration clause in power purchase agreement with CDE).

**D.   The Arbitral Tribunal was Properly Constituted in Accordance with the Parties' Agreement and the ICC Rules**

The second argument raised by Respondents under Article V of the Convention – that recognition should be refused because the Arbitral Tribunal allegedly was not constituted in accordance with the parties' agreement – likewise cannot withstand scrutiny. Although Article V(1)(d) permits a reviewing court to decline recognition if "[t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties," this ground is inapplicable in this case, because the ICC Court faithfully adhered to the terms of the PPA and the ICC Rules in empanelling the Arbitral Tribunal.

Courts applying Article V(1)(d) have emphasized that this ground for non-recognition should be construed narrowly – like all others – and should be deemed inapplicable so long as a reasonable attempt was made in the selection of the arbitration panel to apply the parties' agreement and the governing arbitration rules. See, e.g., Karaha Bodas, 364 F.3d. at 298 (holding that the respondent "failed to meet its burden of showing that the Tribunal was improperly constituted" because the tribunal was empanelled according to a reasonable interpretation of the arbitration agreement and the relevant arbitration rules).

In the instant case it cannot credibly be disputed that the ICC Court reasonably interpreted and applied the terms of the Arbitration Clause and the ICC Rules. In the face of Respondents' bad faith refusal to comply with the Arbitration Clause's prohibition on nominating arbitrators with "business relations with any of the parties" – together with Respondents' failure to meet the time deadline specified by the ICC Court for the nomination of an arbitrator – the ICC Court took the only approach reasonably available to it: appointing a neutral and independent arbitrator on Respondents' behalf. As explained in the ICC Certificate, the ICC Court's decision to make this appointment was explicitly authorized under Article 9.6 of

32

the ICC Rules, which the parties agreed would govern their arbitration proceedings.  Foster

Decl., Exh. A (ICC Cert.) at ¶¶ 8, 19-21; see also Award, ¶¶ 23, 28

       If Respondents' objection to the constitution of the Arbitral Tribunal were

cognizable under Article V(1)(d), then it would be impossible as a practical matter to empanel an

arbitral tribunal and carry out an arbitration in any case where the respondent employed

obstructionist tactics in the arbitrator selection process.  Such tactics should not be countenanced

by this Court, and Respondents' arguments under Article V(1)(d) should be rejected.

**E.**    **U.S. Public Policy Would Not Be Violated by Recognition of the Award**

       Respondents also argue that this Court should decline to recognize the Award

under Article V(2)(b) of the Convention, which permits a court in the country where recognition

is sought to refuse enforcement if "[t]he recognition or enforcement of the award would be

contrary to the public policy of that country."  Respondents argue that U.S. public policy would

be violated by recognition of the Award at issue because this "would place this country in the

position of sanctioning a would-be contract that on its face violates Dominican Republic law

…."  Mot. at 21.  This is an improper attempt by Respondents to bootstrap by converting the

alleged public policy of the Dominican Republic into the public policy of the United States, and

should not be given any credence.

       Courts interpreting the public policy exception of Article V(2)(b) have made clear

that it must be "construed narrowly to be applied only where enforcement would violate the

forum state's most basic notions of morality and justice." Parsons & Whittemore Overseas Co.,

Inc., 508 F.2d at 974; Karaha Bodas, 364 F.3d at 305.  In fact, courts have held that a court

should not apply the public policy exception simply because some aspect of the award is

contrary to U.S. law — let alone because some aspect is contrary to the law of a foreign country.

See, e.g., Coutinho Caro & Co. U.S.A., Inc. v. Marcus Trading, Inc., 95 Civ. 2362, 2000 WL

435566, *12 (D. Conn. Mar. 14, 2000) ("[a]ll laws, be they procedural or substantive, are founded on strong policy considerations. Yet not all laws represent this country's 'most basic notions of morality and justice.' Were it otherwise, the Convention's public policy exception would eviscerate the very goal of the Convention as a whole — to encourage the recognition and enforcement of commercial arbitration agreements") (citations omitted); see also Ukrvneshprom State Foreign Econ. Enter. v. Tradeway, Inc., 95 Civ. 10278, 1996 WL 107285, *6 (S.D.N.Y. Mar. 12, 1996) (noting that purported interests of a foreign country are not relevant to a U.S. court's application of the public policy exception).

