# FOSTER EXHIBIT F



International Chamber of Commerce

*The world business organization*

**International Court of Arbitration  •  Cour internationale d'arbitrage**

# AWARD
# SENTENCE

ICC International Court of Arbitration · Cour internationale d'arbitrage de la CCI

38, Cours Albert 1ᵉʳ, 75008 Paris, France
Telephone +33 1 49 53 28 28   Fax +33 1 49 53 29 33
Website www.iccwbo.org E-mail arb@iccwbo.org

## INTERNATIONAL COURT OF ARBITRATION

### CASE No. 11772/KGA

## CAYMAN POWER BARGE I, LTD.
### (Islas Caimán)

### c/

### 1. EL ESTADO DE LA REPUBLICA DOMINICANA
### (República Dominicana)

### 2. CORPORACION DOMINICANA DE ELECTRICIDAD
### (República Dominicana)

This document is an original of the « *Laudo Preliminar* » rendered in conformity with the Rules of the ICC International Court of Arbitration.

**CCI 11772/KGA**

## Laudo preliminar
## sobre la competencia del Tribunal Arbitral

Dictado por el Tribunal Arbitral compuesto por :

Jean-Paul BERAUDO, Presidente, nombrado por la Corte Internacional de Arbitraje ;

Alejandro M. GARRO, coárbitro, designado por la parte demandante, confirmado por la Corte Internacional de Arbitraje ;

Luis Enrique BOTTARO-LUPI, coárbitro, nombrado por la Corte Internacional de Arbitraje por cuenta de las partes demandadas.

Entre :

CAYMAN POWER BARGE I, LTD, parte demandante,
c/o Midland Trust Corporation (Cayman) Ltd.
P.O. Box 1109, Mary Street, Grand Cayman
Islas Caimán

Representada por :
John C. Reynolds y Genevieve Marie Hartel, Esqs.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre Llp
201 St. Charles Avenue, 49th Floor, New Orleans, Lousiana 70170-5100
Estados Unidos
 Dr. Luis Miguel Pereyra. PEREYRA & ASOCIADOS
Mustafa Kemal Ataturk N° 52, Ensanche Naco
Santo Domingo, Distrito Nacional
República Dominicana

Y

EL ESTADO DE LA REPUBLICA DOMINICANA
El Estado de la República Dominicana a través de su representante autorizado
Corporación Dominicana de Electricidad, Edificio Principal

1

Avenida Independencia Esq. Fray Cipriano de Utrera, Centro de los Héroes
Santo Domingo, República Dominicana

CORPORACION DOMINICANA DE ELECTRICIDAD y su
continuadora jurídica, la Corporación Dominicana de Empresas Eléctricas
Estatales (CDEEE), partes demandadas, Edificio Principal, Avenida
Independencia Esq. Fray Cipriano de Utrera
Centro de los Héroes
Santo Domingo, República Dominicana

Representadas por :
Dr. Práxedes Castillo Pérez y Lic. Américo Moreta Castillo, CASTILLO Y
CASTILLO
Avenida Lope de Vega, edificio N° 4, Sector Naco
Santo Domingo, República Dominicana

********

Preámbulo

**1 -** En un contrato de compra de energía firmado el 17 de marzo de 1998
y su enmienda del 2 de julio de 1999 (en adelante el « Acuerdo de Compra
de Energía » o simplemente « el Contrato ») la sociedad CAYMAN
POWER BARGE (« CPB », « vendedora » o « Demandante ») se obligó a
vender al Estado de la REPUBLICA DOMINICANA (« el Estado »)
representado por la CORPORACION DOMINICANA DE
ELECTRICIDAD (« CDE ») toda la producción de energía producida por
una barcaza generadora de electricidad (« powerbarge » o « la barcaza ») y
la capacidad adicional. La continuadora jurídica de la CDE es ahora la
Corporación Dominicana de Empresas Eléctricas Estatales (« CDEEE »)
creada por la Ley General de Electricidad N° 125-01 de la República
Dominicana de fecha  26 de julio de 2001. La CDE y la CDEEE serán
referidos, en su conjunto, como la « Corporación », mientras que la CDE,
la CDEEE y el Estado dominicano  serán referidos en su conjunto como
las «Demandadas »)..

2

**2 -** Conforme a las cláusulas del Contrato, la CPB construyó, instaló y mantuvo la barcaza generadora de electriciad, mientras que la CDE suplió a la CPB todo el combustible necesario para la producción de electricidad.

**3 -** El Contrato preveía un pago mensual de la energía producida por la barcaza generadora. En caso de retraso de pago « los montos adeudados acumularán interés legal de un (1%) por ciento por mes a partir de la fecha de vencimiento hasta la fecha en que se reciba el pago por la vendedora » (cláusula 10.5). Para garantizar su obligación de pago, el Estado se obligó a mantener, extender, restaurar o re-emitir una Carta de Crédito de un valor nominal de US$ 2,044,912.50 (cláusula 11).

**4 -** En razón del alegado incumplimiento por el Estado de su obligación de pago y de restaurar la Carta de Crédito, la CPB interrumpió la producción de electricidad y se marchó de las aguas dominicanas. Conforme a los términos de la carta recibida por la CCI el 20 de septiembre de 2001, la CPB presentó una demanda de arbitraje contra el Estado y la CDE.

