# FOSTER EXHIBIT G



# CERTIFICATE
## OF ACCURACY

STATE OF NEW YORK )

                                    SS:

COUNTY OF KINGS )

This is to certify that the attached document:

**Award sentence from the International Court of Arbitration regarding
case number 11772/KGA (Cayman Power Barge I, Ltd v. 1. The State of
the Dominican Republic, 2. Corporacion Dominicana De Electricidad),
dated September 19, 2003**

is, to the best of my knowledge and belief, a true, complete, and accurate
translation from the Spanish language into the English language.

_____

Erik Rune

Sworn to and subscribed before me

this 8ᵘ day of _March_ 2007

_____

Notary Public

**VIGDIS ERIKSEN**
**Notary Public, State of New York**
**No. 01ER4805481**
**Qualified in Kings County**
**Commission Expires April 30, 20 /0**



[logo] ICC    International Chamber of Commerce

# AWARD
# SENTENCE

ICC International Court of Arbitration
[address and contact information provided in English]

INTERNATIONAL COURT OF ARBITRATION

CASE No. 11772/KGA

CAYMAN POWER BARGE I, LTD.
(Cayman Islands)

v.

1. THE STATE OF THE DOMINICAN REPUBLIC
(Dominican Republic)

2. CORPORACION DOMINICANA DE ELECTRICIDAD
(Dominican Republic)

This document is an original of the *Laudo Preliminar [Preliminary Arbitration Decision]* rendered in conformity with the Rules of the ICC International Court of Arbitration.

ICC 11772/KGA

## Preliminary Arbitration Decision
## on the Jurisdiction of the Arbitral Tribunal

Handed down by the Arbitral Tribunal made up of:

Jean-Paul BERAUDO, Chairman, appointed by the International Court of Arbitration;

Alejandro M. GARRO, coarbitrator, appointed by the claimant, confirmed by the International Court of Arbitration;

Luis Enrique BOTTARO-LUPI, coarbitrator, appointed by the International Court of Arbitration on behalf of the respondents.

Between:

CAYMAN POWER BARGE I, LTD., claimant,
c/o Midland Trust Corporation (Cayman) Ltd.
P.O. Box 1109, Mary Street, Grand Cayman
Cayman Islands

Represented by:
John C. Reynolds and Genevieve Marie Hartel, Esqs.
Jones, Walker, Waechter, Poitevent, Carrère & Denègre L.L.P
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
United States

Luis Miguel Pereyra, Esq.
PEREYRA & ASOCIADOS
Mustafa Kemal Ataturk No. 52, Ensanche Naco
Santo Domingo, National District
Dominican Republic

AND

THE STATE OF THE DOMINICAN REPUBLIC
The State of the Dominican Republic through its authorized representative
Corporación Dominicana de Electricidad, Edificio Principal

1

Avenida Independencia Esq. Fray Cipriano de Utrera, Centro de los Héroes
Santo Domingo, Dominican Republic

CORPORACION DOMINICANA DE ELECTRICIDAD and its legal successor, the
Corporación Dominicana de Empresas Eléctricas Estatales (CDEEE), respondents,
Edificio Principal, Avenida Independencia Esquina de Fray Cipriano de Utrera
Centro de los Héroes
Santo Domingo, Dominican Republic

Both represented by:
Práxedes Castillo Pérez and Américo Moreta Castillo, Esqs.
CASTILLO Y CASTILLO
Avenida Lope de Vega, edificio No. 4, Sector Naco
Santo Domingo, Dominican Republic

********

Preamble

1 – In an power purchase agreement signed on March 17, 1998, as amended on July 2,
1999 (hereinafter "Power Purchase Agreement" or simply the "Agreement"), the
company CAYMAN POWER BARGE ("CPB," "Seller" or "Claimant") agreed to sell to
the State of the DOMINICAN REPUBLIC (the "State"), represented by the
CORPORACION DOMINICANA DE ELECTRICIDAD ("CDE"), all the power
produced by a barge-mounted power plant ("Power Barge") and additional capacity. The
legal successor of CDE is Corporación Dominicana de Empresas Eléctricas Estatales
("CDEEE"), created by the General Law on Electricity No. 125-01 of the Dominican
Republic, dated July 26, 2001. The CDE and the CDEEE will be referred to jointly as the
"Corporation," while CDE, CDEEE and the Dominican State will be referred to jointly as
the "Respondents"…

2

2 – Pursuant to the clauses of the Agreement, the CPB constructed, installed and maintained the barge-mounted power plant, while CDE furnished CPB all the fuel required to produce the electricity.

