IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAYMAN POWER BARGE I, LTD.,<br><br>Applicant,<br><br>v.<br><br>THE STATE OF THE DOMINICAN REPUBLIC, and CORPORACIÓN DOMINICANA DE EMPRESAS ELÉCTRICAS ESTATALES (formerly known as CORPORACIÓN DOMINICANA DE ELECTRICIDAD),<br><br>Respondents. | Civil Action No. 1:06CV01362 (RMC) |

### DECLARATION OF GEORGE A. BERMANN

Pursuant to 28 U.S.C. §1746, I, GEORGE A. BERMANN, declare the following:

**I.    Professional Background**

1.    I am a Professor of Law at Columbia University School of Law, holding both the Walter Gellhorn Professorship of Law and the Jean Monnet Professorship of European Union Law. I have been a member of that faculty since 1975. At Columbia Law School, I teach and write extensively in the areas of Transnational Litigation, International Arbitration, Comparative Law, European and European Union Law, and WTO dispute Resolution. At Columbia, I have also taught Contracts and Administrative Law.

2.    In addition, I am a member of the visiting law faculties of the Universities of Paris (I and II) and the Institut des Sciences Politiques, in France, where I, each year, teach courses in transnational litigation and arbitration. I am also a member of the law faculty of the College d'Europe in Bruges, Belgium.

3. I am President of the International Academy of Comparative Law and past president of the American Society of Comparative Law. I am also co-editor-in-chief of the American Journal of Comparative Law.

4. I am the author of numerous books, including Party Autonomy: Constitutional and International Limits in Comparative Perspective (Juris Pub. 2004); Transnational Litigation and Arbitration (West Pub. 2003); Cases and Materials on European Union Law (West Pub. 2002); and Transatlantic Regulatory Co-operation (Oxford 2000). I am the author of numerous scholarly articles and contributions to scholarly edited books. I have lectured widely on matters of comparative law, European law and transnational litigation and arbitration.

5. I have been appointed special master to a U.S. judge on matters of foreign law, and I have served as an expert witness, on numerous occasions, to counsel and to courts in both the United States and Europe on matters of national European law, European Union law, comparative law, and private international law. In addition, I have frequently served as an international arbitrator in arbitrations within the framework of the International Court of Arbitration of the International Chamber of Commerce and of the American Arbitration Association, as well as in ad hoc arbitrations. I also commonly serve as advisor to counsel in international arbitrations and as expert witness in such arbitrations.

6. My curriculum vitae is attached hereto as Exhibit A.

II. **Background in this Case**

7. I understand that the present matter is an application by Cayman Power Barge I, Ltd. ("CPB"), a Cayman Islands company, against the Dominican Republic and Corporación Dominicana de Empresas Estatales ("CDEEE", and jointly the "Respondents"), a Dominican state-owned entity, to confirm an arbitral award rendered in France in CPB's favor. The Arbitral Tribunal rendering the award was established under the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce ("ICC").

8. In response to this action for confirmation of the award, the Respondents have filed a motion to dismiss. (In the event the Court does not dismiss CPB's application, Respondents ask the Court to vacate the award, deny confirmation of the award, or stay proceedings pending the outcome of court proceedings in the Dominican Republic.)

9. In support of their motion, Respondents assert in part that certain key provisions of the underlying Power Purchase Agreement (the "Agreement") violate the domestic law of the Dominican Republic. According to Respondents, these violations nullify the parties' agreement to arbitrate (the "Arbitration Clause") and destroy any legal basis for CPB to have initiated the arbitration proceedings or for the ICC to have rendered an award.

### III.    Issue to Be Addressed

10. I have been asked by counsel for CPB to address the question of whether the Dominican Republic and the State-owned CDEEE may avoid confirmation of the Award on the ground that the terms of the underlying Agreement – and in particular the agreement to arbitrate – are contrary to the domestic law of the Dominican Republic as State party to the Agreement.

11. For the purposes of this Declaration, I do not address the jurisprudence of the courts in the United States – including the U.S. courts' application of the Federal Arbitration Act and the 1958 United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), as such – since this aspect of the question is properly addressed by the parties' counsel. Rather, I address the question in terms of the settled principles of international law as derived from the body of international arbitral awards and the academic literature on international arbitration.

