### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

CAYMAN POWER BARGE I, LTD.,

                Applicant,

      v.

THE STATE OF THE DOMINICAN REPUBLIC,
and CORPORACIÓN DOMINICANA DE
EMPRESAS ELÉCTRICAS ESTATALES (formerly
known as CORPORACIÓN DOMINICANA DE
ELECTRICIDAD),

                Respondents.

Civil Action No. 1:06CV01362
(RMC)

### <u>DECLARATION OF SARA V. SICARD</u>

Pursuant to 28 U.S.C. 1746, **SARA V. SICARD**, declares the following:

## I      PROFESSIONAL QUALIFICATIONS:

1.      I have been a member of the Dominican Bar since 1993 and I specialize in the practice of commercial and corporate law, energy law and foreign investment among other fields. I obtained my bachelors degree in law (LLB)  "Licenciatura en Derecho" Cum Laude, at the Pedro Henriquez Ureña University (UNPHU) in the Dominican Republic in 1990. Afterwards, in 1992, I obtained a Masters Degree (LLM) with merit in International Business Law at Queen Mary and Westfield College of the University of London, United Kingdom. I am currently a Partner of Sánchez Raful Sicard & Polanco law firm in the Dominican Republic.

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -2-

## II.     QUESTIONS TO BE ADDRESSED:

2.     I have been asked by counsel for the Applicant, Cayman Power Barge I, Ltd ("CPB"), to

address the following questions regarding Respondents' motion to dismiss filed with this court in

response to the CPB's motion to have the ICC International Court of Arbitration Final Award in

Case No. 11772/KGA/CCO confirmed:

(a)     whether the arbitration and waiver of immunity provisions set forth in articles 18
and 19 of the Power Purchase Agreement signed on March 17, 1998 by Cayman Power Barge I,
Ltd (hereinafter "CPB") and the Dominican State (hereinafter "State"), duly represented at the
time by the Corporación Dominicana de Electricidad (hereinafter the "Corporation") whose legal
successor at this time is Corporación Dominicana de Empresas Eléctricas Estatales ("CDEEE")
(hereinafter the "Agreement") are valid under the laws of the Dominican Republic or whether
they violate:

*- articles 3 of the Dominican Constitution, 6, 1133 and 1172 of the Dominican Civil
Code, because they allow outside interference in the affairs of the State;*
*- articles 46 and 48 of the Dominican Constitution, because they violate the Dominican
Constitution;*
*- article 1004 of the Dominican Code of Civil Procedure, which expressly prohibits
arbitration involving the State or its property.*

(b)     whether the tax provisions established in article 13 of the Agreement are valid
under the laws of the Dominican Republic or whether they violate:

*- articles 37.1, 37.19, 55.10 and 110 of the Dominican Constitution, the latter article
requiring that tax exemptions and/or exonerations from taxes to be approved by the Dominican
Congress;*

3.     I have been supplied with and considered the following documents:

Copies of the Power Purchase Agreement between CPB, the State and the Corporation of
March 17, 1998 in its original Spanish version as well as its English translation, with its
appendices;

Copy of the Preliminary Award (in Spanish) issued by the ICC International Court of
Arbitration in the Case No. 11772/KGA;

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -3-

Copy of the Final Award (in its English translation) issued by the ICC International Court of Arbitration in the Case No. 11772/KGA/CCO;

Copy of the application to confirm Foreign Award filed on August 8, 2006 at the United States District Court for the District of Columbia as per Civil Action No. 0611362;

Copy of Special Entry of Appearance, Motion to Dismiss or Alternatively, for the other Relief and Memorandum in Support of Motion filed on February 20th, 2007 by the State and CDEEE in the United States District Court for the District of Columbia, under Civil Action No. 0611362;

Exhibit C of Respondents' motion to dismiss, containing selected Dominican Republic laws and corresponding English translations to the same.

## III.  SUMMARY OF CONCLUSIONS:

**4.    Clauses 18 and 19 of the Agreement regarding Arbitration and waiver of immunity are valid for the following reasons**:

(a)    The principle of contractual liberty: the parties, including the State, freely consented to the execution of the agreement and formalized the agreement with all of the legal requirement necessary, in accordance to Dominican law.

