# Attachment 1

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAYMAN POWER BARGE I, LTD.
c/o Corporate Filing Services Ltd.
PO Box 613 GT, 4th Floor Harbour Centre
Grand Cayman, Cayman Islands,

            Plaintiff,

      v.

THE STATE OF THE DOMINICAN
REPUBLIC, and CORPORACIÓN
DOMINICANA DE EMPRESAS
ELÉCTRICAS ESTATALES (formerly known
as CORPORACIÓN DOMINICANA DE
ELECTRICIDAD),

            Defendants.

Civil Action No. 1:06CV01362 (RMC)

## DEFENDANTS' REPLY TO APPLICANT CAYMAN POWER BARGE I, LTD.'S MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS APPLICATION TO CONFIRM A FOREIGN ARBITRAL AWARD AND IN <u>OPPOSITION TO RESPONDENTS' MOTION TO DISMISS</u>

The State of the Dominican Republic ("Dominican Republic") and Corporación de

Empresas Eléctricas Estatales ("CDEEE") (collectively "Defendants"), hereby submit their

Reply to Applicant Cayman Power Barge I, LTD.'s Memorandum of Points and Authorities in

Further Support of its Application to Confirm a Foreign Arbitral Award and in Opposition to

Respondents' Motion to Dismiss ("CPB Memorandum") and state as follows:

### <u>INTRODUCTION</u>

First and foremost, Defendants desire to clarify their position with respect to the monies

they owe CPB. Defendants do not dispute that they should pay CPB for the power it supplied

Defendants. But Defendants have consistently argued in the past and continue to maintain that

the arbitration proceeding conducted before the International Court of Arbitration ("ICA") was a

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

wholly impermissible method through which CPB might establish and collect amounts owed to it. As set forth in Defendants' Special Entry of Appearance, Motion to Dismiss or, Alternatively, for Other Relief and Memorandum in Support of Motion ("Motion") and in this Reply, Defendants' opposition is based upon its judgment that the ICA proceedings were illegitimate, among other reasons, because the arbitration provisions under which the arbitration was brought were invalid. In this context, Defendants' opposition to CPB before this Court should be viewed as the insistence by a sovereign nation that the judicial system of the United States should not be used to further this injustice. This request is made by the Dominican Republic because of the importance of what lies at the heart of this dispute: Fundamental issues relating to the interpretation and application of Dominican Republic law respecting that country's sovereignty, Executive Branch authority and Constitutional rights.

Defendants are not suggesting that this Court take any action that would leave CPB without a fair opportunity for recovery. Defendants acknowledge that they would be subject to suit in a Dominican Republic court located in their domicile of Santo Domingo, Dominican Republic.[1] Notwithstanding their arguments regarding the nullity of the Power Purchase Agreement between CPB and Defendants ("PPA"), Defendants further acknowledge that Dominican Republic law allows CPB the right to a recovery under the Dominican Republic/civil law equivalent of unjust enrichment ("enriquecimiento sin causa").[2] Thus, CPB has a viable

---

[1]    *See* Article 1315 of the Dominican Civil Code and Article 59 of the Dominican Code of Civil Procedure which are included in **Exhibit A**.

[2]    *See, e.g.,* attached **Exhibits B-1** (Spanish) and **B-2** (English translation) which is a decision of the Dominican Republic's Supreme Court of Justice dated April 2, 2003. This case involved an illegal confiscation by the Dominican Republic of real estate which was later given to an oil company. The lower court recognized the illegality of the confiscation and of the owner's right to be compensated. Notably, the Dominican Supreme Court of Justice did not reverse the lower court's decision reasoning, in part, that the defendants had been unjustly enriched. *See also* Articles 1315, 1382 and 1383 of the Dominican Republic's Civil Code which are attached in **Exhibit A** (containing statutory provisions related to unjust enrichment under the Civil Code).

*April 19, 2007    AMENDED REPLY    (Correcting filing of April 10, 2007)*

recourse to recover monies that are legitimately owed to it through an action brought before a competent court in the Dominican Republic.

## ARGUMENT

### *1.    This Court lacks jurisdiction and should grant Defendants' Rule 12(b) Motion.*

Defendants have previously argued in their Motion that both the PPA generally and Articles 18 and 19 specifically are invalid and null and void by operation of: Articles 3, 37.1, 37.19, 27.19, 46, 48, 55.10 and 110 of the Dominican Republic's Constitution; Article 1004 of the Dominican Republic's Code of Civil Procedure; and Articles 6, 1133 and 1172 of the Dominican Republic's Civil Code.[3] At bottom, the premise behind Defendants' Rule 12(b) Motion is that both the PPA (generally) and the provisions relating to waiver of immunity and arbitration and taxes (specifically) were invalid and therefore null and void under Dominican Republic law. For this reason, the arbitration award is invalid and there is no applicable Foreign Sovereign Immunities Act ("FSIA") exception (*i.e.,* that 28 U.S.C. § 1605(a)(6) is inapplicable). Thus, this Court lacks jurisdiction and CPB has failed to state a valid claim for relief.[4]

It is well settled that the FSIA "is 'the sole basis for obtaining jurisdiction over a foreign state in our courts.'" *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1161 (D.C. Cir. 2002) (*citing Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434 (1989). A foreign state is immune from Federal District Court jurisdiction unless one of the listed FSIA exceptions applies. *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1161 (D.C. Cir. 2002). "Immunity under the FSIA is not only immunity from liability, but immunity from suit." *Phaneuf v. Republic of Indonesia*, 106 F.3d 302, 305 (9th Cir. 1997).