Far from offending U.S. public policy, recognition and enforcement of the Award at issue would *promote* the important U.S. public policy of encouraging the enforcement of arbitration awards. As this Court recognized in In re Chromalloy, 939 F. Supp. at 913, "[t]he U.S. public policy in favor of final and binding arbitration of commercial disputes is unmistakable, and supported by treaty, by statute, and by case law." See also American Constr. Machinery & Equip. Corp., Ltd., 659 F. Supp. at 429 (finding that "public policy would be violated if the Court *declined* to confirm the award" in response to a sovereign's efforts to use its own law to void agreement to arbitrate) (emphasis added).

Because Respondents have not demonstrated (and cannot demonstrate) any independent U.S. public policy that would be offended by enforcement of the Award, they have not met their burden of establishing this ground for non-recognition of the Award.

### F.     Respondents' Threat to Commence Proceedings in a Dominican Court – Which Was Later Withdrawn – Is No Bar to Recognition and Enforcement of the Award in this Court

Respondents also improperly urge the Court to decline to recognize the Award under Article V(1)(e) of the Convention, which provides that recognition is not required if the "award has not yet become binding on the parties, or has been set aside or suspended by a

34

competent authority of the country in which, or under the law of which, that award was made."
See Mot. at 22.  As part of this argument, Respondents represented in their Motion that "[w]ithin
the next thirty days, Defendants will commence a legal proceeding in the Dominican Republic
seeking a judicial declaration that the PPA was invalid and unenforceable," and suggested that
this threatened proceeding was somehow relevant to the Court's application of Article V(1)(e).
Id.  Respondents later withdrew this threat, announcing in a filing to this Court on March 13,
2007 that they had decided *not* to file any proceedings on the Award in the Dominican Republic
after all – a decision that no doubt reflects a lack of confidence in their contention that parties'
arbitration agreement was invalid under Dominican law.  By virtue of that announcement,
Respondents' invocation of Article V(1)(e) became moot.

   It bears noting, however, that Respondents' invocation of Article V(1)(e) was
misplaced even before they withdrew their threat to initiate proceedings in the Dominican
Republic.  This is because recognition may be refused under Article V(1)(e) only if the award at
issue has been set aside by a "competent authority of the country in which, or under the law of
which, that award was made," and U.S. courts have consistently interpreted that phrase to refer
presumptively to a court *in the arbitral situs* (i.e., the country where the award was rendered).
See, e.g., Karaha Bodas, 364 F.3d at 291-92, 309-10 (holding that there can only be *one* country
whose courts are competent to set aside an award within the meaning of Article V(1)(e), and that
is presumptively the country where the award was rendered); Int'l Standard Elec. Corp. v. Bridas
Sociedad anonima Petrolera Industrial y Commercial, 745 F. Supp. 172, 178 (S.D.N.Y. 1990)
(holding that the reference to the law "under which" an award is made in Article V(1)(e) "refers
exclusively to procedural and not substantive law, and more precisely, to the regimen or scheme
of arbitral procedural law under which the arbitration was conducted," and thus only a court in

the arbitral situs may set aside an award); American Constr. Machinery & Equip. Corp. Ltd., 659 F.Supp. at 429 (holding that the law under which an award was made within the meaning of Article V(1)(e) of the Convention is the law of the arbitral situs: "[t]he law under which this award was made was Swiss law because the award was rendered in Geneva, pursuant to Geneva procedural law"); Coutinho Caro & Co. U.S.A., Inc., 2000 WL 435566, *6 (same).