### La Clausula de arbitraje y el derecho aplicable al Contrato

**5 -** El artículo 17 del Contrato, titulado « ley aplicable », dispone que el Contrato « está redactado y será interpretado bajo las LEYES DE LA REPUBLICA DOMINICANA sin tomar en consideración los principios de conflictos de leyes. »

**6 -** El artículo 18 del Contrato, titulado « arbitraje », prevé lo siguiente :

« 18.1 ARBITRAJE INTERNACIONAL
En el caso de cualquier disputa, controversia, reclamación o diferencia (cada una « Disputa ») surgiendo de o en conexión con este ACUERDO, la PARTE afectada dará aviso por escrito de lo mismo a la otra PARTE. Las PARTES tratarán de resolver tal Disputa de manera amigable. Si dentro de un (1) mes después del aviso de una Disputa la misma no ha sido resuelta, a la solicitud de cualquier PARTE, la Disputa, a pesar de su naturaleza, será referida a arbitraje y finalmente resuelta de conformidad con las reglas de arbitraje establecidas por la Cámara de Comercio Internacional en vigor en París, Francia (las « Reglas de ICC »).

18.2 Los procedimientos de arbitraje serán realizados en París, Francia.

18.3 El derecho de las PARTES de solicitar que se llegue a una resolución de una Disputa o determinación en un procedimiento conforme a este ACUERDO, no será afectado por el hecho de que cualesquiera de las PARTES haya recibido compensación parcial en base condicional o absoluta de cualquier tercero (ya sea un individuo, un estado, una agencia gubernamental o una organización internacional) por concepto de cualquier pérdida o perjuicio sujeto a la disputa.

18.4 Cualquier tribunal de arbitraje que se constituya según este ACUERDO deberá aplicar las Leyes de la República Dominicana y los principios generalmente aceptados del Derecho Internacional.

18.5 Cualquier arbitraje bajo este Artículo será dirigido por un grupo constituído por tres árbitros. No se admitirá ningún árbitro que haya tenido vínculos o relaciones laborales con ninguna de las PARTES. El arbitraje se realizará en idioma español. La decisión del tribunal de arbitraje será definitiva y obligatoria para las PARTES. Cada PARTE tendrá derecho a escoger un árbitro y el tercero se designará conforme a las Reglas de la Cámara de Comercio Internacional de París, Francia (ICC).

18.6 Las PARTES irán a juicio y acuerdan someterse a la jurisdicción para arbitraje o litigio, si resulta necesario para la imposición de cualquier otorgamiento del laudo arbitral emitido por el grupo de árbitros según este Artículo. Este otorgamiento de jurisdicción que aceptan las PARTES, se aplicará a cualquier procedimiento de arbitraje, así como también a la decisión o laudo arbitral emitido por el grupo de árbitros.

18.7 Las PARTES convienen que cualquier arbitraje o juicio podrá ser satisfecho contra cualquier propiedad o bien de las PARTES ubicados en cualquier lugar.

18.8 Las PARTES serán únicamente responsables bajo este ACUERDO. Ningún accionista, inversionista, empleado, director, funcionario ni representante de EL ESTADO, ni de LA VENDEDORA, será personalmente responsable o individualmente sujeto a responsabilidad de

cualquier tipo con respecto a este ACUERDO aún así sea permitido por las leyes que rigen los domicilios de las PARTES ».

« 18.9 El laudo que se produzca deberá decidir sobre los arreglos necesarios para la solución de la Disputa o la terminación de este ACUERDO y el mismo deberá tener el voto de por lo menos dos de los árbitros y será inapelable por las PARTES. El costo de este arbitraje debe ser distribuído entre las PARTES, según especifiquen las Resoluciones Administrativas de la Cámara de Comercio Internacional de París, Francia, en un cincuenta por ciento (50%) entre las PARTES ».

**7 -** El artículo 19, titulado « inmunidad soberana » prevé lo siguiente :

a) « LA CORPORACION y EL ESTADO cada uno incondicionalmente e irrevocablemente : Conviene que la suscripción, entrega y cumplimiento por la parte respectiva de este ACUERDO constituye actos privados y comerciales en vez de actos públicos o gubernamentales ;

b) Conviene que, si cualquier procedimiento es registrado contra EL ESTADO o sus bienes en cualquier jurisdicción en relación a este ACUERDO, no podrá reclamar ninguna inmunidad soberana u otra de tal procedimiento por o en nombre de la parte con respecto a sus bienes ;

c) Renuncia a cualquier derecho de inmunidad soberana u otra inmunidad que tenga o cualquiera de sus bienes actualmente tienen o podrán adquirir en el futuro en cualquier jurisdicción ; y

d) Conviene generalmente en respecto con la imposición de cualquier laudo de arbitraje o sentencia contra el mismo en cualquier procedimiento o jurisdicción, y al otorgamiento de cualquier alivio en conexión con tal procedimiento (incluyendo, sin limitación, el establecimiento, imposición o ejecución contra o con respecto a propiedad cualquiera con independencia de su uso o intención de uso) ».

*********

## POSICIÓN DE LAS DEMANDADAS

**8 -** Apoyándose en la Constitución de la República Dominicana, disposiciones de su Código Civil y Código de Procedimiento Civil y legislación complementaria, las Demandadas alegan la prohición al Estado de comprometerse en arbitraje. Conforme a lo que menciona el Acta de Misión, las demandadas concluyen su contestación a la demanda de arbitraje solicitando :

1. « Se declare la nulidad del artículo 18 del Contrato que prevé el arreglo de las controversias por árbitros, por ser contrario al artículo 48 de la Constitución de la República Dominicana y al artículo 1004 del Código de Procedimiento Civil y al artículo 6 del Código Civil.

2. Se pronuncie la incompetencia de la Corte Internacional de Arbitraje de la CCI por ser contraria a la Ley 50-00 del 12 de julio de 2000, en cumplimiento de los artículos 2 y 3 de la Ley 834-78 del 15 de julio de 1978, que atribuyen competencia para conocer cualquier controversia que pueda derivar de los contratos entre la parte demandante y los demandados a la Cámara Civil y Comercial del Juzgado de Primera Instancia del Distrito Nacional ».