3 – The Agreement stipulated a monthly payment for the electricity produced by the Power Barge. In the event of a late payment, "the amounts overdue will accumulate legal interest of one percent (1%) per month starting on the due date until the date on which payment is received by the vendor" (clause 10.5). To guarantee its payment obligation, the State agreed to maintain, extend, reinstate or reissue a Letter of Credit with a nominal value of US$ 2,044,912.50 (clause 11).

4 – Based on the alleged failure of the State to make payment and to reinstate the Letter of Credit, the CPB interrupted the production of electricity and departed from Dominican waters. In accordance with the terms of the letter received by the ICC on September 20, 2001, the CPB submitted an arbitration claim against the State and the CDE.

**Arbitration Clause and the Law Applicable to the Agreement**

5 – Article 17 of the Agreement, entitled "applicable law," stipulates that the Agreement "is written and shall be interpreted under the LAWS OF THE DOMINICAN REPUBLIC without regard for the principles of conflict of laws."

6 – Article 18 of the Agreement, entitled, "Arbitration," provides as follows:

"18.1 INTERNATIONAL ARBITRATION
In the event of any dispute, controversy, claim or disagreement(each a "Dispute") arising from or in connection with this AGREEMENT, the affected PARTY will communicate it in writing to the other PARTY. The PARTIES will attempt to resolve the Dispute amicably. If within one (1) month after the notice of a Dispute, it has not been resolved, at the request of any PARTY, the Dispute, regardless of its nature, will be referred to arbitration and finally resolved pursuant to the arbitration rules of the International Chamber of Commerce valid in Paris, France (the "ICC Rules").

3

18.2 The arbitration proceedings will be conducted in Paris, France.

18.3 The right of the PARTIES to request a resolution of a Dispute or a determination in a proceeding according to this AGREEMENT will not be affected by the fact that either one of the PARTIES received partial compensation on a conditional or absolute basis from any third party (be it an individual, a state, a government agency or an international organization) for any loss or damage subject to the dispute.

18.4 Any arbitral tribunal constituted pursuant to this AGREEMENT must apply the Laws of the Dominican Republic and the generally accepted principles of International Law.

18.5 Any arbitration under this Article will be conducted by a group made up of three arbitrators. No arbitrator will be admitted if he had any links or labor relations with either one of the PARTIES. The arbitration will be conducted in Spanish. The decision of the Arbitral Tribunal will be final and binding for the PARTIES. Each PARTY will be entitled to choose  one arbitrator, and the third will be designated according to the Rules of the International Chamber of Commerce in Paris, France (ICC).

18.6 The PARTIES will go to court and agree to submit to jurisdiction for arbitration or litigation, if necessary, to impose any arbitration award issued by the group of arbitrators under this Article. This choice of jurisdiction, which the PARTIES accept, will apply to any arbitration proceeding as well as to the decision or arbitration award rendered by the group of arbitrators.

18.7 The PARTIES agree that any arbitration or lawsuit may be paid with any property or assets of the PARTIES located anywhere.

18.8 The PARTIES will be liable only under this AGREEMENT. No shareholder, investor, employee, director, officer or representative of THE STATE or of THE SELLER will be personally liable or individually subject to liability of

4

any kind with respect to this AGREEMENT even if this is allowed by the laws that govern the domiciles of the PARTIES."

"18.9 Any decision reached must rule on the arrangements necessary for the solution of the Dispute or the termination of this AGREEMENT; it must have the vote of at least two of the arbitrators, and it will not be subject to appeal by the PARTIES. The cost of this arbitration must be allocated among the PARTIES, as specified in the Administrative Rules of the International Chamber of Commerce in Paris, France, at fifty percent (50%) for each PARTY."

7 – Article 19, entitled "Sovereign Immunity" stipulates the following:

a) "THE CORPORATION and THE STATE each unconditionally and irrevocably:
   agree that the signing, delivery and compliance by the respective party with this AGREEMENT constitute private and commercial acts, rather than public or government acts;
b) They agree that, if any proceeding is filed against THE STATE or its assets in any jurisdiction in connection with this AGREEMENT, it may not claim any sovereign or other immunity from such proceeding by or in the name of the party in connection with its assets;
c) They waive any sovereign immunity right or other immunity they may have or any held by any of their assets now or in the future in any jurisdiction; and
d) Generally agree with the imposition of any arbitration award or sentence against them in any proceeding or jurisdiction, and the granting of any relief in connection with such proceeding (including, without limitation, the establishment, imposition or execution against or in connection with property, regardless of its use or intended use)."