12. I address the invocation of Dominican law with respect to questions about the agreement to arbitrate solely because Respondents' arguments rest on Dominican law. However, I must note that Respondents' assumption that Dominican law applies in this regard is contrary to the well-reasoned determination by the Arbitral Tribunal in this case that French international arbitration

law governs the Arbitration Clause — a determination that is consistent with international arbitral case law and the international academic literature.[1]

13.  As background for preparing this Opinion, I have reviewed the following materials:

    (a)    the Agreement between the parties;

    (b)    the preliminary award of the Arbitral Tribunal in this case;

    (c)    the final Award of the Arbitral Tribunal in this case;[2]

    (d)    CPB's application to confirm the Award; and

    (e)    Respondents' motion to dismiss or, alternatively, for other relief, and supporting memorandum.

## IV.  Relevant Provisions of the Agreement

14.  The provisions of the Agreement that Respondents rely on are (a) Articles 18, the Arbitration Clause, which provides for, and sets out the process of, arbitration of disputes arising

---

[1] A leading example from the arbitral case law is *Isover St. Gobain v. Dow Chemical France*, ICC Case No. 4131 (interim award of September 23, 1982), XI Y.B Comm. Arb. 131 (1984). There, a tribunal consisting of three leading scholar/practitioners specifically held that the determination of the effectiveness of an arbitration agreement is not to be made on the basis of the law chosen by the parties as applicable to the merits of the dispute (there French law), but rather on the common intent of the parties and the usages that are dictated by the needs of international commerce. The tribunal proceeded to uphold the validity of the arbitration agreement under that standard. Numerous international arbitral tribunals have reached the same result. E.g., ICC Case 4381 (1986). (ICC arbitrators may determine the validity of the arbitration agreement without reference to any national law, including the law governing the contract). And even when international arbitrators' choice of law analysis results in the consultation of a national law, as opposed to general principles, for assessing the validity of the agreement to arbitrate, they often consult the law of the place of arbitration, not the governing law specified in a choice-of-law clause (unless there is a specific provision dictating that such law governs the agreement to arbitrate). See ICC Case 4695 (1984); ICC Case 4604 (1984); ICC Case No. 5029 (interim award of July 16, 1986); ICC Case No. 5505 (1986) (preliminary award). For academic support on this point, see W. Craig, W. Park & J. Paulsson, International Chamber of Commerce Arbitration 53-54, n. 20 (Oceana, 3d ed. 2000); P. Fouchard, E. Gaillard & B. Goldman, International Commercial Arbitration (1999), pp. 317-18. The fact that Dominican law was selected as the governing law of the Agreement as a whole does not alter the analysis as to the law applicable to the agreement to arbitrate. See G. Born, International Commercial Arbitration: Commentary and Materials 110 (Transnational/Kluwer, 2d ed. 2001) ("[t]he weight of authority has refused to apply a general choice of law clause to the arbitration agreement, particularly where the parties' chosen law would invalidate the arbitration clause") (collecting authorities).

[2] Case No. 11772/KGA/CCO.

under or related to the Agreement; (b) Article 19, through which each of the Respondents waives sovereign immunity in relationship to the arbitration and agrees that that the "execution, delivery, and performance by it of [the Agreement] constitute private and commercial acts rather than public and governmental acts"; and (c) Article 13.11, which pertains to exemptions from tax obligations that the Dominican Republic agreed to obtain for CPB.

15. Respondents do not appear to dispute that, pursuant to the aforementioned provisions, they explicitly agreed to arbitrate any disputes under the Agreement and agreed to waive sovereign immunity in relation to the arbitration. In addition, pursuant to Article 12 of the Agreement, Respondents represented to CPB, in inducing CPB to agree to provide services under the Agreement, that the Arbitration Clause and the Agreement as a whole were valid and enforceable under Dominican law. Specifically, the Dominican Republic accepted and warranted under Article 12, among other things, that:

- "[CDE, the predecessor to CDEEE] has all requisite power and authority to agree to the legal and technical aspects and carry on the business referred to in [the Agreement];"

- "[The Agreement] will be enforceable against it in accordance with its terms;"

- "It has the full power authority, and legal right to incur the obligations, to execute, deliver and perform and observe the terms and provisions of [the Agreement];"

- "[The Agreement] constitutes legal, valid, binding and enforceable obligations of THE STATE in accordance with its terms;"

- "All necessary action has been taken, and all approvals required have been obtained, under the LAWS OF THE DOMINICAN REPUBLIC to authorize the execution, delivery, and performance of [the Agreement];"

- " The obligations and covenants of [the Agreement] constitute obligations for the performance of which the full faith and credit of THE STATE is pledged."