(b)    Article 1004 of the Code of Civil Procedure is of restricted application when it comes to the right of the Dominican State to arbitrate. Local law has opened the possibility for internal arbitration and French case law as well as local practice have recognized the legitimacy of international arbitrations.

(c)    Arbitration and waiver of immunity clauses are a common fixture in contracts with the Dominican State and are especially used in all agreements of the energy sector of the Dominican Republic, whenever the State or a State entity is involved.

(d)    Arbitration and waiver of immunity clauses do not amount to a breach of article 3 of the Dominican Constitution because of the restrictive view of sovereign immunity and the fact that the State can freely chose to waive the same.

(e)    Since there has been no infringement of article 3 of the Dominican Constitution or article 1004 of the Code of Civil Procedure of the Dominican Republic, as a result of which there can also be no infringement of articles 46 and 48 of the Dominican Constitution.

(f)    The denial by the State of its responsibilities towards the arbitration and waiver of immunity clause that it signed amounts to a breach of good faith, which is a matter of not only national public order but also international public order.

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -4-

5.    **Article 13 of the Agreement is a valid obligation and does not infringe articles 37, paragraph 19, article 55, paragraph 10 nor article 110 of the Dominican Constitution for the following reasons:**

(a)    It is clear that the obligation assumed by the State has been to channel the tax exonerations that it agreed to through the proper authorities and in case it could not obtain the same, to assume payment of the taxes levied on CPB. As a result, the State did not infringe upon the constitutional obligation of obtaining tax exonerations through the National Congress by signing this agreement.

## IV.    THE LEGAL SYSTEM OF THE DOMINICAN REPUBLIC

6.    To put the reliance on French doctrine and case law in this declaration into context, I will briefly discuss certain general information regarding the Dominican legal system and its primary sources of law which needs to be presented

7.    The Dominican Legal System, for the most part, is derived from laws or statutes known as Napoleonic codes, which were introduced to the country during the period from 1822 to 1844, when Haiti maintained political control over the entire island of Hispaniola. The Dominican Civil and Commercial Codes are actually just a mere translation of the Napoleonic Codes, which were first introduced to the island during French rule and later again under Haitian rule. For those historical reasons, it is common in the Dominican Republic to use French case law and doctrine as primary sources of law, whenever the legal texts in question are based on the French Codes.

8.    Dominican law theorists make a fundamental distinction between primary sources of law, which can give rise to binding legal norms, and secondary sources, sometimes called *authorities*. The primary sources in the Dominican law system are enacted law and custom, with the former

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -5-

overwhelmingly more important. Sometimes, *"general principles of law"* are also considered a primary source. Authorities may have weight when primary sources are absent, unclear, or incomplete, but they are never binding, and they are neither necessary nor sufficient as the basis for a judicial decision. Case law and the writings of legal scholars are as such secondary sources.

9.      As a practical matter, however, it is generally recognized in the Dominican law system that judges do and should take into consideration prior decisions, especially when the settled case law shows that a line of cases has developed. Dominican judicial decisions have de facto weight for the same reasons that underlie the common law doctrine of *stare decisis*.

10.     The writings of legal scholars *(doctrina)*, like the court decisions, are considered authorities in the Dominican law system. In general, it can be said that Dominican judges pay close attention to scholarly opinions (from Dominican as well as French sources), as expressed in general and specialized treatises, commentaries on the codes, monographs, law review articles and case notes, and expert opinions rendered in connection with litigation. Persistent doctrinal criticisms will often prompt re-examination of a holding, and will sometimes even lead to the abandonment of an established judicial position.

11.     The legitimacy of trade customs as a subsidiary source of our Commercial Law can be derived from several articles of the Dominican Civil Code such as articles 1135, 1159 and 1160[1].

---

[1] Article 1135. "Agreements bind not only as to what is expressed therein, but further as regards all the consequences which equity, usage, or law attribute to an obligation by its nature".
Article 1159. "Whatever is ambiguous must be interpreted according to the usage of the country where the contract is made."
Article 1160. "Clauses usual in the contract must be supplied therein, although they are not expressed."

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -6-

12.     Now that the main sources of Dominican law have been covered, I shall proceed to

respond to the specific questions that have been posed to me.