---

[3]    *See* Defendants' Motion, pp. 6-11.

[4]    The validity of both the PPA (generally) and Articles 18 and 19 (specifically) also go to the heart of the Article V(1)(a) defense of the New York Convention which Defendants have raised in this matter.

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

"The *defense* of sovereign immunity may be raised at any time because, if valid, it means that the court lacks power to hear the case." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1161 n.10 (D.C. Cir. 2002). Indeed, when state sovereign immunity is raised, a district court must address "the merits of the immunity question first in order to preserve the immunity that may be determined to exist." *In re Republic of Philippines*, 309 F.3d 1143, 1149 (9th Cir. 2002); *see also Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 706 (9th Cir. 1992) ("As a threshold matter, therefore, a court adjudicating a claim against a foreign state must determine whether the FSIA provides subject matter jurisdiction over the claim.") If immunity is found to exist, the matter must be dismissed.

Defendants are unaware of any case which has considered a federal district court's jurisdiction over a foreign state under the FSIA with respect to confirmation of a foreign arbitration award where the foreign state has asserted that the underlying agreement (both generally and specifically with respect to the arbitration and tax clauses) was void *ab initio* thereby depriving the court of jurisdiction. Neither has CPB identified any such case. Thus, Defendants' position appears to be one of first impression. Notwithstanding, analogous case law from this Court provides ample support for the request by Defendants to dismiss CPB's matter.

At the outset, Defendants note that parties will often file a Rule 12(b) motion seeking dismissal in opposing a motion to confirm a foreign arbitral award. *See, e.g., Termoria S.A. v. Electrificadora Del Atlantico S.A.*, 421 F.Supp.2d 87 (D.D.C. 2006); *see also Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 158 F.Supp.2d 377 (S.D. N.Y. 2001). A recent decision handed down by this Court strongly supports Defendants' Rule 12(b) motion. *See Dynamo v. Ovechkin*, 412 F.Supp.2d 24 (D.D.C. 2006).

4

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

In *Dynamo*, the Russian hockey club Dynamo sought to confirm a Russian arbitration award which held that its former player, Ovechkin, had breached his contract with Dynamo. The arbitration determination enjoined Ovechkin from playing hockey for any club other than Dynamo for the 2005-2006 season. Ovechkin moved to dismiss the action pursuant to Fed. R. Civ. P. 12(b)(1) arguing that the Court lacked subject matter jurisdiction over Dynamo's claims because there was no written agreement to arbitrate. In considering the motion, the Court extensively analyzed the documents which purportedly constituted the agreement in writing. Ultimately, the Court concluded that there was no agreement to arbitrate as required by Article II of the New York Convention, notwithstanding the finding of the arbitration panel that a valid contract existed.[5] The Court granted Ovechkin's Rule 12(b) motion to dismiss.

The *Dynamo* decision is not an isolated instance in which a domestic court has determined that it lacked jurisdiction to address an arbitration matter. In *Dahiya v. Talmidge Int'l, Ltd.*, 2002 WL 31962151 (E.D. La. 2002), *reh'g granted*, 371 F.3d 207 (5th Cir. 2004), the court held that an action could not be removed to federal court under 9 U.S.C. § 205 (*i.e.,* that the court lacked jurisdiction over the matter). The court reasoned that the forum selection clause of the written arbitration agreement was invalid under Louisiana law and, consequently, that there was no provision for arbitration in a country that was a signatory to the New York Convention.

To be sure, federal courts will refuse to confirm arbitration awards on the basis that the underlying contract as a whole was null and void. For example, in *Calvello v. Yankton Sioux Tribe*, 899 F.Supp.431 (D.S.D. 1995), a former manager of a tribal casino applied for confirmation and enforcement of an arbitrator's award under the FAA. Although the Tribe's counsel participated in the underlying arbitration proceeding, the Tribe objected to enforcement

---

[5]     The Court did not consider whether those documents constituted a valid agreement under Russian contract law.

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

of the arbitration award because the contract at issue never received the necessary approvals.

The Tribe contended, therefore, that the entire agreement, including the arbitration clause, was

void. The court held that it had federal question jurisdiction, but that it needed to determine

whether the lawsuit was barred under the doctrine of sovereign immunity. The court reasoned

that the arbitration clause, if part of a valid contract, would be an unequivocal expression of the

Tribe's waiver of sovereign immunity. *Id.* at 436. The court, however, held that the waiver of

sovereign immunity in the arbitration clause was inoperable because the contract at issue was

either: (a) a management agreement which required, but did not have, the approval of the Tribal

General Council in accordance with the Tribe's By-Laws or of the National Indian Gaming

Council pursuant to 25 U.S.C. § 2711; or (b) an employment contract over which the court did

not have subject matter jurisdiction. The court held that if the contract was a management

contract it was null and void and that the court could not enforce the arbitration award because

the contract lacked the necessary approvals. *Id.*

In *A.K. Mgmt. Co. v. San Manuel Band of Mission Indians*, 789 F.2d 785 (9th Cir. 1986),

a management company ("AK") sought a declaratory judgment that an agreement with an Indian