Moreover, this Court has held previously that Article V(1)(e) is discretionary, and that it may decide to recognize and enforce a foreign arbitral award even if that award has been set aside by a "competent authority." See In re Chromalloy, 939 F. Supp. at 913-14 (recognizing and enforcing an Award under the Convention irrespective of the fact that the award had been set aside by a court in the arbitral situs, Egypt). Any application for relief made by the Respondents in the Dominican Republic would not have been worthy of deferential treatment in this Court, as it would have been merely another attempt to avoid payment by hiding behind Dominican law. See Nicor Int'l Corp. v. El Paso Corp., 292 F. Supp.2d 1357, 1375 (S.D. Fla. 2003) (confirming arbitral award and refusing to defer to *Dominican* proceeding which was conducted in disregard for arbitration clause).

For all of the above reasons, any threats by Respondents to initiate legal proceedings in the Dominican Republic – whether past or future – are meaningless.[22]

---

[22] At one point, Respondents cryptically refer in passing to Article V(2)(a) of the Convention, which provides that a court in a country in which recognition of an award is sought may refuse recognition where "the subject matter of the difference is not capable of settlement by arbitration under the law of that country." See Mot. at 14-15. However, Respondents do not actually assert that Article V(2)(a) is applicable in this case, let alone articulate any aspect of the subject matter of the parties' dispute that is "not capable of settlement by arbitration under" U.S. law. And in the event that Respondents are implying here that Dominican law is somehow relevant to the application of Article V(2)(a), that contention is manifestly without merit. Respondents' reference to Article V(2)(a) should be disregarded.

### G.    Respondents' Manifest Disregard Argument Is Unavailing

#### 1.    "Manifest Disregard" Is Not A Ground for Non-Recognition Under the New York Convention

Respondents' argument that the Award was rendered in "manifest disregard" of Dominican law is unavailing because, as a threshold matter, manifest disregard is not a ground for opposing recognition under the Convention.

As noted previously, the law is clear that Article V of the Convention enumerates the few and *only* grounds under which a court may deny an application to confirm under the Convention. TMR Energy, Ltd., 411 F.3d at 304-05; see also Compagnie Des Bauxites De Guinee v. Hammermills, Inc, 1992 WL 122712, at *3 ("a reviewing court may refuse to recognize and enforce an arbitral award *only* if the party seeking such refusal establishes one of the grounds specified in the Convention"); Energoinvest DD v. Democratic Republic of Congo, 355 F. Supp. 2d 9, 11 (D.D.C. 2004) (same).

And manifest disregard of the law is not an Article V ground for non-recognition. Rather, it is a ground that some courts have deemed implicit in Section 10 of Chapter 1 of the FAA, which applies to applications to vacate *domestic* arbitral awards. See, e.g., Lessin v. Merril Lynch, Pierce, Fenner & Smith, Inc., 5 Civ. 171 (RMC), 2006 WL 1096623, *4 (D.D.C. Mar. 31, 2006). Pursuant to 9 U.S.C. § 208, Chapter 1 of the FAA can apply to proceedings brought under the Convention, but only to the extent that its provisions do not conflict with the Convention. Because 9 U.S.C. § 207 requires that a court considering an application for confirmation under the Convention "confirm the award unless it finds one of the grounds for refusal or referral . . . specified *in the said Convention*," the manifest disregard standard that some courts have read into Chapter 1 necessarily conflicts with the Convention, which does not include "manifest disregard" as an available ground for non-recognition. See M & C Corp. v. Erwin Behr GmbH & Co., KG, 87 F.3d at 851 (noting that "Article V of the Convention lists the

37

exclusive grounds justifying refusal to recognize an arbitral award" and that those grounds "do

not include miscalculations of fact or manifest disregard of the law"). See also Admart AG., 457

F.3d at 308 (same); Industrial Risk Ins. v. M.A.N. Gutehoffnungshutte GmbH, 141 F.3d 1434,

1446 (11th Cir. 1998); Ministry of Defense in Support for the Armed Forces of the Islamic

Repub. of Iran, 29 F. Supp. 2d 1168 (S.D. Cal. 1998).[23]  As such, the "application of the FAA's

implied grounds would be in conflict and is thus precluded." Yusuf Ahmed Alghanim & Sons,

W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15, 20 (2d Cir. 1997); M & C Corp. v. Erwin Behr GmbH

& Co., KG, 87 F.3d at 851.[24]

### 2.    Even if "Manifest Disregard" Were a Potential Ground for Non-Recognition, That Standard Could Not Be Met Here

Even if the Court decided to review the Award for manifest disregard of

Dominican law, Respondents have not established any such disregard by the Arbitral Tribunal,

let alone of a level sufficient to meet the required high standard.  To establish manifest disregard,

---

[23]  All of the cases that Respondents cite in the section of its Motion dealing with "manifest disregard" pertain to motions to vacate a *domestic* award under Chapter 1 of the FAA. None are cases opposing recognition under the Convention. See Mot. at 13.