**9 -** Conforme a lo que menciona el Acta de Misión, la República Dominicana considera que :

1. es nulo el artículo 18 del Contrato que prevé el arreglo de las controversias por un Tribunal Arbitral porque, « viola el artículo 1004 del Código de Procedimiento Civil de la República Dominicana » ;

2. es incompetente el Tribunal Arbitral para conocer de las controversias derivadas del Contrato porque « sólo pueden ser apoderados los tribunales de la República Dominicana, únicos competentes, porque esos contratos están regidos por las leyes de la República Dominicana ».

**10 -** Las Demandadas consideran que el artículo 18 del Contrato viola el artículo 1004 del Código de Procedimiento Civil de la República Dominicana, el cual expresa que « no pueden establecerse compromisos (arbitrales), ... sobre las causas que conciernen al orden público, al Estado, a los bienes nacionales, a los municipios, establecimientos públicos... ». Indican las Demandadas que « dicha disposición legal constituye un texto de órden público que no puede ser derogado por convenciones entre particulares y cuya redacción es típica del Derecho Dominicano en el sentido de que el mismo no figuró con esas especificaciones en el Código de Procedimiento Civil de la República Francesa y dicho texto nunca ha sido objeto de modificación de la República Dominicana » (carta de las demandadas del 26 de enero de 2003). Explican que el artículo 18 del Contrato es nulo al contravenir el ordenamiento jurídico dominicano, que atribuye una competencia imperativa a los tribunales de la República Dominicana para conocer de las controversias derivadas de los contratos firmados por el Estado o establecimientos públicos.

En un escrito de fecha 4 de julio de 2003, las Demandadas añaden que el legislador dominicano ha permitido al Estado Dominicano ir a un procedimiento arbitral unicamente cuando éste se desarrolla «por ante las Cámaras de Comercio y Producción dentro del ámbito de la República dominicana conforme con la ley 50-87 del 4 de junio de 1987 « (artículo 15, párrafo 1 ) .

**11 -** Recuerdan las Demandadas que la referencia a las leyes de la República Dominicana se encuentra de manera expresa en el artículo 17 del Contrato : *« Este acuerdo está redactado y será interpretado bajo las leyes de la República Dominicana sin tomar en consideración los principios de conflictos de leyes ».*

**12 -** Las Demandadas concluyen indicando que el artículo 1004 del Código de Procedimiento Civil es de orden público y que, conforme al artículo 48 de la Constitución de la República Dominicana y al artículo 6 del Código Civil , no puede ser derogado por convenciones entre particulares.

13 - Respecto de la posibilidad de oponer la excepción de incompetencia del Tribunal Arbitral, a pesar de haberse negado a depositar la provisión anticipada para gastos del arbitraje (« la provisión » ), las demandadas consideran que nada se opone a que puedan oponer dicha excepción. Al expresar su punto de vista al respecto en el Acta de Misión, las demandadas : « *Consideran que el hecho de que [CPB] haya anticipado el pago de la totalidad de la provisión en sustitución del Estado Dominicano y de la Corporación Dominicana de Empresas Eléctricas Estatales (CDEEE) no significa que se le sancione con la exclusión, ya que al avanzar los gastos del proceso la única consecuencia resultante es el derecho al reembolso de los fondos, en base al artículo 30 inciso 3 del Reglamento y no a considerar como retiradas las demandas, defensas y contrademandas presentadas por el Estado Dominicano y la Corporación... »*

********

### Posición de la CPB

14 - En una carta con fecha del 15 de mayo de 2003, la CPB indicó que se remitía, para explicar su posición sobre el tema, a una carta previa del 7 de marzo de 2003 y a la demanda de arbitraje. En dicha carta, la CPB recordó que ella había pagado la parte de la provisión para gastos del arbitraje que le correspondía haber pagado a las Demandadas, conforme a la invitación que les fuera cursada por la Secretaría de la Corte Internacional de Arbitraje el 6 de septiembre de 2002.

15 - La CPB considera, en consecuencia, lo siguiente :

« Que en razón de que las previsiones del artículo 1 (3) del Apéndice III de las Reglas de Arbitraje de la ICC establecen que « una vez firmada o aprobada por la Corte el Acta de Misión y establecido el calendario provisional, el Tribunal Arbitral, de acuerdo con lo dispuesto en el artículo 30(4), solo continuará el proceso en relación con las demandas principales o reconvencionales para las cuales haya sido pagada la totalidad de la provisión», y ante la reticencia de la parte demandada de cumplir con el pago de la proporción de los costos que le corresponden con ocasión de este proceso, la parte demandante se vió forzada a cubrir dichos costos, a los fines de que fuera posible la continuación del proceso que nos ocupa

8

conforme lo establece la precitada disposición reglamentaria ».