*********

5

## CONTENTION OF THE RESPONDENTS

8 – Basing its contention on the Constitution of the Dominican Republic, the provisions of its Civil Code and Code of Civil Procedure and related law, the Respondents allege that the State is prohibited from submitting to binding arbitration. Pursuant to the provisions of the Terms of Reference, the respondents conclude their answer to the arbitration claim requesting:

1. "That Article 18 of the Agreement be declared null and void, in that it provides for disputes to be settled by arbitrators, which is contrary to Article 48 of the Constitution of the Dominican Republic, Article 1004 of the Code of Civil Procedure and Article 6 of the Civil Code.

2. The ICC's International Court of Arbitration lacks jurisdiction because this is contrary to Law 50-00 of July 12, 2000, in fulfillment of Articles 2 and 3 of Law 834-78 of July 15, 1978, which attribute jurisdiction to hear any dispute that may arise from agreements between the respondent and the claimant to the Civil and Commercial Chamber of the Court of the First Instance in the National District."

9 – Pursuant to the provisions of the Terms of Reference, the Dominican Republic deems that:

1. Article 18 of the Agreement that provides for disputes to be settled by an Arbitral Tribunal is null and void because, "it violates Article 1004 of the Code of Civil Procedure of the Dominican Republic";

2. The Arbitral Tribunal lacks jurisdiction to hear disputes derived from the Agreement because "only the courts of the Dominican Republic may be empowered; only they have jurisdiction, because these agreements are governed by the laws of the Dominican Republic."

6

10 – The Respondents deem that Article 18 of the Agreement violates Article 1004 of the Code of Civil Procedure of the Dominican Republic, which states that "agreements to submit to arbitration may not be made… in cases that concern public policy, the State, national property, municipalities, public institutions…". The Respondents state that "said legal provision constitutes a text on public policy that is not susceptible to repeal by contractual agreements among private parties, and its wording is typical of Dominican Law in the sense that these requirements are not drawn from the French Code of Civil Procedure, and said text has never been subject to revision in the Dominican Republic." (letter from the Respondents on January 26, 2003). They explain that Article 18 of the Agreement is null and void as contrary to Dominican Law, which attributes mandatory jurisdiction to the courts of the Dominican Republic to hear disputes derived from agreements executed by the State or public institutions.

In a brief dated July 4, 2003, the Respondents add that Dominican Law has allowed the Dominican State to go to arbitration proceedings only when they are carried out "in Commercial and Business Chambers under the aegis of the Dominican Republic pursuant to Law 50-87 of June 4, 1987." (Article 15, Paragraph 1).

11 – The Respondents remind the Court that the reference to the Law of the Dominican Republic is expressly stated in Article 17 of the Agreement: "*This Agreement is drawn up and will be interpreted under the Law of the Dominican Republic without taking into consideration the principles of conflict of laws.*"

12 - The Respondents conclude stating that Article 1004 of the Code of Civil Procedure of the Dominican Republic is public policy and that, pursuant to Article 48 of the Constitution of the Dominican Republic and Article 6 of the Civil Code, it is not susceptible to repeal by contractual agreements among private parties.

7

13 – With respect to the possibility of asserting the defense that the Arbitral Tribunal lacks jurisdiction, in spite of their refusal to deposit a provisional advance for the costs of the arbitration (the "Provision"), the Respondents deem that there is nothing preventing them from asserting said defense. Upon expressing their point of view in this respect in the Terms of Reference, the Respondents: *"Deem that the fact that [CPB] paid an advance on costs in the full amount of the Provision, standing in for the Dominican State and the Corporación Dominicana de Empresas Eléctricas Estatales (CDEEE), does not mean sanctioning the Respondents with exclusion, since the only result of paying an advance on the costs of arbitration is the right to reimbursement of these amounts, based on Article 30, subsection 3 of the Rules. This does not entail deeming the claims, defenses and counterclaims filed by the Dominican State and the Corporation withdrawn…"*

********

## CPB's Contention

14 – In a letter dated May 15, 2003, the CPB stated that in order to explain its contention on the matter, it was referring to an earlier letter dated March 7, 2003, and the arbitration claim. The CPB reminded the Court that in said letter, it had paid the portion of the advance on costs payable by the Respondents, in conformity with the invitation sent to them by the Secretariat of the International Court of Arbitration on September 6, 2002.