V.  **Under Settled Principles of International Arbitration Law, Foreign States and their Instrumentalities May Not Invoke Their Own Domestic Law to Avoid Their Obligations to Arbitrate and to Respect Arbitral Awards**

16. It is not unusual for States or their instrumentalities to attempt to avoid an obligation to arbitrate or to respect arbitral awards, by invoking provisions of internal law under which the agreement to arbitrate (or indeed the entire agreement in which the agreement to arbitrate is found) would be considered invalid and unenforceable. As shown below, however, the body of international arbitral awards and the writings of the most authoritative scholars in the field of international arbitration hold that such attempts are improper and unavailing. It is an established principle that a State party may not invoke its own domestic law to defeat an arbitral agreement or award, where the State party itself represented the agreement to be valid under its law at the time it was entered into, and the other party reasonably relied on the validity of the agreement in entering into, and performing under, the agreement.

17. Permitting a State or its instrumentality, after the fact, to impeach an apparently valid arbitration agreement or the award that resulted from it by invoking the agreement's invalidity under the State's own law obviously offends general principles of estoppel, good faith and fair dealing. But it also would clearly jeopardize the security of contractual arrangements to arbitrate and inject an unacceptably high level of uncertainty into the international arbitral regime governing agreements between private parties and foreign States and their instrumentalities.

18. The integrity of contracts with State parties and the integrity of international arbitration as the dispute settlement system of choice in such contracts would be irretrievably harmed if States, after having knowingly entered into a specific agreement with a foreign party and after having expressly provided that any disputes arising out of or related to that agreement would be

subject exclusively to arbitration in a designated forum under a designated set of rules, could renege on those commitments by unilaterally challenging them under their own law.

19. The analysis of this issue does not depend on where exactly in the State's internal hierarchy of legal norms the allegedly offended norm happens to be situated. The frustration of contracts between States and private parties, and the damage to the international arbitration regime by which disputes under such contracts are characteristically resolved, will be just as great when the norm invoked by a State to defeat the parties' understandings is clothed in national constitutional language.

20. Thus, international arbitral case law and the academic literature on international arbitration are all emphatic and unambiguous as to this issue. Accordingly, as demonstrated below, the principle that States and State instrumentalities are bound by their commitments to arbitrate and respect arbitral awards – the peculiarities of their internal law notwithstanding – has become a principle of "international public policy."

*(a)     International arbitral case law*

21. The decisions of international arbitral tribunals consistently and regularly hold that States may not interpose the particularities of their internal law to escape from the obligation to arbitrate found in agreements into which they have entered.

22. A good example is the arbitral award in the case of *Benteler v. Belgium*. The arbitration arose out of a contract dispute between German private parties and Belgium. In resisting arbitration, Belgium invoked national legislation limiting the authority of Belgian state entities to arbitrate. The arbitral panel, sitting in Switzerland, unanimously disagreed, finding the requirement that States and State entities honor their agreements to arbitrate, irrespective of local legal impediments, had become "a principle which is being ever more generally accepted in the law of international arbitration." The panel in *Benteler* suggested that national limitations such as Belgium's may have application to domestic disputes, but not to international ones; and

it concluded that for a State to invoke them in an international case to defeat arbitration would not only violate principles of good faith and estoppel, but also "international public order."[3]

23. The analysis by this tribunal is representative. Numerous other leading international arbitral awards have come to precisely the same conclusion on the same reasoning. The following examples are illustrative:

> "It is a recognized principle of international law that a State is bound by an arbitration clause contained in an agreement concluded by the State itself or by a company owned by the State, and that the State cannot subsequently unilaterally frustrate access by the other party to the dispute resolution system envisaged by the parties in their agreement for the settlement of disputes."[4]

> "A general principle exists which is now universally recognized in relationships between states as well as in international relations between private entities (-- whether the principle be considered a rule of international public policy, an international trade usage, or a principle recognized by public international law, international arbitration law, or 'lex mercatoria'--) whereby the Iranian state would in any event . . . .be prohibited from reneging on an arbitration agreement entered into by itself, or previously, by a public entity . . . ."[5]

> "[I]nternational public policy would be strongly opposed to the idea that a public entity, when dealing with a foreign party, could openly, knowingly, and willingly enter into an arbitration agreement, on which its co-contractor would rely, only to claim subsequently, whether during the arbitral procedure itself or on enforcement of the award, that its own undertaking was void."[6]

> "Whereby it is recognized in arbitration precedent that international public policy is strongly opposed to a government body being able to contract with foreigners, openly and knowingly executing an arbitration clause or wishing to do so and

---

[3] *Benteler v. Belgium* (interim award of Nov. 18, 1983), 1989 Rev. Arb. 339 (Nov. 18, 1983). Excerpts also published in [1985] European Commercial Cases 101. The award was favorably received and commented upon in J. Paulsson, *May a State Invoke its Internal Law to Repudiate Consent to International Commercial Arbitration*, 2 Arb. Int'l 90 (1986).