## V.  VALIDITY OF THE ARBITRATION AND WAIVER OF IMMUNITY CLAUSE OF THE AGREEMENT.

13.     It is my firm understanding that the Arbitration Clause (Art. 18[2]) as well as the Waiver of

Immunity clause (Art. 19[3]) of the Agreement are valid as per Dominican law and do not breach

---

[2] Paragraphs 18.1 to 18.6 of the Agreement state the following regarding Arbitration:

"18.1 INTERNATIONAL ARBITRATION
In the event of any dispute, controversy or disagreement (each a "Dispute") arising from or in connection with this AGREEMENT, the affected PARTY will communicate it in writing to the other PARTY. The PARTIES will attempt to resolve the Dispute amicably. If, within one (1) month after the notice of Dispute, it has not been resolved at the request of any PARTY, the Dispute, regardless of its nature, will be referred to arbitration and finally resolved pursuant to the arbitration rules of the International Chamber of Commerce valid in Paris, France (the "ICC Rules").

18.2 The arbitration proceedings will be conducted in Paris, France.

18.3 The rights of the PARTIES to request a resolution of a dispute or a determination in a proceeding according to this AGREEMENT will not be affected by the fact that either one of the PARTIES received partial compensation on a conditional or absolute basis from any third party (be it in any individual, a state, a government agency or an international organization) for any loss or damage subject to the dispute.

18.4 Any Arbitral Tribunal constituted pursuant to this AGREEMENT must apply the Laws of the Dominican Republic and the general accepted principles of International Law.

18.5 Any arbitration under this Article will be conducted by a group made up of three arbitrators. No arbitrator will be admitted if he had links or labor relations with either one of the PARTIES. The arbitration will be conducted in Spanish. The decision of the Arbitral Tribunal will be final and binding for the PARTIES. Each PARTY will be entitled to choose one arbitrator and a third will be designated according to the Rules of the International Chamber of Commerce of Paris, France (ICC).18.6 The PARTIES will go to court and agree to submit to jurisdiction for arbitration or litigation, if necessary, to impose any arbitration award issued by the group or arbitrators under this Article. This choice of jurisdiction, which the PARTIES accept, will apply to any arbitration proceeding as well as to the decision or arbitration award rendered by the group of arbitrators."

[3]     Article 19 of the Agreement states the waiver of its immunity that the State has agreed to as follows:

"ARTICLE 19: SOVEREIGN IMMUNITY.
THE CORPORATION and THE STATE, each unconditionally and irrevocably:

    a.- Agree that the signing, delivery and compliance by the respective party with this AGREEMENT constitute private and commercial acts rather than public or government acts;

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -7-

Art. 1004 of the Dominican Civil Code of Procedure, the Dominican Civil Code nor the

Dominican Constitution for the following reasons mentioned below.

### A.    Contractual Liberty: Parties are free to consent to arbitration and to waive sovereign immunity.

14.    When reviewing the above articles on arbitration and the waiver of immunity of the

Agreement, there is no mistaking the fact that the parties certainly intended to be bound by

arbitration and that the State and the Corporation, in their executions of purely commercial

actions had agreed to be put in an equal plane with regards to CPB and therefore agreed to waive

its sovereign immunity.

15.    The principle of contractual liberty is one of the most important pillars of our civil and

commercial law system. In that regard, the choice of arbitration and waiver of sovereign

immunity made pursuant to articles 18 and 19 of the Agreement mentioned above, is the

equivalent of law between the parties. Articles 1134 of the Dominican Civil Code and art. 631 of

the Commercial Code are the basis of the said principle and have stated the following:

Art. 1134 of the Civil Code: *"Legally formed contracts have the force of law for those who have made them. They cannot be annulled except by mutual consent or by causes authorized by law. They must be carried out in good faith."*

Art. 631 of the Commercial Code: *"The Commercial courts shall hear: 1[st] all arguments related to commitments and transactions between businessmen, merchants and bankers; 2[nd]*

---

b.- They agree that, if any proceeding is filed against THE STATE or its assets in any jurisdiction in connection with this AGREEMENT, it may not claim any sovereign or other immunity from such proceeding by or in the name of party in connection with its assets;
c.- They waive any sovereign immunity right or other immunity they may have or any held by any of their assets now or in the future in any jurisdiction;
and generally agree with the imposition of any arbitration award or sentence against them in any proceeding or jurisdiction and the granting of any relief in connection with such proceeding (including, without limitation, the establishment, imposition or execution against or in connection with property, regardless of its use or intended use)."