Tribe concerning bingo management on its reservation was valid. The contract did not contain

an arbitration clause, but did contain a provision waiving sovereign immunity with respect to any

action brought by AK to enforce or interpret the agreement. The Tribe argued that the

management contract was void because it lacked necessary approvals. AK contended that the

Tribe had an express and implied duty of good faith and fair dealing to seek the necessary

approvals. AK pointed to specific contractual provisions whereby the Tribe expressly

covenanted to act in good faith and use its best efforts to fulfill its obligations under the

agreement. In addition, AK argued that the Tribe had an implied duty of good faith and fair

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

dealing that is incorporated into every contract. AK further asserted that "a party who prevents

fulfillment of a condition of his own obligation cannot rely on the condition to defeat his own

liability" and that the Tribe was "attempting to avoid its own contractual obligation by refusing

to seek . . . approval when . . . [the] approval is a condition precedent to the [Tribe's]

performance under the agreement." *Id.* at 788-89. The court held that regardless of the

persuasive force of the arguments, the governing law provided that a contract is null and void

without the necessary approvals --

> Therefore, it is logical to conclude that an agreement without . . . approval must
> be null and void in its entirety. No part of it may be enforced or relied upon
> unless and until . . . approval is given. . . . [A]pproval is an absolute prerequisite
> to the enforceability of the contract. To give piecemeal effect to a contract as
> urged by AK, would hobble the statute. The plain words of [the governing law]
> simply render this contract void in the absence of . . . approval. Since it is void, it
> cannot be relied upon to give rise to *any* obligation of good faith and fair dealing.
> Accordingly, we find the general principles do not impose a duty on the [Tribe] to
> seek . . . approval of the Agreement.

*Id.* at 789. Significantly, the court held that "the waiver of sovereign immunity is clearly part of

the Agreement, and is not operable except as part of that Agreement. Since the entire contract is

inoperable without . . . approval, the waiver is inoperable and, therefore, the tribe remains

immune from suit." *Id.*

The *Dynamo, Dahiya, Calvello*, and *A.K. Mgmt* decisions have direct application to this

matter. Specifically, *Dynamo* stands for the proposition that (a) this Court is free to consider the

underlying documents in determining whether jurisdiction exists, and (b) a Rule 12(b) motion is

an appropriate vehicle for dismissing an application to confirm a foreign arbitral award. *Dahiya*

supports the principle that if part of an arbitration provision is void, the district court is without

jurisdiction. The *Calvello* and *A.K. Mgmt* decisions establish that an agreement is null and void

and unenforceable in instances where a purported contract and/or waiver of sovereign immunity

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

of a sovereign nation does not receive proper approval even in instances where a party may have

failed to fulfill certain conditions precedent that resulted in the contract being unenforceable.

As set forth at pp. 6-11 of their Motion, Defendants have shown that the arbitration and

tax provisions and the entire PPA (including the waiver of sovereign immunity) are void under

Dominican Republic law.  Hence, there never was a valid arbitration agreement upon which CPB

could obtain an arbitration award against the Defendants.  Accordingly, the lack of a valid

agreement to arbitrate deprives this Court of jurisdiction over the Defendants.  Defendants' Rule

12(b) motion should be granted.[6]

## 2.    *The Court can vacate the arbitral award under the "manifest disregard" standard.*

Defendants seek vacatur under the common law "manifest disregard" standard for

vacating arbitral awards.  CPB contends that the Defendants' motion to vacate is misplaced and

untimely.[7]  But it is CPB's contention that is unavailing.

Contrary to CPB's contention, the "manifest disregard" standard for vacating an arbitral

award is not bounded by the confines of the Federal Arbitration Act ("FAA").  *See, e.g.,*

*LaPrade v. Kidder, Peabody & Co.,* 246 F.3d 702, 706 (D.C. Cir. 2001) ("*In addition to the*

---

[6]    Although the case was not cited by CPB, in *Buckeye Check Cashing, Inc. v. Cardegna,* 126 S.Ct. 1204, 1210 (2006), the United States Supreme Court held that "[A] challenge to the validity of the contract as a whole, and not specifically the arbitration clause, must go to the arbitrator."  There are some obvious differences between *Buckeye* and the matter in this docket.  The Court in *Buckeye* was addressing a motion to compel arbitration rather than a motion to enforce an arbitral award.  Further, the arbitration at issue in *Buckeye* was domestic rather than international.  Defendants have located only one case in which *Buckeye* was applied in the context of enforcing a foreign arbitration award.  *See R.M.F. Global, Inc. v. Cattan,* 2006 WL 544294 at *4 (W.D.Pa. March 6, 2006) (holding that the plaintiff could not object to the confirmation of an international arbitration award on the ground that it was not afforded the opportunity to attack the validity of the agreement when the plaintiff voluntarily chose not to participate in the arbitration).  Even if *Buckeye* is deemed applicable to the case at hand, however, Defendants have made two separate challenges: a) that the arbitration and tax provisions of the agreement are void under Dominican Republic law; and b) that the PPA as a whole is void under Dominican law.  Thus, even under *Buckeye,* this Court may properly determine whether the arbitration agreement at issue is void and unenforceable because Defendants are specifically challenging the validity of the arbitration clause, and not just the PPA as a whole.