[24]  The Second Circuit has allowed for a limited carve-out to this rule, finding that district courts have the authority to set aside arbitration awards that are rendered in the United States but are nevertheless subject to the Convention (by virtue of the foreign nationality of one or more of the parties) on the basis of "manifest disregard of the law." See Toys "R" Us, 126 F.3d at 23. However, the Court stated that "the Convention is equally clear that when an action for enforcement is brought in a foreign state, the state may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." Id. As such, this Second Circuit exception – permitting manifest disregard to be applied to awards rendered in the United States – is irrelevant to CPB's application for confirmation of an award rendered in France. It also bears noting that in Chromalloy this Court referred to the possibility that "[a]n arbitral award will … be set aside if the award was made in 'manifest disregard' of the law." 939 F. Supp. at 910 (citation and quotation marks omitted, emphasis added). In making this observation, the Court referred to manifest disregard as a "non-statutory theory of vacatur," and cited cases involving awards that were rendered under U.S. procedural law and which were, consequently, potentially subject to vacatur by a U.S. court. Specifically, the Court cited Al-Harbi v. Citibank, N.A., 85 F.3d 680, 683 (D.C. Cir. 1996) (involving an award rendered by an arbitrator who was bound by the parties' agreement to apply the procedural law of New York) and Kanuth v. Prescott, Ball & Turben, Inc., 949 F.2d 1175, 1179 (D.C. Cir. 1991) (involving a domestic U.S. arbitration). This authority cited by the Court in Chromalloy should not properly be applied to an award rendered outside the United States, however, given that a U.S. court lacks the authority to vacate a foreign award, and in light of the reasoning articulated in Toys "R" Us and the other cases cited above.

Respondents must establish that: "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." Lessin, 2006 WL 1096623, *4. "Errors of fact and errors of law are not sufficient," because "[i]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice . . . ." Id. Far from establishing disregard of the law by the Arbitral Tribunal, the references to the Award in Respondents' Motion demonstrate nothing more than *Respondents'* disregard for their own contractual obligations.

### a.    Rescission of the PPA

Respondents argued during the arbitration that the Dominican Civil Code required CPB to formally rescind the PPA before seeking to arbitrate. In finding otherwise, the Arbitral Tribunal considered the terms of the PPA allowing CPB to terminate upon breach without going through the rescission process, as well as the legal jurisprudence relating to the interplay of the Dominican statue and the unequivocal terms of the PPA. Award, ¶¶ 133-137.[25] The Arbitral Tribunal's findings reflect a careful analysis of the PPA and the governing law.

### b.    Interest Calculation

Respondents argued during the arbitration that the Dominican Civil Code's restrictions regarding interest should supersede the express provisions of the PPA. In finding that the terms of the PPA had to be respected, the Arbitral Tribunal found that the Civil Code provision (which was adopted from French law) did not apply in the context of international agreements, and that Respondents could not cast aside contractual obligations that they "freely

---

[25] To the extent that Respondents take issue with Arbitral Tribunal's reference to French law in its effort to interpret Dominican law, such an argument fails because the Dominican Civil Code originates in the French Civil Code and the Respondents, themselves, relied on French jurisprudence when briefing this issue for the Tribunal. Award, ¶ 133; see also Sicard Decl. ¶¶ 6-7. As noted by Ms. Sicard, it is customary for Dominican courts to refer to French authority in the absence of relevant Dominican precedent, due to the similarity of the two countries' laws and their common historical origin. Id.

consented to after long deliberations." Award, ¶ 167.  The Tribunal noted that "granting a petition for nullity of a clause expressly consented to by the party that alleges the nullity, alleging the violation of an internal law rule, conspires against the juridical safety on which the investments and the international contracts from which they stem must inevitably be supported." Id. at 168.  Rather than "ignore" the law (Mot. at 20), the Arbitral Tribunal's rejection of Respondents' attempt to invoke their own law to void their contractual obligations is consistent with international arbitral jurisprudence and with fundamental principles of international law. Bermann Decl. ¶¶ 29-35.