« Que no obstante lo anterior, de conformidad con las provisiones del Artículo 30 (4)  del Reglamento de Arbitraje de la CCI relativo a los Avances para Cubrir el Costo del proceso Arbitral, en caso de que un requerimiento de pago de los costos del procedimiento arbitral no haya sido obtemperado dentro del plazo otorgado a dichos fines, las demandas y contrademandas relevantes, serán consideradas como retiradas ; por lo que en base a la referida disposición, y el incumplimiento de las demandadas de cubrir los costos que le corresponden con ocasión de dicho proceso, las defensas y contra-demandas presentadas por las mismas deberán ser consideradas como retiradas y no deben incluirse en los Términos de Referencia de este proceso Arbitral sometido a la revisión de las partes en fecha quince (15) de febrero del año dos mil tres (2003), entendiéndose que es obvia la intención de las Reglas de la CCI en cuanto a que no tiene derecho a presentar reclamos frente a la jurisdicción arbitral, quien no cumple con sus obligaciones de pago frente a la misma. »

« Que CPB debe reiterar a este Tribunal que el pago de los costos del proceso correspondiente a las demandadas, ha sido cubierto por CPB con la única intención de que dicho proceso pueda ser concluido de conformidad con las Reglas de Arbitraje aplicables y protegiendo los honorarios y gastos administrativos de los Arbitros y del Tribunal con relación al referido proceso, pero jamás con el propósito de cubrir el incumplimiento de la obligación de pago de las demandadas, sobre todo cuando dichas demandadas, luego de consentir válidamente una cláusula compromisoria, deniegan de ella a los fines de evadir su responsabilidad con ocasión de su incumplimiento bajo el contrato objeto de la demanda ».

16 - La CPB considera, en resumen, que conforme al artículo 30 (4) del Reglamento y al artículo 1 (3) de su Apéndice III, titulado « Costos del arbitraje y honorarios »,  la parte que no paga la parte de la provisión que le corresponde, no puede pesentar « defensas y contrademandas ».

17 - Con respecto a la validez de fondo de la excepción de incompetencia, se entiende a partir de la remisión a la demanda de arbitraje, que la CPB

solicita la aplicación de la cláusula 18 del Contrato que prevé el arreglo de las controversias por vía de arbitraje, conforme al Reglamento de Arbitraje de la CCI.

\*\*\*\*\*\*\*\*

## DECISIÓN DEL TRIBUNAL ARBITRAL

### Temas a resolver en este laudo parcial

**18 -** Frente a las posiciones respectivas de las partes, el Tribunal Arbitral debe resolver los puntos litigiosos siguientes :
  - Si debe admitirse la excepción de incompetencia del Tribunal Arbitral presentada por las Demandadas, a pesar de que éstas omitieron abonar la provisión fijada por el Secretario General conforme al artículo 30(1) del Reglamento de la CCI.
  - Si es válida la cláusula de arbitraje o bien si debe hacerse lugar a la excepción de incompetencia del Tribunal Arbitral presentada por las demandadas.



**19 -** Al firmar una cláusula compromisoria una parte se obliga a cumplir con todas las tareas inherentes a un procedimiento arbitral. Entre ellas figura la obligación de pagar los costos y gastos pedidos por la institución que organiza el arbitraje y que ha sido elegida de común acuerdo. Conforme a lo dispuesto por el artículo 30(2) del Reglamento, al comenzar el arbitraje, la Corte fija una provisión para gastos en un monto suficiente para cubrir los honorarios y gastos de los árbitros, incluyendo los gastos administrativos de la CCI.  En su sesión del 15 de noviembre de 2001, la

Corte fijó la provisión para gastos del arbitraje en un monto de $ 184,000.00 (sin perjuicio de reajustes ulteriores).

**20 -** La provisión fijada por la Corte debe ser pagada en partes iguales, a menos que se formulen una o varias demandas reconvencionales, « en cuyo caso la Corte puede fijar provisiones separadas para la demanda principal y para la demanda o demandas reconvencionales. » No ha sido este el caso que se presenta en esta etapa del procedimiento arbitral, porque las Demandadas no han presentado demandas reconvencionales con una evaluación de su monto , antes de que la Corte decida el importe de la provisión , lo que pueden hacer si así lo consideran apropiado en una etapa ulterior del procedimiento. La Corte invitó a las partes a sufragar la provisión de gastos por partes iguales. La Demandante pagó lo que correspondía. Las Demandadas, empero, no cumplieron con esta obligación.

**21 -** A fin de evitar que el procedimiento sea paralizado por la falta de pago de la proporción de la provisión para gastos que le corresponde a uno de los litigantes, el Reglamento de Arbitraje prevé una excepción al principio de la división del pago de la provisión en partes iguales entre demandante y demandadas. Así, la segunda oración del artículo 30(3) del Reglamento expresa que « *cualquiera de las partes podrá pagar la totalidad de la provisión que corresponda a una demanda principal o reconvencional si la otra parte no hace el pago que le incumbe* ». Conforme a ese texto, la Secretaría invitó a la Demandante a substituir a las Demandadas en el pago de su porción de la provisión para gastos. El 26 de febrero de 2003, la Secretaría acusó recibo del pago total de la provisión efectuado por la parte Demandante en sustitución de las partes Demandadas.

**22 -** Las consecuencias de la falta de pago de la correspondiente porción de la próvision sobre los derechos de las partes son diferentes en función de la naturaleza de la provisión fijada por la Corte Internacional de Arbitraje. Cuando la Corte ha decidido fijar provisiones separadas para la demanda principal y para la demanda o las demandas reconvencionales, tal como lo prevé el artículo 30 (2) *in fine* del Reglamento, « cada parte deberá pagar la provisión correspondiente a sus demandas » (Reglamento, artículo 30.3).

12

**23 -** En este supuesto la sanción por falta de pago se indica en el artículo 30.4 del Reglamento: «*Cuando no se ha satisfecho una solicitud de provisión para gastos de arbitraje, el Secretario General puede, previa consulta al Tribunal Arbitral, indicar a éste que suspenda sus actividades y fijar un plazo que no puede ser inferior a 15 días, al vencimiento del cual la correspondiente demanda principal o reconvencional se considerará retirada.* »

**24 -** Hay que recordar que la Corte, en cualquier momento del arbitraje , podrá decidir un reajuste del monto de la provisión, tal como lo prevé el artículo 30 (2) del Reglamento y fijar, de oficio o a pedido de una de las partes,  provisiones para gastos del arbitraje separadas. El monto de las provisiones separadas se funda en la estimación que las propias partes hacen del monto de sus demandas. Si las demandas son presentadas sin evaluación, la Corte les atribuye un valor que permite la aplicación del arancel conforme a las pautas del artículo 4 del Apéndice III del Reglamento de arbitraje de la CCI.