15 – Therefore, the CPB states the following considerations:

"Because the provisions of Article 1 (3) of Appendix III of the ICC's Arbitration Rules establish that 'after the Terms of Reference have been signed or approved by the Court and the provisional timetable has been established, the Arbitral Tribunal will, in accordance with Article 30(4) of the Rules, proceed only with respect to those claims or counterclaims in regard to which the whole of the advance on costs has been paid.' Given the reluctance of the Respondents to comply with payment of its portion of the costs related to these proceedings, the Claimant deemed itself forced to cover said costs, for purposes of making it possible to continue the case at bar

8

pursuant to the aforementioned provision in the rules."

"Regardless of the foregoing, pursuant to the provisions of Article 30 (4) of the ICC's Arbitration Rules related to Advances to Cover the Costs of the Arbitration, in the event that a request to pay the costs of the arbitration proceedings has not been complied with during the period set for these purposes, the relevant claims and counterclaims will be deemed withdrawn. Therefore, based on the aforementioned provision and the Respondents' failure to cover its costs related to these proceedings, the defenses and counterclaims filed by the Respondents are deemed withdrawn, and must not be included in the Terms of Reference of these arbitration proceedings filed for review by the parties on February fifteenth (15th) of the year two thousand three (2003), with the understanding that the intention of the ICC rules is obvious, inasmuch as any party that does not meet its payment obligations related to arbitral jurisdiction does not have the right to file claims with the arbitral tribunal."

"CPB must repeat to this Tribunal that the payment of the costs of the proceedings payable by the Respondents was covered by CPB for the sole purpose that these proceedings could be concluded pursuant to the applicable Arbitration Rules, safeguarding the administrative fees and costs of the Arbitrators and the Tribunal related to the aforementioned proceedings, but never for the purpose of covering the Respondents' failed payment obligation, especially when said respondents, having validly consented to an arbitration clause [a clause containing an agreement to submit to arbitration], denied this in order to evade their liability on the occasion of their breach of contract that is the subject of the claim."

16 – In short, the CPB deems that, pursuant to Article 30 (4) of the Rules and Article 1 (3) of its Appendix III, entitled, "Arbitration Costs and Fees," any party that does not pay its portion of the related provision may not submit "defenses and counterclaims."

17 – Regarding the fundamental validity of the defense of lack of jurisdiction, it is understood that once the arbitration claim was filed, the CPB

requested the application of clause 18 of the Agreement, which provides for settlement of disputes through arbitration in conformity with the ICC's Arbitration Rules.

********

## DECISION OF THE ARBITRAL TRIBUNAL

### Matters to be Resolved in this Partial Decision

18 – Given the respective contentions of the parties, the Arbitral Tribunal must resolve the following matters in dispute:

- Whether the defense of lack of jurisdiction of the Arbitral Tribunal filed by the Respondents should be allowed, in spite of their failure to pay the provision set by the Secretary General pursuant to Article 30(1) of the ICC Rules.

- Whether the arbitration clause is valid, or whether it must allow the defense of lack of jurisdiction of the Arbitral Tribunal filed by the Respondents.

***********

19 – Upon signing the arbitration clause, a party agrees to comply with all the steps inherent in arbitration proceedings. Among these is the obligation to pay the costs and expenses requested by the institution that organizes the arbitration, which was chosen by mutual agreement. Pursuant to the provisions of Article 30(2) in the Rules, as soon as the arbitration begins, the Court will set a provision for costs in an amount sufficient to cover the fees and expenses of the arbitrators, including ICC administrative costs. In its meeting on November 15, 2001,

the Court set the provision for the cost of the arbitration at the amount of $184,000.00 (without prejudice to subsequent adjustments).

20 – The provision set by the Court must be paid in equal parts unless one or several counterclaims are filed, in which case "the Court may fix separate advances on costs for the claims and the counterclaims." This was not the case presented in this phase of the arbitration proceedings, because the Respondents have not filed counterclaims with a valuation of their amount, given which the Court may decide the amount of the provision, which it may do if it so deems suitable at a later stage in the proceedings. The Court requested that the parties pay the provisional advance in equal portions. The Claimant paid its portion. However, the Respondents did not comply with this obligation.

21 – In order to prevent the proceedings from coming to a standstill due to the failure of one of the litigants to pay its portion of the provisional advance, the Arbitration Rules provide an exception to the principle of dividing payment of the provision into equal parts between the claimant and the respondents. Thus, the second sentence of Article 30(3) of the Rules states that, "any party will be free to pay the whole of the advance on costs in respect of the principal claim or counterclaim should the other party fail to pay its share." In conformity with this text, the Secretariat invited the Claimant to stand in for the Respondents in the payment of the Respondents' portion of the advance on costs. On February 26, 2003, the Secretariat confirmed receipt of the payment in full of the advance on costs, effected by the Claimant standing in for the Respondents.