[4] *Elf Aquitaine Iran v. National Iran Oil Corp (NIOC)*, (interim award of Jan. 14, 1982), 11 Y.B. Com. Arb. 97, (1986).

[5] *Framatome v. Atomic Energy Organization of Iran (AEOI)*, ICC Case No. 3896 (interim award of April 30, 1982). The Tribunal also found that, "the party challenging the tribunal's jurisdiction cannot rely on irregularities attributable to itself when contesting the validity of an arbitration agreement which ... was quite clearly entered into with the full knowledge and approval of the highest levels of the Iranian government."

[6] *Italian company v. African state-owned entity*, ICC Case No. 1939 (1971), cited in Y. Derains, *Le statut des usages du commerce international devant les juridictions arbitrales*, 1973 Rev. Arb. 122, 145 and 109 J.D.I. 971, 977 (1982).

> place the contract in a position of trust, then, whether during arbitration proceedings or during the performance of the contract, availing itself of the nullity of its own word . . . ."[7]

> "If [a public entity] were prohibited from entering into arbitration agreements, such prohibition would have to be considered as ineffective on the grounds that it would contravene international public policy, the provisions of which cannot be excluded by applying the law of [the country in question]."[8]

24. There are a very large number of additional reported arbitral decisions to the same effect,[9] leading the authors of perhaps the leading European treatise on international commercial arbitration, upon reviewing a wide array of such rulings, to conclude:

> International arbitral tribunals have consistently taken the view that a state cannot rely on restrictions in its own law to avoid being subject to an arbitration agreement to which it freely consented. The reasoning behind these decisions sometimes varies as a function of differences in the facts of the cases, in the arguments by the parties and in the legal background of the arbitrators. The consistency of the resulting awards is therefore all the more remarkable.[10]

*(b)   Academic literature on international arbitration*

25. The consistent body of arbitral case law and policy is supported with equal consistency in the academic literature on international arbitration. The academic authority overwhelmingly concludes that foreign states and their instrumentalities should not be permitted to escape their obligation to arbitrate or to respect an arbitral award, merely by invoking a rule of internal law that ostensibly renders the dispute non-arbitrable or not arbitrable in the fashion to which the

---

[7]   ICC Case No. 4381 (1986)

[8]   *French construction company v. African state-owned entity*, ICC Case No. 1526 (1975), 103 J.D.I. 997 (1976).

[9]   See, for example, ICC Case No. 7263 (1994) (preliminary award), 22 Y.B. Com. Arb. 92, 97 (1997) (states and public bodies "cannot avail themselves of the incapacity and lack of authorization deriving from their national laws"); ICC Case No. 2321(1974) (preliminary award) ("To require or assume then that a promise of a State to submit to arbitration, in order to be binding has to be confirmed in the face of the arbitrator, would probably impair the sovereignty of a State and its dignity more than the arbitrator's performance of his task, conferred upon him in accordance with what the parties once have agreed upon"); ICC Case No. 5103 (1988).

[10]  P. Fouchard, E. Gaillard & B. Goldman, *International Commercial Arbitration* (1999), pp. 325-26. See also B. Audit, *Transnational Arbitration and State Contracts: Findings and Prospects*, in Hague Academy of International Law, Centre for Studies and Research in International Law and International Relations 77 (1988).

parties had agreed. According to the academic who has most closely studied problems associated with State arbitrations – Professor Karl-Heinz Bockstiegel – it is "a generally accepted principle in both national and international law" "that a State may not abuse legal forms and rights to evade its obligation[s]".[11] This view is uniformly shared by the leading commentators.[12]

26. The leading American treatise-writer on international arbitration reaches the conclusion, again based on international arbitral practice, that "[i]n general, neither arbitral tribunals nor national courts have allowed sovereign states to rely on their own laws to disown their arbitration agreements."[13]

27. Perhaps the leading general European treatise on international commercial arbitration describes as "firmly established" the rule that "States and State-owned entities cannot escape their international arbitral commitments by relying on purportedly restrictive provisions of their own law to challenge the validity of an arbitration agreement into which they unreservedly entered."[14] And the authors of the leading treatise on ICC arbitration agree:

> [I]t would be contrary to fundamental principles of good faith for a state party to an international contract, having freely accepted the arbitration clause, later to invoke its own legislation to contest the validity of its agreement to arbitrate."[15]

They describe this as "an imperative norm ... without reference to any specific national law."[16]

---

[11]    K.-H. Bockstiegel, *Arbitration and State Enterprises* 45 (1984). *See also Acts of State and Arbitration* (Karl-Heinz Bockstiegel ed., 1997).