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -8-

*arguments between associates by reason of a commercial company; 3rd arguments related to acts of trade between any persons.*

*Nevertheless, the parties may, at the moment when they contract them, agree to submit to arbitrators the disagreements indicated above, when the same occur".*

16.     When reviewing the legal formalities that the State and the Corporation went through in the execution process of the Agreement, there is ample proof that the State and the Corporation freely agreed to this Agreement and to be bound by the same.

17.     Under Article 12 of the Agreement, Respondents expressly warranted that they had full power and authority to enter into the Agreement, including the Arbitration Clause, and that the Agreement was enforceable against them.

18.     Two (2) powers of attorney were issued by the President of the Dominican Republic, one of them for the execution of the letter of intent and the other for the execution of the Agreement itself.   The power of attorney for the execution of the Agreement expressly stated that authorization was being given to sign an agreement with an arbitration clause providing for Arbitration according to the rules of the ICC in Paris, France.  These Powers of attorney were all drafted and transmitted through the Office of the Legal Counsel of the Presidency, an entity whose sole purpose is to analyze all legal documentation that is issued by the President and to make sure that no laws are infringed by them. It is only logical that if any laws and specially the Constitution were to have been infringed, that this office would have been the first to know.

19.     Finally, the Agreement was notarized by a duly licensed Dominican Notary Public, attesting that the persons signing the said agreement had in fact been the persons they said they were and had placed their signatures freely.

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -9-

20.     As the parties freely and knowingly consented to the Arbitration Clause, the principle of

contractual liberty requires adherence to the terms of the mutual agreement.


B.     **The restricted application of article 1004 of the Dominican Civil Code of
       Procedure.**

21.     To avoid the impact of the contractual liberty principle, Respondents rely on article 1004

of the Dominican Civil Code.

22.     However, the prohibition to arbitrate imposed by article 1004 of the Dominican Civil

Procedure Code, when one of the parties is the State, is applicable only in the domestic context

and has in essence even been repealed in that context.

23.     Article 1004 of the Dominican Code of Civil Procedure states the following:

"Art. 1004.- Arbitration cannot be established on the gifts and bequests of maintenance,

housing and clothing; on the separation between husband and wife nor in questions of personal

condition; on causes which are concerned with public order, the State, national property,

municipalities, public establishments, gifts and bequests on behalf of the poor; on those

concerning guardianship of minors subject to restraint; on that which may concern or interest

persons presumed absent; and generally on all those things which are entrusted to a guardian".

24.     In that domestic context, article 5 of law No. 58-87 regarding the Chambers of

Commerce of the Dominican Republic introduced an important exception to article 1004 and the

limitations of the state to subject itself to arbitration by permitting the participation of the State in

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -10-

an arbitration if a: the arbitration is conducted by the Council of Conciliation and Arbitration of one of the Chambers of Commerce of the Dominican Republic and b: one of the parties is a member of one of the Chambers of Commerce[4]. Essentially, the restrictions of article 1004 have been mooted as the standard for this exception is easy to meet in the domestic context.

25.    In the context of international arbitration, it is has long been understood that article 1004 has no application. I do not know of any published decision of the Dominican civil courts that deals with this issue, however.[5]

26.    In light of the lack of Dominican case law, the existence of a provision parallel to article 1004 in French law, and the special and deferential attention that has always been placed by the Dominican legal system on the view of the French Courts regarding matters of the international sphere, I will look towards French jurisprudence with respect to the question of whether the State can legally be bound to arbitration.

27.    Regarding international arbitration, French jurisprudence has always made it clear that when the State acts as a "private and commercial" (Art. 19(a)) actor, it can agree to arbitrate and participate in an arbitral proceeding -- and it cannot later invoke its own law to nullify the agreement to arbitrate.