[7]    *See* CPB Memorandum, pp. 20, 37-40.

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

limited statutory grounds on which an arbitration award may be vacated, [*i.e.,* 9 U.S.C. § 10]

*arbitration awards can be vacated* only *if they are in manifest disregard of the law,* or if they are

contrary to some explicit public policy that is well defined and dominant and ascertained by

reference to the laws or legal precedents.") (emphasis added and citations omitted); *Patten v.*

*Signator Ins. Agency, Inc.,* 441 F.3d 230, 234 (4th Cir. 2006) ("As a general proposition, a federal

court may vacate an arbitration award only upon a showing of one of the grounds specified in the

Federal Arbitration Act, *see* 9 U.S.C. § 10(a), *or upon a showing of certain limited common law*

*grounds. The permissible common law grounds for vacating such an award...include...a*

*manifest disregard of the law.*") (emphasis added); *Scott v. Prudential Securities, Inc.,* 141 F.3d

1007, 1017 (11th Cir. 1998) ("*In addition to the grounds for vacatur set out in the FAA,* the

courts have recognized a number of non-statutory grounds that permit a district court to vacate

an arbitration award. *[A] party may challenge an arbitration award without reliance on the FAA*

*if the award is...(3) entered in 'manifest disregard of the law.'*") (emphasis added).  These cases

teach that the common law-created "manifest disregard" standard is *not* dependant upon and/or

bounded by the FAA and, therefore, that the three month bar of 9 U.S.C. § 12 is inapplicable

when a litigant seeks to vacate an arbitration award under that standard.

CPB argues that it is "well settled" that a United States court cannot vacate a foreign

arbitral award.  It goes so far as to claim that "case law . . . establishes *conclusively* that a U.S.

court lacks the authority to vacate a foreign arbitral award."[8]  Tellingly, however, CPB relies

upon non-controlling law from the Third and Sixth Circuits.[9]  The decisions handed down by the

courts in this circuit, however, strongly suggest that manifest disregard is indeed a proper basis

upon which to vacate a foreign arbitral award.

---

[8]      *Id.,* p. 2 (emphasis added).

[9]      *Id.,* p. 20.

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

This Court has previously considered vacatur of a foreign arbitral award in *In re Chromalloy Aeroservices*, 939 F.Supp. 907 (D.D.C. 1996). The *Chromalloy* decision considered the D.C. Circuit's decision in *Al-Harbi v. Citibank*, 85 F.3d 680 (D.C. Cir. 1996). While neither the *Chromalloy* nor *Al-Harbi* decisions resulted in a vacatur of the underlying award based upon each case's particular circumstances, it is noteworthy that (a) both decisions considered vacatur of a foreign arbitral award under the manifest disregard standard, and that (b) neither court indicated that it lacked authority to vacate such an award. Likewise, it is noteworthy that the Fifth Circuit in *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 290 (5th Cir. 2004) – a case heavily relied upon by CPB – stated that "[u]nless the [arbitral tribunal] manifestly disregarded the parties' agreement or the law, there is no basis to set aside the determination that Swiss procedural law applied" to an arbitration. In short, the *Chromalloy*, *Al-Harbi*, and *Karaha* decisions all support Defendants' argument that a federal district court does have authority to vacate a foreign arbitral award under the manifest disregard standard. Defendants' vacatur request should be granted for the reasons set forth in their Motion.

**3.      *French law did not govern the arbitration clause.***

The Arbitration Panel incorrectly applied French law in considering the arbitration clause of the PPA. The terms of the PPA, which provide that the arbitration should be conducted according to ICC and Dominican Republic law, do not create a conflict; thus, the Panel should not have deferred to French law. CPB's defense of the Panel's decision in this regard is therefore unavailing.

Article 18 of the PPA sets forth the arbitration clause. Article 18.1 provides, in relevant part, that a dispute "will be referred to arbitration and finally resolved pursuant to the arbitration rules of the International Chamber of Commerce valid in Paris, France (The "ICC Rules")."

*April 19, 2007    AMENDED REPLY   (Correcting filing of April 10, 2007)*

Article 18.4 further provides that "[a]ny arbitral tribunal constituted pursuant to this AGREEMENT must apply the Laws of the Dominican Republic and the generally accepted principles of International Law."

In construing these two provisions, the Arbitration Panel concluded that Article 18.4 conflicted with Article 18.1 and that "it must be confirmed that the contracting Parties did not designate, by mutual agreement, the law applicable to the arbitration agreement."[10]  The Arbitration Panel therefore applied the procedural law of Paris, France (the situs of the arbitration), stating "there is no element that allows the Court to infer that the Parties had any intention of applying any other law than that in effect in the seat of the arbitration."[11]

In reaching its decision, the Arbitration Panel blatantly – and deliberately – disregarded the plain language of the PPA and the understanding of the parties which clearly and unambiguously stated that the law of the Dominican Republic was to govern the arbitration in conjunction with the ICC rules.  Moreover, the Panel blatantly and deliberately disregarded its own rules.