> **c.    Legal Fees and Costs**

The Arbitral Panel awarded legal fees and costs to CPB, and Respondents now argue that this was contrary to Dominican law.  The Arbitral Tribunal found that legal costs were not specifically dealt with in the PPA, so it looked to the ICC Rules — *i.e.,* which governed procedural issues such as the award of costs — to analyze this issue.  Award, ¶¶ 188-92.  As discussed previously, the Arbitral Tribunal's application of the ICC Rules to procedural issues is consistent with international arbitral jurisprudence.  Rather than flouting Dominican law (Mot. at 20), the Arbitral Tribunal properly considered the terms of Agreement and the relevant law.

## II.    NO STAY IS WARRANTED UNDER ARTICLE VI OF THE CONVENTION

Respondents requested in their Motion that the Court stay these proceedings under Article VI of the Convention pending legal proceedings on the Award that they were purportedly planning to file in the Dominican Republic "within the next thirty days."  Mot. at 22. Article VI of the Convention permits a court to "adjourn the decision on the enforcement of the award" in the event that "an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V(1)(e)" of the Convention.  Respondents contended in their Motion, erroneously, that it would be appropriate for the Court to stay these

proceedings on the ground that a court in the Dominican Republic would be a "competent authority" within the meaning of Article V(1)(e). Mot. at 22-23. This argument is fundamentally flawed for the reasons explained above in Argument Section I(B), namely that only the courts of France, the place where the Award was rendered, are such a "competent authority." See, e.g., Karaha Bodas, 364 F.3d at 291-92, 309-10 (holding that only a court in the arbitral situs is a "competent authority" capable of setting the award aside within the meaning of Article V(1)(e)).

It would seem that Respondents' request for an Article VI stay was in any event mooted when Respondents later announced in their submission to this Court of March 13, 2007 that they had decided *not* to pursue legal proceedings on the Award in the Dominican Republic. After all, Article VI conditions any adjournment of the proceedings on the pendency of "an application for the setting aside or suspension of the award" before a "competent authority referred to in article V(1)(e)," and it was the threatened proceeding in a Dominican court that Respondents cited as a basis for the requested stay. Yet when counsel for CPB contacted Respondents' counsel to confirm that the request for an Article VI stay was no longer operative, they astonishingly replied that their clients intended to persist with their request for such a stay. Foster Decl. ¶¶ 12-14, Exh J (Letter from George K. Foster to Marvin Griff). Respondents nevertheless refused to withdraw their request for a stay, thereby forcing CPB to brief the issue in the instant submission. Id. Under the circumstances Respondents' request for an Article VI stay should not be given the slightest consideration by the Court, except in the sense that the Court should take note of the fact that the request – and Respondents' persistence in maintaining it – was lacking in any colorable legal basis.[26]

_____

[26]  In the event that the Court were to entertain the possibility of an Article VI stay in connection with these proceedings (which it should not do), the Court should order Respondents to post security as a

41

**III.    RESPONDENTS SHOULD BE ORDERED TO PAY CPB'S ATTORNEYS' FEES IN CONNECTION WITH THIS PROCEEDING FOR OPPOSING RECOGNITION IN BAD FAITH**

This Court should invoke its inherent equitable power to order Respondents to reimburse CPB for the costs and attorneys fees' incurred in responding to the Motion.