**25 -** Pero cuando la Corte no ha decidido fijar provisiones separadas, la sanción prevista en el artículo 30.4 del Reglamento no se aplica. En un caso como el presente, la falta de pago de la provisión correspondiente a las Demandadas no priva a éstas del derecho de defenderse.
Además ni el Artículo 6(2), ni ninguna otra norma del Reglamento de Arbitraje subordina la admisibilidad de las objeciones de una parte respecto de la validez del acuerdo de arbitraje al pago por dicha parte de su porción de la provisión para gastos del arbitraje.
En conclusión, la sustitución de las Demandadas por la CPB en el pago de la provisión para gastos no priva a las Demandadas de su derecho a ser escuchadas y plantear sus defensas. Por lo tanto, la excepción de incompetencia es admisible.

********

Conviene examinar a continuación si la excepción de incompetencia está justificada.

********

13

## DETERMINACIÓN DEL DERECHO APLICABLE
## AL CONVENIO DE ARBITRAJE

**26 -** Una excepción está justificada si es conforme al derecho. Esto implica la determinación previa del derecho aplicable al convenio de arbitraje.

**27 -** Las demandadas se refieren al derecho de la República Dominicana (Constitución, Código de Procedimiento Civil, Código Civil) explicando que el artículo 17 del Contrato menciona que « este acuerdo está redactado y será interpretado bajo las leyes de la República Dominicana sin tomar en consideración los principios de conflictos de leyes ». Como lo indica el mismo texto de la cláusula, la elección de la ley dominicana tiene por objeto el « acuerdo », es decir, el Contrato. La elección de la ley , hecha en el artículo 17 del Contrato, no se extiende a la cláusula compromisoria ni al procedimiento arbitral.

**28 -** El artículo 18 (4) del Contrato prevé también que « cualquier tribunal de arbitraje que se constituya según este Acuerdo deberá aplicar las leyes de la República Dominicana y los principios generalmente aceptados del derecho internacional ». Dicha mención se refiere a las leyes y principios que el Tribunal Arbitral debe aplicar para arreglar una eventual controversia. Sería contradictorio con el artículo 18 (1), que prevé que cualquier disputa será « resuelta de conformidad con las reglas de arbitraje establecidas por la Cámara de Comercio Internacional en vigor en París », si se interpreta en el sentido de que las leyes dominicanas son aplicables al convenio arbitral que expresa el acuerdo de las partes para someter posibles controversias futuras a la decisión de árbitros, o al procedimiento arbitral, que organiza y regula las etapas y los actos necesarios a un enjuiciamiento válido de esas mismas controversias .

**29 -** En consecuencia , se tiene que constatar que las Partes contratantes no designaron de común acuerdo la ley aplicable al convenio de arbitraje . El Tribunal Arbitral ha de determinarla a partir de otros elementos acordados por dichas Partes.

La ley aplicable a un convenio de arbitraje , al igual que la ley que rige un acuerdo de voluntades o un contrato en general , es determinada en casi todos los sistemas jurídicos por la ley de autonomía ( convenio de Méjico del 17 de marzo de 1994 , convenio de Roma del 19 de junio de 1980 , jurisprudencia norteamericana ...) . Es decir que es la propia voluntad de las partes que decide  de modo autónomo cual será el derecho que regirá el contrato .

Por ejemplo , el Artículo 7 de la Convención interamericana sobre derecho aplicable a los contratos internacionales (convenio de Méjico o CIDIP V) del 17 de marzo de 1994 prevé que « el contrato se rige por el  derecho elegido por las partes». La misma regla de conflicto está presente en el convenio de Roma .

En ausencia de acuerdo expreso , se suele determinar la ley aplicable a partir de las cláusulas contractuales y de la conducta de las partes . En caso de ineficacia de tal determinación , se localiza el contrato en el sistema jurídico con el cual tiene vínculos más estrechos .

Los criterios que permiten esa localización son diversos y numerosos . Varían de un país a otro y , en el mismo país , de una época a otra . Claro es que el peso que se puede dar a un elemento es función de la naturaleza del contrato o del objeto del acuerdo de voluntades .

**30 -** En el presente caso , el objeto del acuerdo de voluntades es el arreglo de controversias por vía de arbitraje . Un elemento  importante en un convenio arbitral , con efectos prácticos mayores , como será indicado más adelante (véase No 31 ) es la sede o el lugar del arbitraje cuando las partes se pusieron de acuerdo sobre ese sitio .

La mención de la sede del arbitraje figura en el artículo 18 del Contrato, inciso 2, el cual nunca ha sido criticado por las Demandadas. Expresa además un acuerdo de todas las Partes del Contrato sobre un lugar neutro. Se supone que ni la República Dominicana ni la Corporación habrían aceptado al momento de firmar el Contrato, un Tribunal ubicado en las Islas Caymán. Tampoco CPB habría aceptado la competencia de un Tribunal dominicano. Se puede por lo tanto deducir que París ha sido elegido como sede del arbitraje porque era un lugar neutro.