22 – The consequences of a party's failure to pay its portion of the provision on the party's rights vary depending on the nature of the provision set by the International Court of Arbitration. If the Court has decided to set separate provisions for the principal claim and counterclaim(s), such as was set forth at the end of the Rules, in Article 30 (2), "each of the parties will pay the advance on costs corresponding to its claims" (Rules, Article 30.3).12

23 – In this case, the sanction for failure to pay is indicated in Article 30.4 of the Rules: *"When a request for an advance on costs has not been complied with, and after consultation with the Arbitral Tribunal, the Secretary General may direct the Arbitral Tribunal to suspend its work and set a time limit, which must be not less than 15 days, on the expiry of which the relevant claims, or counterclaims, shall be considered as withdrawn."*

24 – It must be remembered that at any time in the arbitration, the Court may decide to adjust the amount of the provision, as is provided in Article 20 (2) of the Rules and set, ex officio or upon request of one of the parties, separate provisions for the costs of arbitration. The amount of the separate provisions is based on an estimate made by the parties themselves on the amount of their claims. If the claims are submitted without valuation, the Court attributes a value to them which allows application of an advance on costs in conformity with the guidelines in Article 4 of Appendix III of the ICC's Rules of Arbitration.

25 – But when the Court has not decided to set separate provisions, the sanction set forth in Article 30.4 of the Rules is not applicable. In a case such as this, the failure to pay the portion of the provision corresponding to the Respondents does not deprive them of the right to assert defenses.

Moreover, neither Article 6 (2) nor any other provision of the Rules of Arbitration subordinates the admissibility of the objections of one party with respect to the validity of the arbitration agreement to payment by said party of its portion of the provision for the costs of arbitration.

In conclusion, the fact that CPB stood in for the Respondents in payment of the advance on costs does not deprive the Respondents of their right to be heard and to assert their defenses. Therefore, the defense of lack of jurisdiction is admissible.

********

It would seem advisable to examine below whether the defense of lack of jurisdiction is justified.

********

## DETERMINATION OF THE LAW APPLICABLE
## TO THE ARBITRATION AGREEMENT

26 – A defense is justified if it is in conformity with the law. This entails a prior determination of the law applicable to the arbitration agreement.

27 – The Respondents refer to the Law of the Dominican Republic (Constitution, Code of Civil Procedure, Civil Code), explaining that Article 17 of the Agreement states that "this Agreement is written and shall be interpreted under the Laws of the Dominican Republic without regard for principles of conflict of laws." As the very text of this clause states, Dominican Law is chosen for the "Agreement," that is, the Contract. The choice of law, made in Article 17 of the Agreement, does not extend to the arbitration clause or to arbitration proceedings.

28 – Article 18 (4) of the Agreement also stipulates that "any arbitral tribunal constituted pursuant to this Agreement must apply the Laws of the Dominican Republic and the generally accepted principles of International Law." This statement refers to the laws and principles the Arbitral Tribunal must apply in order to settle any potential dispute. This would be contradictory with Article 18 (1), which provides that any dispute will be "resolved pursuant to the arbitration rules of the International Chamber of Commerce valid in Paris," if this were interpreted to mean that Dominican Law is applicable to the arbitration agreement in which the parties state their agreement to submit any possible future dispute to the decision of arbitrators, or arbitration proceedings, which organize and regulate the stages and acts required in a valid hearing of these same disputes.

29 – As a result, it must be confirmed that the contracting Parties did not designate, by mutual agreement, the law applicable to the arbitration agreement. The Arbitral Tribunal must therefore determine it based on other elements agreed upon by said Parties.

14

The law applicable to an arbitration agreement, like the law that governs a mutual agreement or a contract, in general, is determined in almost all legal systems by the principle of contractual freedom (Convention of Mexico of March 17, 1994, Convention of Rome of June 19, 1980, U.S. case law...) In other words, it is the very will of the parties that freely decides what Law will govern the contract.

For example, Article 7 of the Inter-American Convention on Law Applicable to International Contracts (Convention of Mexico or CIDIP V) of March 17, 1994, provides that "the contract shall be governed by the law chosen by the parties." The same rule on disputes appears in the Convention of Rome.

In the absence of an express agreement, it is customary to determine the applicable law based on contractual clauses and the conduct of the parties. In the event that such a determination is ineffective, the contract is localized in the legal system with which it has the closest ties.

Standards allowing such localization are diverse and numerous. They vary from one country to another, and in the same country, from one period to another. It is clear that the weight to be given to one element depends on the nature of the contract or the subject of the mutual agreement.