[12]    See, for example, J. Paulsson, *May a State Invoke Its Internal Law to Repudiate Consent to International Commercial Arbitration* 2 Arb. Int'l 90 (1986) ("States seeking to evade arbitration to which they have agreed sometimes invoke provisions of their internal law that purport to prohibit the State from entering into an arbitration agreement with a private party. In the context of international trade today, the clear and widely recognized trend is to refuse to give effect to such domestic prohibitions.")

[13]    G. Born, *International Commercial Arbitration: Commentary and Materials* 238 (Transnational/Kluwer, 2d ed. 2001).

[14]    P. Fouchard, E. Gaillard & B. Goldman, *International Commercial Arbitration* (1999), p. 322-25.

[15]    W. Craig, W. Park & J. Paulsson, *International Chamber of Commerce* Arbitration 45 (Oceana, 3d ed. 2000).

28. The consensus among academic writers is captured in the adoption by the Institute of International Law of a resolution on the subject at its September 1989 session at Santiago di Compostela. According to that resolution, "a State, a state enterprise, or a state entity cannot invoke incapacity to arbitrate in order to resist arbitration to which it has agreed."[17]

### VI. The Arbitral Tribunal's Findings in This Case Were Consistent With The Settled Principles of International Arbitration Law

29. In the arbitration proceedings in the instant case France, Respondents appear to have unsuccessfully raised arguments regarding the nullity of their agreement to arbitrate similar to the ones that they now set forth in their Motion before this Court.

30. In a preliminary award, the Arbitral Tribunal rejected Respondents' arguments, ruling, as a threshold matter, that Dominican law did not apply to the Arbitration Clause (*see supra* at ¶ 12).

31. The Tribunal further held that Respondents' arguments as to the invalidity of the Arbitration Clause were precluded by the "international public policy" of good faith. Such policy, the Tribunal noted, "prevents one Party, even if it happens to be a State, from subsequently denying what it had signed, alleging its lack of power or capacity, thus deceiving the other contracting Party."

32. As an example of a previous affirmation of this policy, the Arbitral Tribunal referenced ICC Case No. 4381 (*see supra* at 9 n.7). The Tribunal also noted that the policy is well-grounded in French law.[18]

---

[16]    Id.

[17]    Art. 5 of Resolution on Arbitration between States, State Enterprises or State Entities and Foreign Enterprises, p. 238, cited in P. Fouchard, E. Gaillard & B. Goldman, *International Commercial Arbitration*, p. 329.

[18]    The French decisions referenced by the Tribunal are *Gatoil v. National Iranian Oil Co.*, CA Paris (Dec. 17, 1991); *Comite Populaire de la Municipalite de Khoms El Mergel v. Sociedad Dalico Contractors*, Cass. le civ. (Dec. 20, 1993).

33. The Arbitral Tribunal concluded that "the decision of the Arbitral [Tribunal] is that the Dominican Republic and [CDEEE] may not, without defaulting on their obligation to act in good faith, deny the application of the arbitration agreement that they, themselves, deliberately and freely entered into after prior study and enjoying all the guarantees set forth in Dominican law regarding powers that must be accorded to officials and other attorneys in fact who execute contracts on behalf of the State."

34. The determination of the Arbitral Tribunal as to the inability of Respondents to invoke the law of the Dominican Republic to void their agreement to arbitrate is thus fully consistent with international arbitral case law and the academic literature on international arbitration.

### VII.   Conclusion

35. There is unanimity in international arbitral case law and in the academic literature of international arbitration (as well in the findings of Arbitration Tribunal in this case), that States should be barred in their efforts to invoke their own domestic law in order to escape the obligations to arbitrate pursuant to a freely entered into arbitral agreement and to respect resulting arbitral awards. States and State entities, including the Respondents, should not enjoy the option of unilaterally defeating the obligations into which they knowingly and willingly entered.

36. This unanimity is warranted and is not surprising. The efficacy of arbitration in a neutral forum as a dispute resolution mechanism is indispensable to the viability of agreements between States and foreign entities. Unless arbitration agreements and the contracts containing them are legally secure, the very practice of contracting with foreign States will be put in peril, and the spillover damage to the integrity of international arbitration generally will be considerable. Precisely because the stakes are so high, the principle is now routinely regarded as having the status of international public policy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22th day of March, 2007.

*George A. Bermann*

George A. Bermann