---

[4]    Article 5: "....Paragraph I.- The disputes that this Council will be able to handle will be those that originate between one or more members of the Chamber and the State or any of its dependencies, be it municipalities, entities, enterprises and autonomous institutions and decentralized from the State and entities of the Public Administration in general, no matter the nature of the dispute".

[5]    In one Superior Administrative court decision in the case of the Dominican State vs. ICANTROBAS of August 30th, 1983 the court addressed a related issue but this decision is not relevant because the contract in question was administrative and not commercial and international as the one between CPB and the Dominican State.

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -11-

28.     In the case of the <u>Myrtoon Steamship v. Agent Judiciaire du Tresor</u>, rendered in April 10th of 1957, the Court of Appeals of Paris had ruled that the foundation for the applicability of art. 1004 of the Code of Civil Procedure was to communicate the matters of State to the State prosecutor. Since the protection of the French prosecutor is not of international public order but of internal public order, the court held that there was no reason why the State could not subject itself to arbitration in an agreement of international characteristics. *It also held that the State could validly and in an anticipated manner waive its immunity, accepting the competence of foreign courts and thereby waiving the protection that can be afforded to it by the Prosecutors office (Ministére Public francais).*

29.     The first French cassation ruling regarding this issue was rendered in the case of San Carlo of April 14th 1964 in which the Court of Cassation also admitted the validity of the arbitration clause in an international agreement in which the State was a party. It is nevertheless in the case of the <u>Galakis</u> issued by the French Court of Cassation in May 2, 1966 that the Court clearly established that for the arbitration clause to be valid in a case in which the State is a party, that it was sufficient to prove the existence of an international contract "made for the purposes, conditions and uses of maritime transport". French doctrine is nevertheless of the understanding that that the validity of the arbitration clause agreed to by a State is extensive to all types of international agreements[6].

---

[6] Jean Robert, L´Arbitrage, 5th edition, Dalloz, 1983, No. 287.

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -12-

30.     In another more recent ruling by the Court of Appeals of Paris (Gatoil Society v National Iranian Oil Company dated December 17, 1991[7]), the court held that the arbitration clause agreed to by the National Iranian Oil Company was valid despite the absence of the authorization by the Iranian parliament required by the Iranian Constitution. The motive given for the sentence was that the arbitration clause contained in an agreement as per the uses of international commerce is of international public order.

31.     There is no doubt in the case at hand that the agreement between CPB and the State is an international agreement. The Power Purchase Agreement executed on March 17, 1998 between the Dominican State, the Corporation and CPB is between parties of different States, as a result of which it is international. Additionally, the parties elected to have disputes resolved by the ICC Court in Paris, France.

32.     As the Agreement is an international agreement, article 1004 has no applicability.  The jurisprudence is clear that Dominican local law does not invalidate the State's agreement to arbitrate.

   C.     **Customary usage of arbitration and waiver of immunity clauses in agreements between the Dominican State and private parties in the energy sector.**

33.     Based on my extensive work in the commercial and energy section in the Dominican Republic, I know that the Dominican State is no stranger to arbitration clauses. The model agreements of the International Federation of Civil Engineers (FIDIC) for public works and

---

[7] This Court Decisión has also been mentioned in the Preliminary Award issued by the ICC Court in the present case.

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -13-

technical consulting which are frequently used by the Dominican State, contain arbitration clauses.

34.     More important is the fact that arbitration clauses and the State's adherence to the same is common practice in the energy sector in the Dominican Republic, the sector which relates to the Agreement in the instant dispute.

35.     On June 24, 1997 the General law on Reform of State-Owned Enterprises No. 141-97 was enacted to create the legal framework through which the Dominican Electrical sector would be capitalized. As a result of said capitalization process and the international public bidding that resulted from the same, five (5) enterprises were created: two (2) generating companies and (2) distribution companies, all of which would be partly owned by the Dominican State and a foreign private party.