The ICC Rules provide that "[t]he proceedings before the Arbitral Tribunal shall be governed by these Rules, *and where these rules are silent, by any rules which the parties or, failing them, the Arbitral Tribunal may settle on,* whether or not reference is thereby made to the rules of procedure of a national law to be applied to the arbitration."[12]  Therefore, not only do the ICC Rules permit reference to other law, they anticipate the need for the Tribunal to refer to national laws and assume that the parties may have agreed on which national law to be applied. In these circumstances, the Arbitration Panel's conclusion that the parties intended French law to

---

[10]    Preliminary Arbitral Award ¶ 29.

[11]    Preliminary Arbitral Award ¶ 30.

[12]    ICC Rules, Article 15 (emphasis added).

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

apply was wholly unsupported by the PPA and therefore was a flagrant error, arbitrary and capricious.

An analogous situation arose in the case of *Coleman & Co. Securities, Inc. v. The Giaquinto Family Trust*, 2000 WL 1683450 (S.D.N.Y. November 8, 2000). In *Coleman*, the choice of law provision located in the arbitration section of the agreement stated that "[a]ny arbitration under this agreement shall be conducted pursuant to the Federal Arbitration Act and the laws of the State of New York." The court stated: "petitioner argues that the parties' choice of both the FAA and New York law to govern their arbitration does not create any conflict or ambiguity in the agreement. I agree." *Id.* at *3. The court noted that the FAA contains no express preemptive provisions, and it does not reflect an intent to occupy the entire field of arbitration. Like the FAA, the ICC Rules do not evidence an intent to occupy the field of arbitration entirely, nor do they provide for the application of the law of the arbitral situs in direct contravention of the parties' agreement. Therefore, no conflict occurred when the parties provided that Dominican Republic law and the ICC Rules should govern the arbitration.

Moreover, the contract at issue in *Coleman* contained two choice of law provisions: "a general one" similar to Article 17 of the PPA, and "a specific one explicitly governing arbitration" (quoted above). *Id.* at *3. The *Coleman* court concluded that by including the arbitration choice of law provision, the parties intended to be bound by New York's arbitration rules. The court concluded that the opposing argument to this conclusion would "effectively read[ ] out of the agreements the parties' arbitration-specific choice of law clause." *Coleman*, 2000 WL 1683450 at *4.[13] That mistake is precisely the one made by the Arbitration Panel in

---

[13]    *See also Insurance Co. of North American v. ABB Power Generation, Inc.*, 925 F.Supp. 1053 (S.D.N.Y. 1996) (choice of law provision specified in arbitration clause of an agreement that also contained a general choice of law provision applied by court in order to resolve a dispute over statute of limitations questions in arbitration).

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

this case.

Agreements should be construed to give effect to the intent and wishes of the parties. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) (It is a "cardinal principle of contract construction [ ] that a document should be read to give effect to all its provisions and to render them consistent with each other."). The parties intended for Dominican Republic law to apply to the substantive interpretation of the PPA and also for the Dominican Republic law to apply to the arbitration proceedings in conjunction with the ICC Rules. They made this intent known by providing for a general choice of law provision (Article 17) as well as a specific arbitration choice of law provision (Article 18). To read Article 18 as simply a general choice of law provision was contrary to the clear intent of the parties and rendered Article 17 superfluous.

But even if the PPA did not provide for the specific law to govern the arbitration, the Arbitration Panel incorrectly applied the law of the arbitral situs (France). Instead, it should have applied the law of the Dominican Republic, the location with substantial connection to the transaction and the dispute. In reaching its decision to apply French law, the Arbitration Panel noted that Paris was chosen as the seat of the arbitration because it was a neutral location.[14] Based upon this choice, the Arbitration Panel bewilderingly assumed – in spite of the plain and unambiguous language of Article 18.4 – that the parties did not intend for the law of the Dominican Republic to be applied to the arbitration.[15] Notably, such an assumption has been specifically rejected by at least one court.

In *Gotaverken Arendal A.B. v. Libyan General National Maritime Co.*, a dispute arose regarding the purchase of vessels by a Libyan company from a Swedish shipyard. In accordance

---

[14]    Preliminary Arbitral Award ¶ 30.

[15]    Preliminary Arbitral Award ¶ 30.

*April 19, 2007    AMENDED REPLY    (Correcting filing of April 10, 2007)*

with the purchase agreement, the arbitration took place in Paris under the ICC Rules. The parties

did not designate the applicable procedural law. The arbitrators ruled in favor of the Swedish

party and the Libyan company appealed to the Paris Court of Appeals. The court noted that Paris

was chosen as the site of arbitration for its neutrality and that France had no relationship to the

dispute. In these circumstances, the court found that the choice of France as the seat of the

arbitration could not be considered "an implicit expression of the parties' intent to subject

themselves, even subsidiarily, to French procedural law." *See* Jan Paulsson, *Arbitration*

*Unbound: Award Detached from the Law of its County of Origin*, 30 Int'l & Comp. L.Q. 358,

385-387 (1981) (attaching an English translation of the operative part of the French judgment).