In light of Respondents' prior written acknowledgement of the validity of the Award, and their promise to pay the same, *no* opposition to the instant Application could have been offered in good faith. But in Respondents' Motion they did much more than merely oppose recognition. In addition to opposing recognition, Respondents' Motion asked the Court to (1) dismiss the Application on the ground that the Court "lacks jurisdiction over this matter" (in disregard of the controlling authority that gives the Court jurisdiction in proceedings to confirm foreign arbitral awards); (2) dismiss the Application for failure to "state a claim upon which relief may be requested" (despite the fact that the relief requested is explicitly authorized by the Convention and its implementing legislation in the United States); (3) "vacate" the Award (in disregard of the authority holding that the Court has no authority to do so); and (4) stay the proceedings under Article VI of the Convention pending judicial proceedings in the Dominican Republic (even though there are no – and will not be – any such proceedings).

For these reasons, and as more fully explained above, each one of Respondents' requests for relief was manifestly without merit and cannot possibly have been offered in good

---

condition of any such stay. Article VI explicitly authorizes the Court to order the posting of security as a condition to any such stay, and such security is routinely ordered under these circumstances, including in cases involving sovereigns. See, e.g., International Ins. Co. v. Caja Nacional De Ahorro y Seguro, 293 F.3d 392 (7th Cir. 2002) (holding that a court could require a foreign State entity to post a bond in an action to confirm an arbitral award without violating sovereign immunity, because the State had waived immunity to pre-judgment attachment by signing the Convention, which expressly provides for such security); Caribbean Trading and Fidelity Corp. v. Nigerian National Petroleum Corp., 90 Civ. 4169 (JFK), 1990 U.S. Dist. LEXIS 17198 (S.D.N.Y. 1990); Spier v. Calzaturificio Tecnica S.p.A., 663 F. Supp. 871, 876 (S.D.N.Y. 1987); Fertilizer Corp. of India v. IDI Management, Inc., 517 F. Supp. 948, 962 (D. Ohio 1981).

faith.  As such, Respondents should bear the burden of the wasteful exercise of opposing the

Motion.  See, e.g., P.M.I. Trading, Ltd. v. Farstad Oil, Inc., 00 Civ. 7120, 2001 WL 38282, *4

(S.D.N.Y. Jan. 16, 2001) (ordering attorneys' fees and costs where respondent's opposition to

recognition of an arbitral award under the Convention was made without a "legitimate basis");

Cliftex Corporation vs. Local 377, New England Regional Joint Board, Amalgamated Clothing

and Textile Workers Union, AFL-CIO, CLC, 625 F. Supp. 903, 909 (D. Mass. 1986) (awarding

attorneys' fees where opposition to recognition of arbitral award was "unsupported" and

"asserted in bad faith").  Cf. Reliance Ins. Co. v. Sweeney Corp., Maryland, 792 F.2d 1137

(D.D.C. 1986) (ordering sanction of attorneys' fees where party frivolously appealed judgment

confirming arbitration award).

## CONCLUSION

For the foregoing reasons, CPB respectfully requests that its Application be

granted, that an Order be issued confirming the Award, that the Court enter judgment thereon in

favor of CPB, and that Respondents' Motion be denied in its entirety.[27]

---

[27]  A proposed Judgment and Order confirming the Award is attached as Exhibit K to the Foster
Declaration.  In addition to the fixed amount of damages set by the Award, and pursuant to the terms of
the Award and consistent with D.C. Code § 15-108, CPB is entitled to prejudgment interest calculated at
the rate set forth in Article 10.5 of the PPA.  Should the Court enter judgment, CPB will submit a
calculation of the precise of amount of interest accrued, if requested by the Court.  Costs and fees are not
included in the proposed Judgment and Order.  Should the Court exercise its discretion to award CPB fees
and costs, CPB will submit documentation of such expenditures upon request.

Dated: March 26, 2007

By: _George Foster_

DECHERT LLP
Frank J. Eisenhart (D.C. Bar No. 418630)
Christian A. Natiello (D.C. Bar No. 473960)
1775 I Street, NW
Washington, DC 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-3333

DECHERT LLP
Robert A. Cohen (admitted *pro hac vice*)
George K. Foster (D.C. Bar No. 497152)
                (admitted *pro hac vice*)
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

Attorneys for Applicant
Cayman Power Barge I, Ltd.

12689949