Por lo tanto ,  entre las leyes que posiblemente podrían ser aplicadas al convenio arbitral , se ha de descartar tanto la ley de las Islas Caymán como la ley de la República Dominicana . En principio , el derecho que rige un

convenio arbitral puede ser diferente de la ley de procedimiento. En el presente caso , no existen elementos que permitan inferir que las Partes tuvieron la intención de aplicar otra ley que no sea el derecho vigente en la sede del arbitraje . Como las partes acordaron inequívocamente que ese lugar sea París , este Tribunal Arbitral , en consecuencia , decide aplicar el derecho francés al convenio de arbitraje .

Es de destacar igualmente el hecho de que las leyes francesas, incluyendo las reglas de procedimientos, son próximas da las leyes en vigor en la República Dominicana, que arrancan de la Escuela Francesa de Derecho. Para una mejor claridad el Tribunal Arbitral indica que no hace aplicación del derecho francés en vigor para los arbitrajes internos, sino que aplicará el derecho creado por la Corte de Casación para una aplicación específica a los arbitrajes internacionales . Se indicará más adelante que es un derecho material internacional sin relación con leyes estatales.

31 -La aplicación del derecho francés del arbitraje internacional se justifica además porque es la ley del país en donde el laudo será dictado y esa ley será también la ley de referencia para apreciar la capacidad de las Partes o la validez del acuerdo arbitral, conforme al artículo V, 1, (a), de la Convención de Nueva York del 10 de junio de 1958 sobre reconocimiento y ejecución de laudos extranjeros , en vigor en la República Dominicana desde el 10 de julio de 2002.

Además, en caso de recurso jurisdiccional para anular el futuro laudo, la Corte de Apelación de París será la jurisdicción competente conforme al artículo 1505 del Nuevo Código de Procedimiento Civil francés que declara competente la Corte de Apelación del territorio en donde se ha dictado el laudo .

## SOLUCIONES DEl DERECHO FRANCÉS FRENTE A LA FIRMA POR UNA ENTIDAD PÚBLICA DE UNA CLÁUSULA COMPROMISORIA

32 - El derecho francés del arbitraje internacional ha sido enfrentado varias veces y desde hace más de cuarenta años a situaciones similares a la del caso presente. Es decir, a casos donde un Estado contrae con una empresa extranjera para que ella le sustituya, parcial o completamente, en la realización de una misión de servicio público, como la producción o

16

distribución de electricidad a la población del Estado en condiciones que incluyen una cláusula compromisoria. Así lo hizo el Ministro francés de la Marina Comercial en 1940.

**33 -** Años después, el Estado francés quiso oponerse a la ejecución del Laudo arbitral manifestando la invalidez de la cláusula compromisoria por ser contraria al artículo 1004 del Código de Procedimiento Civil, en vigor en dicha época, que al igual que el artículo de número idéntico del Código de Procedimiento Civil Dominicano, prohíbe que el Estado sea parte de un procedimiento arbitral.

La Corte de Apelación de París decidió, en una sentencia con fecha del 10 de abril de 1957, Sociedad Myrtoon Steam Ship contra Agent Judiciaire du Trésor, que el Estado estaba obligado por la cláusula y validó el laudo con los motivos siguientes:

« Considerando que el Agente Judicial del Tesoro funda la nulidad del Laudo en la prohibición del Estado para celebrar cláusulas compromisorias ;
Pero considerando que la prohibición está restringida a los contratos domésticos y no se aplica a los contratos que tienen un carácter internacional;
que, en efecto, resulta de los mismos términos del artículo 1004 del Código de Procedimiento Civil, como de su comparación con el artículo 83 del mismo Código, que la prohibición de las entidades públicas de pactar cláusulas arbitrales tiene como único fundamento proteger al Estado ante los tribunales franceses, a efecto de la intervención del Ministerio Público en los expedientes que les conciernen ;
Considerando , además , que el Estado puede válida y anticipadamente renunciar a la inmunidad de la cual goza, aceptando la competencia de tribunales extranjeros y, por consecuencia , abdicando de la protección que puede otorgarle la intervención del Ministerio Público francés… »

**34 -** El texto original francés de la sentencia de la Corte de Apelación de París es el siguiente :
« Considérant que l'Agent judiciaire du Trésor fonde la nullité de la sentence sur l'interdiction faite à l'Etat de compromettre ;

Mais considérant que la prohibition est limitée aux contrats d'ordre interne et est sans application pour les conventions ayant un caractère international;

qu'en effet, il résulte des termes mêmes de l'article 1004 du Code de procédure Civile, comme de sa confrontation avec l'article 83 du même code, que l'interdiction de compromettre faite aux collectivités publiques a pour seul fondement la protection spéciale dont elles bénéficient auprès des juridictions françaises par suite de la communication des causes qui les concernent au ministère public;

Or, considérant que l'Etat peut valablement et à l'avance renoncer à l'inmunité dont il jouit en acceptant la compétence des juridictions étrangères et par conséquent abandonner ainsi la protection du Ministère Public français… ».

**35 -** Está claro que la comunicación al Ministerio Público de los expedientes en los cuales el Estado o una entidad pública francesa es parte es específica del procedimiento francés. Sin embargo, la referencia a la posibilidad para los Estados de renunciar válidamente y con anticipación a la inmunidad de jurisdicción vale para todos los Estados. Lo que hizo la República Dominicana en el artículo 19 del Contrato.

Además, la firma por la República Dominicana, el 20 de marzo del año 2000, del Convenio de Washington del 18 de marzo de 1965 sobre el arreglo de diferencias relativas a inversiones entre Estados y Nacionales de otros Estados, demuestra que la renuncia en adelante a la inmunidad de jurisdicción, dentro de un sistema de arbitraje obligatorio, ha sido interpretada como una situación conforme al orden jurídico nacional.