30 – In this case, the subject of the mutual agreement is the settlement of disputes through arbitration. An important element in an arbitration agreement, with larger practical implications, as will be shown further on (see No. 31), is the seat or location of the arbitration when the parties come to an agreement about said site.

The seat of the arbitration appears in Article 18 of this Agreement, subsection 2, which was never challenged by the Respondents. Furthermore, it states an agreement of all Parties to the Agreement on a neutral location.

It is assumed that neither the Dominican Republic nor the Corporation would have agreed to sign the Agreement at that time [if it had indicated] a Tribunal located in the Cayman Islands. Neither would CPB have accepted the jurisdiction of a Dominican court. Therefore, it can be deduced that Paris was chosen as the seat of the arbitration because it was a neutral location.

Therefore, among the laws that could possibly be applied to the arbitration agreement, the Court would have to rule out both the Law of the Cayman Islands as well as that of the Dominican Republic. In principle, the law that governs

an arbitration agreement may be different from the procedural law. In this case, there is no element that allows the Court to infer that the Parties had any intention of applying any other law than that in effect in the seat of the arbitration. As the parties unequivocally agreed that said location would be Paris, as a result, this Arbitral Tribunal has decided to apply French law to the arbitration agreement.

It is also worth noting that French Law, including procedural law, is close to that in effect in the Dominican Republic, which originated in the French legal tradition. For greater clarity, the Arbitral Tribunal states that it will not apply the law in effect for domestic arbitration in France, rather the law created by the French Court of Cassation for specific application to international arbitration. It will be stated further on that this is substantive international law unrelated to the laws of States.

31 – The application of French international arbitration law is also justified because it is the law of the country in which the decision will be handed down, and this law will also be the law of reference for understanding the capacity of the Parties or the validity of the arbitration agreement, pursuant to Article V, 1, (a) of the Convention of New York of June 10, 1958 on recognition and enforcement of foreign decisions, in effect in the Dominican Republic since July 10, 2002.

Furthermore, in the event of jurisdictional appeal to vacate the decision to be made, the Court of Appeals of Paris will be the competent jurisdiction pursuant to Article 1505 of the New French Code of Civil Procedure that gives jurisdiction to the Court of Appeals in the territory where the decision was handed down.

## SOLUTIONS OF FRENCH LAW REGARDING EXECUTION OF AN ARBITRATION CLAUSE BY A PUBLIC INSTITUTION

32 – From time to time over the past forty plus years, French law on international arbitration has had to deal with situations similar to this case. In other words, it has decided cases in which a State contracts with a foreign company for the company to replace it, completely or partially, in a public service mission, such as production

or distribution of electricity to the population of the State under conditions that may include an arbitration clause. The French Minister of the Merchant Marine did so in 1940.

33 – Years later, the French State wished to assert a defense to the enforcement of an Arbitration Decision, pointing out the invalidity of the arbitration clause as contrary to Article 1004 of the Code of Civil Procedure in effect at that time. Just like the article with the same number in the Dominican Code of Civil Procedure, the French article prohibits the State from being party to arbitration proceedings.

In a decision dated April 10, 1957, in the case Myrtoon Steamship v. Agent Judiciaire du Trésor, the Court of Appeals in Paris decided that the State was bound by the clause, and it validated the decision for the following reasons:

"Whereas the Treasury's Legal Representative bases the nullity of the Decision on the prohibition against the State executing arbitration clauses;

But whereas the prohibition is restricted to domestic contracts and is not applicable to contracts of an international nature;

and whereas, it is in fact derived from the same terms in Article 1004 in the Code of Civil Procedure, comparable to those in Article 83 in the same Code, and the prohibition against public institutions agreeing to arbitration clauses is solely based on protecting the State, in the French courts, for purposes of the involvement of the Attorney General's office in cases that concern them;

Whereas, furthermore, the State may validly waive immunity it has in advance, accepting the jurisdiction of foreign courts and therefore abdicating the protection that may be afforded it by the involvement of the Attorney General's office…"

34 – The original French text of the decision of the Court of Appeals in Paris is as follows:

[Original French version of Spanish translated into English above]

[Original French version of Spanish translated into English on page 16, continued]

35 – It is clear that sending notification to the Attorney General's office for cases in which the State or a French public institution is a party is specific to French procedural law. However, the reference to the possibility for States to validly waive immunity from jurisdiction, in advance, is in effect for all States. This is what the Dominican Republic did in Article 19 of the Agreement.