36.     The By-laws of all of the resulting enterprises created as a result of the capitalization process of the Dominican energy sector as well as all of their basic contracts (Administration contract, contract granting rights for exploitation of electrical works relating to the generation of Electricity, Power Purchase Agreements, Agreements for the transfer of Energy Sale Contract), all contain the same arbitration clause stating that any conflicts between the shareholders of the newly created corporations or the parties to the different basic contracts would be resolved through arbitration in conformance to the provisions of Law 50-87 dated June 4th, 1987 and the Arbitration and Conciliation Court of the National District, Inc. Nevertheless, once the Dominican Republic ratified the New York Convention on recognition and execution of foreign arbitral rulings adopted by the United Nations Conference on International Commercial

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -14-

Arbitration dated June 10th, 1958 and/or the Panama Convention on Commercial Arbitration, the

parties (including the Dominican State) would agree to resolve their disputes:

> *"... by means of an international arbitration, in conformance with the Rules of Arbitration of the International Chamber of Commerce (ICC Rules of Conciliation) dated January 1, 1988, and under the laws of New York........".*

37.    Based on my personal knowledge and experience, I can affirm that most other Power

Purchase Agreements in which the State or the Corporation and its successor, CDEEE, have been

a party of, also contain arbitration clauses similar to the one in the capitalization contracts

mentioned above, as is the case with the Agreement in question.

38.    Regarding the immunity clause, the By-laws of the corporations created as a result of the

capitalization process as well as the basic agreements entered into by the Corporation as a result

of the same, all contain a waiver of immunity by the Corporation to the effect that the same was

"... acting as a business partnership, without any immunity or privilege of jurisdiction[8]...".

39.    In addition, all other energy sector agreements in which the State and/or the Corporation

or CDEEE have been a party and the other party is a foreign entity all contain a waiver of

immunity clause, thereby guaranteeing that the investment made by foreign entities in the very

critical energy sector of the country can be guaranteed and secured.

40.    Respondents' arguments in their Motion are wholly irreconcilable with their standard

practice of entering into arbitration clauses in parallel circumstances.

---

[8]    Art. 58 of the Bylaws of the Generating Companies created as a result of the capitalization process; art. 9(h) of the contract for Exploitation of Electrical works; art. 12.3 (h) of the contract for the signing of shares, etc.

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -15-

D.   **The Arbitration and waiver of immunity clauses do not infringe article 3 of the Dominican Constitution.**

41.    Article 3 of the Dominican Constitution[9] certainly establishes the sovereignty of the Dominican State. Nevertheless the limits to this sovereignty are given to it by the international law whose norms the Dominican Republic has adopted[10]. The Agreement constitutes a "private and commercial act" (Art. 19(a)), in which the Dominican State is participating as a private party.

42.    The trend of Dominican law, as is the trend in most western countries, is to accept a restrictive view of sovereign immunity that excludes commercial activity and property. The State can perfectly act as a private party in commercial activities and contract as a private party and therefore waive its immunity to guarantee an equal standing as per the law with the party that it enters into an agreement with. An agreement to submit to arbitration by a State should be viewed as an implicit waiver to its immunity. Nevertheless, the Agreement in question contains a specific clause waiving immunity which should be respected.

---

[9]        "Art. 3 The sovereignty of the Dominican nation as a free and independent State is inviolable. The Republic is and ever shall be free and independent of any foreign power. Consequently, none of the sovereign powers incorporated under the present Constitution shall realize or cause to be realized any acts which constitute direct or indirect intervention in the internal or external affairs of the Dominican Republic or any interference which makes an attempt on the capacity and integrity and of the attributes which are recognized and dedicated in this Constitution. The principle of no intervention constitutes an invariable norm of international Dominican policy. The Dominican Republic recognizes and applies both general and American rules of International law to the extent that their sovereign powers have adopted them, an pronounces itself in favor of the economic solidarity of the American nations and will support any initiative which is intended for the protection of its basic products and raw materials."

[10] Jorge Prats, Eduardo, "Derecho Constitucional" Vol. I, Pag.120.; 2.2.6.

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -16-

43.     It is important to mention in this regard that the Dominican Republic officially became a

signatory of the 1965 Convention on the Settlement of Investment Disputes between States and

Nationals of Other States, commonly called the ICSID Convention or the Washington

Convention, on March 20th of 2000. The Dominican State still has to present the ratification

papers of the same but the signing of the Convention is an important step forward and a clear

indication of the national consensus that the State can participate in international arbitration in

commercial and investment matters and waive its immunity.