        Defendants recognize that the application of the arbitral situs' procedural law may be

justified if the forum has a significant interest in the dispute (*i.e.,* if one of the parties is from the

forum or if the underlying events occurred in the forum). But as one commentator has aptly

stated: "[w]hen sitting in a forum unrelated to the proceedings, the arbitrator is advised to adopt

the *lex arbitri* of one of the jurisdictions having a significant relationship with the arbitration.

Alternatively, an arbitrator could conduct the proceedings under the law governing the merits of

the dispute so that all aspects of the dispute would be governed by a single legal system." Vitek

Danilowicz, *The Choice of Applicable Law in International Arbitration*, 9 Hastings Int'l &

Comp. L. Rev. 235, 254 (1986). Because Paris was presumably chosen merely for its neutrality,

the Arbitration Panel should have applied Dominican Republic procedural law, either because it

is the only location with a significant relationship to the parties and the underlying dispute or

because Dominican Republic law governed the substantive merits of the dispute.

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

Finally, CPB's reliance on generally established principles of international arbitration as a means of avoiding the application of Dominican Republic law is unavailing.[16] As set forth above, the arbitration, sovereign immunity and tax provisions (specifically) and the PPA (generally) were void *ab initio* as being in conflict with Dominican Republic law. Application of non-binding principles of international law cannot bring to life an otherwise dead arbitration provision.[17]

### 4.   *The arbitration, waiver of immunity and tax provisions (specifically) and the PPA (generally) are invalid and unenforceable under Dominican Republic law.*

CPB argues that the arbitration provision would be valid and enforceable if Dominican Republic law were applied.[18] In principal support of this argument, CPB relies upon the Declaration of Sara V. Sicard, a practicing attorney in the Dominican Republic. Sicard – an advocate for CPB presumably being paid by CPB – has rendered opinions which, on their surface, appear favorable to CPB. But a closer reading reveals that the substantive portions of Sicard's Statement actually *favor Defendants.*

---

[16]    CPB Memorandum, pp. 23-27.

[17]    CPB's reliance upon the Declaration of George A. Bermann for the proposition that principles of international law would prevent Defendants from invoking their own law to avoid their obligation to arbitrate is misplaced. Neither CPB nor Bermann's Declaration cites any controlling authority from either the United States or the Dominican Republic that requires this Court to follow "principles of international law." Absent an applicable and binding treaty to the contrary, neither this Court nor the Dominican Republic is legally bound by such principles. At the very most, "principles of international law" are secondary and nonbinding authority that may be cited for persuasive purposes only. *See, e.g., TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 302 (D.C. Cir. 2005); *see also Martinez-Lopez v. Gonzales*, 454 F.3d 500, 502-03 (5th Cir. 2006).

The principles of international comity provide useful guidance in these circumstances. "International comity...is the degree of deference a domestic forum should pay to the act of a foreign government not otherwise binding on the forum." *Laker Airways Ltd v. Pan American World Airways, Inc.*, 604 F.Supp. 280, 291 (D.D.C. 1984). Application of those principles suggest that when faced with the competing laws of a foreign sovereign nation and the nonbinding standards of international norms, United States courts should grant greater weight and deference to the laws and regulations of the foreign sovereign – particularly when such laws and regulations are the product of a democratic system such as that of the Dominican Republic. *See generally id.* at 292 (listing governing factors to be considered when the issue of international comity is raised).

[18]    CPB Memorandum, pp. 29-31.

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

Defendants agree with Sicard when she states that enacted law is "overwhelmingly" the most important source of primary law in the Dominican Republic.[19]  Likewise, Defendants agree that "Dominican judicial decisions have de facto weight for the same reasons that underlie the common law doctrine of *stare decisis*."[20]  Defendants further agree that secondary sources of law "*may* have weight *when* primary sources are absent, unclear, or incomplete, but they are *never* binding, and they are *neither necessary nor sufficient* as the basis for a judicial decision."[21]  In short, Defendants are in agreement that the Dominican legal hierarchy is similar to that of the United States:  That is, statutes are preeminent, judicial decisions carry de facto weight and create *stare decisis*, and secondary sources are persuasive but not binding.

Sicard cites Article 1004 of the Dominican Code of Civil Procedure which prohibits arbitration involving the State or national property.[22]  She then notes that subsequent Dominican legislation has partially modified Article 1004 to permit State participation in a domestic context.[23]  *Critically, however, Sicard does not cite any subsequent legislation that supersedes Article 1004's prohibition against arbitration involving the State or national property.  Sicard, moreover, concedes that she is unaware of any Dominican civil court decisions that have addressed application of Article 1004 in an international arbitration context.*[24]  Thus, Sicard's contentions regarding the scope of Article 1004 are nothing more than *ipse dixit* voiced by CPB's own paid advocate.

---

[19]    Sicard Declaration, ¶ 8.

[20]    Sicard Declaration, ¶ 9.

[21]    Sicard Declaration, ¶ 8 (emphasis added).

[22]    Sicard Declaration, ¶ 23.

[23]    Sicard Declaration, ¶ 24.

[24]    Sicard Declaration, ¶ 25.