**36 -** Más recientemente, en 1991, la Corte de Apelación de París decidió que una cláusula compromisoria firmada por una sociedad estatal de la República islámica de Irán era válida a pesar de la ausencia de autorización por el parlamento iraní exigida por el artículo 139 de la Constitución de la República de Irán. El motivo dado en la sentencia era que la cláusula de arbitraje contenida en un contrato concluido según los usos del comercio internacional es conforme al orden público internacional (Sentencia Sociedad Gatoil contra National Iranian Oil Company, del 17 de diciembre de 1991).

**37** - El contrato de compraventa de electricidad, concluido el 17 de marzo de 1998 entre el Estado Dominicano y la Corporación , por una parte, y la CPB por otra parte, es un contrato convenido entre partes establecidas en diferentes Estados, es por lo tanto un contrato internacional.

Además , es un contrato comercial porque el Estado y la Corporación no consumen ellos mismos la electricidad que compran sino que la venden a la población y la compraventa de energía entre personas que no actúan por un interés privado está generalmente considerada como una actividad mercantil por su propia naturaleaza . Por la tanto , la presencia de un elemento de internacionalidad quita una posible duda que el contrato tenga un carácter civil . Por no ser ni un contrato de consumo ni un contrato civil , el contrato convenido entre la CPB y las Demandadas es un contrato del comercio internacional . Así lo calificaron las mismas partes al mencionar en el párrafo 19 a) del contrato que « este **ACUERDO** constituye actos privados y comerciales». La presencia de cláusulas compromisorias en tales contratos es algo común , en todas circunstancias conforme a los usos y prácticas del comercio internacional.

**38** - La jurisprudencia de la Corte de Apelación de París ha sido confirmada en 1993, a propósito de una cláusula firmada por un municipio de Libia, por la Corte Suprema francesa (Cour de Cassation). La parte demandada de Libia alegaba la nulidad del convenio de arbitraje por ser contrario a la ley de Libia elegida por las partes como ley del contrato.

La Corte de Casación sostuvo lo siguiente :

« En virtud de una regla material del derecho internacional del arbitraje, la cláusula compromisoria es independiente jurídicamente del contrato principal que la contiene directamente o por referencia y su existencia y eficacia se aprecian, con reserva de las reglas imperativas del derecho francés y del orden público internacional, según la voluntad común de las Partes sin que sea necesario referirse a una ley estatal ».

**39** - El texto francés de la sentencia de la Corte de Casación es el siguiente :

« Mais attendu qu'en vertu d'une règle matérielle du droit international de l'arbitrage, la clause compromissoire est indépendante juridiquement du contrat principal qui la contient directement ou par référence et que son existence et son efficacité s'apprécient, sous réserve des règles

19

impératives du droit français et de l'ordre public international, d'après la commune volonté des parties, sans qu'il soit necessaire de se référer à une loi étatique » (Cour de Cassation, 1° Sala en lo Civil, 20 de diciembre de 1993, Comité Populaire de la Municipalité de Khoms El Mergel contra Sociedad Dalico Contractors).

**40 -** En dicho caso, la Corte de Casación consideró que la Corte de Apelación había analizado correctamente los documentos del expediente y había, de modo soberano, demostrado la « común intención de las Partes de someterse a la cláusula litigiosa ».

Hay que destacar que , en la regla material de derecho del arbitraje que enunció la Corte de Casación , ese tribunal supremo  excluye que la voluntad expresada por las Partes sea corregida por una ley de un Estado, bien sea la ley del contrato, o sea la ley que rige la capacidad de una parte. Además , para un Estado , no se puede hablar de «capacidad» que sería regida por la Constitución nacional , al igual que el estatuto personal de los individuos es regido por su ley personal , sea la ley de su  nacionalidad , sea la ley de su domicilio . Afirmar lo contrario sería admitir que un Estado podría ser incapaz y estar protegido por una clase de tutela . El principio de la soberanía de los Estados se opone a tal análisis .Los Estados , en las relaciones internacionales , tienen el poder de suscribir los compromisos que deseen . Otro problema sería la sanción de un acto realizado por una autoridad pública en contra de los poderes que le otorgan la constitución o las leyes que organizan el Estado . Tal sanción pertenece a los organismos previstos por la constitución . Este Tribunal  Arbitral ha de considerar el acto como válido.

**41 -** La sentencia del 20 de diciembre de 1993 expresa  la  posición de la jurisprudencia francesa sobre un punto litigioso semejante al del presente caso. Dicha posición fue adoptada al menos cuatro años antes de la conclusión del « Acuerdo de Compra de Energía ». Las Demandadas no pueden considerar que el Tribunal Arbitral aplica un derecho nuevo ya que ambas partes podían informarse del contenido del derecho francés del arbitraje internacional cuya aplicación es la consecuencia de la libre elección de París como sede del arbitraje.

## CONSENTIMIENTO DE LAS PARTES PARA SOMETER LA PRESENTE CONTROVERSIA AL ARBITRAJE

**42 -** Hay que examinar a continuación si existe entre las partes una voluntad común de someterse al procedimiento arbitral de la CCI.

**43 -** El texto del artículo 18 (1) del Contrato , reproducido en el párrafo 6 del presente Laudo , es claro en este sentido al igual que la renuncia « a cualquier derecho de inmunidad soberana u otra inmunidad » mencionada en el artículo 19 (c).

Además , se nota que el Estado dominicano tomó varias salvaguardias a fin de verificar su facultad para someter esta controversia al arbitraje y proteger su consentimiento en favor de la validez del contrato :

la intervención de un notario público de la República Dominicana, la licenciada Georgina Thomas, quien certificó que los representantes de las partes comparecieron libre y voluntariamente.