Moreover, the signing by the Dominican Republic on March 20, 2000, of the Convention of Washington of March 18, 1965, on the settlement of differences related to investments among States and the citizens of other States shows that an advance waiver of immunity from jurisdiction within a system of mandatory arbitration has been interpreted as a situation in conformity with a national legal system.

36 – More recently, in 1991, the Court of Appeals of Paris decided that an arbitration clause signed by a State Company in the Islamic Republic of Iran was valid in spite of the lack of authorization from the Iranian National Assembly required by Article 139 of the Constitution of the Republic of Iran. The reason given in the decision was that the arbitration clause contained in the contract executed in accordance with customary international commercial practice was in conformity with international public policy (Decision Société Gatoil v. National Iranian Oil Company on December 17, 1991).

37 – The electricity purchase agreement executed on March 17, 1998 between the Dominican State and the Corporation, for one party, and the CPB, for the other party, is an agreement entered into between parties organized in different states and is therefore an international contract.

Furthermore, it is a commercial contract because the State and the Corporation do not themselves consume the electricity they are buying but rather sell it to the public. The purchase and sale of power between persons that are not acting through a private interest is generally considered to be a commercial activity by its very nature. Therefore, the presence of an international element removes any question that the contract may be civil in nature. Since it is neither a consumer contract nor a civil contract, the contract executed between CPB and the Respondents is an international commercial contract. The parties themselves deemed it as such in stating in paragraph 19 (a) of the contract that "this **AGREEMENT** constitutes private, commercial acts." Arbitration clauses are common in contracts of this nature, under all circumstances in conformity with the customs and practices of international commerce.

38 – The precedent of the Court of Appeals of Paris was confirmed in 1993, with respect to a clause executed by a municipality of Libya, by the French Supreme Court (Court of Cassation). The Libyan respondent alleged that the arbitration agreement was null and void as being contrary to the Law of Libya, chosen by the parties as the law of the contract.

The Court of Cassation held as follows:

"By virtue of a substantive rule in international arbitration law, the arbitration clause is legally independent of the main contract that contains the clause, directly or by reference, and, without prejudice to the mandatory rules of French Law and international public policy, its existence and effectiveness can be seen to be in keeping with a mutual agreement of the Parties, without any need to refer to a State law."

39 – The French text of the decision of the Court of Cassation is as follows:
[Original French version of Spanish translated into English above]

[Original French version of Spanish translated into English on page 18, continued]
(Court of Cassation, First Civil Division, December 20, 1993, Comité Populaire de la Municipalité de Khoms El Mergel v. Sociedad Dalico Contractors).

40 – In that case, the Court of Cassation deemed that the Court of Appeals had correctly analyzed the case documents and had made an excellent demonstration of the "mutual intention of the Parties to submit to the arbitration clause."

It is worth pointing out that in the substantive arbitration rule handed down by the Court of Cassation, this supreme court rules out the will stated by the Parties being corrected by a State law, whether contract law, or the law that governs the capacity of one party. Moreover, for a State, one cannot speak of "capacity" that would be governed by a national Constitution, just as the law that governs individuals is personal law, whether it be national or local law. To state the contrary would be to allow that the State could lack capacity and be under the protection of some form of guardianship. The principle of sovereignty of States is opposed to such an analysis. In international relations, States have the power to sign any commitments they wish to sign. It would be another matter to sanction an act carried out by a public authority contrary to the powers granted to it by the Constitution or the laws issued by the State. Such a sanction belongs to agencies established by the constitution. This Arbitral Tribunal must deem the act as valid.

41 – The decision of December 20, 1993, states the position of French precedent on a litigation matter similar to that in this case. That position was adopted at least four years before the execution of the "Power Purchase Agreement." The Respondents may not conclude that the Arbitral Tribunal is applying a new law, since both parties may become informed on the content of French international arbitration law whose application is the result of the free choice of Paris as seat of the arbitration.

20

# CONSENT OF THE PARTIES TO SUBMIT THIS DISPUTE
# TO ARBITRATION

42 – The following is an examination of whether there is mutual agreement to submit to ICC arbitration proceedings.

43 – The text of Article 18 (1) of the Agreement, reproduced in paragraph 6 of this Decision, is clear in this regard, as is the waiver of "any sovereign immunity right or other immunity" stated in Article 19 (c).

Moreover, the Dominican State used several safeguards to confirm its authority to submit this dispute to arbitration and protect its consent to the validity of the Agreement:

The intercession of a public notary of the Dominican Republic, Georgina Thomas, who certified that the parties' representatives appeared freely and voluntarily.