44.     The Dominican State has on the other hand ratified on November 8, 2001, its adherence

to the Convention on Acknowledgement and Execution of Foreign Arbitral Rulings, signed by

the Dominican Republic in New York on June 10th , 1958 (the *"New York Convention"*). The

text of the Congressional Resolution which ratifies the New York Convention mentions in its

sole article that *"... the Dominican State promises to acknowledge the authorities of arbitration*

*rulings and, at the same time, to grant their execution in conformance with the norms of*

*procedure in effect in its territory"*.  This signifies the willingness of the Dominican State to

accept arbitration rulings even if the State is a party in them.

45.     In view of the above, since there has been no infringement of article 3 of the Dominican

Constitution or article 1004 of the Code of Civil Procedure of the Dominican Republic, as a

matter of consequence, there can also be no infringement of articles 46 and 48 of the Dominican

Constitution.

E.     **The argument made by Respondent of the invalidity of the arbitration and waiver of
       immunity clause of the Agreement amounts to a breach of Good Faith on the part of
       the Dominican State.**

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -17-

46.    It is an undeniable fact that the President of the Dominican Republic willingly signed the

Agreement through its empowree as per the powers given to him by article 55 of the Dominican

Constitution and that he as well as the other officials involved, were very aware of the

responsibilities the State was committing itself to. The argument being made by the State in this

stage basically saying that it was wrong about its capacity to sign the agreement is in our opinion

an irresponsible action and a breach of Good Faith on its part.

47.    The principle of Good Faith is established by article 1134 of the Dominican Civil Code

which states that "... agreements legally formed have the force of law over those who are the

makers of them. They cannot be revoked except with their mutual consent or for causes which

the law authorizes. They must be executed in good faith[11]."

48.    Good faith according to Dominican law constitutes a general principle of law. As a

general principle of contractual law, good faith is of public order. As a result, it is impossible to

elude the execution in good faith of an agreement by a contractual clause to the contrary.

49.    Good Faith plays an important role in the interpretation of contracts, first by determining

the contractual obligations and even further, the "spirit" of the contract, which prevails over the

text itself and secondly by intervening to assure the lasting spirit of the contact: the dynamic

good faith which is interested in the future of the contract.

50.    Good faith appears in the execution stage of the contract as a directive of common sense

and justice for its interpretation. Good faith enables us to determine the extension and nature of

---

[11]    Literal translation provided by "Code Napoleon or The French Civil Code by a Barrister of the Inner Temple", Beard Books, Washington D.C. Ed. 1999, pg. 310.

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -18-

the contractual obligations, in presence of a badly drafted or incomplete contract. Various rules

from the Dominican Civil Code which have been grouped under the title "Regarding the

interpretation of the conventions" (Art. 1156, et. al) are inspired on this principle, particularly

article 1156 which states the following:

> *"Article 1156. In agreements it is necessary to search into the mutual intention*
> *of the contracting parties, rather than to stop at the literal sense of terms".*

51.    In Dominican law, contractual good faith is not a temporary or circumstantial state of

mind: it has to be a continuing behavior, guided by facts and actions on behalf of all of the

contracting parties, from the beginning of their relationship until the end.

52.    Finally, it is important to mention that in the execution of an agreement, the Principle of

Good Faith, is one of the fundamental principles of Dominican civil and commercial law and is

also a general principle of international commerce mentioned in the UNIDROIT principles.

Good faith has also been considered a matter of international public order, above any national

legislation to the contrary.

53.    Based on this international principle of good faith, the Arbitral Tribunal rejected

Respondents' argument that the Arbitration Clause was invalid.  This finding in the Preliminary

Award is consistent with the Dominican notion of good faith.

54.    The principle of good faith precludes any party, even if it is a State, from denying the

agreement it has executed, alleging its lack of power or capacity, thereby defrauding the other

party.