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

Sicard's statements that the State and the CDEEE have entered into other energy related contracts containing arbitration and waiver of immunity provisions are irrelevant.[26] Under Sicard's analysis, the enacted law is preeminent in the Dominican Republic. Article 1004 of the Dominican Republic's Code of Civil Procedure explicitly prohibits arbitration involving the State or its national property (which would include CDEEE). As attested by Sicard, this Article has *only* been amended to permit arbitration in the domestic context.[27] Article 3 of the Constitution explicitly prohibits any of the sovereign powers incorporated under the Constitution (such as the Executive Branch or Congress) from "realiz[ing] or caus[ing] to be realized any acts which constitute direct or indirect intervention in the internal or external affairs of the Dominican Republic." Moreover, Articles 6, 1133 and 1172 of the Dominican Civil Code explicitly prohibit contracts which seek to contravene existing law. Similar restrictions are imposed under Dominican Republic law in connection with exemptions or exonerations from taxes. *See* Motion, pp. 9-11. Because the arbitration, waiver of immunity and tax provisions (specifically) and the PPA (generally) contravene Dominican Republic law, they are null and void, among other reasons, by operation of Articles 46 and 48 of the Dominican Constitution. Thus, even under Sicard's analysis, the preeminence of enacted law in the Dominican system means no

---

[26]    Sicard Declaration, ¶ 33-39.

[27]    Sicard Declaration, ¶ 24.

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

established practice or custom can somehow validate a contract that directly contravenes established law.[28]  That similar provisions may have been included in other energy related contracts is therefore of no moment.It is undisputed that the PPA was the result of actions taken by the Executive Branch which were never approved by Congress. As Defendants have shown, these actions were improper and contravened Dominican Republic law and, accordingly, nullified the PPA *ab initio*.  Notably, when the Dominican Republic's Executive Branch has previously acted unilaterally and in contravention of established law, the Dominican Supreme Court has not hesitated in striking down and nullifying such acts.[29]

The result argued here by Defendants is not "specious" or a "cynical and bad faith" attempt to avoid a debt that arose out of the PPA as CPB overzealously asserts.[30]  Indeed, Defendants maintain that CPB's proper judicial recourse is to seek payment through a Dominican Republic court. Defendants have not cited any authority that would ultimately prevent CPB from recovering monies it is owed if CPB were to pursue its claim before the Dominican Republic courts.  But as a matter of law, CPB cannot recover its debt via an arbitration proceeding that was prohibited by the law that governed the commercial transaction between the parties.  Because the "agreement is not valid under the law to which the parties have subjected it" (Article V.1(a) of the New York Convention), the arbitration was null.  CPB's Application must therefore be denied.

---

[28]    This result is no different than analogous situations that occur – sometimes with great frequency – in the United States. For example, it is an undeniable fact that motorists throughout the United States impermissibly "run" red lights and stop signs each day.  While the practice may be common, it does not make such violations lawful.

[29]    *See, e.g.,* attached **Exhibit C** (Spanish version) and **Exhibit D** (English version) of a October 1, 2003 decision of the Dominican Republic's Supreme Court of Justice which declared as unconstitutional part of a presidential decree which had unilaterally (and without Congressional authorization) imposed a 10% surcharge on various items. *See also* Article 4 of the Dominican Republic Constitution (as set forth in **Exhibit A**) which establishes clear divisions between the legislative and executive powers.

[30]    CPB Memorandum, p. 3.

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

**5.    CPB's Application should be denied because the composition of the Arbitral Panel was not in accordance with the arbitration provision of the PPA.**

CPB argues that the Arbitration Panel was properly constituted under the PPA and ICC rules.[31] Yet despite its assertions, CPB neither denies nor contests that the Arbitral Tribunal unilaterally and inexplicably only gave Defendants a mere seven days to propose a new arbitrator, after denying Defendants' second requested arbitrator. Nor does CPB disagree that the Defendants' third proposed arbitrator – who, by any standard, was proposed promptly – was nonetheless summarily rejected by the Tribunal. CPB suggests that the Tribunal's decision to deny Defendants' their right to appoint an arbitrator was Defendants' own fault, arising from Defendants' own "misconduct."[32] At bottom, however, CPB cannot refute that Defendants were unable to select an arbitrator of their choosing as expressly contemplated by the parties under the arbitration provision of the PPA. For the reasons set forth more fully in their Motion, Defendants were unduly prejudiced by this decision of the Tribunal and therefore, CPB's requested confirmation should be denied under Article V(1)(d) of the New York Convention.

**6.    Public policy warrants denial of CPB's Application.**

This Court should also deny CPB's Application on the basis of Article V(2)(b), the public policy exception of the New York Convention. Even if this defense were to be construed narrowly consistent with the cases relied upon by CPB, the public policy exception remains a proper bar to CPB's recovery.

At the very heart of this case are the issues of (a) whether the rule of law controls its outcome (*i.e.,* should controlling Dominican law apply), and (b) whether actions taken in violation of the law of another country can be legitimized through the legal system of the United

---

[31]    CPB Memorandum, pp. 32-33.

[32]    CPB Memorandum, p. 6.