Una carta de intención con fecha del 19 de noviembre, por lo tanto cuatro meses anterior al Contrato, escrita en papel con membrete de la Corporación Dominicana de Electricidad, firmada por ambas partes.

Un poder especial del Presidente de la República al Secretario de Estado, Administrador General de la Corporación Dominicana de Electricidad, con fecha del 29 de noviembre de 1997.

La carta de transmisión, con fecha del 1 de diciembre de 1997, de dicho poder especial al Administrador General de la Corporación por el Consultor Jurídico del Poder Ejecutivo.

Un poder especial, con fecha del 17 de marzo de 1998, del Presidente de la República al Secretario de Estado, Administrador General de la Corporación Dominicana de Electricidad, para que concluya el Acuerdo de Compra Energía con la CPB.

Una carta de transmisión con fecha del 18 de marzo de dicho poder especial al Administrador General de la Corporación por el subconsultor jurídico del Poder Ejecutivo.

**44 -** El poder especial para suscribir un contrato de compra de energía con la CPB resume el contrato que debía ser firmado por el Secretario de Estado y menciona lo siguiente : « En el caso de cualquier disputa, controversia, reclamación o diferencia surgidas o en conexión con el Acuerdo, la parte afectada dará aviso por escrito de lo mismo a la otra Parte. Las Partes tratarán de resolver tal disputa de manera amigable. Si dentro de un mes después del aviso de una disputa, la misma no ha sido resuelta, sin importar su naturaleza, será referida a arbitraje y finalmente resuelta de conformidad con las reglas de arbitraje establecidas por la Cámara de Comercio Internacional en vigor en París, Francia, debiéndose aplicar las leyes de la República Dominicana y los principios generalmente aceptados del Derecho Internacional ».

**45 -** Dicho documento, interno de la Administración Dominicana, firmado por el Presidente de la República, preparado por los servicios de la consultoría jurídica del Poder Ejecutivo, transmitido por el subconsultor jurídico del Poder Ejecutivo , recibido por el Secretario de Estado, remitido a un notario público de la República Dominicana, demuestra que la firma de la cláusula compromisoria por el representante del Estado y de la Corporación no ha sido accidental. Al menos, los servicios de la consultoría jurídica del Poder Ejecutivo podían llamar la atención de los firmantes sobre el hecho de que el Acuerdo derogaba varias provisiones de la Constitución, del Código de procedimiento civil y del Código Civil.
En conclusión , el Tribunal Arbitral nota que , además de las precauciones tomadas por las partes para asegurarse que el Estado cumplía con la reglamentación administrativa en vigor , en el Artículo 12 .1.3 del Contrato se reconoció expresamente que el Estado « tiene el poder , autoridad y derecho legal total» para actuar como lo hizo .

# EL PRINCIPIO DE LA BUENA FE ES DE ORDEN PÚBLICO INTERNACIONAL

**46 -** Después de la firma de la cláusula, el deber de actuar de buena fe, que es un principio general del derecho del comercio internacional, mencionado por ejemplo en los Principios UNIDROIT sobre los contratos internacionales, impide que una Parte, aunque fuese un Estado, niegue posteriormente lo que ha firmado, alegando su falta de poder o de capacidad, engañando así al otro contratante.

**47 -** Así se decidió en el Laudo CCI N° 4381, dictado en 1986, a propósito de una cláusula arbitral acordada entre una sociedad estatal iraní y una sociedad privada francesa. La primera alegaba la nulidad de la cláusula por ser contraria al artículo 139 de la Constitución de la República Islámica de Irán. El Tribunal Arbitral compuesto de un coárbitro francés y otro iraní , y presidido por un jurista sueco, decidió lo siguiente :

« Considerando que ha sido reconocido en la jurisprudencia arbitral que el orden público internacional se oponía con fuerza al hecho de que un órgano estatal, contratando con personas extranjeras al país, pueda concluir abiertamente sabiéndolo o queriéndolo, un convenio arbitral

que pone el contratante en situación de confianza y pueda después, sea en el procedimineto arbitral, sea en el procedimiento de ejecución, prevalerse de la nulidad de su propia palabra y que (la demandada), en cuanto a su capacidad de sociedad estatal, falle claramente a la obligación de revelar las exigencias del derecho iraní relativas a la conclusión de contratos por personas públicas». Finalmente decidió que era « con buena fe» que (la demandante) dió su acuerdo a la cláusula arbitral y que se debía considerar la inaptitud (de la demandada) como sin efecto por ser contraria al orden público internacional cuya aplicación no podía ser excluida por el derecho iraní».

23

**48 -** En el presente caso, el Tribunal Arbitral decide que la República Dominicana y la Corporación no pueden, sin faltar a la obligación de actuar de buena fe, denegar la aplicación del acuerdo arbitral que ellas mismas han deliberadamente y libremente celebrado , con posterioridad a un estudio previo y disfrutando de todas las garantías que prevé la ley dominicana en cuanto a los poderes con que deben contar los funcionarios y otros apoderados que suscriben contratos en nombre del Estado .

**\*\*\*\*\*\*\*\***

El Tribunal Arbitral decide :

que la excepción de incompetencia presentada por el Estado y la Corporación es admisible ;

que dicha excepción de incompetencia no está jurídicamente justificada.

En consecuencia , se declara competente para decidir sobre la presente controversia.

Reserva su decisión sobre costos hasta el laudo final.

Sede del arbitraje : París,

19 de septiembre de 2003

Jean-Paul BERAUDO , Presidente

Alejandro M. GARRO

Luis Enrique BOTTARO LUPI

Coárbitro                    Coárbitro