A letter of intent dated November 19, thus four months prior to the Agreement, written on the letterhead of the Corporación Dominicana de Electricidad, signed by both parties.

A special power of attorney from the President of the Republic to the Secretary of State, General Manager of the Corporación Dominicana de Electricidad, dated November 29, 1997.

The cover letter, dated December 1, 1997, of said special power of attorney to the Chief Executive Officer of the Corporation through the Chief Counsel to the Executive Branch.

A special power of attorney dated March 17, 1998, from the President of the [Dominican] Republic to the Secretary of State, General Manager of the Corporación Dominicana de Electricidad, for him to execute the Power Purchase Agreement with the CPB.

A cover letter dated March 18 for said special power of attorney to the General Manager of the Corporation through the Assistant Chief Counsel to the Executive Branch.

44 – The special power of attorney to execute an agreement with the CPB to purchase power summarizes the contract that was to be signed by the Secretary of State and states the following: "In the event of any dispute, controversy, claim or difference that arises from or in connection with the Agreement, the injured Party will give the other Party written notice of the injury. The Parties will try to resolve the Dispute in an amicable way. If within one month of notice of the Dispute, the Dispute has not been resolved, regardless of its nature, it will be referred to arbitration and finally resolved in conformity with the arbitration rules established by the International Chamber of Commerce in effect in Paris, France. The applicable laws must be those of the Dominican Republic as well as generally accepted principles of international law.

45 – Said document, internal to the Dominican administration, signed by the President of the Republic, drawn up through the services of the Office of the Chief Counsel to the Executive Branch, transmitted by the Assistant Chief Counsel to the Executive Branch, received by the Secretary of State, and submitted to a public notary of the Dominican Republic, shows that the execution of the arbitration clause by the representative of the State and the Corporation was not accidental. At least, the services of the Office of the Chief Counsel to the Executive Branch could alert the signers to the fact that the Agreement repealed several provisions of the Constitution, the Code of Civil Procedure and the Civil Code.

In conclusion, the Arbitral Tribunal notes that, in addition to the precautions taken by the parties to assure that the State was in compliance with the administrative regulations in effect, in Article 12.1.3 of the Agreement, it is expressly acknowledged that the State "has the power, authority and full legal right" to act as it did.

## THE PRINCIPLE OF GOOD FAITH IS
## INTERNATIONAL PUBLIC POLICY

46 – After the execution of the clause, the duty to act in good faith, which is a general principle of international commercial law, referred to for example in the UNIDROIT Principles on international contracts, prevents one Party, even if it happens to be a State, from subsequently denying what it had signed, alleging its lack of power or capacity, thus deceiving the other contracting Party.

47 – It was so decided in ICC Decision No. 4381, handed down in 1986, with respect to an arbitration clause agreed upon between a State-owned Iranian company and a private French company. The Iranian company alleged that the clause was null and void as being contrary to Article 139 of the Constitution of the Islamic Republic of Iran. The Arbitral Tribunal, comprising French and Iranian coarbitrators and a Swedish chairman, decided as follows:
"Whereas it is recognized in arbitration precedent that international public policy is strongly opposed to a government body being able to contract with foreigners, openly and knowingly executing an arbitration clause or wishing to do so and placing the contractor in a position of trust, then, whether during the arbitration proceedings or during the performance of the contract, availing itself of the nullity of its own word, whereby, in its capacity as a state company, it clearly defaults on its obligation to disclose Iranian legal requirements related to the execution of contracts by public entities." Its final decision was that the claimant was 'in good faith' when it agreed to the arbitration clause, and that the respondent's lack of legal competency must be deemed without effect since it is contrary to international public policy, the application of which may not be excluded by Iranian Law."

48 – In the case at bar, the decision of the Arbitral Tribunal is that the Dominican Republic and the Corporation may not, without defaulting on their obligation to act in good faith, deny the application of the arbitration agreement that they, themselves, deliberately and freely entered into after prior study and enjoying all the guarantees set forth in Dominican Law regarding powers that must be accorded to officials and other attorneys in fact who execute contracts on behalf of the State.

********

The decision of the Arbitral Tribunal is:

that the defense of lack of jurisdiction submitted by the State and the Corporation is admissible;

that said defense of lack of jurisdiction is not legally justified.

Therefore, the Tribunal declares itself competent to decide on this dispute.

The Tribunal reserves its decision on costs until the final decision.

Seat of the arbitration: Paris
*September 19, 2003*

s/Jean-Paul BERAUDO, Chairman

s/Alejandro M. GARRO                    s/Luis Enrique BOTTARO LUPI

    Coarbitrator                            Coarbitrator