## VI.    VALIDITY OF THE TAX CLAUSE OF THE AGREEMENT.

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -19-

55.    Article 13 of the Agreement does not infringe articles 37, paragraph 19, article 55 paragraph 10 and article 110 of the Constitution of the Dominican Republic. The respondent alleges that article 13 of the Agreement, which establishes that *"the State agrees to obtain from the corresponding taxing authorities or political subdivision in the Dominican Republic, in favor of THE SELLER and subcontractors that are not legal residents of the Dominican Republic, the exoneration or exemption from those TAXES from which THE CORPORATION benefits, extending them to THE SELLER..."* is in fact a violation of articles 37, paragraph 19, article 55, paragraph 10 and article 110 of the Dominican Constitution.

56.    Upon scrutiny of the constitutional articles in question, one notices that the argument made by the respondent is baseless. The obligation of article 55, paragraph 10 of the Dominican Constitution to submit agreements to congress relates to only when they a.) contain a provision that is relative to the encumbrance of national revenues; b.) relate to the disposition of real or fixed properties with a value in excess of RD$20,000.00; c.) contain the relief of loans; or d.) when they stipulate for the exemption of taxes in general[12]. Article 110 of the Constitution and article 37, paragraph 19 only confirm the point that it is only Congress that has the power to

---

[12] Article 55, paragraph 10 states the following: "Art. 55.- The President of the Republic is the head of the public administration and the commander in chief of all armed forces of the Republic and of the police force. It shall be the responsibility of the President of the Republic: ...10.- To sign contracts, submitting them for approval to the National Congress when they contain provisions relative to the encumbrance of national revenues, the disposition of real or fixed properties with a value in excess of twenty thousand gold pesos, or the relief of loans or the stipulation from taxes in general, in accordance with Article 110; without such approval in other cases".

Declaration of
Sara V. Sicard, Esq.
March 23rd, 2007
Page -20-

approve taxes or the exemption thereof and in general approve the agreements signed by the President in those specific cases mentioned in article 55, paragraph 10 mentioned above[13].

57.    As per article 55, paragraph 10 of the Constitution, it is the sole prerogative of the President of the Republic to request Congress for the approval of tax exonerations et al; this approval can therefore not be requested by a private party as were the allegations of the respondent in the documents that were submitted to us.

58.    Article 13.1 of the Agreement is specifically drafted to mean that the President, would, through the proper channels (*"taxing authorities or political subdivision in the Dominican Republic[14]"*), obtain the tax exonerations mentioned in the agreement. This clause is not drafted to the effect that the tax exonerations were being given at that point and time but that the authorities would process the exonerations through the proper entities, which in this case is the National Congress.

59.    This commitment was so clear in the fact that the President could not directly give tax incentives that article 13.1.1 further clarifies the point by stating that *"if THE SELLER must pay any tax, including on the import of materials, assets, equipment and spare parts to be used in the*

---

[13]    Article 37.- The Congress has the responsibility to : ...19.- Approve or not the contracts submitted to it  by the President of the Republic in conformity with Section 10 of Article 55 and with Article 110".

Article 110: No exemption will be recognized nor exoneration, reduction or limitation on taxes, assessments or treasury or municipal laws to the benefit of members of the public shall be granted, except as indicated by law. Nevertheless, members of the public can acquire, either through concessions authorized by law or through contracts approved by the National Congress, the irrevocable rights to benefits, for the entire time stipulated by the concessions or contract, and in compliance with the obligations imposed by one or the other, from exemptions, exonerations, reductions or limitations on taxes, assessments or treasury or municipal laws incidental in specific works or public utility firms or in specific works or firms toward which it is important to attract, either for the development of the national economy or any other object of social interest, the investment of new capital".

[14] See art. 13.1 of the Agreement.

*operation of the unit... [that the State would] consent under this Agreement to reimburse THE
SELLER for the amount of the tax paid*".

60.   In rejecting Respondents' argument that article 13.1.1. is invalid, the Arbitral Tribunal
concluded that the provision was not in violation of the Dominican Constitution as it merely
gave the State the power to act within the bounds of the Constitution.  The Tribunal's analysis
reflects an accurate understanding of the Dominican Constitution.

61.   In conclusion on this issue, the commitment agreed to by the State in article 13 the
Agreement was made within the Constitutional boundaries of article 55, paragraph 10, article
110 and article 37, paragraph 19 of the Constitution, as a result of which the same is valid.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is
true and correct.

Executed this twenty third (23rd) day of March, 2007.

Sara V. Sicard