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

States.  Principles of international comity support Defendant's request that this Court should

deny CPB's confirmation request --

> [Under comity t]he interests of both forums are advanced--the foreign
> court because its laws and policies have been vindicated; the domestic
> country because international cooperation and ties have been strengthened.
> *The rule of law is also encouraged, which benefits all nations.*
> Comity is a necessary outgrowth of our international system of politically
> independent, socio-economically interdependent nation states….[N]o
> nation can expect its laws to reach further than its jurisdiction to prescribe,
> adjudicate, and enforce. Every nation must often rely on other countries to
> help it achieve its regulatory expectations. *Thus, comity compels national
> courts to act at all times to increase the international legal ties that
> advance the rule of law within and among nations.*"

*Laker Airways Ltd. v. Pan American World Airways, Inc.*, 604 F.Supp. 280, 291-92 (D.D.C.

1984) (*citing Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C.

Cir. 1984)) (emphasis added).  Defendants urge this Court to give full consideration to these

comity principles in the context of the important issues at the center of this dispute.  Such an

evaluation will lead to the denial of CPB's Application as a matter of public policy.

### 7.    *The Court should stay a ruling on this matter.*

Defendants have decided not to pursue a declaratory determination in the Dominican

Republic.  But that does not mean that a stay should not be issued.

Matters central to the Dominican Republic's sovereignty, Executive Branch authority and

Constitutional requirements are involved in CPB's confirmation request.  As corroborated by the

Sicard Declaration, at the very least, application of Article 1004 of the Dominican Code of Civil

Procedure in the context of an international arbitration involving the State and its property is an

issue of first impression that Dominican Republic courts have not considered.  Because of the

potential widespread impact of this Court's ruling, prudence and principles of comity strongly

suggest that if this Court is not prepared to refuse to confirm the award, the Court should

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

nonetheless stay a ruling on CPB's Application and either (a) send certified questions of law to

the Supreme Court of the Dominican Republic (similar to the process by which United States

federal courts certify questions of law to the highest courts of the states), or (b) allow CPB the

opportunity to pursue recovery of monies it is owed in a Dominican Republic court.

In either event, staying a ruling on this matter for these purposes would have a two-fold

benefit. First, it would put the key issues of Dominican Republic law upon which this dispute

rests squarely in the hands of a Dominican Republic court. Second, a stay would preserve CPB's

ability to seek confirmation of the arbitral award at a future date in the event that CPB were to be

denied a fair opportunity to pursue recovery of its debt.

### 8.    *Defendants should not be ordered to pay CPB's costs and attorneys' fees in connection with this proceeding.*

CPB requests this Court to order Defendants to reimburse CPB for its costs and fees

incurred in responding to Defendants' Motion.[33] As a basis for this request, CPB points to

Defendants' arguments related to (a) lack of jurisdiction, (b) failure to state a claim, (c) vacatur,

and (d) stay of proceedings. But as set forth above, all of Defendants arguments have been made

in good faith.

With respect to their Rule 12(b) Motion, Defendants have argued reasonably and in good

faith that the PPA (generally) and the arbitration, immunity waiver and tax provisions

(specifically) were void *ab initio*. Because of this nullity, the arbitration should never have

occurred, and thus there is no valid basis for jurisdiction under the FSIA. In support of their

argument, Defendants have cited the *Dynamo, Dahiya*, *Calvello*, and *A.K. Mgmt* decisions which

support the position taken by Defendants. Defendants believe this is a matter of first impression.

---

[33]    CPB Memorandum, pp. 42-43.

*April 19, 2007   AMENDED REPLY   (Correcting filing of April 10, 2007)*

With respect to their vacatur argument, Defendants have reasonably and in good faith relied upon law from the D.C. Circuit to support their argument that (a) the "manifest disregard" standard operates independently from the FAA, and that (b) vacatur in this instance is proper. At most, this issue appears to be unsettled in the D.C. Circuit.

Finally, Defendants have reasonably and in good faith recommended that this Court stay confirmation of CPB's application to enable either (a) questions of law to be certified to the Dominican Republic's Supreme Court, or (b) CPB the opportunity to pursue recovery of amounts it is owed in a Dominican Republic court while simultaneously preserving CPB's ability to seek confirmation of the arbitral award at a future date in the unlikely event that CPB is denied its "day in court." Given both the profound and far-reaching impact of the issues involving Dominican Republic law, and the fact that CPB's rights would be preserved, Defendants' stay request is a reasonable and good faith proposal designed to permit an appropriate and fair resolution of this dispute.

*April 19, 2007    AMENDED REPLY   (Correcting filing of April 10, 2007)*
## CONCLUSION

**WHEREFORE,** for the foregoing reasons and for the reasons set forth in their Motion, Defendants request that this Court dismiss CPB's Application or, alternatively, provide such other relief as Defendants have requested.

Respectfully submitted,

/s/ _____

Marvin T. Griff (D.C. Bar No. 423839)
Michael Fielding (D.C. Bar Admission – Motion to appear *pro hac vice* granted)
Blackwell Sanders Peper Martin, LLP
750 17th St. N.W., Suite 1000
Washington, D.C. 20006-3901

*Attorneys for Defendants The State of the Dominican Republic and Corporación Dominicana de Empresas Eléctricas Estatales*

Dated: April 10, 2007

## Certificate of Service

I herby certify that on this 10th day of April, 2007, a true and correct copy of the above and foregoing was served by electronically filing it with the Court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

/s/ _____

Washington, DC 20006-2401

*Attorney for Defendants The State of the Dominican Republic and Corporación Dominicana de Empresas Eléctricas Estatales*

23